FILED 1

APR 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

D. PETERSON, et al,                    .        Docket No. CA 01-2094
                                       .
          Plaintiffs,                  .        Washington, D. C.
                                       .        March 17, 2003
          vs.                          .        10:00 a.m.
                                       .
THE ISLAMIC REPUBLIC OF IRAN,          .
MINISTRY OF FOREIGN AFFAIRS AND        .
THE MINISTRY OF INFORMATION AND        .
SECURITY,                              .
                                       .
          Defendants                   .
                                       .
. . . . . . . . . . . . . . . . .      .
                                       .
J. BOULOS, et al,                      .        Docket No. CA 01-2684
                                       .
          Plaintiffs,                  .
                                       .
          vs.                          .
                                       .
THE ISLAMIC REPUBLIC OF IRAN,          .
THE IRANIAN MINISTRY OF                .
INFORMATION AND SECURITY,              .
                                       .
          Defendants                   .
. . . . . . . . . . . . . . . . .      .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          THOMAS FORTUNE FAY, ESQUIRE
                             DAN GASKILL, ESQUIRE
                             601 Pennsylvania Avenue, N.W.
                             #900 - South Building
                             Washington, D.C. 20004
                             202 589 1300

                             STEVEN R. PERLES, ESQUIRE
                             1615 New Hampshire Avenue, N.W.
                             Washington, D.C. 20009
                             202 745 1300

23

APPEARANCES:

                                    ANTHONY LASPADA, ESQUIRE
                                    1802 North Morgan Street
                                    Tampa, Florida 30602
                                    813 223 6048

                                    ALLEN ROTHENBERG, ESQUIRE
                                    1518 Walnut Street
                                    Philadelphia, Pennsylvania
                                    215 732 7000

                                    ROBERT P. FEENEY, ESQUIRE
                                    702 Russell Avenue,
                                    Suite 300
                                    Gaithersburg, Maryland 20877
                                    301 840 1500

                                    JAY J. GLENN, ESQUIRE
                                    2275 Half Day Road
                                    #350
                                    Bannockburn, Illinois 60015
                                    847 526 9202

                                    JOSEPH PETER DRENNAN, ESQUIRE
                                    218 North Lee Street
                                    Alexandria, Virginia 22314
                                    703 519 3773

                                    FERRIS R. BOND, ESQUIRE
                                    JANE C. NORMAN, ESQUIRE
                                    Bond & Norman, PLLC
                                    700 5th Street, N.W.
                                    #200
                                    Washington, D.C. 20001
                                    202 682 1051

                                    DONALD A. CLOWER, ESQUIRE
                                    KAY M. CLARKE, ESQUIRE
                                    Clower & Clarke, Esquires
                                    601 Pennsylvania Avenue, N.W.
                                    Washington, D.C. 20004
                                    202 638 0086

                                    FREDRIC J. EINHORN, ESQUIRE
                                    77 South Washington Street
                                    Suite 206
                                    Rockville, Maryland 20850
                                    301 702 5400

APPEARANCES:                        BARBARA ELLEN PATTIN, ESQUIRE
                                    2919B Olney-Sandy Spring Road
                                    Olney, Maryland 20832

Official Court Reporter:            SANTA THERESA ZIZZO
                                    Room 4800C U. S. Courthouse
                                    Washington, D. C. 20001
                                    (202) 289-1160

Computer-Aided Transcription of Stenographic Notes

Pages 1-93

4

```
 1                      I N D E X

 2   WITNESSES:        DIRECT      CROSS      REDIRECT      RECROSS

 3   T. GERAGHTY        20

 4   Videotape Deposition

 5   of J. SALAM-MAHMOUD Page 48

 6   J. LYONS           49

 7   Videotape Deposition

 8   of R. Baer         Page 58

 9   S. RUSSELL         59

10   Videotape Deposition

11   of R. Paz          Page 87

12   EXHIBITS:      FOR IDENTIFICATION      IN EVIDENCE

13   FOR THE PLTFS.

14     10                                    28

15     1,2                                    35

16     20-22                                  41

17     24                                     66

18     26                                     68

19     25                                     71

20     23                                     90

21

22

23

24

25
```

5

1                    P R O C E E D I N G S

2          THE DEPUTY CLERK:  The Matter of D. Peterson, et al

3    versus The Islamic Republic of Iran, et al.  Civil Action 2001,

4    Number 2094.  And in the matter of J. Boulos, et al versus The

5    Islamic Republic of Iran, et al.  Civil Action 2001-2684.  Mr.

6    Fay, Mr. Perles, Mr. Gaskill, Mr. Laspada and Mr. Rothenberg

7    for the plaintiffs.

8          THE COURT:  Good morning.

9          MR. FAY:  Good morning, Your Honor, and happy St.

10   Patrick's Day.

11         THE COURT:  Well, I have my green on.

12         MR. FAY:  Yes, I'll report this immediately to the

13   pastor over at St. Mary's.

14         Your Honor, we have a few housekeeping matters before

15   I would like to make a short opening statement.  We, when I say

16   we I mean Mr. Perles and myself, have been assisted in this

17   case by a number of other attorneys.  I've asked them this

18   morning to enter an appearance and many of them are here.  Mr.

19   Gaskill, I think, went out in the hall.

20         MR. GASKILL:  I'm here.

21         MR. FAY:  Okay.  Dan Gaskill.

22         MR. GASKILL:  Good morning, Your Honor.

23         THE COURT:  Joseph Peter Drennan.

24         MR. DRENNAN:  Good morning, Your Honor.

25         MR. FAY:  Ferris Bond.

6

1          MR. BOND:  Good morning, Judge.  Nice to see you

2  again.

3          MR. FAY:  Donald Clower.

4          MR. CLOWER:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. FAY:  Anthony J. Laspada.

7          MR. LASPADA:  Good morning, Your Honor.

8          MR. FAY:  Jane Norman.

9          MS. NORMAN:  Good morning.

10          MR. FAY:  Kay Clarke.

11          MS. CLARKE:  Good morning, Your Honor.

12          MR. FAY:  Fredric Einhorn.

13          MR. EINHORN:  Good morning, Your Honor.

14          MR. FAY:  Barbara Ellen Pattin.

15          MS. PATTIN:  Good morning, Your Honor.

16          MR. FAY:  Mrs. Pattin is a former partner of mine.

17  And Jay Glenn.

18          MR. GLENN:  Good morning, Your Honor.

19          MR. FAY:  Your Honor, Mr. Glenn is a member of the bar

20  of the State of Illinois.  Both the federal and the state bar.

21  I would move his admission pro hac vice for purposes of these

22  proceedings.

23          THE COURT:  The motion is granted.  Glad to have you

24  here.

25          MR. FAY:  I should add all other counsel are admitted

1    to the bar of this Court.

2            Your Honor -- Allen, you've got to make out a

3    praecipe, I'm sorry.  Allen Rothenberg who is a member of the

4    bar of this Court is also a member of the New York and

5    Pennsylvania bars.

6            MR. ROTHENBERG:  Good morning, Your Honor.

7            MR. FAY:  And I apologize.  But I have an excuse.  He

8    didn't make out a praecipe.

9            Your Honor, we are here this morning because on the

10   morning of Sunday, October 23rd, 1983 just before seven a.m. a

11   criminal act took place resulting in the death of in excess of

12   241 men.

13           This Court has previously held in a ruling on the

14   motions, a motion of the plaintiffs, I should say motions of

15   the plaintiffs for default, that the service requirements of 28

16   United States Code Section 1608 have been complied with.  That

17   the defendants, The Islamic Republic of Iran and The Ministry

18   of Information and Security of the Republic of Iran have failed

19   to respond and that the plaintiffs are therefore entitled to

20   move forward to prove their case.

21           We, when I say we, Mr. Perles and I in our past cases

22   have asked, we ask in this case, that the Court adopt the

23   standard of clear and convincing evidence as the standard of

24   proof.  We do that because we're asking for an award of

25   punitive damages, and that is the acceptable norm in the

1   District of Columbia where punitive damages are requested.

2         At the time of entry of default this Court addressed

3   in some detail the question of the circumstances under which a

4   military service member can recover damages for injury or

5   death.  I note in that regard that as a result of both this

6   occurrence, the bombing of the embassy in Beirut some months

7   before in 1983, and numerous other acts, the Republic of Iran

8   in January of 1984 was named by the Department of State as a

9   sponsor of terrorism and I ask the Court to take judicial

10   notice of that.

11         THE COURT:  Iran.

12         MR. FAY:  Iran, yes.  Iran was noted at that time

13   under the statute that complies with the request, with the

14   necessity of their status as a state purveyor of terrorism.

15         The Court today -- the acts before the Court today as

16   well as other acts of terrorism mark The Islamic Republic of

17   Iran as, in the words of Department of State, a leading state

18   supporter of terrorism in the world.

19         The acts described in the complaint, which we've

20   proven, fulfills the definition of 22 United States Code

21   Section 2656 for terrorism.  "A premeditated, politically

22   motivated violence perpetrated against noncombatant parties."

23         Let me put this matter in perspective.  Lebanon

24   emerged as an independent nation at the end of World War II

25   with a constitution which segmented off areas of power to the

1   various groups within that state.  The Maronites, the Sunni

2   Muslims, the Shi'ite Muslims and the Druze.  And although there

3   were some bumps in the road, that continued to be the rule and

4   the state continued to be a functioning state.  Until the

5   emergence in the 1970s of a number of factors.  The most

6   important of which for our purposes was the emergence of The

7   Islamic Republic of Iran as a militant theocratic totalitarian

8   state with a dedication of purpose not just relating to the

9   Iranian people but relating to the entire world.  That is, to

10  spread Islam across the world.  That differs it yet from any

11  other state, Islamic state in the world.

12         Now, the object was to develop across the world

13  conditions under which Islam would dominate.  The testimony

14  will show that in accordance with that dedication, in the 1980s

15  Iran began to carry out its mission through an organization in

16  Lebanon known as Hezbollah or the Party of God.  The testimony

17  will show, however, that Hezbollah was a mere front.  It had no

18  existence independent of the support of Iran and simply served

19  to mask Iran as the real acting party.  The evidence in this

20  case will demonstrate beyond any question that Iran was the

21  party that carried out these attacks.

22         Now, in late 1982 at the request of the Government of

23  Iran with the concurrence of the United Nations, a number of

24  nations sent troops to Lebanon merely to make a presence within

25  Lebanon.  That presence was undertaken with various rules which

1    are very significant for the Court here today.  I'm putting up

2    on the monitor the rules of engagement that were given to the

3    Marines that were sent to Lebanon in 1982.

4              "One:  When on post, mobile or foot patrol, keep

5    loaded magazine in weapon, bolt closed, weapon on safe, no

6    round in the chamber.

7              Two:  Do not chamber a round unless told to do so by a

8    commissioned officer unless you must act in immediate

9    self-defense where deadly force is authorized.

10             Three:  Keep ammo for crew-served weapons readily

11   available, but not loaded.  Weapon is on safe.

12             Four:  Call local forces, LAF, to assist in self-

13   defense effort.  Notify headquarters.

14             Five:  Use only minimum degree of force to accomplish

15   any mission.

16             Six:  Stop the use of force when it is no longer

17   needed to accomplish the mission.

18             Seven:  If you receive effective hostile fire, direct

19   your fire at the source.  If possible, use friendly snipers."

20   It doesn't define that term friendly snipers.

21             "Eight:  Respect civilian property; do not attack it

22   unless absolutely necessary to protect friendly forces.

23             Nine:  Protect innocent civilians from harm.

24             Ten:  Respect and protect recognized medical agencies

25   such as Red Cross, Red Crescent, et cetera."

1           Now, I think it's interesting to juxtapose those rules

2   with the rules out of our local jury instructions in criminal

3   cases for self-defense.  I'm not sure whether everybody can see

4   that or not.  But let me read those off.

5           "A person play use a reasonable amount of force in

6   self-defense.  A person may use an amount of force which at the

7   time of the incident he, she reasonably believes is necessary

8   to protect himself, herself from imminent bodily harm.  Deadly

9   force.  A person may use a reasonable amount of force in

10  self-defense including in some circumstances, deadly force.

11  Deadly force is force that is likely to cause death or serious

12  bodily harm.  A person may use deadly force in self-defense if

13  she or he actually and reasonably believes at the time of the

14  incident that she or he is in imminent danger of death or

15  serious bodily harm from which she or he can save himself only

16  by using deadly force against his or her assailant."

17          Noteworthy is the fact that for the civilian in the

18  District of Columbia walking down the street the rules of

19  engagement, if you will, are more liberal than they were for

20  the Marines who were sent into Lebanon in 1982 and were still

21  there on October 23rd, 1983.  The civilian walking down the

22  street, for instance, if he's licensed, can have a weapon with

23  a round in the chamber.  He doesn't have to judge whether or

24  not fire coming at him is effective.  And he has the right to

25  be reasonably mistaken, which the rules of engagement given the

1    Marines did not so provide.  The humanitarian rules governing

2    actions of our servicemen were not regarded by Iran as respect

3    for other people and their institutions and beliefs, but rather

4    as an opportunity.

5         The testimony in this case will show that or on about

6    September 26th, 1983, a message was sent from the Iranian

7    Ministry of Information and Security in Tehran to Ambassador

8    Muhtafhemi, that's Muhtafhemi, who was the Ambassador of Iran,

9    to Damascus.  Now, Ambassador Muhtafhemi was not a regular

10   member of the diplomatic corps, the evidence will show.  His

11   task instead was far different.  His task was to carry out

12   attacks upon -- terrorist attacks upon western forces and to

13   otherwise build Hezbollah.

14        There will be introduced under the sealing of this

15   Court a copy of an intercept of that message from The Ministry

16   of Information and Security in Tehran to Ambassador Muhtafhemi

17   instructing him to go ahead with the attack.  That message will

18   also -- the intercept of that message will also be confirmed by

19   videotape deposition by an Israeli official of Shin Beth.  So

20   there's no question as to the authenticity of the message.

