UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEBORAH D. PETERSON,
Personal Representative
of the Estate of
James C. Knipple (Deceased), et al

Plaintiffs

v.                                              Civil Action# 1:01CV02094(RCL)

THE ISLAMIC REPUBLIC OF IRAN, et al.

Defendants

## REPORT OF SPECIAL MASTER PURSUANT TO ORDER OF REFERENCE CONCERNING COUNTS CCXXIX-CCXXXII

In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below. This is an action for wrongful death resulting from an act of state sponsored terrorism on the part of the Defendants and their agents occurring on and prior to the 23rd day of October 1983 at the Beirut, Lebanon United States Marine Barracks.

The following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence and have been established by clear and convincing documentary evidence and testimony.

1. James Langon IV was born May 11, 1963, in the United States of America and, as at birth, and so remained until his death, a citizen of the United States of America.

2. James Langon III has been duly appointed the personal representatives of the estate of James Langon IV, deceased, for the purpose of this lawsuit.

3. On October 23, 1983, the Decedent was a member of the United States Marines having enlisted on July 20, 1981, and was stationed in Beirut, Lebanon.

4. On October 23, 1983, the Marine Barracks building housing the Decedent's Marine Battalion in Beirut was attacked by a suicide bomber who was driving a truck which penetrated to the center of the building where the truck, which was carrying a large quantity of explosives, detonated, collapsing the building resulting in the deaths of 241 American personnel, including the Decedent.

5. As a result of the explosion, Decedent, James Langon IV, suffered severe injuries which resulted in his death.

6. The official service death certificate (report of casualty), admitted as an official record and marked as exhibit "2" at the depositions held herein indicated that the death of the Decedent was due to a terrorist attack at Beirut, Lebanon on October 23, 1983.

7. There is no evidence from which the Special Master can make a finding that the Decedent suffered bodily pain or suffering as a result of his injuries.

8. As a result of the death of James Langon IV, his estate suffered a loss of accretions to the estate which could have been expected to occur during the course

of his anticipated life. The said losses are the subject of a report under oath from Dr. Jerome Paige and are supported by Dr. Paige's testimony given in this matter by videotape. The report and the supporting calculations have been reduced by Dr. Paige to present value in accordance with <u>District of Columbia V. Barritaeu,</u> 399 A. 2d563(D.C. App. 1979). Based upon the foregoing, the amount of loss to the estate is in the amount of One Million, Sixty Six Thousand, Nine Hundred and Three ($1,066,903) Dollars as reduced to present value.

9. As a result of the death of James Langon IV, his father has suffered and will continue to suffer severe mental anguish and the loss of society. The testimony has clearly established that he has never recovered from the shock of his loss. The emotional trauma he sustained is permanent and significant.

### James J. Langon III

James Langon III testified about the relationship he had with his son, James Langon IV, and the effect this son's death has had on him.

James III and his wife at the time separated when James IV was eight years old. For most of the next decade, James IV spent the week with his mother and the weekend with his father. When he was in high school, this pattern changed because he had friends and was developing a social life of his own. James attended two different elementary schools and attended Piscataway High School, where his mother was a teacher. His father was a teacher at another high school.

James III describes his son as compassionate from an early age, caring

especially about animals and the environment. The two liked to go camping on the weekends. James made a point of taking his son to visit extended family as well because he wanted his son to know that he still had extended family, even though his immediate family was no longer intact.

James believes his son's grades in high school were partially a rebellion against his parents, who were both teachers. His son's grades did not reflect his ability. James IV was, however, very talented musically. He had played the trumpet from age nine and took private lessons in high school. James IV had good friends in high school in the band. They played together during the summers as a quartet. He and his best friend joined the service together, but his friend didn't make it past Parris Island. He played in concert and marching band in high school. James IV expressed interest in Johnson and Wales College. He wanted to study cooking. Later on, he expressed interest as well in Monmouth College or Rutgers.

James IV had a tough time in high school. James III had taken his son to a counselor who said James IV was looking for a connected family. James IV pointed out to his father that the Marines are like a family in many respects. In this context, James III understood his son's choice to join the Marine Corps, even though he was not very happy with it. James IV joined the Marine Corps before he got his high school diploma. He finished his GED while he was in Spain.

