**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
DEBORAH D. PETERSON,                 )
Personal Representative                       )
of the Estate of James C. Knipple (Dec.), et al.,  )
                                                    )
                          Plaintiffs,            )
               v.                                  )          consolidated civil actions
                                                    )          01CV02094 (RCL)
ISLAMIC REPUBLIC OF IRAN, et al.,  )          01CV02684 (RCL)
                                                    )
                          Defendants.          )
_____)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**REGARDING CAUSES OF ACTION**
**AND EVIDENCE REGARDING DAMAGES**

## I.    INTRODUCTION

Due to the large number of Plaintiffs involved in this case, the Court split these proceedings into two phases:  one phase for the liability trial and one phase to present proof of damages.  On May 30, 2003, this Court issued a decision that found the Islamic Republic of Iran and the Iranian Ministry of Information and Security civilly liable for the wrongful deaths, and physical and emotional injuries caused by the detonation of an enormous suicide-truck-bomb and the consequential destruction of the Marines barracks in Beirut, Lebanon on October 23, 1983.[1]  Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46 (D.D.C. 2003).[2]  Iranian responsibility derived from their government's general role in training, organizing, and funding Hezbollah, the terrorist militia that carried out the suicide attack, and for their government's specific role in directing and organizing the attack itself.

The Court thereafter appointed special masters to hold damages hearings and gather evidence.  The special masters have now completed the damages hearings and issued a report and recommendation for each of the over 800 Plaintiffs in the two consolidated cases, Peterson v. Islamic Republic of Iran, 01-cv-2094-RCL and Boulos v. Islamic Republic of Iran, 01-cv-2684-RCL.  The Plaintiffs submit this memorandum to both furnish the Court with the law to support the causes of action asserted by each Plaintiff and to direct the Court to the relevant special master's report that supports each Plaintiff's claim for damages.  In each section that describes a cause of action, each

---

[1]  "They did not make war.  They were simply victims of war, in an honorable attempt to keep the peace.  The gift of these men was of the ultimate quality and we know that it was of such value that it cannot be given again."  Beirut-Memorial On Line cover page, http://www.beirut-memorial.org/ (last visited October 25, 2006).

[2]  A decision in a related proceeding issued on March 27, 2006.  Prevatt v. Islamic Republic of Iran, 421 F. Supp. 2d 152, 156 (D.D.C. 2006).

Plaintiff able to assert the cause of action has been identified, along with a citation to the relevant special master's report and recommendation and its docket number.

## II.     THE FORUM'S CHOICE-OF-LAW RULES REQUIRE THE USE OF THE STATE COMMON LAW OF THE PLAINTIFFS' DOMICILE AT THE TIME OF THE ATTACK

The statutory language of the FSIA compels the usage of the same choice-of-law provisions as would be used in litigation against a private party, rather than a foreign state.  28 U.S.C. § 1606.

The District of Columbia, the forum state here, utilizes choice-of-law principles that analyze the "'governmental interests', under which [the court] evaluate[s] the governmental policies underlying the applicable laws and determine[s] which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review."  District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995).

The law of the forum, the District of Columbia, therefore provides the operative choice-of-law analysis for this case.  Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 69 (D.D.C. 2006).  The District of Columbia choice-of-law rules employ "a refined government interest analysis under which courts 'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review.'"  Id.  (citing to Hercules & Co. v. Shama Rest. Corp., 566 A.2d 31, 41 (D.C. 1989)).  The recent decisions that have analyzed the application of the D.C. choice-of-law rules to cases brought under 28 U.S.C. § 1605(a)(7) have routinely drawn upon the state common law of the plaintiff's domicile at the time of the attack.  E.g., Damarrell v. Islamic Republic of

<u>Iran</u>, 2005 U.S. Dist. LEXIS 5343 at *57-67 (D.D.C. March 29, 2005).   Plaintiffs therefore present the Court with evidence below of each Plaintiff's domicile on the morning of October 23, 1983 as well as the law from that domicile for each Plaintiff's cause of action.

There are three categories of plaintiffs arising from this bombing attack:  1) the estates of those murdered in the attack, 2) the physically and emotionally injured survivors of the attack and 3) the emotionally injured family members of the first two categories.  <u>See id.</u> at *66-67.  The cause of action for the estates of those murdered in the attack will be provided by the domicile of their residence at the time of the attack.  <u>Id.</u> at *67-68.  The cause of action for the physically injured survivors will also be provided by the domicile of their residence at the time of the attack.  <u>Id.</u> at *67, 70.  The cause of action for the emotionally injured family members will also be provided by the domicile of their residence at the time of the attack.  <u>Id.</u> at *70.  The applicable states and the relevant causes of action are identified below.

### III.   THE WRONGFUL DEATH CAUSE OF ACTION FOR THE UNITED STATES SERVICEMEN KILLED IN THE IRANIAN BOMBING OF THE MARINE BARRACKS IN BEIRUT IS PROVIDED BY THE STATE COMMON LAW OF THE DECEDENT'S DOMICILE AT THE TIME OF THE ATTACK

As discussed above, the state of the victim's domicile at the time of the bombing provides the law that informs the wrongful death cause of action.  Causes of action for wrongful death and survival actions have been asserted for those murdered by Defendants on October 23, 1983.  Decedents in this case were all domiciled in the following states:  California, North Carolina, Oklahoma, Pennsylvania, South Carolina and Texas.  Each decedent was murdered as a result of an intentional act by the Defendants and their

agents.  <u>Peterson</u>, 264 F. Supp. 2d at 61.  The wrongful death and survival cause of action

from each state is described below.

## A.   THE WRONGFUL DEATH CAUSE OF ACTION FROM CALIFORNIA

Decedent Michael Gorchinski was domiciled in the state of California at the time

of his unfortunate death.  (See Master Report at docket number 185, based upon counts

CXLI-CXLIV in the amended complaint filed April 24, 2006).

Under California law a wrongful death cause of action is separate and distinct

from a survival action.  "Unlike a wrongful death cause of action, a survival cause of

action is not a new cause of action that vests in heirs on the death of the decedent, rather

it is a separate and distinct cause of action which belonged to the decedent before death

but, by statute, survives that event."  <u>Moore v. County of Kern</u>, 2006 U.S. Dist. LEXIS

56428 at *19 (E.D. Cal. 2006) (citing to <u>Grant v. McAuliffe</u>, 264 P.2d 944 (Cal. 1953)).

The damages available under a wrongful death cause of action include "damages may be

awarded that, under all the circumstances of the case, may be just but may not include

damages recoverable under Section 377.34."  Cal. Code Civ. Pro. § 377.61.  These

damages include:

- pecuniary losses, which are "financial benefits the survivors were receiving from the decedent at the time of death and those reasonably to be expected in the future."  <u>Smallwood v. American Trading & Transp. Co.</u>, 839 F. Supp. 1377, 1388 (N.D. Cal. 1993) (citing <u>Cervantes v. Maco Gas Co.</u>, 2 Cal. Rptr. 75 (Cal. Ct. App. 1960)).

- and non-pecuniary losses such as "'loss of the society, comfort, care and protection afforded by the decedent.'"  <u>Smallwood</u>, 839 F. Supp. at 1388 (citing <u>Krouse v. Graham</u>, 562 P.2d 1022 (Cal. 1977)).  Recoverable non-pecuniary losses include "love, companionship, comfort, affection, society, solace or moral support, loss of enjoyment of sexual relations, [and] loss of physical assistance in

the operation or maintenance of the home." <u>Ledger v. Tippitt</u>, 210 Cal. Rptr. 814 (Cal. Ct. App. 1985).

The damages provided for by Cal. Code Civ. Pro. § 377.34 are those available under a survival cause of action, which include:

> In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement.

The damages described above are available to the estate of Michael Gorchinski and his survivors.

## B.   THE WRONGFUL DEATH CAUSE OF ACTION FROM NORTH CAROLINA

The following decedents were domiciled in North Carolina at the time of their unfortunate deaths:  Abbott, Estate of Terry (see Master Report at docket number 182, based upon counts (V-VIII (5-8) in the amended complaint filed April 24, 2006), Allman, Estate of John Robert (see Master Report at docket number 55, based upon counts (IX-XII (9-12) in the amended complaint filed April 24, 2006), Bates, Estate of Ronny (see Master Report at docket number 123, based upon counts (XIII-XVI (13-16) in the amended complaint filed April 24, 2006), Baynard, Estate of James (see Master Report at docket number 56, based upon counts (XVII-XX (17-20) in the amended complaint filed April 24, 2006), Beamon, Estate of Jess (see Master Report at docket number 58, based upon counts (XXI-XXIV (21-24) in the amended complaint filed April 24, 2006), Belmer, Estate of Alvin (see Master Report at docket number 145, based upon counts (XXV-XXVIII (25-28) in the amended complaint filed April 24, 2006), Blankenship,

Estate of Richard (see Master Report at docket number 95 and 208, based upon counts (XXIX-XXXII (29-32) in the amended complaint filed April 24, 2006), Blocker, Estate of John W. (see Master Report at docket number 57, based upon counts (XXXIII-XXXVI (33-36) in the amended complaint filed April 24, 2006), Boccia, Estate of Joseph, Jr. (see Master Report at docket number 191 (XXXVII-XL (37-40) in the amended complaint filed April 24, 2006), Bohannon, Estate of Leon, Jr. (see Master Report at docket number 159, based upon counts (XLI-XLIV (41-44) in the amended complaint filed April 24, 2006), Bonk, Estate of John, Jr. (see Master Report at docket number 96, based upon counts (XLV-XLVIII (45-48) in the amended complaint filed April 24, 2006), Boulos, Estate of Jeffrey (see Master Report at docket number 34 in <u>Boulos v. Islamic Republic of Iran</u>, 01-cv-02684-RCL, based upon counts (I-IV (1-4) in the complaint filed on December 28, 2001), Boyett, Estate of John Norman (see Master Report at docket numbers 97, 110 based upon counts (CDLXXXI-CDLXXXIV (481-484) in the amended complaint filed April 24, 2006), Burley, Estate of William (see Master Report at docket number 35 in <u>Boulos v. Islamic Republic of Iran</u>, 01-cv-02684-RCL, based upon counts (V-VIII (5-8), in the amended complaint filed April 24, 2006), Callahan, Estate of Paul Lynn (see Master Report at docket number 173, based upon counts (XLIX-LII (49-52) in the amended complaint filed April 24, 2006), Camara, Estate of Mecot (see Master Report at docket number 190, based upon counts (LIII-LVI (53-56) in the amended complaint filed April 24, 2006), Campus, Estate of Bradley (see Master Report at docket number 133, based upon counts (LVII-LX (57-60) in the amended complaint filed April 24, 2006), Ceasar, Estate of Johnnie (see Master Report at docket number 98, based upon counts (LXI-LXIV (61-64) in the amended complaint filed April 24, 2006), Conley,