21        There also will be testimony that this message was as

22   they say in the intelligence business perhaps, a 24-karat gold

23   message in terms of reliability.  No question there.

24        There will be testimony also from Dr. Clawson, from

25   Dr. Paz as to the organization of Iran.  And its workings at

1   that time that this occurred could not have taken place without

2   the concurrence of the very highest levels in both places,

3   meaning the president, Rasfanjani, and the supreme leader of

4   Iran, the Ayatollah Khomeini.

5          We will then introduce testimony by videotape

6   deposition that in conformity with his instructions from the

7   highest level, Ambassador Muhtafhemi made a telephone call from

8   Damascus to Boalbek, a city in the Bekaa Valley, on the Eastern

9   side of Lebanon.  That testimony will be given by videotape

10  deposition by a former Hezbollah member known by the pseudonym,

11  for purposes of this case, as Mahmoud.  He will testify from

12  his personal knowledge that the Ambassador contacted leaders of

13  the Iranian Revolutionary Guard, sometimes referred to as the

14  Postaran, (spelled phonetically) by telephone in October from

15  Damascus to Boalbek, instructing them to go ahead with the

16  planned attacks on American Marines and the French forces.  The

17  recipient of this call was a man by the name of Sayed Kansani,

18  an Iranian, who was then head of the Iranian Revolutionary

19  Guard, the Postaran, in Lebanon.

20         Mahmoud will further testify that also present were

21  Kosh Balkhtian, another Iranian, and Fnu Dahkani, an Iranian in

22  charge of military affairs for Iran.  There were several others

23  present, including the head of -- the present head of

24  Hezbollah, Sheik Sobhi Tufeilly.

25         The witness will further testify that these men went

14

1    to -- from Boalbek to Beirut where they prepared explosives to

2    carry out their assignment against the American Marines and

3    against the French forces.

4           He will testify further that a truck was obtained

5    which was of similar variety to the trucks used to transport

6    bottles of water, not unlike here.  And in the airport water is

7    sold in bottles at the airport by one Lebanese company.  The

8    truck was painted to appear to be the same.  In that truck were

9    planted explosives.

10          There will be later testimony in this case by Danny

11   Defenbaugh who was the head of the FBI Forensic Operation after

12   the case, that the computations made by him as an expert in

13   explosives shows that approximately 21,000 pounds of explosives

14   were used in this case.  Over ten tons planted in the truck.

15          In addition, planted in the truck were cylinders of

16   butane to enhance the explosion.  Now, that would not make the

17   explosion larger but it would make the explosion more deadly to

18   those who were in its way.

19          The testimony will make it clear that the work in this

20   regard was done by the Iranians with Hezbollah members

21   essentially as security and assisting merely in the work.

22          Mr. Mahmoud will further testify that on the day of

23   the attack Hezbollah intercepted the truck bearing cartons of

24   water containers on the road to the airport.  It's a normal

25   occurrence for this truck to come into the airport.  Once it

1    reached the airport -- this would be Plaintiffs' Exhibit Number

2    One we have blown up also down here, up at the top of the

3    exhibit may be found number six.  Along this line ran a road, a

4    vehicle could then turn onto the road where there is a

5    four-point turn, which is the road down into the airport.

6            Now, although at this time while there was sniper fire

7    at the airport, not around the clock but certainly consistent,

8    and some artillery and mortar fire, this airport continued

9    functioning and some civilian aircraft would come into the

10   airport.  So it would not be usual to see this vehicle drive

11   down this road.

12           Now, the top of the Marine area is marked here by

13   eight, where my pen is.  At that point there was a gate, so to

14   speak, for vehicles to come through.  However, the Iranians in

15   planning this occurrence took into account that fact and

16   anticipated that that would be more guarded.  They also

17   computed the size of the truck that will be able to fit into

18   this building, BLT1-8 headquarters building.  That's Eighth

19   Marine Battalion Landing.  And the size that would be needed to

20   break through.

21           What they did was they came down the road, went past

22   the entrance, made a turn into what's marked on here as a

23   parking lot.  This was largely unoccupied at this time.  And it

24   gave the truck time to do a circle, gather speed, then go

25   forward through the line of concertina wire which it broke,

1    and continuing on in towards the building.

2          There will be testimony in this case from Sergeant

3    Steve Russell who was a Sergeant of the Guard, and that's

4    marked at the entrance of the BLT.  That at some point in here

5    as it broke through the concertina wire he heard a large

6    report, turned and saw the truck going forward towards the

7    building.  Whereupon he turned, ran through the building

8    shouting for everybody to get down, to warn them.  And there

9    was an opening on this side of the building and on the other

10   side.  He ran completely through the building, shouting for

11   everybody to get down.  Significantly, when he got to the other

12   side of the building he turned, looked back, and in the exact

13   middle of the building where the letters BLT stand, there were

14   crossed flags of the United States and the United States Marine

15   Corps.  The truck noticeably braked, to come to exactly that

16   point.  He said at that point the driver had disappeared, going

17   down, and presumably was reaching for a trigger mechanism on

18   the floor.  There was a brief instant and then there was a

19   blinding flash.  That's significant because of the methods used

20   to bring down a building of this type.  And the method is that

21   the charge is set to blow out the supports and then drop the

22   building floor by floor.  Any building, no matter what its

23   size, can be demolished in this way, to cut the supports by

24   some explosive or heat charge and then the building will drop

25   floor by floor all the way down.  That's exactly what happened

1   in this case.

2          The result was, to put it bluntly, devastating.  This

3   is a photograph from the Federal Bureau of Investigation team

4   which answered the call and went to investigate the occurrence.

5   The crater blasted was more than 30 feet across.  There was no

6   particle even of the driver ever found that could be

7   identified.  The only part of the truck which could be

8   identified was part of the differential, apparently, and part

9   of the cam shaft inside the engine.  Exactly how the explosion

10  happened to blow the cam shaft out of the engine is not known,

11  but that was the only thing that was left of the truck and the

12  driver.

13         We do now, however, about the driver, because we know

14  that from Mr. Mahmoud's testimony.  The driver was a man by the

15  name of Rhadi (spelled phonetically) who was an Iranian.  The

16  Iranians took no chances that Hezbollah in its formative stages

17  would not cooperate and instead had the truck actually driven

18  by an Iranian.

19         The testimony, too of both Mr. Defenbaugh and Roy

20  Anderson, an expert from the ATF who is now retired, is that

21  this was an operation which was carried out with a high degree

22  of skill and it was not merely a volunteer operation, let us

23  say, in the sense a backyard operation.

24         Also in the investigation by the FBI on part of a

25  surviving piece of concrete was found the residue of an

1  explosive known by its letters as PETN.  Because of the

2  consistency of this explosive, under microscopic examination

3  and chemical analysis it could be known that this was

4  manufactured in a bulk.  Now, the reason that's important is

5  there are two uses really for this type of explosive.  This is,

6  in blasting caps where it's used in very small amounts, in

7  which case it would have been manufactured for that purpose.

8  That would have been able to have been seen under microscopic

9  and chemical analysis.  And it's sold to military sources in

10  bulk.  This was in bulk.  So the explosive that was in there

11  that was exploded was not gathered by somebody opening up

12  unused artillery shells or something from a construction site.

13  It was a military, producer-military explosive.  I should add,

14  too, that that explosive is not manufactured in Lebanon.  It is

15  manufactured in Iran.

16       There will further be testimony from both Dr. Clawson

17  and Michael Ledeen who at that point was a Special Assistant to

18  the Secretary of State, concerning the political purpose of

19  this attack.  The political purpose of the attack was to remove

20  the United States as a factor in Lebanon.  Unfortunately the

21  United States has departed from Lebanon.  In that sense

22  unfortunately, very unfortunately, this attack was successful.

23       There will be testimony, too that this has been

24  classified as a terrorist attack by the Department of Defense.

25  We will introduce a copy of one of the DOD certificates of

1    death indicating so.  The others were all of the persons whom

2    we represent who were deceased whom we will introduce on the

3    damages hearings which will follow.

4            Your Honor, we ask that the Court weigh all of this at

5    the end of all the testimony, after the evidence on damages

6    also has been submitted.  We will ask that the Court award an

7    amount not only in compensatory damages but in punitive

8    damages.  And in that regard we ask the Court -- we will ask

9    the Court to consider a formula which would deter in terms of

10   overall value of the compensatory damages as well as the

11   amounts spent in Iran for terrorism at this time.  The

12   testimony will show with regard to Iran that it was spending at

13   this point in the neighborhood of $75,000,000 a year on

14   terrorism.  But we ask that because this case involves a number

15   of individuals, that the Court entertain at least the thought

16   that the appropriate manner of awarding punitive damages be a

17   multiple of the total amount of the compensatory damages award.

18           Thank you, Your Honor.

19           THE COURT:  Thank you, Mr. Fay.

20           Is there anyone in the courtroom who purports to speak

21   for the defendants?

22           Hearing no one, Mr. Fay, you may proceed.

23           MR. FAY:  Your Honor, at this point we would call

24   Colonel Tim Geraghty.

25   (COLONEL TIM GERAGHTY, WITNESS FOR THE PLAINTIFFS, SWORN)

1                         DIRECT EXAMINATION

2     BY MR. FAY:

3     Q    Could you please state your full name and address?

4     A    Timothy J. Geraghty.  I'm living in Nashville, Tennessee,

5     130 Sturbridge Drive, in Franklin, Tennessee.

6     Q    Could you give us your date and place of birth?

7     A    July 8th, 1937, St. Louis, Missouri.

8     Q    And where did you live growing up?

9     A    I was born and raised in St. Louis.

10    Q    Could you please describe your course of education for us

11    up to the present time, including any postgraduate courses?

12    A    I had parochial school at the Franciscans.  I went to a

13    Christian Brothers military prep school outside of St. Louis

14    and a Jesuit university and into the Marine Corps.  And while

15    in Honolulu on duty as the Inspector of the Force

16    Reconnaissance Company in Honolulu I on weekends and nights

17    attained my master's degree from Pepperdine University.

18    Q    Colonel, did the Jesuits prepare you adequately for the

19    Marine Corps?

20    A    They did.

21    Q    Could you detail for us your career in the Marine Corps?

22    A    I joined the Marines right out of college in '59.  I went

23    to Officer's Candidate School.  In the latter part of '59, I

24    was commissioned in December, went directly to the Basic

25    School, class of '60.  And then directly thereafter to Okinawa.

1    I was an 03, infantry officer out of basic school.  Went to

2    Pendleton, and then over to Okinawa for a 13-month company tour

3    and then back at Pendleton.  Stayed in the infantry.  And then

4    Vietnam stirred up in '65.  I was at the First Division and was

5    deployed from -- with the division in mid-65 and went to

6    Vietnam the first time in the end of '65, December of '65.  And

7    essentially stayed there.  I extended my tour twice there

8    through December of '67.  I was commanding officer most of that

9    time for 18 months of Charlie Company First Recon Battalion.

10   Q    What is a recon?

11   A    A recon unit, I see some members in the audience from a

12   recon that was with me in Beirut, they do the surveillance.

13   They're out for long patrols primarily, finding, closing with,

14   identifying the enemy.  From there I went back to Camp Lejeune.

15   I was hospitalized with hepatitis and some ailments and then

16   reported into Camp Lejeune in early '68 one day, and the next

17   day found myself in Thessalonika, Greece for planning for

18   deployment to the Med and I was the operations officer of the

19   Third Battalion Second Marines, and floating around in the

20   Mediterranean for seven months there at the end of '68.  I was

21   short-toured down, normally the tour is two years, I was a

22   major then, to take over the Force Reconnaissance desk at

23   Quantico.  I had that job for two years and essentially a lot

24   of trips both in '69, '70 and '71 back to Vietnam.  We were

25   doing a lot of combat evaluation of tactical gear.  And then I

1    was assigned or selected to be the Aide to the commanding

2    general, Lieutenant General Nash at the Development Educational

3    Command and I was his Aide for about 18 months until he

4    retired.  From there I went to Marine Corps Command Staff

5    College and then back to Okinawa for an unaccompanied tour

6    where I was the director of a leadership seminar for officers

7    and staff NCOs, and then S3, operations officer, at the Third

8    Recon Battalion.

9            After that I had orders for the inspector instructor

10   slot in Honolulu.  It's a reserve outfit.  I essentially was

11   the recruiter out there, too since there wasn't a recruiting

12   officer present there.  Sort of a dual hat.  And at that time,

13   as I mentioned previously, worked for and received my master's

14   from Pepperdine.  I was essentially promoted out of that job in

15   two years, it was normally a three-year tour, and was assigned

16   to Washington at the headquarters of the Marine Corps where I

17   for about a year and a half was in the personnel side, policy

18   side of headquarters, Marine Corps, and then was selected for a

19   job with the Central Intelligence Agency in SOG, the Special

20   Operations Group, which required special clearances, for about

21   six months, background checks, and then was assigned to SOG for

22   three years there in the late seventies, early eighties.

23           At that time I was promoted to Colonel in early '81.

24   And then was assigned to be the Operations Office of the G3 of

25   the Second Recon Division at Camp Lejeune and I held that job

1   for about 18 months and then coincidentally 20 years ago today

2   I assumed command of the 24th Marine Amphibious Unit on St.

3   Patrick's Day day in '83.

4          We locked on and did our training and then sailed for

5   Lebanon and I was the commanding officer through the return of

6   the unit from Lebanon and then was made -- was -- changed

7   command, turned over my command in early '84 and then I --

8   because I was supposed to go for a second tour out there but it

9   was changed, and then was -- the last six months I was the

10  Deputy Chief of Staff for Readiness, and then my last tour was

11  commanding officer of the Marine Barracks in Norfolk where I

12  retired from there in the fall of '86.

13  Q   During your service in the Marine Corps have you on various

14  occasions received decorations for your service to your

15  country?