James III was proud of his son. He had applied himself in boot camp and had benefited for it. He was confident and appeared more grown up. After

graduation, James IV went to the Mediterranean several times. He was sent to Beirut in 1983. James III dreaded the thought of his son going to a war zone. He wanted his son to audition for the Marine Corps Band. His son put it off again and again and gave his father excuses. He finally told his father that he couldn't do it. He didn't want to use his skills to get out of going to Beirut and leave his friends to go into a dangerous situation. He felt like he would be deserting them. When James III was in Beirut, one of the fleet bands played for his group. He wrote to his father and said he could have hung with those guys.

James' MOS was as a cook. In Beirut, James IV wrote to his family about how the people in Lebanon loved the American troops. He also wrote about how all the buildings in the city were bombed out. The different factions seemed to be fighting over nothing and for no reason. As James pointed out, the people who had started the conflict were all dead. In September, 1983, he wrote to his father and described how he had seen one of his friends hit by a rocket. He wrote he had learned about himself, but disapproved of their mission in Beirut. He felt that the American Marines were dying for no real reason. He urged his father and stepmother to have faith that he would come back alive.

James urged his family to write to him and tell him about the good things that were happening back home. He wanted to know that his family was alright and that they were happy. James III enjoyed getting letters from his son. Receiving those letters and the one time James IV found a phone booth in Greece on R&R and called his parents were highlights for James III.

James IV, writing to his grandmother, conveyed that he was living in a bombed out Ramada Inn and it was very hot. He was bored. There was nothing to do but work, sleep and ponder.

James had fallen asleep in front of the TV on October 22nd, 1983. When he woke up the next morning, the news about the bombing was on. He had a horrible feeling that something was wrong. He had to go to church and be godfather to his brother's second child. Throughout the service, he was holding the small child feeling like he was falling apart inside. Early the next morning, a Warrant Officer from the Marine Corps knocked on his door and informed him that James IV was dead. James screamed. James felt like he had been cut down the middle, bisected with a large sword.

For a long time, James felt like his life had no meaning. He felt like, whoever he had been, he wasn't that person any more. He found it impossible to go back to work. He drank more than he had and started smoking again. When he did go back to work, he found it helpful because it kept him occupied. He didn't think about his son so much. James feels his son's death contributed to the end of his second marriage. James had to agree with his wife that he wasn't emotionally supportive after his son's death. He still feels withdrawn sometimes.

After the bombing, James IV was the first casualty released in the New York area. One of the other cooks in James IV's unit wrote to James III after the bombing, explaining how he and James IV were close and how he had only missed the bombing because he had been injured in a bombing earlier and was on

the ship receiving medical treatment. James III received several condolence calls from parents of other Marines after the bombing.

James has participated in celebrations and remembrances such as the dedication of the Beirut Veterans Memorial. It is painful to do so, but he feels it is good for him and for the other parents.

James had always felt, like his father and grandfather felt, a part of him would outlive him in his son. He felt a part of himself died when James IV died in Beirut. He always saw something of himself in his son. He feels any damages he collects in this case will be inadequate as compensation to replace his son. No amount of money can replace his son. He still carries the letters his son wrote him from Beirut. He thought he lost them once and he felt irresponsible, like he was letting his son down. He eventually found the letters and he cried. His son's letters have far more value to him than any amount of money.

## CONCLUSIONS OF LAW

1.  Wrongful Death.

The Plaintiffs have provided comprehensive testimony from the expert, Dr. Jerome Paige, clearly detailing the loss of accretions to the estate of each person. These calculations are detailed and supported by the evidence set forth in the report whose summary page is annexed to this report and have been established pursuant to sound guidelines without question. The Special Master concludes as a

matter of law that judgment should be entered for this element of damages for the estate of James Langon IV in the amount of One Million, Sixty Six Thousand, Nine Hundred and Three ($1,066,903) Dollars.

2. Survival Action-Pain and Suffering.

There is no evidence from which the Special Master can conclude that the Decedent endured bodily pain and suffering after the attack and prior to his death.

3. Solatium.

The Foreign Sovereign Immunities Act provides for an award for solatium consisting of emotional injury inflicted upon persons other than the decedent by the actions of the Defendants and/or their agents. The Court in the Flatow case stated that this is an item of damages which belongs to the individual heirs personally for the injuries to the feelings and the loss of the decedent's comfort, support and society. The unexpected quality of death and its emotional impact may be taken into consideration in gauging the emotional impact to those left behind. In the present case, the impact upon the surviving family was profound and is permanent. The Special Master concludes as a matter of law that Five Million ($5,000,000) Dollars is an appropriate amount of compensation for James Langon III, father of the Decedent.

Date June 7 2006

Special Master  Jeffrey G. Mankewich