Estate of Robert Allen (see Master Report at docket number 91, based upon counts (LXV-LXVIII (65-68) in the amended complaint filed April 24, 2006), Cook, Estate of Charles Dennis (see Master Report at docket number 89, based upon counts (LXIX-LXXXII (69-72) in the amended complaint filed April 24, 2006), Copeland, Estate of Johnny Len (see Master Report at docket number 88l, based upon counts (LXXIII-LXXVI (73-76) in the amended complaint filed April 24, 2006), Cosner, Estate of David (see Master Report at docket number 183 and 212, based upon counts (LXXXI-LXXXIV (81-84) in the amended complaint filed April 24, 2006), Coulman, Estate of  Kevin (see Master Report at docket number 160, based upon counts (LXXVII-LXXXX(77-80) in the amended complaint filed April 24, 2006), Crudale, Estate of Rick Robert (see Master Report at docket number 134, based upon counts (LXXXV-LXXXVIII (85-88) in the amended complaint filed April 24, 2006), Cyzick, Estate of Russell (see Master Report at docket number 124 and 209, based upon counts (LXXXIX-XCII (89-92) in the amended complaint filed April 24, 2006), Devlin, Estate of Michael J. (see Master Report at docket number 135, based upon counts (XCIII-XCVI (93-96) in the amended complaint filed April 24, 2006), Dorsey, Estate of Nathaniel G. (see Master Report at docket number 87, based upon counts (XCVII-C (97-100) in the amended complaint filed April 24, 2006), Dunnigan, Estate of Timothy (see Master Report at docket number 184, based upon counts (CI-CIV (101-104) in the amended complaint filed April 24, 2006), Earle, Estate of Bryan L. (see Master Report at docket number 175, based upon counts (CV-CVII (105-108) in the amended complaint filed April 24, 2006), Fulcher, Estate of Michael (see Master Report at docket number 84, based upon counts (CXVII-CXX (117-120) in the amended complaint filed April 24, 2006), Gallagher, Estate of Sean (see Master

Report at docket number 136 (CXXI-CXXIV(121-124) in the amended complaint filed April 24, 2006), Gangur, Estate of George (see Master Report at docket number 176, based upon counts (CXXV-CXXVIII (125-128) in the amended complaint filed April 24, 2006), Garcia, Estate of Randall (see Master Report at docket number 177, based upon counts (CXXIX-CXXXII (129-132) in the amended complaint filed April 24, 2006), Ghumm, Estate of Harold (see Master Report at docket number 125, based upon counts (CXXXIII-CXXXVI (133-136) in the amended complaint filed April 24, 2006), Giblin, Estate of Timothy (see Master Report at docket number 137 and 216, based upon counts (CXXXVII-CXL (137-140) in the amended complaint filed April 24, 2006), Gordon, Estate of Richard (see Master Report at docket number 138, based upon counts (CXLV-CXLVIII (145-148) in the amended complaint filed April 24, 2006), Green, Estate of Davin (see Master Report at docket number 83, based upon counts (CXLIX-CLII (149-152) in the amended complaint filed April 24, 2006), Hairston, Estate of Thomas (see Master Report at docket number 122, based upon counts (CLIII-CLVI(153-156) in the amended complaint filed April 24, 2006), Haskell, Estate of Michael (see Master Report at docket number 111, based upon counts (CLVII-CLX (157-160) in the amended complaint filed April 24, 2006), Helms, Estate of Mark A. (see Master Report at docket number 92, based upon counts (CLXI-CLXIV (161-164) in the amended complaint filed April 24, 2006), Hester, Estate of Stanley Glenn (see Master Report at docket number 82, based upon counts (CLXV-CLXVIII (165-168) in the amended complaint filed April 24, 2006), Hildreth, Estate of Donald (see Master Report at docket number 81, based upon counts (CLXIX-CLXXII (169-172) in the amended complaint filed April 24, 2006), Holberton, Estate of Richard H. (see Master Report at docket number 126, based upon

counts (CLXXII-CLXXVI (173-176) in the amended complaint filed April 24, 2006), Hudson, Estate of Dr. John R. (see Master Report at docket number 113, based upon counts (CLXXVII-CLXXX (177-180) in the amended complaint filed April 24, 2006), Hukill, Estate of  Maurice (see Master Report at docket number 112, based upon counts (CLXXXI-CLXXXIV (181-184) in the amended complaint filed April 24, 2006), Iacovino, Estate of Edward (see Master Report at docket number 139, based upon counts (CLXXXV-CLXXXVIII (185-188) in the amended complaint filed April 24, 2006), Innocenzi, Estate of Paul (see Master Report at docket number 42, based upon counts (IX-XIII (9-12) in the amended complaint filed April 24, 2006), Jackowski, Estate of James (see Master Report at docket number 160, based upon counts (CLXXXIX-CXCII (189-192) in the amended complaint filed April 24, 2006), James, Estate of Jeffrey (see Master Report at docket number 79, based upon counts (CXCIII-CXCVI (193-196) in the amended complaint filed April 24, 2006), Jenkins, Estate of Nathaniel (see Master Report at docket number 78, based upon counts (CXCVII-CC(197-200), in the amended complaint filed April 24, 2006), Johnston, Estate of Edward (see Master Report at docket number 186, based upon counts (CCI-CCIV (201-204) in the amended complaint filed April 24, 2006), Jones, Estate of Steven (see Master Report at docket number 161, based upon counts (CCV-CCVIII (205-208) in the amended complaint filed April 24, 2006), Julian, Estate of Thomas (see Master Report at docket number 140, based upon counts (CCIX-CCXII (209-212) in the amended complaint filed April 24, 2006), Keown, Estate of Thomas (see Master Report at docket number 146, based upon counts (CCXIII-CCXVI (213-216) in the amended complaint filed April 24, 2006), Knipple, Estate of James (see Master Report at docket number 101, based upon counts (1-1V (1-4) in the

amended complaint filed April 24, 2006), Kreischer, Estate of Freas (see Master Report at docket number 102 and 210, based upon counts (CCXXI-CCXXIV (221-224) in the amended complaint filed April 24, 2006), Laise, Keith (see Master Report at docket number 178, based upon counts (CCXXV-CCXXVIII (225-228) in the amended complaint filed April 24, 2006), Langon, Estate of James H. (see Master Report at docket number 147, based upon counts (CCXXIX-CCXXXII (229-232) in the amended complaint filed April 24, 2006), LaRiviere, Estate of Michael (see Master Report at docket number 77, based upon counts (CCXXXIII-CCXXXVI (233-236) in the amended complaint filed April 24, 2006), LaRiviere, Estate of Steven B. (see Master Report at docket number 141, based upon counts (CCXXXVII-CCXL (237-240) in the amended complaint filed April 24, 2006), Livingston, Estate of Joseph, III (see Master Report at docket number 103, based upon counts (CCXLV-CCXLVIII (245-248) in the amended complaint filed April 24, 2006), Lyon, Estate of Paul (see Master Report at docket number 76, based upon counts (CCXLIX-CCLII (249-252) in the amended complaint filed April 24, 2006), Macroglou, Estate of John (see Master Report at docket number 202, based upon counts (CCLXI-CCLXIV (261-264) in the amended complaint filed April 24, 2006), Maitland, Estate of Samuel (see Master Report at docket number 203, based upon counts (CCLVII-CCLX (257-260) in the amended complaint filed April 24, 2006), Martin, Estate of Charlie Robert (see Master Report at docket number 75, based upon counts (CCLXV-CCLXVIII (265-268) in the amended complaint filed April 24, 2006), Massa, Estate of  David (see Master Report at docket number 142, based upon counts (CCLIII-CCLVI (253-256)  in the amended complaint filed April 24, 2006), McCall, Estate of John (see Master Report at docket number 179, based upon counts

(CCLXIX-CCLXXII (269-272) in the amended complaint filed April 24, 2006), McDonough, Estate of James (see Master Report at docket number 204 and 217, based upon counts (CCLXXIII-CCLXXVI (273-276) in the amended complaint filed April 24, 2006), McMahon, Estate of Timothy (see Master Report at docket number 104, based upon counts (CCLXXVII-CCLXXX (277-280) in the amended complaint filed April 24, 2006), Menkins, Estate of Richard, II (see Master Report at docket number 164, based upon counts (CCLXXXI-CCLXXXIV (281-284)  in the amended complaint filed April 24, 2006), Meurer, Estate of Ronald (see Master Report at docket number 162, based upon counts (CCLXXXV-CCLXXXVIII (285-288)  in the amended complaint filed April 24, 2006), Milano, Estate of Joseph (see Master Report at docket number 115, based upon counts (CCLXXXIX-CCXCII (289-292)  in the amended complaint filed April 24, 2006), Moore, Estate of Joseph (see Master Report at docket number 171, based upon counts (CCXCIII-CCXCVI (293-296) in the amended complaint filed April 24, 2006), Myers, Estate of Harry Douglas (see Master Report at docket number 73, based upon counts (CCXCVII-CCC (297-300) in the amended complaint filed April 24, 2006), Nairn, Estate of David Johns (see Master Report at docket number 114 , based upon counts (CCCI-CCCIV (301-304) in the amended complaint filed April 24, 2006), Olson, Estate of John (see Master Report at docket number 207, based upon counts (CCCV-CCCVIII (305-308) in the amended complaint filed April 24, 2006), Owens,  Estate of Joseph (see Master Report at docket number 72, based upon counts (CCCIX-CCCXII (309-312) in the amended complaint filed April 24, 2006), Page, Estate of Connie Ray (see Master Report at docket number 71, based upon counts (CCXIII-CCCXVI (313-316) in the amended complaint filed April 24, 2006), Parker, Estate of Ulysses G. (see Master

Report at docket number 106 and 211, based upon counts (CCCXVII-CCCXX (317-320) in the amended complaint filed April 24, 2006),  Pearson, John L., Sr. (see Master Report at docket number 117, based upon counts (CCCXXI-CCCXXIV (321-324) in the amended complaint filed April 24, 2006), Perron, Estate of Thomas S. (see Master Report at docket number 70, based upon counts (CCCXXV-CCCXXVIII (325-328) in the amended complaint filed April 24, 2006), Phillips, Estate of John Arthur, Jr. (see Master Report at docket number 206, based upon counts (CCCXXIX-CCCXXXII (329-332) in the amended complaint filed April 24, 2006), Pollard, Estate of William Roy (see Master Report at docket number 69, based upon counts (CCCXXXIII-CCCXXXVI (333-336) in the amended complaint filed April 24, 2006), Prevatt, Estate of Victor Mark (see Master Report at docket number 165, based upon counts (CCCXXXVII-CCCXL (337-340) in the amended complaint filed April 24, 2006), Price, Estate of James C. (see Master Report at docket number 40, based upon counts (XVII-XX (17-20) in the amended complaint filed April 24, 2006), Prindeville, Estate of Patrick K. (see Master Report at docket number 68, based upon counts (CCCXLI-CCCXLIV (341-344) in the amended complaint filed April 24, 2006), Quirante, Estate of Diomedes J. (see Master Report at docket number 67, based upon counts (CCCXLV-CCCXLVIII (345-348) in the amended complaint filed April 24, 2006), Richardson, Estate of Warren (see Master Report at docket number 166, based upon counts (CCCXLIX-CCCLII (349-352) in the amended complaint filed April 24, 2006), Rotondo, Estate of Louis (see Master Report at docket number 107 and 218, based upon counts (CCCLIII-CCCLVI (353-356) in the amended complaint filed April 24, 2006), Sauls, Estate of Michael (see Master Report at docket number 66, based upon counts (CCCLVII-CCCLX (357-360) in the amended complaint