16  A   Yes, I have a number of awards.

17  Q   Could you tell us about those?

18  A   Well, you know, a lot were standard.  The Legion of Merit

19  and the Bronze Star, the Vietnamese Cross of Gallantry, Navy

20  Achievement Medal.  A few presidential citations.

21  Q   What was the full time of your tours in Vietnam, Colonel?

22  A   I was over there every year from '65 through '71 except '68

23  where I was out in the Mediterranean, so my tours -- I didn't

24  have tours in my job as the Force Recon Officer at the

25  Development Center but I was going on extended temporary duties

1   out there for anywhere from a matter of weeks to a couple of

2   months to -- for different evaluations and testing and studies

3   that we were giving.

4   Q    And your duty assignment on October 23rd, 1983 was

5   Commander of the 24th MAU in Beirut?

6   A    That's correct.

7   Q    When did the 24th MAU arrive in Lebanon?

8   A    We arrived there in May.  I arrived a few days earlier.  We

9   had sailed across by ship out of Marine Amphibious Group,

10  Readiness Group, out of Norfolk, and we arrived in the

11  Mediterranean and at that time I got off ship to fly into

12  Beirut, ahead of the ship, to primarily start the transition

13  process with Jim Meade, Colonel Meade, who was the commanding

14  officer of the 22nd who we were relieving.

15  Q    Could you set the stage for us here by describing the

16  situation in Lebanon as of the time of the arrival of your

17  group, the 24th MAU?

18  A    Well, the environment in Lebanon was beginning to change

19  but it was still pretty calm as Lebanon goes, Beirut, in the

20  eighties.  The embassy had been attacked with a suicide bomber

21  in April, April 18th, I believe it was, which was just a few

22  weeks before we arrived there.  And that was an eye-opener.

23        But I have specific recollection on -- when I arrived

24  there being asked what dress uniform that I was going to be

25  taking ashore for the social side, you know, with the embassies

1   and the different events that were a matter of really

2   obligation of commanders of all the multi-national force, the

3   British, the Italians, the French and us, the Americans, that

4   we would attend with the Lebanese, as well as other

5   ambassadorial or diplomatic functions.  And I made a very early

6   decision which from experience, when you're going to make those

7   decisions make them up front so you're not changing anything

8   that's going to carry over and I just made decisions that I

9   wasn't going to take any uniforms that weren't combat gear.

10  Everyone else was going to do the same thing and they were

11  going to wear their combat gear all the time.  It was a

12  question of just changing the full face and expression of what

13  we were going to do.  And essentially for two occasions in my

14  entire time there when I went to what I consider exceptions of

15  the social rule.  Because of specific reasons I just didn't get

16  involved in that.  But it was much calmer.

17          Marines were going on liberty.  They were going in

18  town to eat.  They were -- it was just a lot more relaxed

19  environment and they were generally being accepted very much by

20  the people.  When we would go on patrols we were met -- the

21  kids were coming out and very friendly.  And I have to add, it

22  wasn't just the Americans.  What was unique with Lebanon is

23  that you had forces from different countries, a multi-national

24  peacekeeping force, but you didn't have a headquarters above

25  it.  So the liaison between all the different countries, the

1   different commanders particularly, was, I thought, very

2   crucial.  And so I had up front put liaison officers in all

3   their headquarters, obviously with their concurrence, and that

4   became very important, but I would -- for instance, the Italian

5   commander, French, British, whatever, I would go with them with

6   their commanders in tours of their areas like we would host

7   them to ours.  And the kids would go up and be just as friendly

8   to them as they were to the Americans.  So it was much

9   different in the beginning.  And in a nutshell, the key

10  difference in my watch is that it was changing.  It was

11  changing very fast, very dynamic, and not for the better.

12  Q    What was the mission assigned to your unit, the 24th MAU?

13  A    Continuation of the same, which is essentially a presence

14  mission, and it was nebulous to be sure.  And 20 years later I

15  can tell you go and ask ten people and you'll get ten different

16  definitions, but essentially what it was, it was primarily a

17  peacekeeping mission and it was to show your presence, and when

18  I say ours, and this is throughout all the forces, is that we

19  were out showing a presence, primary to provide stability to

20  the area.  And I might add that there's no doubt in just about

21  anyone involved at the time, we saved a lot of lives by our

22  presence there for awhile.  And that was part of, I might add,

23  in my judgment, the success of that, our presence mission

24  there, and it was working is the primary reason why we were

25  targeted.

27

1    Q    What was the source of that mission?  In other words, who

2    determined the mission?  Was it determined by you?  Or the next

3    level up?

4    A    No, that comes down from the Pentagon.  From the Department

5    of Defense and the European Command through threat forces,

6    through Europe, through the Sixth Fleet and then through the

7    amphibious task force commander downward.

8    Q    Did you have occasion to witness a short videotape

9    regarding your marine unit in Lebanon and what day-to-day

10   life -- at least a taste of what it was like?

11   A    Yes.

12   Q    And was that, to the extent you could go into detail, was

13   that accurate?

14   A    It was accurate.

15            MR. FAY:  Can we dim the lights?

16            (Videotape played)

17            THE COURT:  Your exhibit number?

18            MR. FAY:  That is -- I don't know if we marked this as

19   an exhibit number.  We ask that it be admitted into evidence.

20   BY MR. FAY:

21   Q    Mr. Geraghty, let me show you -- I don't know if we can

22   make this -- I put up the rules of engagement which we obtained

23   from historical sources.  First of all, I would ask whether or

24   not this is in fact an accurate copy of the rules of engagement

25   that you were given?

1    A    It is.

2         MR. FAY:  Your Honor, we would ask that this exhibit

3    which I believe is Exhibit Number Ten, Plaintiffs' Exhibit

4    Number Ten, be admitted into evidence.

5         THE COURT:  It's received.

6                        (Plaintiffs' Exhibit No. 10

7                         was received in evidence)

8    BY MR. FAY:

9    Q    Now, Colonel, going down from the top on these, "When on

10   post, mobile or foot patrol, keep loaded magazine in weapon,

11   bolt closed, weapon on safe, no round in chamber," that was the

12   instruction given along with these others to all of the Marines

13   in the 24th MAU?

14   A    That's correct.

15   Q    I believe I've seen a card with this -- these rules printed

16   on them.  Were they handed out to every single Marine?

17   A    That's correct.  We went over those in great detail.

18   Q    And were these rules adhered to at all times, especially up

19   to October 23rd, 1983?

20   A    Yes.

21   Q    What's the meaning really of the term rules of engagement,

22   if there has been any definition given to it.

23   A    They're essentially the parameters you operate under with

24   the primary focus on the mission which was a peacekeeping

25   mission, and that's sacrosanct.  That is the focus.  And that

1   these are essentially the parameters that we operate under.

2   Q   How would these differ from the rules which presumably were

3   being enforced for a Marine walking guard duty over at the

4   Marine Barracks even as you testify here today?

5   A   The rules -- these were geared primarily again with the

6   peacekeeping mission inside and the sensitivities of killing or

7   maiming someone accidentally.  That could be a tinderbox.  That

8   could start a whole chain of events.  The rules of having not a

9   chamber in the weapon --

10  Q   Not a round in the chamber?

11  A   Not a round in the chamber, I'm sorry, and having it on

12  safe is commonplace.  Even within the compounds of Vietnam we

13  never had a round in the chamber when you're inside of those

14  compounds.  There is -- it's when you deploy, when you're going

15  out in patrol and so on.  And what it is, is you train them,

16  and it's a matter of just a second or two where you pull the

17  bolt to the rear, put a round in the chamber and take the

18  safety off, you've got it ready to go.  But it's to put in

19  their mind that there's a thought process before you engage.

20  With the caveat of that is that any time that there was any

21  personal threat that was derived from any individual is that

22  they certainly have the authority to round the chamber.

23  Q   Now, let me direct your attention to Plaintiffs' Exhibit

24  Number One.  I have a blownup copy here.  You can see that

25  easily as you testify.  Let me also put a copy on the viewer.

1   Now, first of all, does this appear to be not according to his

2   scale but a reasonably accurate copy of the map of the area in

3   which your Marines were deployed?

4   A   Yes.

5   Q   And could you point out -- first of all, on the left side,

6   what do these lines over to the left side as you look at the

7   screen indicate?  Along there, there.  There, I'm sorry.

8   A   Yes.  Those are berms inside -- on the eastern side of the

9   entrance to the Beirut International.  Behind those areas are

10  taxiways and so on.  The Lebanese had some aircraft.  In fact,

11  we used part of that for our aviation element.

12  Q   Now, somebody entering the airport would use what route?

13  Maybe you could just take my -- well, maybe you could come over

14  to this and take my pen and show it.

15  A   Yes.

16  Q   As one would enter the airport, perhaps you can show how a

17  civilian, for instance, would enter the airport?

18  A   Yes, it's this main entry point down to the end here with

19  the circle here is where the terminal was.  The main terminal.

20  So consequently this was where most of the traffic would be

21  coming towards you.

22  Q   And could you identify on that the area where the BLT1-8

23  was?

24  A   Yes, right here.  Just right off of the highway.  The entry

25  highway.

1    Q    And then where would the entrance into your area be?

2    A    The MAU headquarters?

3    Q    Yes.

4    A    It's just 100 meters behind right here.

5    Q    Okay.  You can resume the stand.

6         Now, you referred to the -- earlier to the 24th MAU

7    and BLT1-8 and for the record, what do those terms include?

8    A    I apologize.  Yes, I know this is slang of the Pentagon.

9    MAU is a Marine Amphibious Unit which is -- incidentally now

10   it's been changed to Marine Expeditionary Unit.  The MAUs are

11   now MEUs.  And it's the designation of a unit of essentially

12   2000 or so Marines with a ground element supporting arms.  The

13   aviation unit.  And then the BLT is Battalion Landing Team.  In

14   this case the battalion was First Battalion Eighth Marines, and

15   it becomes a landing team.  A battalion is essentially

16   infantry.  And the way the Marine Corps structure builds them

17   is that it's given a lot of supporting elements to make it a

18   landing team which includes amphibious tractors, tanks,

19   artillery, recon, engineers, all these, and sundry support

20   elements that make it a landing team.

21   Q    Now, I referred in my opening to this area of the airport,

22   let me put this back on, as still being a civilian airport

23   facility up to October 23rd, 1983 and perhaps beyond that.

24   This just goes to October 23rd, 1983.  For passengers who wish

25   to dodge small arms fire, mortar fire and artillery fire.  Was

1    this still a civilian landing facility?  In other words, did

2    planes occasionally come in there?

3    A   Yes, and it's important to note that Lebanon, you know,

4    historically is a trading country.  It's the crossroads for the

5    Mideast, Paris, and the Orient.  But that it's essentially a

6    trading country which drew in people and that's all the way

7    back to the time of the Phoenicians.  So the opening and the

8    maintaining to keep their ports open and specifically in the

9    modern era, their airport was probably no higher priority that

10   the Government could have to demonstrate to the people that the

11   Government is functioning and that there's a sense of normality

12   back.  So there was a great pressure to have that remain open.

13   Q   Was there any other functioning international airport in

14   Lebanon at that time or even actually to the present?

15   A   No.

16   Q   Was there also construction going on at the airport during

17   this time?

18   A   Yes.  Many.  Because of the civil war that essentially, you

19   know, going back to the seventies, '76, that it became so

20   intense, there was so much destruction it was a continual

21   process of blowing something up and then they would start

22   reconstruction.  Again, because of the priority of what the

23   airport meant to the Government of Lebanon, there was probably

24   no higher priority than to reconstruct when the shells come in,

25   do some damage and so on, to not only build up the areas of

1  destruction but there's actually an expansion going on at the

2  same time.

3  Q    Colonel, during this period, up until October 23rd, 1983,

4  what police power even did your people have?  For example, if

5  somebody came waltzing down the road that I'm pointing to now

6  such as might be found over at Union Station now with kids at

7  this time of the year walking through with knapsacks on their

8  backs and so forth, what authority did your people have to stop

9  them, search them, do anything to them?

10 A    None.  No, that was part of the dilemma that we had is the

11 Lebanese Army was in charge of the security of the airport per

12 se and we had our perimeter in a different area but who was

13 coming, when it was opening -- in fact, I took a lot of hits on

14 why I allowed the airport to reopen because it increased our

15 vulnerability.  I had no say in that.  That's the Prime

16 Minister of the country who is making those decisions.  So we

17 had liaison, Lebanese Army liaison officers working for us and

18 that was the primary intercommunication we had with the

19 Lebanese Armed Forces.

20 Q    So if Joe and Sally Sophomore today wander through Union

21 Station with a knapsack on their back, the transit police at

22 the station have more of a right to stop somebody and ask them

23 what's in the knapsack and what they're doing there than your

24 Marines had the right to stop somebody going down that road?

25 A    Oh, yes.

1   Q    Now, you mentioned an outside perimeter that was set up by

2   the Lebanese Armed Forces.   Maybe we should back up a minute.

3   What was the consistency of the Lebanese Army at this point?

4   A    The Lebanese Army was, and this was part of their whole

5   program, to essentially make an army, is include all the

6   different factions that were fighting one another, the Druze

7   and the Phalangists and the Christians and the Sunni and the

8   Shi'ites.   And they had all those into and trained within the

9   Lebanese Army.   And they were making progress.   I can remember

10  going to a number of the graduation ceremonies and giving NCO

11  awards to the graduates and they were Druze and they were

12  Shi'ites and they were Phalangists.   So General Tanouse,

13  (spelled phonetically) the general of the Lebanese Army, I

14  think was doing a magnificent job in trying to put that

15  together.   But it fell apart pretty fast when the factions

16  started fighting again.

17  Q    Did this outside perimeter even stay in touch with your

18  people?   For instance, if a truck was coming in, did they get

19  on the radio and say hey, fellow, watch out for the truck

20  coming down the road?

21  A    No, because the Lebanese control.   When the airport is open

22  you have to understand there are literally hundreds of vehicles

23  coming in there as well as trucks.   Just the hubbub of an

24  international airport.   And again going back to the importance

25  of Lebanon keeping this airport open.   So you have families as

1    they would come to the airport, and not necessarily to leave,

2    just to see the planes.  Just to get away.  So it was

3    considered to be a secure spot at times.