filed April 24, 2006), Schnorf, Estate of Charles (see Master Report at docket number 108, based upon counts (CCCLXI-CCCLXIV (361-364) in the amended complaint filed April 24, 2006), Schultz, Estate of Scott Lee (see Master Report at docket number 169, based upon counts (CCCLXV-CCCLXVIII (365-368) in the amended complaint filed April 24, 2006), Scialabba, Estate of Peter James (see Master Report at docket number 167, based upon counts (CCCLXIX-CCCLXXII (369-372) in the amended complaint filed April 24, 2006), Scott, Estate of Gary R. (see Master Report at docket number 148, based upon counts (CCCLXXIII-CCCLXXVI (373-376) in the amended complaint filed April 24, 2006), Shipp, Estate of Thomas (see Master Report at docket number 149, based upon counts (CCCLXXVII-CCCLXXXX (377-389) in the amended complaint filed April 24, 2006), Shropshire, Jerryl D. (see Master Report at docket number 181, based upon counts (CCCLXXXI-CCCLXXXIV (381-384) in the amended complaint filed April 24, 2006), Simpson, Estate of Larry H., Jr. (see Master Report at docket number 129, based upon counts (CCCLXXXV-CCCLXXXVIII (385-388) in the amended complaint filed April 24, 2006), Smith K., Estate of Kirk Hall (see Master Report at docket number 64, based upon counts (CCCLXXXIX-CCCXCII (389-392) in the amended complaint filed April 24, 2006), Smith, Estate of Thomas G. (see Master Report at docket number 65, based upon counts (CCCXCIII-CCCXCVI (393-396) in the amended complaint filed April 24, 2006), Smith, Estate of Vincent Lee (see Master Report at docket number 109, based upon counts (CCCXCVII-CD (397-400) in the amended complaint filed April 24, 2006), Sommerhof, Estate of William Scott (see Master Report at docket number 63, based upon counts (CDI-CDIV (401-404) in the amended complaint filed April 24, 2006), Spencer, Estate of Stephen (see Master Report

at docket number 62, based upon counts (CDV-CDVIII (405-408) in the amended complaint filed April 24, 2006), Stelpflug, Estate William John (see Master Report at docket number 130, based upon counts (CDIX-CDXII (409-412) in the amended complaint filed April 24, 2006), Stephens, Estate of Horace R. (see Master Report at docket number 93, based upon counts (CDXIII-CDXVI (413-416) in the amended complaint filed April 24, 2006), Stockton, Estate of Craig (see Master Report at docket number 168, based upon counts (CDXVII-CDXX (417-420)  in the amended complaint filed April 24, 2006), Stokes, Estate of Jeffrey (see Master Report at docket number 116, based upon counts (CDXXI-CDXXIV (421-424) in the amended complaint filed April 24, 2006), Sturghill, Estate of Eric D. (see Master Report at docket number 150, based upon counts (CDXXV-CDXXVIII (425-428) in the amended complaint filed April 24, 2006), Sundar, Estate of Devon (see Master Report at docket number 61, based upon counts (CDXXIX-CDXXXII (429-432) in the amended complaint filed April 24, 2006), Thorstad, Estate of Thomas see Master Report at docket number 170, based upon counts (CDXXXVII-CDXL (437-440) in the amended complaint filed April 24, 2006), Tingley, Estate of Stephen Dale (see Master Report at docket number 60, based upon counts (CDXXXIII-CDXXXVI (433-436) in the amended complaint filed April 24, 2006), Vallone, Estate of Donald H., Jr. (see Master Report at docket number 51 and 214, based upon counts (CDXLI-CDXLIV (441-444) in the amended complaint filed April 24, 2006), Washington, Estate of Eric (see Master Report at docket number 151, based upon counts (CDXLV-CDXLVIII (445-448) in the amended complaint filed April 24, 2006), Wigglesworth, Estate of  Dwayne (see Master Report at docket number 121, based upon counts (CDXLIX-CDLII (449-452) in the amended complaint filed April 24, 2006),

Williamson, Estate of Johnny Adam (see Master Report at docket number 53, based upon counts (CDLXI-CDLXIV (461-464) in the amended complaint filed April 24, 2006), Williams, Estate of Rodney J. (see Master Report at docket number 52, based upon counts (CDLIII-CDLVI (453-456) in the amended complaint filed April 24, 2006), Winter, Estate of William Ellis (see Master Report at docket number 131, based upon counts (CDLXV-CDLXVIII (465-468) in the amended complaint filed April 24, 2006), Woollett, Estate of Donald E. (see Master Report at docket number 172, based upon counts (CDLXIX-CDLXXII (469-472) in the amended complaint filed April 24, 2006, Wyche, Estate of Craig (see Master Report at docket number 188, based upon counts (CDLXXIII-CDLXXVI (473-476) in the amended complaint filed April 24, 2006), Young J., Estate of Jeffrey D. (see Master Report at docket number 54, based upon counts (CDLXXVII-CDLXXX (477-480) in the amended complaint filed April 24, 2006).

North Carolina's wrongful death cause of action is codified at N.C. Gen. Stat. § 28A-18-2.  See e.g., Wilkerson v. Nelson, 395 F. Supp. 2d 281, 288 (M.D.N.C. 2005). The statute allows recovery of the following damages:

- expenses for care, treatment and hospitalization incident to the injury resulting in death;

- compensation for pain and suffering of the decedent;

- the reasonable funeral expenses of the decedent;

- the present monetary value of the decedent to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

   a.   net income of the decedent;

b.       services, protection, care and assistance of the decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered;

c.       society, companionship, comfort, guidance, kindly offices and advice of the decedent to the persons entitled to the damages recovered.

- and nominal damages when the jury so finds.

N.C. Gen. Stat. § 28A-18-2 (2006).

Plaintiffs are also entitled to prejudgment interest equal to the legal rate from the filing of the lawsuit to the date of payment.  "Under North Carolina law, which controls this case, prevailing tort plaintiffs are entitled to pre-judgment interest.  'In an action other than contract, the portion of money judgment designated by the fact finder as compensatory damages bears interest from the date the action is instituted until the judgment is satisfied. Interest on an award in an action other than contract shall be at the legal rate.'"  Josefson v. AMR Corp., 1998 U.S. Dist. LEXIS 12525 at *19 (M.D.N.C. 1998) (citing to N.C. Gen. Stat. § 24-5 (1996)).  This lawsuit was filed on October 3, 2001.

A survival action in North Carolina is preserved by N.C. Gen. Stat. § 28A-18-1. "Upon the death of any person, all demands whatsoever, and rights to prosecute or defend any action or special proceeding, existing in favor of or against such person, except as provided in subsection (b) hereof, shall survive to and against the personal representative or collector of his estate."  Id.  The damages under the survival statute are coextensive with those allowable under the wrongful death statute, N.C. Gen. Stat. § 28A-18-2.  See McInnis v. Provident Life & Accident Ins. Co., 21 F.3d 586, 589 (4th Cir. 1994).

The damages described above are available to the estate of those Plaintiffs identified above and their survivors.

### C.   THE WRONGFUL DEATH CAUSE OF ACTION FROM OKLAHOMA

Decedent Daniel Kluck was domiciled in the state of Oklahoma at the time of his unfortunate death.   (See Master Report at docket number 128, based upon counts CCXVII-CCXX, in the amended complaint filed April 24, 2006).

Oklahoma's wrongful death statute is codified at 12 Okl. Stat. § 1053.  See e.g., Patten v. General Motors Corp., Chevrolet Motor Div., 699 F. Supp. 1500, 1505 (W.D. Okla. 1987).  The statute requires a wrongful act by the defendant that causes the death of the decedent.  12 Okl. Stat. § 1053(a).  The personal representative then may maintain the action against the defendant as if the decedent had lived.  Id.  The statute allows recovery of the following damages to the following members of the decedent's family:

- Medical and burial expenses, which shall be distributed to the person or governmental agency as defined in Section 5051.1 of Title 63 of the Oklahoma Statutes who paid these expenses, or to the decedent's estate if paid by the estate.

- The loss of consortium and the grief of the surviving spouse, which shall be distributed to the surviving spouse.

- The mental pain and anguish suffered by the decedent, which shall be distributed to the surviving spouse and children, if any, or next of kin in the same proportion as personal property of the decedent.

- The pecuniary loss to the survivors based upon properly admissible evidence with regard thereto including, but not limited to, the age, occupation, earning capacity, health habits, and probable duration of the decedent's life, which must inure to the exclusive benefit of the surviving spouse and children, if any, or next of kin, and shall be distributed to them according to their pecuniary loss.

- The grief and loss of companionship of the children and parents of the decedent, which shall be distributed to them according to their grief and loss of companionship.

12 Okl. Stat. § 1053.   "Where the recovery is to be distributed according to a person's pecuniary loss or loss of companionship, the judge shall determine the proper division." Id.

The damages described above are available to the estate of Daniel Kluck and his survivors.

### D.   THE WRONGFUL DEATH CAUSE OF ACTION FROM PENSYLVANIA

Decedent Richard A. Fluegel was domiciled in the state of Pennsylvania at the time of his unfortunate death.   (See Master Report at docket number 201, based upon counts CXIII-CXVI, in the amended complaint filed April 24, 2006).

Under Pennsylvania law, an action may be brought for the death of an individual caused by a wrongful act or unlawful violence of another provided no recovery for the same action was previously obtained by the injured individual during his lifetime.   42 Pa.C.S.A. § 8301; see e.g., Black v. City of Reading, 2006 U.S. Dist. LEXIS 19014 at *26 (E.D. Pa. April 7, 2006).

Beneficiaries under the statute include "the spouse, children or parents of the deceased, whether or not citizens of the Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth."   42 Pa.C.S.A. § 8301(b).

A wrongful death action in Pennsylvania is brought to recover pecuniary loss and loss of services for the benefit of "spouse, children or parents of the deceased" as enumerated by § 8301(b).   "Its purpose is to compensate the enumerated relatives for the

pecuniary loss in the form of lost earnings occasioned by the death, as well as services the decedent would have performed for the family." Walsh v. Strenz, 63 F. Supp. 2d 548, 550 (M.D. Pa. 1999).   The scope of damages avilable under Pennsylvania law include the following special damages:  "in addition to other damages, damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death."  42 Pa.C.S.A. § 8301.

A survival action is brought under 42 Pa.C.S.A. § 8302 for the benefit of the estate.  "Damages include the decedent's pain and suffering, loss of gross earning power from the date of injury until death, and the loss of earning power less personal maintenance expenses from the time of death through the decedent's estimated working life span."  Walsh v. Strenz, 63 F. Supp. 2d 548, 550 (M.D. Pa. 1999).

The damages described above are available to the estate of Richard Fluegel and his survivors.

### E.    THE WRONGFUL DEATH CAUSE OF ACTION FROM SOUTH CAROLINA

Decedent Scipio William, Jr. was domiciled in the state of South Carolina at the time of his unfortunate death.  (See Master Report at docket number 120, based upon counts CDLVII-CDLX, in the amended complaint filed April 24, 2006).

South Carolina law permits an action based upon the wrongful act of one that causes the death of the decedent.  S.C. Code Ann. § 15-51-10.

The beneficiaries of such an action would be the wife or husband and child or children of the decedent and, if there is no wife, husband, child or children, then the parent or parents would substitute as the beneficiaries, and if there are no parents, then

for the benefit of the heirs of the decedent.  S.C. Code Ann. § 15-51-20.  "In a wrongful death case, the issue of damages is not directed toward the value of human life that was lost, but rather the damages sustained by the beneficiaries as a result of the death." Hurd v. United States, 134 F. Supp. 2d 745, 774 (D.S.C. 2001) (citing Welch v. Epstein, 536 S.E.2d 408, 421 (S.C. Ct. App. 2000)).

The damages should be "proportioned to the injury resulting from the death to the parties respectively for whom and for whose benefit such action shall be brought."  S.C. Code Ann. § 15-51-40. Those damages may include "[d]amages for wrongful death under South Carolina law include: '(1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship and (6) deprivation of the use and comfort of the intestate's society, the loss of his experience, knowledge and judgment in managing the affairs of himself and his beneficiaries.'"  Hurd, 134 F. Supp. 2d at 775 (D.S.C. 2001) (quoting from F. P. Hubbard & R.L. Felix, The South Carolina Law of Torts 610 (2d ed. 1997)).  By statute, South Carolina allows funeral expenses to be recovered in either the wrongful death action or the survival action but not both.  S.C. Code Ann. § 15-5-100.