4         It also highlighted the -- how careful we had to be

5    that there wasn't accidental discharge that could kill or could

6    maim some civilian that would -- in the circumstances that we

7    operated I think would be very detrimental to our mission.

8    Q   Let me ask you with regard to the backside, if you will, of

9    the area, the direction from which the attack ultimately came.

10   I'll put up Exhibit Number Two.  Incidentally, is this an

11   accurate representation, not to scale, but an accurate

12   representation for our purposes here of that area?

13   A   Yes, sir.

14        MR. FAY:  Your Honor, we would ask that Plaintiffs'

15   Exhibits One and Two be admitted into evidence.

16        THE COURT:  Received.

17                         (Plaintiffs' Exhibit Nos. One & Two

18                          were received in evidence)

19        THE DEPUTY CLERK:  Excuse me, what is Number Two?

20        MR. FAY:  Number Two is a map.

21        Your Honor, I have a book here with -- the original

22   copies of the exhibits and which have blownup copies.  I have a

23   copy as well and pass that up to Your Honor.

24        THE DEPUTY CLERK:  Is there an exhibit list?

25        MR. FAY:  Well, perhaps it's not in there but I'll

1    provide it.

2            THE DEPUTY CLERK:  What are you calling it?

3            MR. FAY:  This is Number Two.

4            THE DEPUTY CLERK:  What is its name?

5            MR. FAY:  It is a depiction of the area of attack

6    including sentry and other key locations.

7    BY MR. FAY:

8    Q   Directing your attention, Colonel, to this area, from

9    the -- what's marked here as entrance on the back of the

10   parking area, was there any Marine position outside of what is

11   noted as concertina wire stretching across that parking lot?

12   A   No, that was one of the sensitivities that we had to

13   realize because we were where we were, is beyond that

14   concertina wire direct fire was going right into the terminal

15   which was the main hub.  So there was nothing outside of that

16   concertina.  And the only other forces, Marine forces that were

17   not in this area were over at the university through the town

18   that was isolated and of course after the bombing at the

19   British Embassy at our embassy we had special forces there for

20   security.

21   Q   How many units would be parked outside the concertina wire

22   in the part that was marked as a parking lot?

23   A   Depending on the time.  When the shelling would start, and

24   for the same reasons they wanted to close it, the target, not

25   to allow the airport to open was the primary target of the bad

1  guys.  So once that is shelled it essentially would be empty.

2  Once they tried to reopen it and so on, you had hundreds of

3  cars just coming and parking, people in the hubbub of the

4  airport operating.

5  Q   And the term concertina wire, that is what?  What does that

6  mean?

7  A   It's a barbed wire that's circular that the Marines and

8  either military uses, to prohibit entry into, and these

9  particularly were reinforced concertina.  We had stakes

10 actually driven into the ground to stop vehicles and so on.  We

11 tested those quite a bit and it would stop normal vehicles and

12 small trucks, vans and so on.

13 Q   But not a heavy truck?

14 A   No, not a heavy truck.  And you hit on the basic problem

15 here is that we were -- the dilemma we had is that the mission

16 was composed and directed really by the diplomats.  The

17 diplomatic service.  Our position was not a tactical position.

18 In fact, it was atrocious.  And it was tolerable with the

19 mission when we started.  Again I go back to it all changed in

20 our watch and that's essentially what the problem was.  Our

21 mission because we were targeted and the artillery and all the

22 other things, that we became a primary target along with the

23 French and the other forces, it was directed toward us.  So

24 that changed the whole complexion and really endangered all the

25 more our vulnerability of the deployment at work.

1            I have to mention that there were plans that I was

2    fully supporting to redeploy a good part of the Marines to the

3    south into a different area in order to just reduce the profile

4    of the numbers where we were.  But that never came to pass.

5    So, in a nutshell, I told some people these are the

6    circumstances, particularly after the Israelis withdrew at the

7    end of August, the 28th of August, is that the -- and we became

8    a primary target during what we call the September Wars, is the

9    environment and the changes essentially changed our mission,

10   but no one changed our mission.  Circumstances changed our

11   mission but we could not change the mission and that is part, I

12   think, in my judgment the -- the primary dilemma in

13   circumstances like this in going in as a peacekeeping mission

14   and any change to the status quo becomes interpreted as

15   weakness, particularly when their vulnerability -- you start

16   taking casualties, you change the status quo, and there's a

17   reluctance do that because it would send a signal that you're

18   weakening or that you're doing it.  And that I think is a big

19   part.

20           I wanted to -- in fact, starting -- we were less than

21   a month before redeployment and being relieved there in

22   October, and I actually wanted to start backloading early,

23   again, to reduce the signature ashore, but that didn't come to

24   pass because they figured again that any reduction of force at

25   this time would be interpreted as cutting and running or a sign

1    of weakness.  So those are the kind of issues that bounce back

2    and forth.

3    Q   Colonel, just to get a little bit better idea of this area,

4    I've placed on the viewer Plaintiffs' Exhibit Number 21 marked

5    for identification.  And the place where I put my pen, is this

6    an accurate representation of the BLT1-8 building?

7    A   That's correct.

8    Q   And to the left where I've placed my pen again, is this the

9    avenue, if you will, leading to the airport?

10   A   Yes, the southbound towards the terminal, and northbound

11   away, towards the city.

12   Q   And then where I place my pen now would be the parking

13   lot --

14   A   That's correct.

15   Q   -- area?  And I'm now placing Plaintiffs' Exhibit Number 20

16   on the viewer.  I'd ask you whether this is an accurate

17   representation of the interior of that BLT building.

18   A   That's correct.

19   Q   At the time of the occurrence, was it the same as it

20   appears now?  That is to say, with boxes and so forth in that

21   area?

22   A   Yes.  Those are essentially the boxes where we put our

23   gear, administrative records, office equipment, you know.  The

24   field gear.  And so on.  They're boxed in that and they're

25   going back towards the ship.  And that's where, I might add,

1  that just a couple of weeks before the bombing, General Kelly,

2  Commandant of the Marine Corps, stood right in the center there

3  and gave Purple Hearts out to some of the members.

4  Q    And where I'm placing my pen now, that is where the flags

5  were located?

6  A    Yes.

7  Q    That was the flag of the United States and the flag of the

8  Marine Corps?

9  A    Marine Corps, yes.

10  Q    Now, was that pretty precisely the center of the structure

11  on the ground floor?

12  A    Yes, looking at it, it had an atrium like you have in like

13  the embassy suites at the Hyatt.

14  Q    Let me put up 22.

15  A    There you go.  And that was essentially right in the center

16  of that atrium.

17  Q    And that would be such as we've -- I think the words Hyatt

18  atrium has almost become a term in the English language.  And

19  that's what it looked like?

20  A    Yes.

21          MR. FAY:  Your Honor, we would ask that Exhibit

22  Numbers 20, 21 and 22 be admitted into evidence.

23          THE COURT:  Received.

24                          (Plaintiffs' Exhibit Nos. 20-22

25                          were received in evidence)

1    BY MR. FAY:

2    Q    Could you trace your footsteps on October 23rd, 1983 to the

3    point at which the attack took place?

4    A    Yes.  I had gotten up at five, around five o'clock, 5:30,

5    which was the normal time that my day would start.  And what I

6    would do, my office is right above my operations center, I

7    would go down to check the overnight traffic and see if

8    anything has occurred or -- if anything actually were that

9    important, they would wake me.  But it was quiet and because of

10   the severe artillery and fire in the weeks before I recall this

11   vividly, going outside into the parking lot right outside my

12   headquarters there and was just sort of taken aback how quiet

13   it was.  You know, in the early morning hours.  There weren't

14   too many things moving.  No songbirds or anything else.  It had

15   cleared up.  It was just very quiet.  And we were in a period

16   of cease fire at that time.  And there was serious talk of

17   Syrian reconciliation talks and negotiations that were going

18   to -- they were planning for the following week.  And that we

19   were told that the BIA, the Beirut International airport, was

20   the area where all the different factions were going to meet

21   primarily because of the security of that area.

22   Q    Colonel, you mentioned the Syrians and the Israelis, the

23   French, and UK troops and the Marines.  In any way was there

24   any representation at all that Iranian personnel were present?

25   By representation I mean was there any legal status for Iran

1   within Lebanon at that time that you know of?

2   A    No, we knew that through intelligence, you know, Iranian

3   Revolutionary Guards were out in Bekaa Valley under Syrian

4   control.  We knew that.

5        But to continue with your question, I went back to --

6   up to my office and I wasn't there back in my office that long

7   went this tremendous explosion occurred and my first thought

8   was it was a rocket.  I thought a Syrian rocket that had hit

9   us.  And it blew -- I had windows taped and sandbags all in

10  front of our offices there at the MAU headquarters as it was at

11  the BLT.  All of us had.  But it blew all of the glass that we

12  had taped fortunately before then, and sandbags through my

13  office.  And my XO was -- and we shared the room there above

14  our operations center and it blew both of us a number of times

15  in the room against the far wall and actually blew out the door

16  going down to the operations center.

17       So I just -- I ran downstairs to see what it was and I

18  went down to the COC and they were okay.  I mean there was dust

19  and dirt clouds all around.  A fog.  And feeling my way out and

20  got outside and there was just like a heavy fog.  You couldn't

21  see anything but the smell of cordite and concrete was in the

22  air.  Fine powder.  And I went around the corner and there was

23  a Lebanese liaison at the United Nations building there that I

24  thought was hit and that was all right and so on.

25       And I was joined then by my logistics officer, Major

1  Melton, and was still trying to figure out where it landed and

2  what it did.  Because we had no way of knowing the means of

3  delivery except there was a hell of an explosion.  And I was

4  looking in the fog one way and Major Melton is the one that

5  said, my God, sir, the BLT building is gone.  Now, what

6  happened is that the smoke had cleared, started clearing out a

7  little bit and he saw that essentially the BLT building had

8  been destroyed.

9  Q   Colonel, let me show you what has been marked as

10  Plaintiffs' Exhibit Number 23.  And following where I'm placing

11  my pen, is this all that remained of the BLT building?

12  A   Yes.

13  Q   Is this an accurate photograph depicting the destruction

14  done to the BLT building?

15  A   Yes, yes.

16  Q   Could you tell us a little bit about the rescue efforts,

17  Colonel?

18  A   In a word, heroic.  The Marines just pitched in.  There

19  were a number of parallel things going on.  The first is to get

20  organized a rescue effort to help dig out the Marines, sailors

21  and soldiers as much as we could.  So starting that on one

22  hand.  On the other hand, I had the just an instinct that we

23  were going to get hit again.  At least I just felt it was

24  happening.  At the same time we're taking sniper fire.  And

25  people were converging obviously on the building.

1          The Lebanese, God bless them, the first ones with the

2   heavy equipment, were on the spot and started using the heavy

3   equipment to get the slabs off and help in the rescue effort.

4   The Italians came.  The British, all of them.

5          We found out then that just a couple of minutes after

6   us the French got hit at their parachute headquarters just a

7   couple of minutes northeast of us.  And the same thing as this,

8   a smaller truck went into the basement and brought down a

9   seven- or eight-story building.  They lost 59 paratroopers and

10  over 100 wounded.

11         But the effort to get that -- the other thing is I had

12  to get on SatCom back to National Command Center to get support

13  out there because I had lost -- the BLT was the one that had

14  the operations to control the artillery and all the sundry

15  units.  That's part of the BLT function.  So my headquarters

16  had to assume that function with the absence of the BLT.  And

17  at the same time I had to get another BLT complete headquarters

18  out there in order to pick that up, plus an additional rifle

19  company for security because I felt our vulnerability.

20         And that's when -- we have a stand by at Camp Lejeune,

21  a 24 hour, seven-24 fly away, and that's when the Two Six under

22  Lieutenant Colonel Kelly were out there within a day.

23  Q   What was the final casualty number, if you recall?

24  A   241.

25         MR. FAY:  Your Honor, I don't have any other questions

45

1   of Colonel Geraghty at this point.

2           THE COURT:  I take it, Colonel, you were the commander

3   of the overall marine operation in Lebanon, what's that, the

4   MAU?

5           THE WITNESS:  That's correct.

6           THE COURT:  And then this barracks that was actually

7   hit, what had it been before?

8           THE WITNESS:  It was used as an aviation

9   administrative building, for a better term.  What was

10  interesting about it, Your Honor, through all the wars and

11  trials and tribulations of Lebanon, the Syrians used it as

12  their headquarters when they were occupying, the Israelis used

13  it as a hospital, and primarily it was considered by the

14  Lebanese of one of their strongest buildings.  It was strong,

15  with reinforcement rods and so on.

16          I think in retrospect is that the artillery and the

17  heavy fire that -- artillery fire that we started getting there

18  at BIA, and most of the Marines were on the runway.  We had

19  tents set up and hardback and so on.  And then we brought some

20  armor ashore for protection, but we didn't use that building

21  that much early because we just kept the forces deployed.  But

22  it was the artillery and the threat that we were facing that I

23  had no choice, I had to get them in hardened structures.  And

24  there weren't too many places to go and this was one of them.

25          I could tell you other buildings in that area.  We

1   were going down in the basement and everything.  I had to get

2   the forces ashore since I could not reduce their signature.

3   And the threat that I always thought was artillery barrages and

4   rockets and mortars, that they could bring to bear on us.  So

5   it's in that context.

6          THE COURT:  When did the Marines first go into Lebanon

7   in this peacekeeping role?  Like a year before?

8          THE WITNESS:  That's correct.  It was September I want

9   to say, of '82.  Primarily with the mission of helping the

10  French to remove the PLO.  The fighters.  And they had agreed,

11  there were a lot of negotiations, to get them out of Lebanon

12  and send them mostly I think to Tunisia.  That is, spread them

13  around through the Mediterranean.  And the mission there was

14  with the French and it was successful, to remove the fighters

15  and all that.

16         Now, part of that, we find out later, part of that

17  quotient in removing the fighters was the agreement

18  diplomatically that the United States had made to provide

19  security on refugee camps that were left behind.  Really

20  unprotected from the Palestinian standpoint.  And so after the

21  fighters left, the Marines' decision is rather than linger

22  around there, what was it?  And the decision was made to get

23  them out.  There was no reason to linger there according -- you

24  know, coming down from above.