The personal representative of the decedent may bring a survival action under South Carolina law for the purpose of recovering whatever damages the decedent would have been able to recover had he or she survived.  S.C. Code Ann. § 15-5-90 (Law. Co-op. 2000).  "A court may award damages in a survival action for conscious pain, suffering and, mental distress of the deceased and also for the deceased's medical, surgical, and hospital bills."  Hurd, 134 F. Supp. 2d at 775 (D.S.C. 2001) (citing to Welch v. Epstein, 536 S.E.2d 408, 421 (S.C Ct. App. 2000)).

The damages described above are available to the estate of Scipio William, Jr. and his survivors.

## F.   THE WRONGFUL DEATH CAUSE OF ACTION FROM TEXAS

Decedent Danny Estes was domiciled in the state of Texas at the time of his unfortunate death.  (See Master Report at docket number 99, based upon counts CIX-CXII, in the amended complaint filed April 24, 2006).

Under Texas law, liability for wrongful death arises from a person's or his agent's or servant's wrongful act when it causes an injury that causes an individual's death.  Tex. Civ. Prac. & Rem. Code Ann. § 71.002(b).  "An action to recover damages as provided by this subchapter is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a).  Recoverable damages are defined as "proportionate to the injury resulting from death."  71.010(a).

Damages are available under the Texas wrongful death statute and survival statute for the pecuniary benefits the beneficiaries would have received but for the death, medical expenses, funeral expenses and the pain and suffering and mental anguish experienced by the decedent.  Wellborn v. Sears, Roebuck & Co., 970 F.2d 1420, 1428 (5th Cir. 1992); Stanford v. McLean Trucking Co., 506 F. Supp. 1252, 1255 (D. Tex. 1981).  Damages predicated on pecuniary losses may include "the reasonable pecuniary value of counsel, protection, advice, services, care and attention."  Stanford, 506 F. Supp. at 1256.  Texas law also allows recovery for a wide range of emotional damages, including damages for the "mental anguish and loss of society and companionship" suffered by family members as a result of the death.  Wellborn, 970 F.2d at 1429 (5th Cir.

1992).  The damages should compensate for the "'emotional pain, torment, and suffering' experienced due to the death of a family member."  Id.

The damages described above are available to the estate of Danny Estes and his survivors.

### IV.   THE CAUSES OF ACTION FOR THE SERVICEMEN INJURED DURING THE BOMBING IN 1983 IS PROVIDED BY THE STATE COMMON LAW OF NORTH CAROLINA AND CALIFORNIA

As described above in section I., the law that supplies the causes of action for the US citizens who were at the Marine Barracks on October 23, 1983 and survived the bombing but suffered severe physical and emotional injuries is the law of the victim's domicile at the time of the bombing.  All of the Plaintiffs listed immediately below suffered fear of imminent physical harm and were violently, physically and emotionally injured as a result of the intentional bombing by Defendants and their agents.  All of the victims of the bombing who were at the barracks and survived the bombing were either domiciled in the states of North Carolina or California at the time of the bombing.

### A.   ASSAULT AND BATTERY

### 1.   NORTH CAROLINA LAW

The following Plaintiffs were domiciled in the state of North Carolina at the time their injuries were incurred in Beirut:  Albright, Marvin, (See Master Report at docket number 192, based upon counts CDLXXXV-CDLXXXIX (485-489) in the amended complaint filed April 24, 2006), Arroyo, Pablo (See Master Report at docket number 94, based upon counts DCVIII-DCXII (608-612) in the amended complaint filed April 24, 2006), Banks, Anthony (See Master Report at docket number 132, based upon counts

CDXC-CDXCIV(490-494) in the amended complaint filed April 24, 2006), Burnette, Rodney (See Master Report at docket number 90, based upon counts CDXCV-CDXCIX (495-499) in the amended complaint filed April 24, 2006), Comes, Frank W. (See Master Report at docket number 193 and 213, based upon counts D-DIV (500-504) in the amended complaint filed April 24, 2006), Dolphin, Glenn (See Master Report at docket number 174, based upon counts DV-DIX (505-509) in the amended complaint filed April 24, 2006), Eaves, Daniel (See Master Report at docket number 86, based upon counts DLXXXIX-DXCIII (589-593) in the amended complaint filed April 24, 2006), Garner, Truman (See Master Report at docket number 194 and 215, based upon counts DXV-DXIX (515-519) in the amended complaint filed April 24, 2006), Gerlach, Larry (See Master Report at docket number 100, based upon counts DXX-DXXIV (520-524) in the amended complaint filed April 24, 2006), Hlywiak, John (See Master Report at docket number 195, based upon counts DXXV-DXXIX (525-529) in the amended complaint filed April 24, 2006), Hunt, Orval (See Master Report at docket number 196, based upon counts DXXX-DXXIV (530-534)), Jacobs, Joseph (See Master Report at docket number 80, based upon counts DXXXV-DXXXIX (535-539) in the amended complaint filed April 24, 2006), Kirkpatrick, Brian (See Master Report at docket number 189, based upon counts DXL-DXLIII (540-543) in the amended complaint filed April 24, 2006), Matthews, Burnham (See Master Report at docket number 74, based upon counts DXLIV-DXLVIII (544-548) in the amended complaint filed April 24, 2006), Mitchell, Timothy D. (See Master Report at docket number 158, based upon counts DXCIV-DXCVIII (594-598) in the amended complaint filed April 24, 2006), Lovelle, Moore (See Master Report at docket number 205, based upon counts DXLIX-DLIII (549-553) in the

amended complaint filed April 24, 2006), Nashton, Jeffrey (See Master Report at docket number 187, based upon counts DLIV-DLVIII (554-558) in the amended complaint filed April 24, 2006), Oliver, John Edward (See Master Report at docket number 105, based upon counts DLIX-DLXIII (559-563) in the amended complaint filed April 24, 2006), Rivers, Paul (See Master Report at docket number 197, based upon counts DXCIX-DCIII (599-603) in the amended complaint filed April 24, 2006), Russell, Stephen (See Master Report at docket number 143, based upon counts DLXIV-DLXVIII (564-568) in the amended complaint filed April 24, 2006), Spaulding, Dana (See Master Report at docket number 180, based upon counts DLXIX-DLXXIII (569-573) in the amended complaint filed April 24, 2006), Swinson, Craig (See Master Report at docket number 198, based upon counts DLXXIV-DLXXVIII (574-578) in the amended complaint filed April 24, 2006), Toma, Michael (See Master Report at docket number 59, based upon counts DCIV-DCVII (604-607) in the amended complaint filed April 24, 2006), Wheeler, Pastor Danny (See Master Report at docket number 199, based upon counts DLXXIX-DLXXXIII (579-583) in the amended complaint filed April 24, 2006), Young, Thomas P. (See Master Report at docket number 200, based upon counts DLXXXIV-DLXXXVIII (584-588) in the amended complaint filed April 24, 2006).

Under North Carolina law:

In order to be held liable for an assault, the defendant must put the other party in apprehension of an imminent contact. "Ordinarily, mere words, unaccompanied by some act apparently intended to carry the threat into execution, do not put the other in apprehension of an imminent bodily contact, and so cannot make the actor liable for an assault..."

Hall v. Ashe Mem. Hosp., 2000 U.S. Dist. LEXIS 6454 at *31 (W.D.N.C. 2000) (citing

Dickens v. Puryear, 302 N.C. 437, 446, 276 S.E.2d 325 (1981)). "A 'battery' is the

'offensive touching of the person of another without his/her consent ....'" <u>Reese v. Meritor Auto.</u>, Inc., 2000 U.S. Dist. LEXIS 21254 at *47 (W.D.N.C. 2000) (quoting from <u>City of Greenville v. Haywood</u>, 130 N.C. App. 271, 502 S.E.2d 430, 433 (1998)).  The damages available to a plaintiff who proves an assault and battery include "the present worth of all damages that naturally flow from the defendant's conduct."  <u>In re Air Crash Disaster at Charlotte, N.C.</u>, 982 F. Supp. 1101, 1111 (D.S.C. 1997) (applying North Carolina law) (citing <u>King v. Britt</u>, 148 S.E.2d 594, 597 (N.C. 1966)).  These damages include "pecuniary loss and expenses, loss or diminution of earnings during incapacity, impairment of future earning capacity, and pain and suffering, including mental suffering."  <u>Air Crash Disaster at Charlotte, N.C.</u>, 982 F. Supp. at 1111.  The Plaintiffs listed above have stated a claim for assault and battery under North Carolina law.

### 1.    CALIFORNIA LAW

The following Plaintiff was domiciled in the state of California at the time his injuries were incurred in Beirut: Frye, Charles (See Master Report at docket number 85, based upon counts (DX-DXIV (510-514) in the amended complaint filed April 24, 2006).

To make out a claim for assault under California law, the Plaintiffs must "establish (1) that defendant intended to cause harmful or offensive contact, or the imminent apprehension of such contact, and (2) that plaintiff was put in imminent apprehension of such contact." <u>Austin v. Terhune</u>, 367 F.3d 1167, 1172 (9th Cir. 2004) (citing to <u>Brooks v. United States</u>, 29 F. Supp. 2d 613, 617 (N.D. Cal. 1998)).  A battery is any "intentional, unlawful and harmful contact by one person with the person of another." <u>Cole v. Doe</u>, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005) (citing to <u>Barouh v. Haberman</u>, 26 Cal. App. 4th 40, 45 (1994)).

Under California law, the damages available to plaintiff who has successfully stated a claim for battery should be compensation for all the harm proximately caused by the tortuous acts, including "mental worry, grief, distress, and mortification suffered by the plaintiff, as well as her fright, nervousness, anxiety, shock, humiliation, indignity and physical pain." Fluharty v. Fluharty, 59 Cal. App. 4th 484 (1997); Priest v. Rotary, 634 F. Supp. 571, 584 (N.D. Cal. 1986).

Charles Frye has stated a claim for assault and battery under California law.

## B.     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Plaintiffs who suffered physical injuries in Beirut on the morning of October 23, 2003 also bring a claim for intentional infliction of emotional distress against the Defendants.

### 1.     NORTH CAROLINA LAW

Under North Carolina law, the elements necessary for an action for intentional infliction of emotional distress

> are extreme and outrageous conduct by defendants which is intended to and does in fact cause severe emotional distress. Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (quoting Dickens v. Puryear, 302 N.C. 437, 276 S.E.2d 325 (1982)). North Carolina courts have defined extreme and outrageous conduct as conduct that exceeds all bounds usually tolerated by decent society.  Stanback v. Stanback, 297 N.C. 181, 196, 254 S.E.2d 611, 622 (1979). The second Restatement of Torts describes the conduct necessary to rise to the level of intentional infliction of emotional distress as atrocious and utterly intolerable. Restatement (Second) of Torts § 46 comt. d (1965).

Fiumara v. AT&T Technologies, Inc., 1993 U.S. Dist. LEXIS 21274 (M.D.N.C. 1993).  For the reasons set forth in section V.A. below, the Plaintiffs who were

domiciled in North Carolina should recover on their claims for intentional infliction of emotional distress.

## 2.    CALIFORNIA LAW

Under California law, the elements of the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. Christensen v. Superior Court, 54 Cal. 3d 868, Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965 .  In order to be outrageous, conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.  Christensen v. Superior Court, 54 Cal. 3d 868, Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965. The defendant must have engaged in conduct intended to inflict injury, or engaged in conduct with the realization that injury will result. Christensen v. Superior Court, 54 Cal. 3d 868, Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965.  For the reasons stated in section V.A. below, the Plaintiffs who were domiciled in California should recover on their claims for IIED.