25         Well, the machines went and they weren't gone I

1   wouldn't say a matter of weeks when the -- what triggered the

2   return was the President of Lebanon, Bashir Gemayel, was

3   assassinated.  And that started -- whether with Israeli

4   coalition or what, but the Christian forces, Phalangist forces

5   went into Sabra and Shatila and massacred women and children.

6   It was really bad.  And it was really I think out of a sense of

7   obligation that -- and this was right up at President Reagan's

8   level, that we can't have that kind of behavior and not provide

9   protection and it was after the horse was out of the barn, but

10  still provide some kind of stability and protection there.

11  That's what brought the Marines back in with the so-called

12  presence.  So it's one of those missions where the road to hell

13  is paved with good intentions for all the things that we did.

14        But I think in retrospect the changing of -- how

15  things rapidly deteriorated and we became the target primarily

16  because of the success of what we were doing was starting to

17  have I think some positive effect which would generate this.

18        THE COURT:  Thank you very much, Colonel.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  We'll take our morning recess.

21        MR. FAY:  Thank you, Your Honor.

22        (Recess)

23        THE COURT:  All right, Mr. Fay?

24        MR. FAY:  Your Honor, at this time we would present

25  the deposition testimony of Joseph Salam and Mahmoud.

1          THE COURT:  All right.

2          MR. FAY:  Your Honor, while we're waiting I spied

3    another distinguished member of our bar who has been working

4    with us on this case, Mr. Feeney.  Robert Feeney.

5          MR. FEENEY:  Good morning, Your Honor.

6          THE COURT:  Mr. Feeney.

7          MR. FAY:  I guess we need a little work on the lights.

8          There.

9          (Videotape deposition of Joseph Salam played)

10          (Mr. Fay requested on the videotape deposition that

11    Mr. Salam be qualified as an expert)

12          THE COURT:  The witness is well qualified, and the

13    request is granted.

14          (Videotape deposition of Joseph Salam continued,

15    followed by videotape deposition of Mahmoud)

16          MR. FAY:  Your Honor, may I approach the bench?

17          (Off the record)

18          THE COURT:  The Court will recess at this time.  We

19    will resume at two o'clock with the testimony of Admiral Lyons.

20          (Lunch recess, 12:10 p.m. to 2:00 p.m.)

21                        AFTERNOON SESSION 2:10 P.M.

22          MR. FAY:  Good afternoon, Your Honor.  At this time we

23    would call James Lyons as a witness.

24    (JAMES LYONS, WITNESS FOR THE PLAINTIFFS, SWORN)

25                      DIRECT EXAMINATION

49

1    BY MR. FAY:

2    Q    Would you please state your full name and address?

3    A    I live on 9481 Piney Mountain Road, Warrenton, Virginia.

4    Q    And your full name, please?

5    A    It's Admiral James A. Lyons, Jr., USN retired.

6    Q    Could you detail your education for us, Admiral Lyons?

7    A    I've listened to a lot of guns go off, so you've got to

8    speak up.

9         You understand that, don't you, Judge?

10        THE COURT:  I do.

11        THE WITNESS:  Good.

12   BY MR. FAY:

13   Q    Admiral, could you detail your education for us?

14   A    I graduated from the Naval Academy in 1952, the Naval War

15   College in 1964, and the National War College in 1971.

16   Q    Okay.  Is your senior year in Navy the year that they beat

17   Army?

18   A    That's right, 14 to two.

19        THE COURT:  I'm shocked you raised that in this Court.

20        THE WITNESS:  But the year before we lost 38 to

21   nothing.

22        THE COURT:  I'll resist saying good.

23        MR. FAY:  I'd ask for judicial cognizance that the

24   witness' memory has not faded, Your Honor.

25   BY MR. FAY:

1  Q    After graduation from the Naval Academy, what was your

2  first duty assignment, Admiral?

3  A    Well, I had essentially tours in the amphibious force and

4  the destroyer force and the cruiser force and then I was Exec-O

5  of a destroyer in 1959.  I took command of the destroyer in

6  1966.  And went on from there.

7  Q    Could you review your career from that point with the Navy?

8  A    Well, the -- and I guess you mean where I went from that

9  tour?

10  Q    Yes.  Yes.

11  A    I was the Executive Assistant to the Deputy Chief for Naval

12  Operations for Plans, Policy and Operation, 71 to '74.  I took

13  command of a guided missile cruiser, 1974 to '75.  I was Chief

14  of Staff of a carrier group, '75 and '76 and then I came back

15  to the Pentagon as the Senior JCS Planner for the Navy.  I was

16  selected for Rear Admiral in January, '78.  And after a short

17  tour on the Navy Staff I went to the Joint Staff as the

18  Director of Political and Military Affairs from '78 to '80.

19          In 1980 I went to take command of task force 73 in the

20  Pacific which I was responsible for all the logistics and the

21  first deployment of the pre-position ships in Diego Garcia.

22  From that tour I was ordered as Commander of the Seventh Fleet

23  and the NATO Striking Fleet.  That was '81 to '83.

24          In '83 to '85 I was the Deputy Chief of the Naval

25  Operations for Plans, Policy and Operation.  Then the Navy

1    opted for all JSC matters.  I was also the U.S. military rep

2    for the United Nations during that same period, and in 1985,

3    '86, '87, I was Commander in Chief of the Pacific Fleet.  At

4    which point they told me they thought I ought to look for other

5    employment.

6    Q    In your course at the Naval War College and later at the

7    National Defense University, what was your major area of

8    interest?

9    A    Well, it was -- I focused a lot on the Middle East, Persian

10   Gulf, Indian Ocean, and some of the intricacies that involved

11   the region.

12   Q    And later as Director of Political Military Affairs for the

13   Joint Chiefs of Staff organization, what were your areas of

14   responsibility?

15   A    Well, basically the world, but I focused primarily on the

16   Middle East and Europe.  After the Iranians sacked our embassy

17   in November, '79 I was responsible for developing the first

18   concept for the deployment showing task force.  I also in that

19   position accompanied the then Secretary of Defense, Harold

20   Brown, who was the first Secretary of Defense ever to make a

21   trip to the Middle East, where we visited Saudi Arabia, Jordan,

22   Israel, Egypt and so on.

23   Q    And could you describe your areas of responsibility when

24   you were Commander of the Mobile Logistics Support Force?

25   A    Well, again, as I previously, said I was responsible for

1  all logistics for the Seventh Fleet.  Responsibility for the

2  pre-position ships, and at that time the diplomats were still

3  being held hostage in Iran.  So that was a primary focus of our

4  efforts.

5  Q   At one point in your career -- when did you first come into

6  the area of Iran?  Waters nearby Iran?

7  A   Well, that was in 1967 when I had command of a destroyer.

8  I was up at Collog Island.  (Spelled phonetically)  All the

9  states in the region at that time.  So I would say my first

10 on-scene dates back to 1967.

11 Q   From July of 1983 until September, 1985 when you were

12 Deputy Chief of Naval Operations, did you at the same time

13 function, ever function with regard to the United Nations?

14 A   That's the same period of time.

15 Q   Yes.

16 A   Right.

17 Q   And that function with regard to the United Nations was

18 what?

19 A   That involved a variety of things which included the Middle

20 East as well but, of course, at that particular period of time

21 we were -- the Soviet threat was somewhat number one on the

22 agenda.  And I was also the JSC rep on conventional arms

23 limitations talks with the Soviet Union, and then I headed up

24 the U.S. Incidents-At-Sea Talks in Moscow in 1984.

25 Q   In your position as Deputy Chief of Naval Operations in

1   July of 1983 to September, 1985, did you have occasion to

2   receive intelligence information with respect to areas where

3   American military forces were involved?

4   A    I did.  Numerous ones.

5   Q    Was it in the normal course of your work as Deputy Chief of

6   Naval Operations?

7   A    Correct.

8   Q    Admiral, in your position as Deputy Chief of Naval

9   Operations, did you have occasion to become aware of an

10  intercept of a message to the Iranian Ambassador in Damascus

11  from the Iranian Government in Tehran in the fall, late

12  September of 1983?

13  A    You know, we -- that message came -- I got to see that

14  message on the 25th of October, two days after the event of the

15  Marine Barracks blowup.  And that message was formulated in the

16  latter part of September, approximately four weeks before the

17  Marine Barracks blowup.

18  Q    When you say formulated, would that be the same as

19  intercepted in some way?

20  A    Well, you can say that we know with certainty that the

21  Iranian Ambassador called in the leader of the terrorist group,

22  Islamic Amal, (spelled phonetically) Hussein Moussaoui, and

23  gave him instructions to carry out attacks on the forces in

24  Lebanon and to take a spectacular action against the United

25  States Marines.

1   Q    Were you ever able to determine why this intercept of late

2   September, 1983 did not reach you until two days after the

3   attack on the Marine Barracks at Beirut?

4   A    I've asked that question a thousand times.   I don't know.

5   I first saw it when the Director of Naval Intelligence walked

6   into my office and said this is something you'd better take a

7   look at.

8   Q    Have you brought a copy of that record with you today?

9   A    Well, I'm not authorized to do that, but I have here an

10  envelope which I will hand the Court which will provide

11  sufficient information for the Court to request that document

12  through appropriate channels.

13  Q    Is that still classified information?

14  A    As far as I know.

15  Q    And that is in an envelope marked Plaintiffs' Exhibit

16  Number Five?

17         THE COURT:  Seven.

18         MR. FAY:  Seven, I'm sorry.  Seven.  Your Honor, we

19  would ask that this exhibit be admitted into evidence but kept

20  under seal of the Court and not published.

21  BY MR. FAY:

22  Q    Admiral, without disclosure of intercept methods with

23  appropriate consideration of national security factors, can you

24  describe essentially the information, the type of information

25  you received?

1    A    Well, as I said, we know with certainty that the Iranian

2    Ambassador directed Hussein Moussaoui, the terrorist leader of

3    the Islamic Amal, to conduct attacks against the military

4    forces in Lebanon and to take a spectacular action against the

5    U.S. Marines.  Beyond that, I can't go.

6    Q    Admiral, over your years as a naval officer, was part of

7    your profession the evaluation of intelligence information?

8    A    Well, I would say if there was ever a 24-karat gold

9    document, this was it.  This is not something from the third

10   cousin of the fourth wife of Muhammad the taxicab driver.

11   Q    You don't have any doubt, I take it, as to the authenticity

12   of that message?

13   A    No.

14   Q    And you don't have any doubt that it was sent by somebody

15   in a position in Tehran to give such an order to the

16   Ambassador?

17   A    Correct.

18   Q    Could you express your opinion, you've already said

19   24-Karat, but -- Your Honor, we would ask that the Admiral be

20   qualified as an expert permitted to express an opinion with

21   regard to the reliability of the exhibit which we've placed in

22   evidence?

23          THE COURT:  Your request is granted.

24   BY MR. FAY:

25   Q    Could you -- you already mentioned 24-Carat, so to some

1  extent you've answered it but perhaps before I ask that

2  question, could you perhaps tell us a little bit about the type

3  of information that the military gets in intelligence and how

4  much of it is good, how much of it is okay?

5  A    Well, at that particular period of time there were

6  thousands of messages from every source you can imagine.

7  However, not like this message, which should have set off all

8  the bells and whistles.

9  Q    How often would a message of this type of importance, of

10 this type of reliability come across your desk, come to your

11 attention as Deputy Chief of Naval Operations?

12 A    That's the only one I've seen of that quality.

13 Q    One last question, Admiral, are you being compensated in

14 any way for your time either in the traffic jam trying to get

15 here or for your testimony, more importantly.

16 A    No, not at all.

17       MR. FAY:  Your Honor, I have no other questions of

18 this witness.

19       THE COURT:  At the time the intercept was brought to

20 you by the Chief of Naval Intelligence, you evaluated it in the

21 same way you have here today that this was an intelligence --

22       THE WITNESS:  I took it immediately to the Secretary

23 of the Navy and to the Chief of Naval Operations.

24       THE COURT:  No question this was the real Mc Coy in

25 your view.

1          THE WITNESS:  No question.

2          THE COURT:  And it was treated that way by those

3    officials as well.

4          THE WITNESS:  Correct.

5          MR. FAY:  Your Honor, I don't have any other

6    questions.

7          MR. PERLES:  May I have a moment with Mr. Fay, please?

8          THE COURT:  Yes.

9    BY MR. FAY:

10   Q    Admiral, you mentioned Amal.  Was this the precursor

11   organization to Hezbollah?

12   A    Correct.

13         THE COURT:  Thank you very much, Admiral.

14         MR. FAY:  Thank you, Admiral.

15         THE COURT:  You can step down.

16         Let me say one thing to the ladies and gentlemen who

17   are here.  I want to try to accommodate as many plaintiffs who

18   can observe some part of these proceedings as I can.  I've

19   indicated to the Marshals that about every 30 minutes the last

20   row on each side of the audience I'm going to ask to step out

21   and let other plaintiffs step in so that they'll have an

22   opportunity to observe these proceedings as well.  If there are

23   others who want to rotate in and out, you may do so when we do

24   that rotation but I think that will allow some of the people

25   who are waiting out in the hall to try to get into the

1   courtroom to come in.

2           Okay, Mr. Fay.

3           MR. FAY:  Your Honor, at this time we would present by

4   videotape the deposition testimony of Mr. Robert Baer.

5           THE COURT:  All right.

6           (Videotape deposition of Robert Baer played)

7           THE COURT:  What's the name of his book?

8           MR. FAY:  Hang on just a minute, Your Honor.

9           THE COURT:  Is it going to be an exhibit?

10          MR. FAY:  We can introduce it as an exhibit, yes.  I

11  tried to actually get a copy and didn't.  I have an excerpt

12  here but I could not get the entire book.  It's a wonderful

13  title.  See No Evil.  I think it was published in 2001, Your

14  Honor.

15          Your Honor, our next witness will be Sergeant Steve

16  Russell, and the direct examination will be conducted by Mr.

17  Gaskill.

18          THE COURT:  All right.

19          MR. GASKILL:  Good afternoon, Your Honor.  Dan

20  Gaskill.

21  (SERGEANT STEVE RUSSELL, WITNESS FOR THE PLAINTIFFS, SWORN)

22                      DIRECT EXAMINATION

23  BY MR. GASKILL:

24  Q   Good afternoon, Mr. Russell.

25  A   Good afternoon.

1  Q    Would you please state your full name and address for the

2  reporter?