## V.    THE CAUSES OF ACTION FOR THE FAMILY MEMBERS OF THE SERVICEMEN KILLED AND INJURED DURING THE BOMBING IN 1983 IS PROVIDED BY THE STATE COMMON LAW OF THEIR DOMICILE AT THE TIME OF THE BOMBING

Plaintiffs have listed below the state common law that defines each Plaintiff's cause of who presses a claim forward for intentional infliction of emotional distress (IIED).  There are two exhibits attached that list alphabetically and then state-by-state

each plaintiff who has an IIED claim and what state they were domiciled in at the time of the attack.  (See Exhibit 3 and 4).

## A. ALABAMA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In 1980 the Alabama Supreme Court first recognized the tort of intentional infliction of emotional distress, or the tort of outrage, using the Restatement of Torts and defined the cause of action as:

> [o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme.

American Road Serv. Co. v. Inmon, 394 So. 2d 361 (Ala. 1980).

The Court further found that by extreme "we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." American Road Serv. Co. v. Inmon, 394 So. 2d 361 (Ala. 1980).

In order to prevail on a tort-of-outrage claim, a plaintiff is required to prove that the defendant's conduct: "'(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" Harrelson v. R.J., 882 So. 2d 317, 322 (Ala. 2003) (quoting Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1043 (Ala. 1993)).

The Defendants intentionally drove a truck containing an enormous amount of explosives into the Marine Barracks in Beirut, Lebanon in the early morning of October

23, 1983.  "Warren Parker, who served as an explosives expert with the Army and the ATF for forty years, testified that the effectiveness of the attack demonstrated that it had been the result of careful planning."  Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 57 (D.D.C. 2003).   The Defendants acted with deadly deliberation and terrible intention.

The Defendants' conduct was extreme and outrageous.  The Defendants built a bomb inside a truck and then their agent forcefully committed suicide while detonating it in order to vaporize hundreds of other unarmed human beings who were in Lebanon on a peace-keeping mission.  Many of the victims died horrific deaths, suffering from severe burns and trauma associated with a death caused by explosively-accelerated debris:

> Steve Russell, the sergeant of the guard at the time of the explosion, testified that he had observed several victims of the bombing who were in severe pain before their deaths. Sgt. Russell stated that death was not instantaneous for many of the victims, and that many of the victims of the explosion endured extreme pain and suffering.

Id. at 58.  There are few acts that fit the definition of extreme and outrageous conduct— "beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society"—as completely and perfectly as suicide bombing.  The horror of suicide bombing is something we may have confronted all too often in these sad times, but it can never be said that suicide bombing is tolerable in a civilized society.

The Defendants intended to terrorize and thereby emotionally injure the family members of those killed and injured at the Marine Barracks as surely as they intended to incinerate every service member who slept in the barracks.

> As a general rule, to state a claim for intentional infliction of emotional distress, the outrageous and extreme conduct must be directed at the plaintiff, although there may also be a cause of action when the conduct causes severe emotional distress "'to a member of such person's immediate family who is present at the time.'" See Green v. Chicago Tribune Co., 286

> Ill. App. 3d 1, 675 N.E.2d 249, 257-58, 221 Ill. Dec. 342 (Ill. 1st Dist.
> 1996) (quoting Restatement (Second) of Torts § 46(2)(a)). Courts have
> uniformly held that a terrorist attack -- by its nature -- is directed not only
> at the victims but also at the victims' families. See Burnett v. Al Baraka
> Inv. and Dev. Corp., 274 F. Supp. 2d 86, 10[8] (D.D.C. 2003) ("A terrorist
> attack on civilians is of course intended to cause emotional distress to the
> victims' families."); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27,
> 35 (D.D.C. 2001) ("'If the defendants' conduct is sufficiently outrageous
> and intended to inflict severe emotional harm upon a person which is not
> present, no essential reason of logic or policy prevents liability.'"). In this
> case, the evidence demonstrates that defendant's campaign of attacks
> against Westerners was intended not only to harm the victims, but to instill
> terror in their loved ones and others in the United States. See Dammarell,
> 281 F. Supp. 2d at 109-113.

Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 (D.D.C. 2005).  The raison

d'etre of an act of terrorism is to terrorize innocent civilians with acts of horrifying and

mind-numbing brutality.  Without the audience of family members at home, an act of

terrorism loses its inertia and its claim to infamy.  See e.g., Sutherland v. Islamic

Republic of Iran, 151 F. Supp. 2d 27, 50 (D.D.C. 2001).  Unfortunately, the Beirut

bombing was quite successful in this regard.  The bombing has become a blueprint for

continuing atrocities against Americans abroad:

> It does run deeper, bin Laden, himself, a Saudi exile, seems to have been
> energized by the U.S. presence in Saudi Arabia of troops, which went
> there during the Gulf War period, and they wanted the troops out of the
> Middle East region. There wasn't what you might have expected hateful
> rhetoric about Israel or anything like that. They just wanted the American
> troops and influence out of the Middle East. And he made reference to the
> Beirut bombing in 198[3], which preceded the U.S. withdrawal from
> Lebanon. And he said, Ali Mohamed, in court, that this is the same
> method to force the U.S. to pull out of Saudi Arabia.

CNN transcript of interview with Phil Hirschkorn regarding Ali Mohamed's guilty plea

in Manhattan federal court, aired October 20, 2000,

http://transcripts.cnn.com/TRANSCRIPTS/0010/20/bn.01.html (last visited

October 25, 2006).

The most important goal of the attack was to dislodge the United States government's peacekeeping mission so the Defendants could install a friendly government. "Having established the existence of Hezbollah as a separate entity, the government of Iran framed the primary objective of Hezbollah: to engage in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran." Peterson, 264 F. Supp. 2d at 51. The brave souls who were proudly serving their country in Beirut on the morning of October 23, 1983 were a means to a political end.

The record of the emotional distress suffered by the Plaintiffs is replete with evidence of truly extraordinary emotional suffering. The circumstances surrounding the family member's learning whether or not their loved ones were dead added further weight to the quantum of suffering. They immediately knew the barracks were utterly destroyed but it was not until the United States government had painstakingly identified each of the remains by whatever means possible, often by dental records, that the family members were given official notification their loved one had died.

> It was Sunday morning and I was sleeping and I got a phone call from my father. He had a frantic sound to his voice that I had never heard before and he said - he just screamed, "Debbie, our worst nightmare has been realized. And I turned on the television and saw what was happening. . . .

> It seemed like an awful long time [before word of his death was received]. We waited and waited and waited. We watched every television, we were - I mean, the house was filled with people. We watched the television, we got every newspaper, photograph, magazine we could. We looked for his face among the survivors. We even thought we saw him a couple of times. All of his friends gathered, neighbors, and we held out hope even though the count was rising. . . .

> I think around November 7th or 8th, we got a phone call . . . They wanted dental information and identifying marks, anything we could give them, and my father told them about a scar on his forearm. The next day, they told us that he was identified.

> We brought him home on the 9th, on his 21st birthday, and we buried him on the 10th, the Marine Corps birthday. I remember the casualty officer, he was all by himself, he came to the house. We were all gathered around, and he told us that Jim was among the dead. It was official.
>
> I remember the casualty officer sitting next to my father and they both seemed really quiet while everybody else was screaming and yelling and crying, and my dad just sat there really quiet. And then when everybody left, he went downstairs and started to scream Jim's name over and over and over again at the top of his lungs.

Id. at 58-59.  The Plaintiffs respectfully direct the Court to Exhibits 3 and 4, which contain all Plaintiffs' names with references to the Special Masters' reports of those Plaintiffs for an individualized account of each Plaintiff's claim of severe emotional distress as a result of the intentional and outrageous actions of the Defendants and their agents.

## B.   CALIFORNIA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

"Under California law, the elements of the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Christensen v. Superior Court, 820 P.2d 181 (Cal. 1991), Potter v. Firestone Tire & Rubber Co., 863 P.2d 795 (Cal. 1993).  The court described the meaning of outrageous as "conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community."  Christensen v. Superior Court, 820 P.2d 181 (Cal. 1991), Potter v. Firestone Tire & Rubber Co., 863 P.2d 795 (Cal. 1993). "The defendant must have engaged in conduct intended to inflict injury, or engaged in conduct with the

33

realization that injury will result." Christensen v. Superior Court, 820 P.2d 181 (Cal. 1991); Potter v. Firestone Tire & Rubber Co., 863 P.2d 795 (Cal. 1993).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in California should recover on their claims for IIED.

## C.   COLORADO LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Rugg v. McCarty, 476 P.2d 753 (Colo. 1970), the Colorado Supreme Court approved the definition of IIED as set out in the Restatement (Second) of Torts 46 (1965):

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

The court also applied the Restatement's commentary to hold that the level of outrageousness required for conduct to create liability for intentional infliction of emotional distress is extremely high: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Rugg v. McCarty, 476 P.2d 753 (Colo. 1970); Coors Brewing Co. v. Floyd, 978 P.2d 663 (Colo. 1999).  The elements of a claim for outrageous conduct are (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused the plaintiff to suffer severe emotional distress. Culpepper v. Pearl St. Bldg., Inc., 877 P.2d 877 (Colo. 1994); see also Coors Brewing Co. v. Floyd, 978 P.2d 663, 665 (Colo. 1999).  "Outrageous conduct" is defined

as conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." Culpepper v. Pearl St. Bldg., Inc., 877 P.2d at 882 (Colo. 1994) (quoting Destefano v. Grabrian, 763 P.2d 275, 286 (Colo. 1988)); see Coors Brewing Co. v. Floyd, 978 P.2d 663 (Colo. 1970).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Colorado should recover on their claims for IIED.

## D.   CONNECTICUT LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In order to prevail on a count based on intentional infliction of emotional distress, under the law of Connecticut the plaintiff must allege and prove four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." DeLaurentis v. New Haven, 597 A.2d 807 (Colo. 1991).  "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Mellaly v. Eastman Kodak Co., 597 A.2d 846 (Conn. 1991).

"Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against

the actor, and lead him to exclaim, Outrageous!"  Carrol v. Allstate Ins. Co., 262 Conn.

433, 443, 815 A.2d 119 (2003) (internal quotation marks omitted).  For the reasons stated

in section V.A. above, the Plaintiffs who were domiciled in Connecticut should recover

on their claims for IIED.

### E.  DISTRICT OF COLUMBIA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Under the law of the District of Columbia, a claim for intentional infliction of

emotional distress will succeed only where a defendant engages in (1) "extreme or

outrageous conduct" which (2) "intentionally or recklessly" causes (3) "severe emotional

distress to another."  Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984); Bernstein v.

Fernandez, 649 A.2d 1064, 1075 (D.C. 1991); Kerrigan v. Britches of Georgetowne, 705

A.2d 624 (D.C.1997).  To establish the required degree of "outrageousness," the plaintiff

must allege conduct "so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community."  Howard Univ. v. Best, 484 A.2d 958, 985 (D.C.

1984); Bernstein v. Fernandez, 649 A.2d 1064, 1075 (D.C. 1991); Kerrigan v. Britches of

Georgetowne, 705 A.2d 624 (D.C.1997) (quoting Restatement (Second) of Torts § 46

cmt. d (1965)).

The conduct must be "so outrageous in character, and so extreme in degree, as to

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community."  Homan v. Goyal, 711 A.2d 812, 818 (D.C.

1998); Larijani v. Georgetown Univ., 791 A.2d 41 (D.C. 2002) (quoting Drejza v.

Vaccaro, 650 A.2d 1308, 1312 (D.C. 1994)).  In general, "a case of intentional infliction

of emotional distress is made out only if the recitation of the facts to an average member

of the community would arouse his resentment against the actor, and lead him to exclaim

'[o]utrageous!'" Homan, supra, 711 A.2d at 818 (quoting Restatement (Second) of Torts

§ 46 (1965)); Larijani v. Georgetown Univ., 791 A.2d 41 (D.C. 2002).  For the reasons

stated in section V.A. above, the Plaintiffs who were domiciled in the District of

Columbia should recover on their claims for IIED.