3  A    Steven Edward Russell.  I live at 116 Depot Street, Belle

4  Haven, Massachusetts.

5         MR. FAY:  Maybe if you can get the mike a little bit

6  closer.

7         THE WITNESS:  I'm sorry.

8  BY MR. GASKILL:

9  Q    What was the date and place of your birth?

10  A    July 14th, 1955, Boston, Massachusetts.

11  Q    What high school did you attend?

12  A    I went to South Boston High School.  We moved to the

13  suburbs and I graduated from Algonquin High.

14  Q    Did you go to any schooling after that?

15  A    I did a couple of years of college.

16  Q    Did you have any occupation or jobs during high school?

17  A    I worked in a warehouse for Sears & Roebuck.

18  Q    And how old were you when you entered the Marine Corps?

19  A    19.

20  Q    You were right out of high school?

21  A    Yes.

22  Q    Have you held a steady occupation after you've gotten out

23  of the Marine Corps?

24  A    No.

25  Q    What year did you get out of the Marine Corps?

1   A    I left the Marine Corps on a medical retirement in 1994.

2   Q    Was that the first time you got out of the Marine Corps?

3   A    No, I originally went into the Marine Corps in 1974,

4   graduated in 1977, got out of the Marine Corps in 1977 and did

5   five years as a civilian, worked primarily at General Motors

6   for five years, loading cars, and then went back into the

7   Marine Corps in 1982.

8   Q    Why did you do that?

9   A    I missed the Corps.

10  Q    What did you miss about it?

11  A    The camaraderie and the esprit de corps.  The camaraderie,

12  the professionalism.  The respect.  I just didn't find civilian

13  life too attractive.

14  Q    Back in October 1983 how were you employed?

15  A    I was attached to the Second Marine Division, Camp Lejeune.

16  I was a member of the TOW Company, Second Tank Battalion.

17  Q    What was your rank at the time?

18  A    E-5 Sergeant.

19  Q    How long were you in the Marine Corps before you picked up

20  E-5 or Sergeant?

21  A    Exactly two years and a week.  I was -- I picked that up

22  meritoriously.

23  Q    Could you define a meritorious promotion, please?

24  A    That's a promotion that is given to a deserving Marine,

25  basically promoted ahead of his peers.  For example, I think at

1    that time a sergeant would be promoted to approximately 12 to

2    14 months of grade with good conduct marks, and if he proved

3    himself worthy of the next high rank he would be promoted ahead

4    of his peers.

5    Q    You said you were a member of TOW Company, Second Tank

6    Battalion?

7    A    Yes.

8    Q    What does that mean?

9    A    That's tube launch optically tracked wire command link

10   guided anti-armor weapons system.

11   Q    What do those fit, on the back of a jeep?

12   A    At the time they were mounted in the rear of an M51 jeep.

13   They were two-men crew-served weapons and they could also be

14   manned portable to be deployed in a better offensive position

15   on a tripod.

16   Q    Were you with any other units during 1983?

17   A    Yes, actually during the month of March into April we were

18   attached adcom-opcom which is administratively and

19   operationally to the 8th Marines as an attachment.

20   Q    As an attachment to who?

21   A    To 8th Marines.  They were going on a Med Float.

22   Q    What is a Med Float?

23   A    A Med Float is approximately every six months Marines would

24   rotate on a cruise.  Usually it's about five ships.  An

25   infantry battalion of Marines with their attachments such as

62

1    ourselves, TOWS, Artillery, Tanks, Recon, receive attachments

2    from other divisions and they would go on floats to the

3    Mediterranean to be like a force in readiness if the Marines

4    were needed in the Middle East or in that area.

5    Q    Did there come a time when your unit finally did deploy on

6    this Med Float?

7    A    Yes, we did.

8    Q    And when was that?

9    A    If I remember correctly, it was April 11th of 1982.

10   Q    And did you leave right out of Camp Lejeune?

11   A    We left Camp Lejeune that morning and drove to Morehead

12   City with our equipment gear, personnel and, you know, we

13   mounted -- actually embarked on the ships in Morehead City and

14   from there the ships left for the Middle East.

15   Q    And where exactly in the Middle East did you end up going?

16   A    We ended up going to Beirut, Lebanon.

17   Q    As a noncommissioned officer in the United States Marine

18   Corps what were you initially told about the nature of this

19   deployment?

20   A    Initially it was going to be basically a Med Float.  Again,

21   just to go over to the Mediterranean, Middle East, in that

22   area, but, of course, it was generally believed we would be in

23   Beirut.  At that time there was already a MAU, an amphibious

24   unit in Lebanon, so our role was to replace them.

25   Q    And what if anything were you told about the nature of the

1    deployment itself?

2    A    To be peacekeepers.

3    Q    What does that mean?

4    A    At that time we really didn't know.  To this day I really

5    can't --

6         THE COURT:  Well, you know today it's to be sitting

7    ducks.

8         THE WITNESS:  Yes, sir.

9    BY MR. GASKILL:

10   Q    Who generally told you that this was a peacekeeping

11   mission?

12   A    The superior officers and those in command.

13   Q    Sergeant Russell, what does the term rules of engagement

14   mean to you?

15   A    Rules of engagement were rules provided to us to let us

16   know in specific situations how to react, how to act or react

17   depending on, for example, hostage situations or whatever the

18   case may be, where we were going.

19   Q    Did you understand these rules to be guidance to help you

20   out, or were these orders?

21   A    No, these were orders.

22   Q    How many basic rules of engagement were there?

23   A    There were ten.

24   Q    And how did you remember them?

25   A    Well, on ship on the way over every Marine was issued what

1    did they call an ROE card and we had to memorize them and we

2    were told specifically at that time that those cards will be

3    kept at all times from that point on in our upper left breast

4    pocket.

5    Q    Do you have the actual card --

6    A    Yes, I do.

7    Q    -- that you were handed that day and kept in Beirut?

8    A    I have it with me.

9    Q    Please to yourself read these rules of engagements that are

10   posted here.  This was Plaintiffs' Exhibit 12A.  Do these

11   differ in any way from the rules on your card?

12           THE COURT:  I think it's Plaintiffs' Ten is the way I

13   have it marked.

14           MR. GASKILL:  I'm sorry, Your Honor.

15   A    Yes, they're exactly the same.

16   Q    Did you ever question the rules of engagement?

17   A    No, they were orders, you do what you were told.

18   Q    During your time in Beirut, was there ever any more

19   discussion at all about the rules of engagement and why they

20   were important?

21   A    Well, off and on at all times myself as an NCO I made sure

22   that my fellow Marines, for example, always carried it and it

23   never left our breast pocket.  A utility jacket.  I checked

24   them once in a while to make sure they carried it and they

25   understood, knew what the rules of engagement were and what

1  they meant.

2  Q    Did you yourself school other lower ranking Marines about

3  having it in their left breast pocket and understanding what

4  they mean?

5  A    Well, I made sure that they had them, but primarily, like I

6  said earlier, it was just a standing order.  You followed the

7  rules of engagement.  You have didn't ad lib it.  Maybe number

8  two means this.  You just took it the way it is.

9  Q    I want to direct your attention now to a specific date,

10  October 23rd, 1983.  Do you remember what you were doing about

11  five a.m. Beirut time?

12  A    0500, October 23rd, I was a Sergeant of the Guard located

13  in my guard shack at the BLT headquarters building.

14  Q    Okay.  Can you describe the outside of the guard shack,

15  please?

16  A    The guard shack basically it was like I call it

17  tinkerproof.  A small aluminum frame plexiglas enclosure.  Just

18  enough room for myself and a couple of shelves beside me.  With

19  sandbagged walls perhaps chest high.

20  Q    Does this picture accurately represent the guard shack that

21  you're talking about?

22  A    That's my guard shack.

23  Q    Behind this wall of sandbags this is your guard shack?

24  A    Yes, sir, it's not actually behind the wall.  It's within

25  that wall of sandbags.

1   Q    Very well.

2            THE COURT:  What's that number on that exhibit?

3            MR. GASKILL:  24, Your Honor.

4            THE COURT:  All right.

5            MR. GASKILL:  Your Honor, we would move at this time

6   that this photo marked Plaintiffs' Exhibit 24 for purposes of

7   identification be admitted into evidence.

8            THE COURT:  Received.

9                         (Plaintiffs' Exhibit No. 24

10                        was received in evidence)

11  BY MR. GASKILL:

12  Q    What were your specific duties as the Sergeant of the

13  Guard?

14  A    Primarily as any Sergeant of the Guard would, make rounds,

15  make sure the troops on post were awake, alert, understood

16  anything that came up.  Let me know if they had seen anything

17  unusual, anything happened.  You know, basically just keep an

18  alert.  Make rounds.  Keep radio communications with them at

19  all times.  Radio checks every half hour, 45 minutes or so.

20  Q    And what if anything occurred out of the ordinary during

21  that post on the night of the 22nd to the morning of the 23rd?

22  A    I want to say around 0300, 0400 I got a call from COC which

23  is Combat Operations Center which is located in the same

24  building, from the radio man upstairs saying that they had

25  received some sort of threat of a possible car bomb attack or

1    car bomb of some sort.  They described it as -- the description

2    they had was a white over blue or a blue over white, meaning

3    white roof with a blue body or vice versa.  A Mercedes.  I can

4    remember that distinctly.

5            So at that time I took the information into my brain.

6    I physically went to every exterior perimeter post which would

7    have been Post Four, Five, 5A, Six and Seven and made sure that

8    they understood.  I told them if you see this vehicle, let me

9    know.  If you see anything suspicious similar to that vehicle,

10   let me know.

11   Q    How much space, if any, was between your guard booth and

12   the actual barracks?

13   A    Well, the guard shack itself actually sits -- if you look

14   at that picture it actually sits underneath the overhang of the

15   second floor of the building.  So the guard shack basically was

16   just underneath the overhang of the second floor.  Like there's

17   a porch there that surrounded the building.

18   Q    Were there any barricades, natural or otherwise, between

19   the guard shack and the airport terminal behind you?

20   A    The only thing between me, the guard shack and the airport

21   terminal which was you might say the civilian side of the

22   perimeter, running east and west there was I call it an

23   engineered, designed and built concertina which is a kind of

24   barbed wire, and barbed wire engineered fence shaped sort of

25   like a tepee with crisscrossing patterns of barbed wire and

1   intermingled with concertina wire.

2   Q   Sergeant Russell, I'm showing you now what has been marked

3   for identification as Plaintiffs' Exhibit Number 26.  Does this

4   drawing accurately depict the position of the concertina wire

5   or barbed wire fence?

6   A   If you would raise it up just a little bit more.  Just

7   below that number six and seven you'll see the wire running

8   across east and west.  The airport road is to the left.  You

9   can see Posts Five, 5A, Six and Seven.  But yes, that's an

10  approximation of where that fence was located.

11  Q   Besides not being to scale you'd say it's accurate?

12  A   No, sir, it's not to scale.  It's close.

13          MR. GASKILL:  Your Honor, plaintiffs would move at

14  this time Plaintiffs' Exhibit 26 into evidence.

15          THE COURT:  Received.

16                          (Plaintiffs' Exhibit No. 26

17                          was received in evidence)

18  BY MR. GASKILL:

19  Q   What if anything out of the ordinary occurred between the

20  hours of six a.m. and seven a.m. on October 23rd, 1983?

21  A   I want to say it was approximately 0615 or so, maybe 0610.

22  I was sitting in that guard shack that you showed earlier.

23  When I say sitting in it, there's a chair with arms or perhaps

24  a swivel chair I sat in, with radios to my left and right.  But

25  the entrance was facing into the lobby.  So I sat there facing

1    into the lobby of the building.  And I remember a Marine came

2    down, a tall Marine came down.  He had sweats on, white or gray

3    sweats, sweatpants, sweatshirt.  And I said how are you doing,

4    devil dog.  Shooting the breeze.  We have three weeks to go

5    before we go home.  So we talked, you know, small talk for a

6    few minutes.  And the conversation kind of petered out.  It

7    probably didn't last three or four minutes.

8           And the very next thing that I heard was a very

9    loud -- off in the distance behind me I heard a noise, a pop, a

10   snap.  To this day I say it sounded like a two-by-four

11   breaking.  It was very loud but it was directly to my rear.

12   Initially of course I heard it and it caught my attention but I

13   must have said to myself, well, it's Sunday morning, 0630,

14   whatever.  You know, there had been construction throughout the

15   week behind us at the airport terminal.  You know, trucks came

16   out.  A lot of construction noise.  So I didn't really think

17   anything of it at first but within a few seconds it just made

18   me look over my left shoulder.

19   Q    And what happened next?

20   A    I looked over my shoulder and I saw -- if you look at that

21   picture, I saw a large yellow Mercedes truck at Position One

22   coming through an open gate and bouncing.  It was a curb there

23   that he bounced over.  As I looked at him I saw him bound

24   through that gate.  And I immediately turned back to my front

25   and I said out loud to myself, where the fuck did he come from.

1    And at that time I remember obviously -- I told myself I've got

2    to get a better look at this.  So I went to stand up because

3    the sandbags were, perhaps this side outside the plexiglas.

4         So I went to stand up with my .45.  My .45 caught on

5    the arm of the chair.  So I fiddled with it just for a second.

6    Stepped outside the guard shack which again is forward toward

7    the lobby.  Turned completely around and looked through the

8    plexiglas, and by that time the vehicle had reached Position

9    Two on this sketch which is about half the distance between

10   where I saw him first and myself.