> **F.   FLORIDA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Florida has also adopted section 46(1) of the Restatement (Second).  "The Fourth

District joined with the First and Fifth in adopting Section 46, Restatement (Second) of

Torts (1965) as the appropriate definition of the tort.  Nonetheless, the Fourth District did

not conform its findings to the comments explaining the application of this definition:

> d. *Extreme and outrageous conduct* . . . It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" . . .

Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277 (Fla. 1985).  For the reasons

stated in section V.A. above, the Plaintiffs who were domiciled in Florida should recover

on their claims for IIED.

> **G.   GEORGIA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Georgia has also adopted section 46(1) of the Restatement (Second).   "The Restatement 2d of Torts, § 46 (1) (1965) defines this tort as follows:   One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."   <u>Yarbray v. Southern Bell Tel. & Tel. Co.,</u> 409 S.E. 2d 835 (Ga. 1991).

Georgia law recognizes the tort of intentional infliction of emotional distress. <u>Thomas v. Ronald A. Edwards Constr. Co.,</u> 293 S.E. 2d 383 (Ga. Ct. App. 1982); <u>Dunn v. Western Union Tel. Co.,</u> 59 S.E. 189 (Ga. Ct. App. 1907). The burden which the plaintiff must meet in order to prevail in this cause of action is a stringent one, however. "In order to sustain a cause of action in this state for the tort of intentional infliction of emotional distress, a plaintiff must show that 'defendant's actions were so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff.'" <u>Sossenko v. Michelin Tire Corp.,</u> 324 S.E. 2d 593 (Ga. Ct. App. 1984); <u>Georgia Power Co. v. Johnson,</u> 274 S.E. 2d 17 (Ga. Ct. App. 1980). <u>Bridges v. Winn-Dixie Atlanta, Inc.,</u> 335 S.E. 2d 445 (Ga. Ct. App. 1985).

"To recover for intentional infliction of emotional distress, the [appellants] were required to prove the following elements: (1) intentional or reckless conduct, (2) which is extreme and outrageous, (3) and caused the emotional distress, (4) which is severe." <u>Adams v. Carlisle</u>, 630 S.E. 2d 529 (Ga. Ct. App. 2006).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Georgia should recover on their claims for IIED.

## H.    ILLINOIS LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Illinois recognized the tort of IIED in 1961.  Knierim v. Izzo, 174 N.E.2d 157 (Ill. 1961).  The tort may be maintained even though unaccompanied by physical injury or the threat of physical injury.  Pierce v. Board of Education, 358 N.E.2d 67 (Ill. App. Ct. 1976).  "The elements of the tort for the intentional infliction of emotional distress are (1) extreme and outrageous conduct, (2) intent by the defendant to cause, or a reckless disregard of the probability of causing emotional distress, (3) severe or extreme emotional distress suffered by the plaintiff, and (4) an actual and proximate causation of emotional distress by the defendant's outrageous conduct."  Pierce v. Board of Education, 358 N.E.2d 67 (Ill. App. Ct. 1976).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Illinois should recover on their claims for IIED.

## I.    INDIANA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Indiana has also adopted section 46(1) of the Restatement (Second). "Indiana now recognizes a separate cause of action for intentional infliction of emotional distress, without the need for an accompanying tort."  City of Anderson v. Weatherford, 1999 Ind. App. LEXIS 731 (Ind. Ct. App. 1999).  Intentional infliction of emotional distress is committed by "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another . . . ."  Cullison v. Medley, 570 N.E.2d 27, 31 (Ind. 1991).

Intentional infliction of emotional distress is found where there is "conduct exceeding all bounds usually tolerated by a decent society [and causing] mental distress of a very serious kind."  Cullison v. Medley, 570 N.E.2d 27, 31 (Ind. 1991); Ledbetter v.

Ross, 725 N.E.2d 120 (Ind. Ct. App. 2000).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Indiana should recover on their claims for IIED.

### J.    KANSAS LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Supreme Court of Kansas has defined the tort of outrage as follows:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. Proof of four elements is required to establish the cause of action: (1) Conduct of a defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

Liability for extreme emotional distress has two threshold requirements which must be met and which a trial court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.

Taiwo v. Vu, 822 P.2d 1024 (Kan. 1991).

For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Kansas should recover on their claims for IIED.

### K.    KENTUCKY LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Kentucky has also adopted section 46(1) of the Restatement (Second).  "The tort of intentional infliction of emotional distress has been evolving over the past century.  At first the courts refused to permit recovery for 'mental pain or anxiety' and adopted the view of Lord Wensleydale on the belief that 'the law cannot value and does not pretend to redress, when the unlawful act complained of causes that alone'."  Kroger Co. v.

Willgruber, 920 S.W.2d 61(Ky. 1996) (quoting Lynch v. Knight, 9 H. L. 557 at 598, 11 Eng. Rep. 854 (1861)).

"Our Commonwealth first adopted the tort of intentional infliction of mental distress in the case of Craft v. Rice, 671 S.W.2d 247 (Ky. 1984).  In Craft, we adopted Restatement (Second) of Torts, section 46, and recognized the elements of proof necessary for this new tort:

> 1. The wrongdoer's conduct must be intentional or reckless;
>
> 2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
>
> 3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and
>
> 4. The emotional distress must be severe."

Craft, 671 S.W.2d at 249. Kroger Co. v. Willgruber, 920 S.W.2d 61 (Ky. 1996); Osborne v. Payne, 31 S.W.3d 911 (Ky. 2000).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Kentucky should recover on their claims for IIED.

### L.      LOUISIANA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Louisiana has also adopted section 46(1) of the Restatement (Second).  "[In] order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."  Nicholas v. Allstate Ins. Co., 765 So.2d 1017 (La. 2000); White v. Monsanto Co., 585 So.2d 1205, 1209 (La. 1991).  "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Nicholas v. Allstate Ins. Co., 765 So.2d 1017 (La. 2000).  The leading case on the standards for proving intentional infliction of emotional distress is White v. Monsanto, 585 So.2d 1205 (La. 1991), which set out the following principles:

> In order to recover for intentional infliction of emotional distress, a plaintiff must establish that the conduct of the defendant was extreme and outrageous, that the emotional distress suffered by the plaintiff was severe, and that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

585 So.2d at 1209.  The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.  Not every verbal

encounter may be converted into a tort; on the contrary, "some safety valve must be left through which irascible tempers may blow off relatively harmless steam." White v. Monsanto, 585 So. 2d 1205 (La. 1991); Singleton v. St. Charles Parish, 833 So. 2d 486 (La. Ct. App. 2002).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Louisiana should recover on their claims for IIED.

### M.   MARYLAND LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Maryland has also adopted section 46(1) of the Restatement (Second).  "There are four elements which must coalesce to impose liability for intentional infliction of emotional distress.  Those elements are: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." Hamilton v. Ford Motor Credit Co., 502 A.2d 105 (Md. Ct. Spec. App.1986); Harris v. Jones, 380 A.2d 611 (Md. 1977).

We wish to stress that each of these four requirements must be satisfied completely before a cause of action will lie; meeting even one element less than fully will not suffice.  Moreover, the initial determination of whether these elements have been satisfied rests with the trial judge.  Harris v. Jones, 380 A.2d 611 (Md. 1977); Hamilton v. Ford Motor Credit Co., 502 A.2d 105 (Md. Ct. Spec. App.1986).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Maryland should recover on their claims for IIED.

### N.     MASSACHUSETTS LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Massachusetts has also adopted section 46(1) of the Restatement (Second). "To prevail on their claim for intentional infliction of emotional distress, the plaintiffs must establish:

> (1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

Payton v. Abbott Labs, 437 N.E.2d 171 (Mass. 1982) (citing Agis v. Howard Johnson Co., 355 N.E.2d 315 (Mass. 1976)); Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189 (Mass. 1997). To be considered extreme and outrageous, the defendant's conduct must be "beyond all bounds of decency and . . . utterly intolerable in a civilized community." Sena v. Commonwealth, 629 N.E.2d 986 (Mass. 1994), quoting Restatement (Second) of Torts § 46 comment d (1965). For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Massachusetts should recover on their claims for IIED.

### O.     MICHIGAN LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Michigan has also adopted section 46(1) of the Restatement (Second). "In order to state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) extreme or outrageous conduct; (2) which intentionally or recklessly, (3) causes, (4)

extreme emotional distress. <u>McCahill v. Commercial Ins. Co.</u>, 446 N.W.2d 579 (Mich. Ct. App. 1989).

"Similarly, the Restatement of Torts defines intentional infliction of emotional distress as follows:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> (2) Where such conduct is directed at a third person, the actor is subject to liability  if he intentionally or recklessly causes severe emotional distress.
>> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>>
>> (b) to any other person who is present at the time, if such distress results in bodily harm.

<u>Restatement (Second) of Torts</u> § 46 (1965). <u>McCahill v. Commercial Ins. Co.</u>, 446 N.W.2d 579 (Mich. Ct. App. 1989).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Michigan should recover on their claims for IIED.

## P.    MINNESOTA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Minnesota has also adopted section 46(1) of the Restatement (Second). "Intentional infliction of emotional distress consists of four distinct elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." <u>Hubbard v. United Press Int'l, Inc.</u>, 330 N.W.2d 428 (Minn. 1983), see also Restatement (Second) of Torts § 46(1) (1965).  "We have cautioned that intentional infliction of emotional distress is "sharply limited to cases involving particularly egregious facts" and

that a "high threshold standard of proof" is required to submit the claim to a jury." Hubbard, 330 N.W.2d at 439.

Conduct is "extreme and outrageous" when it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  Hubbard, 330 N.W.2d at 439 (quoting Haagenson v. National Farmers Union Property and Casualty Co., 277 N.W.2d 648 (Minn. 1979)) Langeslag v. KYMN Inc., 664 N.W.2d 860 (Minn. 2003).  To qualify as extreme and outrageous, the conduct must lead an average member of the community to exclaim "Outrageous!" Id; Langeslag v. KYMN Inc., 664 N.W.2d 860 (Minn. 2003).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Minnesota should recover on their claims for IIED.

## Q.    MISSISSIPPI LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Mississippi has also adopted section 46(1) of the Restatement (Second). "This Court has been clear in holding that a plaintiff asserting a claim for mental anguish, whether as a result of simple negligence or an intentional tort, must always prove that the emotional distress was a reasonably foreseeable result of the defendant's conduct." Adams v. U.S. Homecrafters, Inc., 744 So. 2d 736, 742 (Miss. 1999); Morgan v. Greenwaldt, 786 So. 2d 1037 (Miss. 2001). "In cases of intentional infliction of emotional distress, where the defendant's conduct was "malicious, intentional or outrageous," the plaintiff need present no further proof of physical injury." Morgan v. Greenwaldt, 786 So. 2d 1037 (Miss. 2001)

"Most recently, in Estate of Walker, we stated, 'If there is outrageous conduct, no injury is required for recovery for intentional infliction of emotional distress or mental

anguish. . . . If the conduct is not malicious, intentional or outrageous, there must be some sort of demonstrative harm, and said harm must have been reasonably foreseeable to the defendant.'" Morgan v. Greenwaldt, 786 So. 2d 1037 (Miss. 2001) (quoting Morrison, 680 So. 2d at 806) (citations omitted). For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Mississippi should recover on their claims for IIED.