11        At that position he was -- if you look at that sketch

12   you'll see to the left of that vehicle there's a vertical line

13   which was actually like an eight-inch pipe, metal or cast iron

14   pipe that was laid there for perhaps traffic coming in and out,

15   for whatever reason, but he came through that gate, went around

16   it to the right, which anybody would.  So he turned right

17   directly back towards -- straight at me.  So he was leaning.

18   When I looked at him a second time I saw the vehicle leaning

19   heavily, coming straight for me.

20   Q   Sergeant Russell, I want to back you up to when the truck

21   was at Position One coming towards the gates there.

22   A   Yes, sir.

23   Q   Would this photograph accurately reflect the view the

24   driver had of your guard shack at the time?

25   A   Yes, sir, it shows the open gate and the guard shack.

1            MR. GASKILL:  Your Honor, plaintiffs move to admit

2   what has been marked Plaintiffs' Exhibit Number 25 into

3   evidence.

4            THE COURT:  Received.

5                         (Plaintiffs' Exhibit No. 25

6                         was received in evidence)

7   BY MR. GASKILL:

8   Q    Let me put this back up.  So the truck is coming directly

9   towards you now.

10  A    Yes, sir.

11  Q    And how fast is it going?

12  A    He was moving pretty quick.  I can't say how fast he was

13  going.  He was moving pretty good.

14  Q    Did there come a point at which you could actually see the

15  driver inside the vehicle?

16  A    Yes, sir, I did.

17  Q    Can you describe him?

18  A    Perhaps 30 feet from me at Position Two, 30, 40 feet, but I

19  looked -- obviously the truck caught my attention right there

20  and I distinctively looked right at the driver's face.  He in

21  turned looked directly back at me.  We made eye contact and he

22  had what I call a shitty grin on his face.

23  Q    How old would you say he was?

24  A    No more than 25, mid-twenties.

25  Q    What was he wearing?

1   A    I remember a patterned shirt.  It could have been

2   camouflage.

3   Q    Okay.  What about the features of his face?

4   A    Dark skin.  What I mean is slightly darker than myself.

5   Middle Eastern.  He had a grubby -- perhaps what I call a

6   scrubby seven-day beard, not full beard but a scrubby seven-day

7   beard.  Mustache.  Curly black hair.

8   Q    Okay.  And at this time is the man in the sweatpants, the

9   Marine who was wearing sweatpants, is he still standing with

10  you at this time?

11  A    Yes, sir, he is.

12  Q    And what happened next?

13  A    You have to realize from beginning to end this happened

14  very quickly, but the second time at Position Two when I turned

15  around to fully look at the vehicle and we made eye contact

16  something snapped inside me and I immediately spun around and

17  turned quick, pointed at that Marine and pointed actually to

18  the east and I said get the fuck out of here.  That individual

19  took off.  I immediately at the same time started heading into

20  the lobby of the building.

21  Q    Where was the truck when you entered the lobby of the

22  building?

23  A    Right behind me.

24  Q    What position on this?

25  A    He was perhaps between two and three at that time.

1   Q    How close behind you?

2   A    20 feet, 30 feet.  No more.

3   Q    You said he was grinning.  Well, I say you say he was

4   grinning.  Can you describe your perception of that grin?

5   A    Again I call it a shitty grin.  Basically I got you.  He

6   had reached the point of no return, so to speak.  He had a

7   combat stance position, so to speak.  No matter what happened,

8   from that instant on he was coming at me.  A smile of success

9   you might say.

10  Q    Okay.  And what happened next?

11  A    Then again I told that Marine go.  I screamed at him.  He

12  was halfway gone anyway.  But I continued into the lobby of the

13  building and all I could think to do, and again I just reacted,

14  I did what I did, all I could think to do was put my head up

15  and scream perhaps three times, to hit the deck, to hit the

16  deck, to hit the deck.  And continued through the center of the

17  lobby, slightly at an angle to the right, and headed towards

18  the exit on the opposite side.

19  Q    And before he entered, did you attempt to halt the driver

20  at all?

21  A    No, no, sir.  No time.  It happened too fast.

22  Q    As a Marine Sergeant on guard duty -- how many times have

23  you performed guard duty on other occasions?

24  A    Many many many times.  I can't remember how many times.

25  Q    And as of October, 1983 did the rules of engagement still

1   apply to you as a guard?

2   A   Absolutely.

3   Q   And the rules of engagement for your firearm at that time,

4   what were they?

5   A   Well, in compound no one had a magazine in the weapon.   The

6   only ones that did, the only ones that were allowed to were the

7   Marines, for example, on Post Four, Five, 5A, Six and Seven on

8   the exterior post.   They were allowed to have a magazine in the

9   weapon.   We me as a sergeant guard I had a .45 at my side and

10   two .45 magazines on my left side.   The magazines had to stay

11   in the pouch.   My weapon was not loaded.

12   Q   What was your understanding of why you couldn't have a

13   magazine in the weapon in the guard shack?

14   A   Safety of people, number one.   And it wasn't combat.   It

15   was peacekeeper.

16   Q   Let me ask you this, you look over your shoulder, the truck

17   is coming into the building now at Position Three.

18   A   Yes, sir.

19   Q   What happened next?

20   A   What happened was I exited the lobby on the opposite side.

21   A few things happened at that instant, and I'm talking instant

22   in time.   Number one, I caught sight of a Marine on fire watch

23   from the motor pool directly outside the building, and there

24   was a two-foot tall concrete wall, and I remember pointing at

25   him get the fuck out.   I just yelled at him to get down which,

1    believe it or not, I saw him start to go down.  At the same

2    time I heard a loud noise behind me.  A very loud bang behind

3    me.  And as I'm turning slightly left to run into the open

4    parking lot and looked over my shoulder one more time again and

5    that's when that vehicle was basically at Position Three.  He

6    had just hit the guard shack, my guard shack.  He hit the

7    sandbags, the radios, the chair, every bit of it.  Came into

8    that lobby and then that same view -- I'm sorry.  And in that

9    same view it was like a wave on the ocean beach.  It was just a

10   pure beautiful wave of sand from the sandbags that came in.

11   Q   What did you believe based on your training as a Marine

12   Sergeant that this truck was going to do once he got inside?

13   A   He was attacking us.  I don't know how he was going to

14   attack us.  He was in a hearse.  Whether he was going to

15   explode, burn, whatever, would jump out and start shooting at

16   us, I have no idea.  Maybe he just intended to drive, run over

17   me.  I have no idea.

18   Q   Is it your testimony that you ran into the building that

19   you knew was about to be attacked?

20   A   Absolutely.  Yes, I did.

21   Q   What were you thinking?

22   A   I don't know.  Again, something snapped.  I turned,

23   reacted, told him to go, ran in, screamed.  I think the only

24   thing on my mind was to warn.  There was no time to do anything

25   about it.  Even, for example, if I had -- at that instant had

1    an antitank rocket in my hand and been able to blow up that

2    truck, he was coming in.   It was that close, that big, that

3    fast.   He was coming in.

4    Q    Can you briefly describe the building itself, please?

5    A    The building, four stories high.   I think they call it an

6    atrium-style building where you walk into the lobby and you

7    look up, and just as you do in this courtroom, basically you

8    see the roof of the building just this large, if not larger.

9    The second, third and fourth floors had balconies completely

10   surrounding around the building just like this ledge there.

11   And the rooms were there.   The rooms were located on the

12   exterior of the building itself.   So you walked in and four

13   stories up you saw the roof.   There were skylights.

14   Q    Was there anything significant in the lobby at all on the

15   day of the attack?

16   A    Well, significant to me and any Marine would be in the very

17   center of that lobby there was an American flag and a Marine

18   Corps flag crossed, six feet high or so.   Held up by sandbags.

19   And that's about all that was there.   There wasn't much there

20   at that time.

21   Q    So we have the truck now in Position Three.   And as the

22   truck moves to Position Four, what happens?

23   A    Okay.   After Position Three when I looked back and saw the

24   wave of debris come in I ran perhaps just not too many feet,

25   ten feet more, at best.   And looked back one last time and this

1   is when I saw -- the first thing I noticed was the vehicle came

2   to a stop.  As though the driver applied the brakes.  The

3   vehicle came to a stop.  And at the same time, perhaps

4   ceremoniously or otherwise, the flags went down.

5          I noticed a lot of damage to the truck in the front.

6   It was a split windshield.  The driver's side of the windshield

7   was damaged.  Smashed.  There was lot of damage to the upper

8   part of the cab over the head of the driver.  Perhaps in coming

9   in he obviously hit the guard shack and maybe the overhang of

10  the second floor.

11  Q   Sergeant Russell, you testified that the rooms were up

12  around the building.

13  A   Yes.

14  Q   The second, third and fourth floors?

15  A   Yes, they were.

16  Q   What if anything was the lobby of the building used for?

17  A   The lobby was primarily -- I know there had been a desk or

18  two in there.  At temporary times there may have been an office

19  or two temporarily set up, but it was used primarily for

20  storage of equipment.  Mainly what they call K-Rats.

21  Q   Does it come in a case?  How large is a case of K-Rats?

22  A   K-Rat, it was about this large and maybe this tall.  It was

23  an aluminum tray that was packed inside that they would put

24  into a steam machine.

25  Q   Where were these K-Rats located?

1   A    Prior to this they were stacked inside the lobby.   There

2   were quite of few of them in there.

3   Q    Would it have been possible for the truck to get to the

4   center of the building with those K-Rats there?

5   A    I don't think so.   There were a lot there.   They were quite

6   heavy.

7   Q    When were the K-Rats removed?

8   A    The day before.

9   Q    So the truck stops at Position Four.   Could the truck have

10   continued on if it wanted to?

11   A    Absolutely.   I mean other than the American flag and the

12   Marine Corps flag going down, there was nothing impeding its

13   travel.

14   Q    But you're looking back now at the front of the truck as

15   you run out of the building, is that right?

16   A    Yes, sir.

17   Q    And what happened next?

18   A    The next thing I saw was a bright flash, a yellow flame

19   that started at the lower left from my perspective, which would

20   have been the passenger side lower right of the front bumper.

21   It began very quickly, but the flame grew and spread diagonally

22   across directly over the driver's windshield.   The next thing I

23   felt was heat and confusion and that was it.   I was

24   unconscious.

25   Q    And what happened after you woke up?

79

1   A   I think I was out for about a minute, a minute and a half.

2   I woke up on my stomach.  I woke up on my stomach and I managed

3   to look up.  The first thing I did was look up and all I could

4   see was gray dust.  There was a very strong smell.  I saw gray,

5   and the smell was very strong.  I can say that my senses came

6   back rather quickly.  I saw gray dust.  And a little debris

7   directly in front of me was very dusty, very smoky.  So I

8   couldn't see past it.

9   Q   After you awoke you said your senses came back to you?

10  A   I got all my senses back.

11  Q   What were you smelling at that time?

12  A   I smelled some sort of explosive, and I have said all along

13  that the explosive smell I smelled was -- I don't think -- have

14  you ever heard of a thing called PETN?  If I can describe that.

15          My dad was a rock superintendent.  Blasting all his

16  life.  He used to load holes with dynamite and after the

17  dynamite was loaded they would pull bags of you might call it

18  pelletized like, you know, pellets of salt you put on ice or

19  whatever, and they put bags of this to fill the hole to the

20  very top.  I think it was PETN.  But it was called PETN.  And

21  again this is from my childhood.  And my dad would take me to

22  work, show me how the holes were drilled.  They would load the

23  holes, myself as a five or six-year old little kid, with the

24  old fashion wooden plunger block.  Bang.  That was the biggest

25  thrill in the world for me.

1   Q    And your dad let you blow up the rocks?

2   A    Yes, he did.  He was the rock superintendent.  But the

3   PETN -- the reason I say that is because after the blast, come

4   on, dad, I want to go see.  No, no, no, son.  He would tell me

5   stay where we are.  Because if you get the smoke from the PETN

6   it would give you a severe headache.  If you inhaled the smoke,

7   breathe it in, it would give you a severe headache.  So

8   everybody stayed away for quite sometime.  Ten to 15 minutes at

9   least, for it to dissipate.  Because it would give you a severe

10  headache.  But that PETN I can say to this day I remember the

11  smell.  A very burning, burnt explosive smell.  It smells -- C4

12  has a smell of its own.  Dynamite has its own smell.  PETN has

13  a smell of its own.  And I remember that smell.

14  Q    What was the first thing you saw and thought when you woke

15  up?

16  A    When I woke up I saw the debris in front of me and the very

17  first thing I said to myself is that son of a bitch did it.  He

18  fucking did it.  And then I said to myself out loud, if I light

19  a match this place is going up again.  Because the smell of the

20  explosive was so strong.

21  Q    Could you see anything at this time?

22  A    Only a couple of feet in front of me but not too quickly.

23  It was dissipating.  The cloud of dust and smoke.

24  Q    So when the cloud of dust and smoke eventually dissipated,

25  essentially what remained of this building, the four-story

1   building?

2   A   It was approximately a 15- to 20-foot pile of rubble to my

3   left.

4   Q   And what did you hear at this time?

5   A   Excuse me.  The very first thing I heard was a black Marine

6   screaming for help.  Help me.

7   Q   I'm sorry.

8   A   He was screaming for help.  Help me.  Dear God, somebody

9   help me.  I could hear him right to my left.  Through a large

10  crack in what was the roof of the building.  It was so clear.

11  Q   He was asking for --

12  A   It was so clear and so distinct.  I knew it was a black

13  Marine.  I could tell.  It was a black Marine.

14  Q   Did you move to help him?

15  A   Instinctively.  I remember trying to move in that

16  direction.  I couldn't move.  I was -- I couldn't move.  I'm

17  sorry.  Somehow shortly after that within a few seconds or so,

18  I don't know how I did it, I managed to roll on to my back.  At

19  that time it had cleared up pretty good.  I could see a lot.

20  And the first thing I told myself was I've got to get up,

21  somehow sit myself up or whatever.  I've got to see what's

22  happened here.  No one was moving.  No one was around actually.