## R.   MISSOURI LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Missouri has recognized a cause of action for intentional infliction of emotional distress. "In order to state an emotional distress claim, the plaintiff must plead extreme and outrageous conduct by a defendant who intentionally or recklessly causes severe emotional distress that results in bodily harm." Nazeri v. Missouri Valley College, 860 S.W.2d 303, 316 (Mo. 1993); see also Restatement (Second) of Torts, § 46. "To recover for intentional infliction of emotional distress**,** the Plaintiff must show (1) the defendant's conduct was extreme and outrageous; (2) the defendant acted intentionally or recklessly; and (3) the defendant's conduct caused extreme emotional distress resulting in bodily harm." Thomas v. Special Olympics Mo., Inc., 31 S.W.3d 442, 446 (Mo. Ct. App. 2000), Cent. Mo. Elec. Coop. v. Balke, 119 S.W.3d 627 (Mo. Ct. App. 2003).

"Additionally, the plaintiff must establish that the sole intent in acting was to cause emotional distress." Thomas v. Special Olympics Mo., Inc., 31 S.W.3d 442, 446 (Mo. Ct. App. 2000) Cent. Mo. Elec. Coop. v. Balke, 119 S.W.3d 627 (Mo. Ct. App. 2003). For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Missouri should recover on their claims for IIED.

### S.     NEBRASKA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Nebraska has also adopted section 46(1) of the Restatement (Second).

To recover for intentional infliction of emotional distress**,** a plaintiff must prove (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it.

See Brandon v. County of Richardson, 624 N.W.2d 604 (Neb. 2001); Roth v. Wiese, 716 N.W.2d 419 (Neb. 2006).

"Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case."  Heitzman v. Thompson, 705 N.W.2d 426 (Neb. 2005). "The facts must be such that when heard, an average member of the community would resent the actor and exclaim 'Outrageous!'"  Heitzman, 705 N.W.2d at 431; Roth v. Wiese, 716 N.W.2d 419 (Neb. 2006).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Nebraska should recover on their claims for IIED.

### T.     NEW MEXICO LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

For intentional infliction of emotional distress New Mexico courts have adopted the approach used in the Restatement (Second) of Torts § 46 (1965). See generally Padwa v. Hadley, 981 P.2d 1234 (N.M. Ct. App. 1999); Trujillo v. Northern Rio Arriba Elec. Coop., 41 P.3d 333 (N.M. 2001).

The following elements must be proven to establish a claim of intentional infliction of emotional distress: (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was

extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress.

Hakkila v. Hakkila, 812 P.2d 1320, 1330 (N.M. Ct. App. 1991); Trujillo v. Northern Rio Arriba Elec. Coop., 41 P.3d 333 (N.M. 2001).

The Restatement describes extreme and outrageous conduct as that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Restatement (Second) of Torts § 46 cmt. d; see also Stieber v. Journal Publ'g Co., 901 P.2d 201, 205 (N.M. Ct. App. 1995); Trujillo v. Northern Rio Arriba Elec. Coop., 41 P.3d 333 (N.M. 2001).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in New Mexico should recover on their claims for IIED.

## U.    NEW YORK LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The state of New York has adopted the rule set forth in Restatement (Second) of Torts § 46 (1) that: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."  Murphy v. American Home Products Corp., 448 N.E.2d 86 (N.Y. 1983).

The tort of intentional infliction of emotional distress predicates liability on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society.  Fischer v Maloney, 373 N.E.2d 1215 (N.Y. 1978); Murphy v American Home Prods. Corp., 448 N.E.2d 86 (N.Y. 1983).  The conduct must be "extreme and outrageous" and "beyond all possible bounds of decency" and "utterly intolerable in a civilized community".  Fischer v Maloney, 373

N.E.2d 1215 (N.Y. 1978). "The tort of intentional infliction of emotional distress predicates liability on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society". Freihofer v Hearst Corp., 480 N.E.2d 349 (N.Y. 1985).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in New York should recover on their claims for IIED.

## V.   NEW JERSEY LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The New Jersey Court first recognized intentional infliction of emotional distress in Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857 (N.J. 1988). In order to state such a cause of action, "plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857 (N.J. 1988). "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857 (N.J. 1988).  A cause of action for intentional infliction of emotional distress also requires that "the emotional distress suffered by the plaintiff must be 'so severe that no reasonable [person] could be expected to endure it.'" Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857 (N.J. 1988).

In addition, in order to constitute actionable intentional infliction of emotional distress, defendant's conduct must be sufficiently severe to "cause genuine and substantial emotional distress or mental harm to average persons." Taylor v. Metzger,

706 A.2d 685 (N.J. 1998).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in New Jersey should recover on their claims for IIED.

### W.   NORTH CAROLINA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

North Carolina has also adopted section 46(1) of the Restatement (Second). "The essential elements of an action for intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress.'" Johnson v. Colonial Life & Accident Ins. Co., 618 S.E.2d 867 (N.C. Ct. App. 2005); Waddle v. Sparks, 414 S.E.2d 22, 27 (N.C. 1992). "Conduct is extreme and outrageous when it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Guthrie v. Conroy, 567 S.E.2d 403, 408-09 (N.C. Ct. App. 2002); Johnson v. Colonial Life & Accident Ins. Co., 618 S.E.2d 867 (N.C. Ct. App. 2005).

To meet the standard of extreme and outrageous conduct, the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community[.]" Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 121.  Rather, to give rise to a successful claim, the complained of conduct must "'exceed all bounds usually tolerated by decent society and . . . cause mental distress of a very serious kind.'" Stanback v. Stanback, 254 S.E.2d 611, 622 (N.C. 1979) (quoting Prosser, The Law of Torts, § 12, p. 56 (4th Ed. 1971)).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in North Carolina should recover on their claims for IIED.

## X.   OHIO   LAW   OF   INTENTIONAL   INFLICTION   OF EMOTIONAL DISTRESS

Ohio has also adopted section 46(1) of the Restatement (Second).  "In a case for intentional infliction of emotional distress, a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress. See Reamsnyder v. Jaskolski, 462 N.E.2d 392 (Ohio 1984); Phung v. Waste Management, 644 N.E.2d 286 (Ohio 1994).

"As a preliminary matter, it must be observed that this court has recognized intentional infliction of emotional distress to be an independent tort." Reamsnyder v. Jaskolski, 462 N.E. 2d 392 (Ohio 1984); Yeager v. Local Union 20, 453 N.E. 2d 666 (Ohio 1983).

The state of Ohio has used the Restatements rule as provides as follows: "One who by extreme and out-rageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Russ v. TRW, Inc., 570 N.E.2d 1076 (Ohio 1991).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Ohio should recover on their claims for IIED.

## Y.   OKLAHOMA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Oklahoma first adopted the tort of intentional infliction of emotional distress, also known as the tort of outrage, in Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978).  The tort is governed by the narrow standards of the Restatement (Second) of

Torts 46.  The tort requires evidence of extreme and outrageous conduct coupled with severe emotional distress.  Gaylord Entertainment Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.  Oklahoma uses the Section 46, Restatement (second) of Torts definition for Outrageous Conduct.

"The second element of this tort requires proof that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community." Miller v. Miller, 956 P.2d 887 (Okla. 1998).  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Oklahoma should recover on their claims for IIED.

## Z.     PENNSYLVANIA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The state of Pennsylvania bases the definition of outrageous conduct in a claim for intentional infliction of emotional distress on the Restatements (Second) of Torts. This section states:  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Jordan v. City of Philadelphia, 66 F. Supp. 2d 638 (E.D. Pa. 1999).  To bring an intentional infliction of emotional distress claim, the plaintiff must show that the

defendant's (1) extreme and outrageous conduct, (2) intentionally or recklessly, (3) caused, (4) severe emotional distress.  Kazatsky v. King David Memorial Park, 527 A.2d 988, 991 (Pa. 1987); Stouch v. Brothers of Order, 836 F. Supp. 1134, 1144-1145 (E.D. Pa. 1993).

To satisfy the first element of the four-prong test, the conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency as to be regarded as atrocious and utterly intolerable in a civilized community. Malia v. RCA Corporation, 690 F. Supp. 334, 336 (M.D. Pa. 1988); Rittenhouse Regency Affiliates v. Passen, 482 A.2d 1042, 1043 (Pa. Super. Ct. 1984) (citing, inter alia, Martin v. Little Brown and Co., 450 A.2d 984, 988 (Pa. Super. Ct. 1988); Restatement (Second) of Torts § 46.  For the reasons stated in section V.A. above, the Plaintiffs who were domiciled in Pennsylvania should recover on their claims for IIED.

## AA.   RHODE ISLAND LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Rhode Island requires proof of the following elements to satisfy a claim for IIED:

> Generally speaking, to establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.
>
> Second, the defendant's conduct must be extreme and outrageous. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Third, the defendant's actions must have been the proximate cause of the plaintiff's

> emotional distress. Fourth, the emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be expected to endure it." By circumscribing the cause of action with an elevated threshold for liability and damages, courts have authorized legitimate claims while eliminating those that should not be compensable.

Cliff v. Narragansett TV, L.P., 688 A.2d 805, 813 n.5 (R.I. 1996).  For the reasons stated in section V.A. above, the plaintiffs who were domiciled in Rhode Island should recover on their claims for IIED.

## BB.    SOUTH CAROLINA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

South Carolina has also adopted section 46(1) of the Restatement (Second).

> [A] plaintiff must establish that (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community;' (3) the actions of the defendant caused the plaintiffs emotional distress; and (4) the emotional distress suffered by the plaintiff was 'severe' so that 'no reasonable man could be expected to endure it.' Although 'severe' emotional distress is usually manifested by 'shock, illness or other bodily harm,' such objective symptomatology is not an absolute prerequisite for recovery of damages for intentional ... infliction of emotional distress.

Shiftlet v. Allstate Ins. Co., 2006 U.S. Dist. LEXIS 68072 at *25 (D.S.C. 2006) (quoting from Ford v. Hutson, 276 S.E.2d 776, 778-779 (S.C. 1981)).  For the reasons stated in section V.A. above, the plaintiffs who were domiciled in South Carolina should recover on their claims for IIED.

### CC. SOUTH DAKOTA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

South Dakota has also adopted section 46(1) of the Restatement (Second). Maryott v. First Nat'l Bank, 624 N.W.2d 96, 104 (S.D. 2001). "The elements of an IIED claim are: (1) An act by defendant amounting to extreme and outrageous conduct; (2) intent on the part of defendant to cause plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's injuries; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct." Hansen v. McLeod United States Publ. Co., 2006 U.S. Dist. LEXIS 24131 at *30 (S.D.S.D. 2006) (citing to Petersen v. Sioux Valley Hosp. Ass'n, 486 N.W.2d 516, 518 (S.D. 1992)). For the reasons stated in section V.A. above, the plaintiffs who were domiciled in South Dakota should recover on their claims for IIED.

### DD. TENNESSEE LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Tennessee has also adopted section 46(1) of the Restatement (Second). Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). "'Claims based on this tort seek recovery for mental or emotional disturbance alone, unconnected with any independently actionable tort or with any contemporaneous or consequential objectively ascertainable injury. Three elements must be established by Plaintiff to prevail on such a claim: first, the conduct complained of must be intentional or reckless; second, the conduct must be so outrageous that it is not tolerated by civilized society; and third, the conduct complained of must result in serious mental injury.'" Woodard v. Morgan Tire & Auto, Inc., 2006 U.S. Dist. LEXIS 71479 at *20-21 (M.D. Tenn. 2006) (quoting from John Doe 1 ex rel. Jane Doe 1 v. Roman Catholic Diocese, 154 S.W.3d 22, 31 (Tenn. 2005)). For the

reasons stated in section V.A. above, the plaintiffs who were domiciled in Tennessee should recover on their claims for IIED.