23  I couldn't see anybody else.  And again this is not a very long

24  time after the explosion.  So the first thing I did was to get

25  up on my elbows, so to speak.  I'm laying on my back and I get

1  up on my elbows and I look down and why couldn't I move ,for

2  one.  My left foot was reversed.

3  Q    What do you mean your left foot was reversed?

4  A    I thought it was gone but it was still pointing to the

5  ground and I looked at my left hand up beside me and it looked

6  like it had been pulled apart.  I was trying evaluate myself.

7  Why couldn't I move.  Why couldn't I respond.  But anyway --

8  Q    Do you remember clearly looking at your hand?

9  A    Yes, I do.

10  Q    Describe your hand.

11  A    It was split on both sides and the palm was basically

12  hanging, it looked worse than it was, but it was oozing pus.

13  And by now I had all my senses.  I could smell explosives.  I

14  could hear cries.  I could see what was going on clearly.  And

15  I could smell blood.  I had all my senses.  And I could feel

16  pain, severe pain, stinging, numbness, from the waist down.

17  Q    Sergeant Russell, how many voices did you hear pleading for

18  help in this commotion?

19  A    If I had to say honestly, three or four.  Not for long.

20  Q    And how long after the blast did you hear people screaming

21  for help?

22  A    Honestly, two or three minutes.  Two or three minutes.  I

23  heard no voices after that.  I think the only other thing I

24  heard after that was what I think was perhaps rounds going off

25  inside the building.  That's when help arrived.

83

1    Q    So two to three minutes later there was silence and you

2    didn't hear those voices again?

3    A    I still hear them quite often, every day.  But they only

4    lasted a few minutes.

5    Q    How did you get out of that immediate area that day?

6    A    I think I was very fortunate.  Immediately after that, a

7    few seconds had passed, as I was looking down which was now

8    looking east, there was a stairway leading down to the gravel

9    parking lot behind our now gone building and there was a Marine

10   Major, I don't remember his name, and in TOW we had two medical

11   corpsmen and I know that the instant his foot hit the bottom

12   step he turned and looked and we made eye contact and he

13   pointed and told his corpsman to get over there.  I was the

14   very first one attended to.  I was very fortunate.  I think

15   they saved my life.

16   Q    Where did they take you?

17   A    They took me -- if you look at that picture north of Post

18   Five, there was a Post Four.  That's where they put me on a

19   cart, eventually put me on a cart.  Actually that's Post Five,

20   I'm sorry.  If you move that.  Post Four was actually more to

21   the east.  Yes, there you go, there's Post Four.  I was moved

22   up there with a cart within a few others, within approximately

23   ten to 15 minutes.

24   Q    How many other victims did you see at that point?

25   A    At that point?

1   Q   Yes.

2   A   No more than four or five.

3   Q   And where did you go after that?

4   A   We went over to a two and a half ton truck, brought into

5   the MAU infirmary.  Brought inside.  I remember they put me up

6   against the wall just inside the door.  I was one of the first

7   ones in there and I stayed in there for perhaps 25, 35 minutes

8   as they kept bringing them in.

9   Q   Did you see any more victims at that point?

10  A   Yes, I did.

11  Q   How many?

12  A   Perhaps another dozen at least.

13  Q   Did you get a good look at one of them?

14  A   One in particular, yes, I did.

15  Q   Would you describe that person?

16  A   Lying on my back, over my shoulder I heard some severe

17  moaning.  He was bleeding on a cot.  He didn't have a back, but

18  he was bleeding.  He had no back.  He was breathing erratically

19  in gasps.  He was moaning.  And he -- it stopped.  That was

20  about it.  25, 30 minutes or so.

21  Q   Sergeant Russell, you obviously had some severe physical

22  injuries as a result of this blast, but right now I want to

23  focus on what if any psychological issues you have dealt with

24  as a result of this bombing?

25  A   Post-traumatic stress disorder.  I'm on medication.  I

1   haven't slept with my wife in years.  I can't.

2   Q    Why is that?

3   A    Too violent.  I sleep on the floor.  I sleep in front of

4   the fireplace.

5   Q    What kind of emotions have you been dealing with lately?

6   A    The last couple of days have been hard.  On any given day,

7   sometimes more often than not -- excuse me, a sound, a sight or

8   smell brings it right back.  I've noticed that my memory has

9   dissipated quite a bit lately with my age, but this day is as

10  clear as it was as if it happened this morning.

11  Q    What if any psychological medications are you taking now?

12  A    I'm on fluoxetine, which is Prozac, and I take hydroxyzine

13  to sleep, which doesn't do any good.

14  Q    Will any of these meds -- do you have any reason to believe

15  that any of these medications will affect your ability to

16  remember and testify accurately as to what happened on October

17  23rd, 1983?

18  A    No, sir, not one bit.  No, sir.  It's burned in my memory

19  every second, in color.  It's there.

20          MR. GASKILL:  Your Honor, I would like to ask Mr.

21  Russell just one more question and it's kind of a non-specific

22  question, but I'll ask the Court's indulgence to allow him to

23  answer this.

24          THE COURT:  All right.

25  BY MR. GASKILL:

1   Sergeant Russell, recognizing that you may not have the

2   opportunity to see these family members again, what if anything

3   would you like to say and tell them about that day?

4   A   I don't know how to put it into words.  I'm sorry.  A few

5   people had pointed fingers at me.  I could have done something

6   else.  I'm sorry I was there.  It happened too fast, as I just

7   explained.  Nothing could have been done to stop it.  I hope

8   I've done some good today.  And if I step down right now and

9   drop dead I'd be happy, because I've been a good Marine.

10          (Applause)

11          MR. GASKILL:  No further questions, Your Honor.

12          THE COURT:  We'll take our afternoon recess.

13          (Recess)

14          MR. FAY:  Your Honor, at point we would present the

15   testimony of Dr. Reuven Paz by videotape deposition.

16          THE COURT:  All right, you may proceed.

17          MR. FAY:  We have a little mouse on the screen.  I

18   don't know how we'll get rid of it.

19          THE DEPUTY CLERK:  That's as much as you can do.

20          MR. FAY:  That's all I can do.  I think the mouse will

21   watch too.  Thank you.

22          (Videotape deposition of Dr. Reuven Paz played)

23          (On the videotape deposition Mr. Fay asked that he be

24   qualified to testify as an expert witness and render an opinion

25   on Islamic terrorists groups)

1          THE COURT:  I agree, and you may proceed.

2          (Videotape deposition of Dr. Reuven Paz resumed)

3          MR. FAY:  Thank you, Your Honor.  That concludes our

4    testimony for today.  We'll be able to start tomorrow at --

5          THE COURT:  Why don't you approach the bench and let

6    go over the exhibits.

7          (Bench Conference)

8          THE COURT:  Do you have one for Professor Paz?

9          MR. FAY:  I think I'm mixed up.

10         THE COURT:  On the record I received Seven under seal

11   as the CV.

12         MR. FAY:  Yes, that's right.  That should be Five and

13   this should be Seven.

14         THE COURT:  So the identification of the exhibit for

15   Admiral Lyons should be Five, Plaintiffs' Exhibit Five

16   submitted in camera, instead of Seven.

17         MR. FAY:  Correct, Your Honor.

18         THE COURT:  Okay.

19         MR. FAY:  Number Seven.

20         THE COURT:  And this is Number Five, that should be

21   Seven.  And then Plaintiffs' Ten was the rules of engagement

22   that I received.

23         MR. FAY:  Yes.  We have the deposition --

24         THE COURT:  Yes.  Now, are those marked?  The first

25   video was -- how was it marked?

1        MR. FAY:  Yes, I have an envelope to put it in.

2        THE COURT:  Okay.  My concern is we'll have a

3   different court reporter tomorrow.  She's going to have to have

4   the exhibit numbers of the videos that were played when she

5   inserts them.

6        MR. FAY:  This is the only one that has to be held

7   under seal.  Number Six.

8        THE COURT:  Okay.  And which is that?

9        MR. FAY:  Number Six, Your Honor, it's the videotape

10  of Mahmoud-Salam.

11       THE COURT:  Okay.  And what are you providing me in

12  camera that has actual identification?

13       MR. FAY:  You mean of Mr. Mahmoud?

14       THE COURT:  Right.

15       MR. FAY:  That is the deposition notice.  I have to

16  bring it tomorrow.

17       THE COURT:  But that's not identified.

18       MR. FAY:  It's not identified.

19       THE COURT:  This is an actual deposition.

20       MR. FAY:  Yes.

21       THE COURT:  All right.  And then what was the first

22  video you played?

23       MR. FAY:  That was just an introductory video.  I

24  didn't mark that, but I can.

25       THE COURT:  I think we ought to mark that if you want

1    to preserve this as well.  Whatever the next number is.

2            THE DEPUTY CLERK:  27 would be next.

3            THE COURT:  So it would be Plaintiffs' 27?

4            MR. FAY:  Yes.

5            THE COURT:  That would be that first video that we

6    made with Colonel Geraghty.

7            MR. FAY:  Yes.

8            THE COURT:  And then Robert Baer, what is his

9    deposition?

10           MR. FAY:  I don't have it marked as an exhibit.  I'll

11   give it the next number.

12           THE DEPUTY CLERK:  28.

13           THE COURT:  28.  And then the next one played would be

14   Dr. Paz?

15           MR. FAY:  Yes, Your Honor.

16           THE COURT:  And you'll mark that 29?

17           MR. FAY:  Yes, Your Honor.

18           THE COURT:  And then -- because the Mahmoud-Salam is

19   marked Plaintiffs' Six.

20           MR. FAY:  Yes.

21           THE COURT:  Okay.  Now -- and then all the -- let's

22   see, the one item that I'm not sure was moved in was

23   Plaintiffs' 23 which is a photograph.  Let me ask the clerk if

24   his record shows that it was received.

25           THE DEPUTY CLERK:  It does not show that, Your Honor.

1          MR. FAY:  23 is a photograph.

2          THE COURT:  It was identified, and I'll receive 23 as

3    well.

4          MR. FAY:  Okay.

5                         (Plaintiffs' Exhibit No. 23

6                          was received in evidence)

7          THE COURT:  And I've received 24, 25, 26.  All right.

8    Any others?

9          MR. FAY:  I move in 23 as well.

10          THE COURT:  Obviously.  Any others?

11          MR. FAY:  I believe that was the photograph of the

12   building after the destruction.

13          THE COURT:  Yes.  Before we break in open Court, do

14   you want to give me a preview of tomorrow?

15          MR. FAY:  Yes, Your Honor.  Incidentally, I'm going to

16   have this marked as the next exhibit, which is 30.  That's just

17   the un translated Mahmoud deposition.  So --

18          THE COURT:  So it should be under seal, too.

19          MR. FAY:  Yes, and it should be under seal, too.

20          THE COURT:  All right.

21          MR. FAY:  Thank you.

22          (Bench Conference concluded)

23          THE COURT:  All right.  If we could have order in the

24   Court.

25          Mr. Fay, would you give me a preview then of what

1   you're expecting to do when we proceed tomorrow?

2        MR. FAY:  Your Honor, tomorrow we have scheduled

3   testimony from Danny Defenbaugh. Danny Defenbaugh was the agent

4   in charge of the forensic part of the FBI investigation of this

5   occurrence.  There are a number of photographs he has.  He

6   gives an expert conclusion and so forth.

7        Next we have Warren Parker.  Mr. Parker is an expert

8   in explosives.  He was trained by the Army, spent 20 some years

9   in the Army, and then spent around another 20 years as an

10  expert with Alcohol, Tobacco & Firearms with the Treasury

11  Department.  And he will testify with regard to his conclusions

12  regarding the explosions and so forth.

13       Both of them will indicate, contrary to what the

14  television announcer, probably without much information at the

15  time, said was 2000 pounds.  Their conclusion is that it was

16  about 21,000 pounds of explosives used in this explosion which

17  would make it the largest non-nuclear explosion on the earth.

18  On the record at least.

19       Next we will have testimony from Lieutenant Colonel

20  Howard Gerlach who is the Commander of Battalion Landing Team

21  1-8.

22       THE COURT:  Defenbaugh and Parker both went to the

23  scene at the time?

24       MR. FAY:  Well, Parker did not but Defenbaugh did,

25  Your Honor.  Parker will testify from the records.  He's

1    reviewed extensive records.  There are a number of physical

2    findings of people on the scene that he's reviewed, such as

3    objects thrown away from the scene during the course of the

4    explosion from which he can come to a conclusion, give an

5    opinion as to the strength of the explosive.

6           THE COURT:  Okay.

7           MR. FAY:  Then Debbie Peterson --

8           THE COURT:  Gerlach was the relief force?

9           MR. FAY:  No, Lieutenant Gerlach was in charge of 1-8

10   Battalion Landing Team that was in the sector that was bombed.

11          THE COURT:  Oh.  Okay.

12          MR. FAY:  And he is here to testify.  He's here today

13   also.  And then there will be testimony from Debbie Peterson

14   and Lynn Smith Derbyshire, sisters of two Marines who died in

15   the assault.  And finally we end up with testimony from Michael

16   Ledeen who was the Special Assistant to the Secretary of State

17   at that time, with regard to the political objectives and

18   course being followed by Iran.  And then testimony finally by

19   Dr. Patrick Clawson with regard to Iran, the way it was

20   organized and so forth.

21          THE COURT:  Okay.  All right.  Anything else you need

22   to raise today?

23          MR. FAY:  Not today, Your Honor.  Thank you.

24          THE COURT:  All right.  The Court will be in recess

25   until ten o'clock tomorrow.

93

1          MR. FAY:  Thank you, Your Honor.

2          THE COURT:  Thank you very much.

3          For those of you unable to return tomorrow, thank you

4  for your attention and your quietness today.  I appreciate it

5  and I'll see you back tomorrow morning.

6          (Proceedings recessed at 4:40 p.m., to resume on March

7  18, 2003 at 10:00 a.m.)

8                    CERTIFICATE OF REPORTER

9  I certify that the foregoing is a correct transcription from

10 the record of proceedings in the above-entitled matter.

11                    _____

12                         Official Court Reporter