## EE.   TEXAS LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Texas has also adopted section 46(1) of the Restatement (Second).  "Under Texas law, the tort of intentional infliction of emotional distress requires that a plaintiff prove that: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's conduct caused emotional distress to the plaintiff, and (4) the resulting emotional distress was severe."  Gray v. Sage Telecom, Inc., 2006 U.S. Dist. LEXIS 73752 at *46 (N.D. Tex. 2006) (citing MacArthur v. University of Texas Health Center at Tyler, 45 F.3d 890, 898 (5th Cir. 1995)).  For the reasons stated in section V.A. above, the plaintiffs who were domiciled in Texas should recover on their claims for IIED.

## FF.   WASHINGTON LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Washington has also adopted section 46(1) of the Restatement (Second).  "To prove a claim for intentional infliction of emotional distress ('outrage') in Washington, a plaintiff must establish (1) the defendant intentionally or recklessly inflicted emotional distress, (2) the conduct of the defendant was outrageous and extreme, and (3) the conduct resulted in severe emotional distress to the plaintiff.  Conduct is outrageous and extreme when it goes 'beyond all possible bounds of decency' and is 'atrocious, and utterly intolerable in a civilized community.'"  Wood v. Gonzaga Univ., 2006 U.S. Dist. LEXIS 30541 at *21 (E.D. Wash. 2006) (quoting Grimsby v. Samson, 85 Wash.2d 52,

59, 530 P.2d 291, 295 (1975)) (citations omitted).  For the reasons stated in section V.A.

above, the plaintiffs who were domiciled in Washington should recover on their claims

for IIED.

### GG.   WEST VIRGINIA LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

West Virginia has also adopted section 46(1) of the Restatement (Second):

> In West Virginia, the plaintiff must prove four elements to prevail on a
> claim of intentional infliction of emotional distress (also known as the tort
> of outrage).  In order to establish a claim for intentional infliction of
> emotional distress under West Virginia law, the plaintiff must show that:
> (1) the defendant's conduct was atrocious, intolerable, and so extreme and
> outrageous as to exceed the bounds of decency; (2) the defendant acted
> with intent to inflict emotional distress, or acted recklessly and were
> substantially certain that emotional distress would result in their conduct;
> (3) the actions of the defendant caused the plaintiff to suffer emotional
> distress and (4) the emotional distress suffered by the plaintiff was so
> severe that no reasonable person could be expected to endure.

Kennen v. Wheeling Hosp., Inc., 2006 U.S. Dist. LEXIS 2351 at *14 (N.D. W. Va. 2006)

Travis v. Alcon Laboratories. Inc., 202 W. Va. 369, 504 S.E.2d 419, 425 (W. Va. 1998).

For the reasons stated in section V.A. above, the plaintiffs who were domiciled in West

Virginia should recover on their claims for IIED.

### HH.   WISCONSIN LAW OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

West Virginia has also adopted section 46(1) of the Restatement (Second).  "In

Wisconsin, the elements of a claim for intentional infliction of emotional distress are: (1)

respondent's conduct was intentional, (2) respondent's conduct was extreme and

outrageous; (3) respondent's conduct was a cause-in-fact of petitioner's injury; and (4)

petitioner suffered an extreme and disabling emotional response to respondent's conduct."

Sustman v. Wisconsin, 2006 U.S. Dist. LEXIS 38858 at *15 (W.D. Wis. 2006) (citing

Alsteen v. Gehl, 21 Wis. 2d 349, 359-60, 124 N.W.2d 312, 318 (1963).  For the reasons

stated in section V.A. above, the plaintiffs who were domiciled in Wisconsin should

recover on their claims for IIED.

## VI.     DIOMEDES QUIRANTE WAS A U.S. NATIONAL, PURSUANT TO 8 U.S.C. §1101(a)(22)(B)

Diomedes J. Quirante can sue Defendants under 28 U.S.C. § 1605(a)(7) as a US

national as defined by 8 U.S.C. § 1101 (a)(22).  On September 6, 1958, Diomedes J.

Quirante was born in the Philippines near Clark Air Force Base.  The Quirante family

consisting of Diomedes' parents, Godofredo and Belinda Quirante, and Diomedes' five

brothers and sisters, Edgar, Milton, Sabrina, Liberty, and Belinda were born and raised in

the Philippines.  The rest of the Quirante family (outside of the immediate family) lived

in the United States.  Diomedes Quirante was not a United States Citizen (as status

imposed by the Immigration and Naturalization Act) on October 23, 1983, the day of the

attack of the Barracks in Beirut, Lebanon.  Diomedes came to the United States to

become a doctor.

Diomedes Quirante enlisted in the Navy on December 1, 1980 and took an oath of

allegiance to the United States when he was enlisted.  At the time of enlistment he had a

Bachelor of Science degree from the University of Santo Tomas in the Philippines.

While in the Navy he became a field medical service technician certified by the U.S.

Navy Bureau of Medicine and Surgery.  At the time Diomedes Quirante came to the

United States, his brother, Edgar, had been living in California and had applied for

citizenship.  The Navy helped Diomedes apply for citizenship before going to Beirut with

the 24th MAU.  In the 1980's non-citizens in the military could not become citizens until

they had been enlisted for at least five years.  Because of his premature death in 1983, it was impossible for Diomedes to become a citizen.  He was however a legal permanent resident in 1983.  Diomedes Quirante's last known address was Camp LeJuene, North Carolina.

Diomedes Quirante received two posthumous awards; a Purple Heart and Navy Expeditionary Medal.  On November 25, 1983 he was buried at Arlington National Cemetery with full United States Military Honors.  See Exhibit 5.  Diomedes was in good standing and had no criminal record, which would have prevented him from receiving a Purple Heart.  Diomedes Quirante is the only known non-citizen military person killed in the Beirut bombing of the Marine Barracks.  At the time of his death he no longer had an allegiance to any other country, but the United States.[3]

Most importantly, Diomedes began the application process for US citizenship prior to his death.  The Quirante family was told by a Navy Official that Diomedes had started the naturalization process but the family has no absolute proof of this action. Belinda Quirante, Diomedes' mother, was told by Diomedes that he had filled out the paperwork with a Navy Official and the process had started.   The family does not remember the names of these Navy Officials and they did not find any documentation of this in his belongings.[4]  Although there is no documentation, it is likely that the Navy would help Diomedes fill out and file this paperwork, especially on the eve of his expected service in Beirut.  Diomedes had made an allegiance to the United States when he enlisted, he stated as all enlisting officers do;

---

[3] Application for posthumous United States Citizenship is being made on behalf of Diomedes Quirante.
[4] Most of the personal records of the 24th MAU personnel in the HQ building were destroyed in the bombing. See 24th MAU- A Marine Remembers, Glenn Dolphin, Publish America, LLLP (2006)

"I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God."

The term "national" is defined in 8 U.S.C. § 1101 (a)(22), as "a person owing permanent allegiance to the United States."  In almost all of the cases in which a person was claiming to be a U.S. national, the person had been convicted of a felony and was using it to not get deported.   None of the decisions below set out a clear test of the factors in which a person would be considered a "national", unless they are a citizen or born in the United States.  Several federal courts that have addressed the definition of the term "national" recognize that it "came into popular use in this country when the United States acquired territories outside its continental limits, and was used in reference to noncitizen inhabitants of those territories."  Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59 (2002); see Rabang v. INS, 35 F.3d 1449, 1452 (9th Cir. 1994).

The United States Court of Appeals for the Second Circuit held that a Canadian citizen, who was a permanent legal resident for twenty years, and married to a U.S. citizen was not a national because he had failed to apply for citizenship and had not renounced his allegiance to Canada.  Oliver v. United States Dept. of Justice, 517 F.2d 426 (2d Cir. 1975). Diomedes no longer had an allegiance to the Philippines.

The United States Court of Appeals for the Eighth Circuit held that a Mexican citizen, who was a twenty year legal permanent resident, and married to a U.S. citizen was not a national because he never applied for citizenship.  Carreon-Hernandez v. Levi,

543 F.2d 637 (8th Cir. 1976).   This case would not preclude Diomedes from being recognized as a US national because he had applied for citizenship.

The United States Court of Appeals for the Ninth Circuit held that all of the circuits have recognized that length of legal permanent residency alone does not make one a national, but one factor in being recognized as an American national may be applying for citizenship.   Hughes v. Ashcroft, 255 F.3d 752 (9th Cir. 2001).   This court ruled that in order for a person to qualify for national status, "the person must, at a minimum, demonstrate (1) birth in a United States territory or (2) an application for United States citizenship."   Under Hughes, Diomedes met the minimum requirement for recognition as a US national by applying for US citizenship.

The United States Court of Appeals for the Fourth Circuit has held that because a person "was a permanent resident alien of the United States who had applied for United States citizenship, he was indeed a national".   U.S.A. v. Morin, 80 F.3d 124 (4th Cir. 1996).   This Court agreed that "an application for citizenship is the most compelling evidence of permanent allegiance to the United States short of citizenship itself."   Id. Under Morin, Diomedes has demonstrated the most compelling evidence of permanent allegiance to the United States short of citizenship itself by applying for US citizenship. Additionally, the fact pattern in Morin more closely matches Diomedes' case because unlike in most other cases construing nationality under 8 U.S.C. § 1101 (a)(22), Diomedes was not trying to avoid deportation by hollowly invoking nationality on a flimsy claim of permanent residence.

Thus Diomedes Quirante's situation differs from these other cases in two important respects: (1) he was shouldering the duties of an American in which service he

acted with the "last full measure of devotion"[5]; and (2) Quirante's declaration of allegiance by taking the oath of service in the Armed Forces of the United States was permanent, that is it lasted to the final moment of his life, unlike the litigants in the other cases who had left the military.

Although there are many Court opinions which have excluded persons from the definition of "national", the decisions in Hughes and Morin together have opened the door to the full understanding of "allegiance". Diomedes was a Naval Medical serving the country he loved to which he had sworn allegiance to the end of his life. He wanted to be a citizen. He was overseas, in another country, serving in accordance with his allegiance to the United States. He died for this allegiance. There can not be any stronger allegiance.

Should the Court rule that Diomedes Quirante was a national or a posthumous citizenship be granted, the Court must use a state law cause of action. The entire family, except the brother, Edgar Quirante (who was living in California on October 23, 1983), were living in the Republic of the Philippines. The Philippines have somewhat different legal system than the United States. The Plaintiffs ask that the Court apply the law of the forum, District of Columbia law, or federal common law for this particular case.

## VI.    CONCLUSION

Plaintiffs therefore respectfully request the Court to approve of the special masters' award recommendation in accordance with the law of the states where Plaintiffs' where domiciled on the morning of October 23, 1983.   The damages are to compensate the Plaintiffs for their injuries.    This case will also serve as a demonstration to the Defendants that their conduct in supporting acts of terrorism in violation of standards of

---

[5] Quoted from The Gettysburg Address, Abraham Lincoln.

civilized society shall not go unpunished, and to send a message to them and others that

the United States of America and its citizens respond to the lawless acts of terror and

murder with the application of orderly justice.

**Respectfully submitted,**

***Thomas Fortune Fay***
**THOMAS FORTUNE FAY**
**Unified Bar No. 23929**
**601 Pennsylvania Avenue, NW**
**#900 - South Building**
**Washington, D.C.  20004**
**(202) 638-4534**

***Steven R. Perles***
**STEVEN R. PERLES**
**Unified Bar No. 326975**
**Edward MacAllister**
**Unified Bar No. 494558**
**1146 19th Street, NW**
**Suite 500**
**Washington, DC 20036**
**(202)955-9055**

**Attorneys for Plaintiffs**

**November 15, 2006**