# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                              )

**DEBORAH D. PETERSON,** )
**Personal Representative of the** )
**Estate of James C. Knipple (Dec.),** *et al.*, )
                              )

      **Plaintiffs,** )
                              )      **Consolidated Civil Actions:**
        **v.** )           **01-2094 (RCL)**
                              )           **01-2684 (RCL)**
                              )

**ISLAMIC REPUBLIC OF IRAN,** *et al.*, )
                              )

      **Defendants.** )
_____)

## MEMORANDUM OPINION

## BACKGROUND

These actions arise from the October 23, 1983, bombing of a United States Marine barracks in Beirut, Lebanon, in which 241 American servicemen operating under peacetime rules of engagement were murdered by a suicide bomber. This attack was regarded as the most deadly state-sponsored terrorist attack made against American citizens, until the tragic attacks on September 11, 2001.

The nearly one thousand plaintiffs in this consolidated action are many of the family members and estates of the 241 servicemen killed in the attack. Plaintiffs allege that the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are liable for damages from the attack because they provided material support and assistance to

Hezbollah,[1] the terrorist organization that orchestrated and carried out the bombing.  Plaintiffs have relied upon causes of action founded upon provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7).

## **PROCEDURAL HISTORY**

On March 17-18, 2003, this Court conducted a bench trial to determine the defendants' liability for their part in the perpetration of this attack.  After reviewing the evidence presented by plaintiffs at trial, including testimony from lay and expert witnesses, this Court issued an opinion finding that the defendants were legally responsible for providing material financial and logistical support to help carry out this tragic attack on the 241 servicemen in Beirut in 1983.  *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 61 (D.D.C. 2003).  In that opinion, this Court also found that the surviving family members have suffered and will continue to suffer mental anguish and loss of society.  *Id.*  Finally, this Court directed special masters to consider each claim brought by plaintiffs, and indicated that it would make a determination on the amount of compensatory and punitive damages for each claim after the Court received reports from the special masters.[2]  The Court reaches this determination on the issue of damages in this opinion.

---

[1] According to the Oxford English Dictionary, the term "Hezbollah" is synonymous with the terms "Hizbollah" and "Hizbullah," all of which are English transliterations of the Arabic term referring to the extremist Shiite Muslim group also known as the "Party of God."  *See* Oxford English Dictionary (2d ed. 1989).  Accordingly, to the extent that any of these terms are used within this opinion, they shall be used interchangeably.

[2] In a prior case where this Court held Iran responsible under the Foreign Sovereign Immunities Act as a state sponsor of terrorism, this Court noted that its statutory duty is clear and that there is no danger of inadvertent interference with foreign relations.  *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 16 (D.D.C. Mar. 11, 1998) (Lamberth, J.).  "Article I of the Constitution establishes that Congress has 'authority to enact laws applicable to conduct beyond the territorial boundaries of the United States.'"  *Id.* (quoting *EEOC v. Aramco*, 499 U.S. 244, 260-61 (1991).  The Foreign Sovereign Immunities Act not only applies to extraterritorial

The Court reviews the determinations made by the special masters *de novo*.  *See* Fed. R. Civ. P. 53(g)(3).

## **DISCUSSION**

I.      *Assessment of Validity of Each Plaintiff's Cause of Action*

In order to ensure that the Court determines the appropriate amount of damages available to each plaintiff under the law, it must first ensure that each plaintiff has a valid claim under state law.  The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law."  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. Sept. 29, 2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.)).

In order to determine the applicable state law to each action, the Court must look to the choice of law rules of the forum, in this case, the choice of law rules of the District of Columbia.  *See Blais*, 459 F. Supp. 2d at 54.  Under District of Columbia choice of law rules, courts employ a modified government interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most

---

conduct, but one of its express purposes is to affect the conduct of terrorist states outside the United States, in order to promote the safety of United States citizens overseas.  Congress specifically restricted application of the statute to foreign state defendants which the Executive Branch, via the State Department, has determined are foreign state sponsors of terrorism.  *See id*. This Court is aware that the judgment entered today may be the largest ever entered by a court of the United States against a foreign nation.  The President has not filed a suggestion of interest indicating that actions by this Court will in any way interfere with the foreign relations of the United States.  This Court is properly performing its duty under a constitutional statute.

advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted). Application of this governmental interest test generally points to the law of plaintiff's domicile as having the greatest interest in providing redress to its citizens. Accordingly, the validity of each of the plaintiffs' claims shall be determined by the state in which they were domiciled at the time of the attack.

In this action, three types of claims have been sought. First, the personal representatives and estates of the servicemen killed in the attack have brought claims for wrongful death, in which the plaintiffs and beneficiaries seek compensation in the form of the present value of the decedent's lost wages and earnings that he would have earned but for his untimely death. Second, the surviving servicemen have brought claims for battery against the defendants. Third, the family members of both the deceased and surviving servicemen have brought claims for intentional infliction of emotional distress ("IIED") against the defendants for their part in materially bringing about the attack. The Court will assess the relative merits of each of the claims separately.

A.    *Wrongful Death Claims*

Wrongful death claims were brought by the personal representatives and estates of the following deceased servicemen:

Terry Abbott, John Robert Allman, Ronny Kent Bates, James Baynard, Jess W. Beamon, Alvin Burton Belmer, Richard D. Blankenship, John W. Blocker, Joseph John Boccia Jr., Leon Bohannon, John Bonk Jr., Jeffrey James Boulos, John Norman Boyett, William Burley, Paul Callahan, Mecot Camara, Bradley Campus, Johnnie Ceaser, Robert Allen Conley, Charles Dennis Cook, Johnny Len Copeland, David Cosner, Kevin Coulman, Rick Crudale, Russell Cyzick, Michael Devlin, Nathaniel Dorsey, Frederick Douglass, Timothy Dunnigan, Bryan Earle,

Danny R. Estes, Richard Andrew Fluegel, Michael D. Fulcher, Sean Gallagher, George Gangur, Randall Garcia, Harold Ghumm, Timothy Giblin, Michael Gorchinski, Richard Gordon, Davin M. Green, Thomas Hairston, Michael Haskell, Mark Anthony Helms, Stanley G. Hester, Donald Wayne Hildreth, Richard Holberton, Dr. John Hudson, Maurice Edward Hukill, Edward Iacovino Jr., Paul Innocenzi III, James Jackowski, Jeffrey Wilbur James, Nathaniel Walter Jenkins, Edward Anthony Johnston, Stephen Jones, Thomas Adrian Julian, Thomas Keown, Daniel Kluck, James C. Knipple, Freas H. Kreischer III, Keith Laise, James Langon IV, Michael Scott LaRiviere, Steven LaRiviere, Richard Lemnah, Joseph Raymond ("Joel") Livingston III, Paul D. Lyon Jr., John Macroglou, Samuel Maitland Jr., Charlie Robert Martin, David Massa, John McCall, James E. McDonough, Timothy R. McMahon, Richard Menkins II, Ronald Meurer, Joseph Peter Milano, Joseph Moore, Harry Douglas Myers, David Nairn, John Arne Olson, Joseph Albert Owens, Connie Ray Page, Ulysses Gregory Parker, John L. Pearson, Thomas S. Perron, John Arthur Phillips Jr., William Ray Pollard, Victor Mark Prevatt, James Price, Patrick Kerry Prindeville, Diomedes J. Quirante, Warren Richardson, Luis J. Rotondo, Michael Caleb Sauls, Charles Jeffrey Schnorf, Scott Lee Schultz, Peter Scialabba, Gary Randall Scott, Thomas Alan Shipp, Jerryl Shropshire, Larry H. Simpson Jr., Kirk Hall Smith, Thomas Gerard Smith, Vincent Smith, William Scott Sommerhof, Stephen Eugene Spencer, William Stelpflug, Horace Renardo ("Ricky") Stephens Jr., Craig Stockton, Jeffrey Stokes, Eric D. Sturghill, Devon Sundar, Thomas Paul Thorstad, Stephen Tingley, Donald H. Vallone Jr., Eric Glenn Washington, Dwayne Wigglesworth, Rodney J. Williams, Scipio Williams Jr., Johnny Adam Williamson, William Ellis Winter, Donald Elberan Woollett, Craig Wyche, Jeffrey D. Young.[3]

Out of the 128 deceased servicemen, 123 were domiciled in North Carolina at the time of the attack.[4]  The servicemen who were not domiciled in North Carolina at the time of the attack

---

[3] In association with their wrongful death claims, the respective estates of Alvin Burton Belmer, Nathaniel Walter Jenkins, Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley have sought damages for pain and suffering incurred during the time at which they were alive after the attack and the time at which they died.  The measure of damages for each of these servicemen will be assessed in the damages portion of this opinion, *see infra* Section II.B.1, and does not affect the validity of their wrongful death claims.

[4] Deceased serviceman, Diomedes J. Quirante, was born in the Phillippines in 1958, and was not a United States citizen.  Therefore, an issue exists as to whether Diomedes J. Quirante has standing to recover against Iran and MOIS under the FSIA's "state sponsored terrorism" exception.  In order for a plaintiff to so recover, he or she must show that: (1) the State

were domiciled in California, Oklahoma, South Carolina, and Vermont.[5]  This difference in

domicile is of no moment, however, because the wrongful death statutes of each of the

servicemen's respective states of domicile imposes liability on an actor when his "wrongful act,

neglect, or default" causes a person's death, and had that person lived, he could have recovered

damages from the actor.  Cal Civ. Proc. Code § 377.60(a) (2007); N.C. Gen. Stat. § 28A-18-2(a)

(2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. § 15-51-10 (2006); Vt. Stat. Ann. tit. 14,

§ 1491 (2007).  Each statute provides for recovery of numerous categories of damages, including

---

Department had previously designated the foreign sovereign as a "state sponsor of terrorism" or
did so based on the event in question; (2) the victim or plaintiff was a U.S. national when the
event took place; and (3) "the foreign sovereign engaged in conduct that falls within the ambit of
the statute."  *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28,
2006).

    As this Court has already found in its Memorandum Opinion establishing the defendants'
liability for this attack, the first and third requirements are satisfied.  Therefore, the only issue
remaining is whether Diomedes qualifies as a United States national.  The term "U.S. national"
embraces both United States citizens and non-citizens who owe permanent allegiance to the
United States.  8 U.S.C. § 1101(a)(22) (2006).  In this case, the evidence shows that Diomedes
clearly was a U.S. national.  First, though a citizen of the Phillippines, Diomedes enlisted in the
United States Army when he was twenty one years old.  As a part of his commitment to
becoming a member of the United States Armed Forces, Diomedes was required to take an oath
to defend and uphold the Constitution of the United States.  Once enlisted, he was assigned to the
2nd Marine Division, Fleet Marine Force (FMF) in Camp Lejeune, North Carolina.  He remained
a member of the United States Army in North Carolina from that time until his death in Beirut,
Lebanon in 1983.  His oath, and ultimate heroic act of dying while a member of the United States
Army establishes beyond any doubt that Diomedes J. Quirante's allegiance to the United States
was permanent.  Therefore, this Court finds that Diomedes J. Quirante was a United States
national at the time he was killed.  Accordingly, Diomedes has standing under the FSIA to
recover against the defendants.

    There still remains the issue of what law governs Diomedes' claims.  In light of the fact
that he was stationed in Camp LeJeune, North Carolina before being sent to Lebanon, this Court
finds that North Carolina is the state with which Diomedes had the closest and most substantial
connection.  Therefore, the law of North Carolina shall govern Diomedes' wrongful death claim.

    [5] The Court could not determine the domicile of one serviceman, Frederick Douglass,
because no evidence was presented on behalf of his estate.  For this reason, the Court will
dismiss the claim brought by the personal representative of his estate without prejudice.

pecuniary loss in the form of the present monetary value of the decedent to the persons entitled to receive the damages recovered, expenses for care, treatment and hospitalization incident to the injury resulting in death; and reasonable funeral expenses.  *See* Cal Civ. Proc. Code § 377.61 (2007); N.C. Gen. Stat. § 28A-18-2(b) (2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. § 15-51-20 (2006);  Vt. Stat. Ann. tit. 14, § 1491 (2007).  Additionally, North Carolina allows for the recovery of compensation for pain and suffering of the decedent.  N.C. Gen. Stat. § 28A-18-2(b).[6]

Based upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for wrongful death under North Carolina law.  Accordingly, those valid heirs and beneficiaries under North Carolina's intestate statute are entitled to share in the recovery of the damages awarded as a result of each serviceman's untimely death.

B.     *Battery Claims*

Claims of battery were brought against the defendants by the following servicemen who ultimately survived the attack:

Marvin Albright, Pablo Arroyo, Anthony Banks, Rodney Darrell Burnette, Frank Comes Jr., Glenn Dolphin, Frederick Daniel Eaves, Charles Frye, Truman Dale Garner, Larry Gerlach, John Hlywiak, Orval Hunt, Joseph P. Jacobs, Brian Kirkpatrick, Burnham Matthews, Timothy Mitchell, Lovell "Darrell" Moore, Jeffrey Nashton, John Oliver, Paul Rivers, Stephen Russell, Dana Spaulding,

---

[6] The servicemen who seek pain and suffering during the survival period between the attack and their deaths were each domiciled in North Carolina at the time of the attack. Therefore, the Court need only concern itself with North Carolina law on the issue of pain and suffering.

Craig Joseph Swinson, Michael Toma, Danny Wheeler, Thomas D. Young[7]

Out of the twenty six surviving servicemen seeking damages for battery, twenty five of them were domiciled in North Carolina at the time of the attack.  The one remaining surviving serviceman, Charles Frye, was domiciled in California at the time of the attack.  Both states, however, recognize that a battery is deemed to be an offensive touching of the person by another without consent.  *See Rains v. Superior Court*, 198 Cal. Rptr. 249, 252 (Cal. Ct. App. 1984); *Ormond v. Crampton*, 191 S.E.2d 405, 410 (N.C. App. 1972).  Therefore, the battery claims for each of the servicemen can be assessed evenly.

Based upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for battery under North Carolina and California law.  Therefore, each may recover the appropriate amount of compensatory damages as determined by this Court.

### C.    *Intentional Infliction of Emotional Distress Claims*

The remaining 753 plaintiffs have sought claims for intentional infliction of emotional distress, and awards for pain and suffering incurred as a result of their extreme emotional grief and psychological anguish associated with the knowledge that their family members are either deceased or alive but permanently scarred both physically and mentally.  Each of these plaintiffs were domiciled in a number of different states–and in one family's case, the Phillippines–at the time of the attack.  Accordingly, this Court must determine whether each of these plaintiffs has brought a valid cause of action under each state's respective law.

---

[7] Because these individuals can recover for their mental anguish and suffering under their respective battery claims, the Court need not consider each plaintiff's intentional infliction of emotional distress claim, which would result in an impermissible double recovery.

In order to accomplish this, the Court must first analyze whether such a cause exists under each state's laws.  Next, to the extent that a state recognizes IIED claims, this Court must determine which family members have standing to recover for IIED under each state's laws.  Then this Court must assess whether the plaintiffs have established the essential elements of the claim.

### 1.    *Intentional Infliction of Emotional Distress: State Law Analysis*

The states of domicile for these 753 plaintiffs are: Alabama, California, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, and Wisconsin.  The family of serviceman Diomedes J. Quirante was domiciled in the Phillippines.[8]

Each of the states mentioned above recognize the existence of a cause of action for intentional infliction of emotional distress, rooted in Section 46 of the Restatement (Second) of

---

[8] Though the surviving immediate family members of Diomedes J. Quirante are not United States citizens, the Court finds that they have standing under the FSIA to bring claims for intentional infliction of emotional distress under North Carolina law.  The "state sponsored terrorism" exception to the FSIA requires only that either the plaintiffs *or the victim* be a United States national at the time of the attack.  *Prevatt*, 421 F. Supp. 2d at 158.  Therefore, the Quirante family members' intentional infliction of emotional distress claims may be brought because Diomedes was a United States national at the time he was killed.  *See supra* note 3.  Applying District of Columbia choice of law principles, North Carolina is the state with the strongest interest in determining the claims brought by Diomedes' family members because their claims are intertwined with–and result from–Diomedes' death.  Therefore, this Court finds that the claims brought by the Quirante family are governed by North Carolina law.

Torts.[9]   Though each state has its own particular means of describing intentional infliction of emotional distress, upon inspection of each state's laws the elements of intentional infliction of emotional distress are met in each state if it can be demonstrated that: (1) the defendant engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress.[10]

There still remains the issue of whether each plaintiff has standing to recover under state

---

[9] *See, e.g.*, *American Rd. Serv. Co. v. Inmon*, 394 So.2d 361 (Ala. 1980); *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982); *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970); *Murray v. Bridgeport Hosp.*, 480 A.2d 610, 614 (Conn. 1984); *Johnathan Woodner Co. v. Breeden*, 665 A.2d 929, 934-35 (D.C. 1995); *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985); *Yarbray v. Southern Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 837 (Ga. 1991); *Palmateer v. International Harvester Co.*, 406 N.E.2d 595, 598 (Ill. App. Ct. 1980), *rev'd on other grounds*, 421 N.E.2d 876 (Ill. 1981); *Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002); *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984); *White v. Monsanto Co.*, 585 So.2d 1205, 1208-1210 (La. 1991); *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *George v. Jordan Marsh Co.*, 258 N.E.2d 958, 921 (Mass. 1971); *Dornfeld v. Oberg*, 503 N.W.2d 115, 117 (Minn. 1993); *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. 1993); *Morrison v. Means*, 680 So. 2d803, 805-06 (Miss. 1996); *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981); *Gall v. Great Western Sugar Co.*, 363 N.W.2d 373, 376 (Neb. 1985); *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988); *Mantz v. Follingstad*, 505 P.2d 68, 74-75 (N.M. App. 1972); *Murphy v. Am. Home Prods. Corp.,* 448 N.E.2d 86, 90 (N.Y. 1983); *Yeager v. Local Union 20,Teamsters, Chauffeurs, Warehousemen, & Helpers of America*, 453 N.E.2d 666, 671 (Ohio 1983); *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978); *Forster v. Manchester*, 189 A.2d 147, 151-52 (Pa. 1963); *Champlin v. Washington Trust Co.*, 478 A.2d 985, 988 (R.I. 1984); *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981); *Christians v. Christians*, 637 N.W.2d 377, 382 (S.D. 2001); *Levy v. Franks*, 159 S.W.3d 66, 82-83 (Tenn. Ct. App. 2004); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *Sheltra v. Smith*, 392 A.2d 431, 433 (Vt. 1978); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974); *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Wayne County Bank v. Hodges*, 338 S.E.2d 202, 205 (W. Va. 1985).

[10] *See supra* note 7.

law for the defendant's attack on the plaintiffs' respective family members.  Section 46(2) of the Restatement (Second) of Torts governs the ability of plaintiffs to recover for intentional infliction of emotional distress where the defendant's conduct is directed at a third party.  Restatement (Second) of Torts § 46(2).  Section 46(2) of the Restatement specifically states that only present third parties may recover for an IIED claim.  Nonetheless, the Caveat to the section leaves open the possibility of other possible situations where a defendant could be liable for intentional infliction of emotional distress under this section.

Each state has interpreted this ambiguity differently.  Some states have explicitly allowed for situations where the presence requirement is unnecessary to establish an IIED claim.  Florida, for example, has acknowledged that an immediate family member may recover for intentional infliction of emotional distress even if he or she was not present at the time of the outrageous conduct.  *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App.1991).  Along the same lines, California has found that a plaintiff's presence is not always required, and is deemed unnecessary in situations where the defendant is aware of the high probability that the defendant's acts will cause a plaintiff severe emotional distress.  *Christensen v. Superior Court*, 820 P.2d 181, 203-204 (Cal. 1992).[11]  Therefore, as this Court found in *Heiser*, when a terrorist attack occurs, the presence element is not required to bring a valid IIED claim under either Florida or California law, and that plaintiffs domiciled in these states at the time of the attack may bring a

---

[11] Applying this standard, this Court found in *Heiser* that, given the extreme nature of a terrorist attack, the presence element for an IIED claim under California law did not need to be proven.  *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 305 (D.D.C. Dec. 22, 2006) (Lamberth, J.).

claim for IIED without establishing their presence at the scene of the injury.[12]  Much like Florida

and California, Vermont has no presence requirement for plaintiffs to recover for the intentional

or reckless infliction of emotional distress.  *Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990).

Additionally, there are a number of states at issue in this action whose Supreme Courts

have not specifically addressed the issue of whether a plaintiff's presence is required.  Some of

the laws of these states–Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, and Kansas–were previously analyzed by this Court in *Heiser*, in which this Court

found that no such presence requirement was necessary in these states given the severe nature of

terrorist attacks.  *See Heiser*, 466 F. Supp. 2d at 328-29, 333 (Tex.), 341 (Minn.), 343-44 (Wisc.),

345-46 (N.Y.), 349 (N.C.), 352 (Ind.), 354 (Okla.), 355 (Kans.).[13]  In this case, the respective

---

[12] This finding, of course, is on the assumption that those plaintiffs have standing to recover in the first place.  Those plaintiffs without standing to recover under the law of their respective domiciliary states may not recover, regardless of whether a plaintiff with standing could so recover.

[13] The Oklahoma Supreme Court has rejected recovery for mental anguish and suffering under an IIED claim brought by bystanders.  See *Slaton v. Vansickle*, 872 P.2d 929, 931-32 (Okla. 1994).  According to Oklahoma's Supreme Court, it is long recognized that "recovery for mental anguish is restricted to such mental pain or suffering as arises from an injury or wrong to the person rather than from another's suffering or wrongs committed against another person." *Vansickle*, 872 P.2d at 931.  Following this logic, the Oklahoma Supreme Court limited recovery when a plaintiff's IIED claim rests on conduct directed at a third party to situations where: "1) the plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from actually viewing the injury to another rather than from learning of the accident later; and 3) a familial or other close personal relationship existed between the plaintiff and the party whose injury gave rise to the plaintiff's mental anguish."  *Kraszewski v. Baptist Med.  Ctr. Of Okla., Inc.*, 916 P.2d 241, 248 (Okla. 1996).  This limitation on third party recovery is of no moment, however, due to the simple fact that it has been repeatedly found that "a terrorist attack-by its nature-is directed not only at the victims but also at the victims' families."  *Heiser*, 466 F. Supp. 2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)).  Therefore, the decedents' near relatives are also direct victims of this horrendous attack.  Accordingly, this Court finds that the limitations imposed by the Oklahoma Supreme Court on recovery for pain and suffering due to injuries sustained by a third party do not

state supreme courts of a number of states–Alabama, Connecticut, District of Columbia, Illinois,

Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New

Jersey, New Mexico, Rhode Island, Tennessee, Virginia–have not specifically addressed whether

a plaintiff's presence is required to establish a viable IIED claim.  Accordingly,"in light of the

severity of [a terrorist attack,] and the obvious range of potential grief and distress that directly

results from such a heinous act,"[14] and because "a terrorist attack-by its nature-is directed not

only at the victims but also at the victims' families,"[15] this Court adopts the rationale it set forth in

*Heiser* regarding the presence element for IIED claims in states that have been silent on the issue.

*See Heiser*, 466 F. Supp. 2d at 328-29.  Therefore, this Court finds that claims for intentional

infliction of emotional distress may be brought by family members without having to establish a

presence requirement under Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, Kansas, Alabama, Connecticut, District of Columbia, Illinois, Indiana, Kansas,

Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey, New

Mexico, Rhode Island, Tennessee, and Virginia laws.[16]

   Other states at issue in this case–Georgia, Missouri, South Carolina, South Dakota,

Washington, and West Virginia–have allowed third party plaintiffs to recover, but only when the

defendant's conduct is "directed at" the third party plaintiffs themselves.[17]  As this Court and

apply to the family members seeking redress before this Court today.

   [14] *Heiser*, 466 F. Supp. 2d at 328.

   [15] *Id.* (quoting *Salazar*, 370 F.Supp.2d at 115 n. 12).

   [16] *See supra* note 10.

   [17] *See, e.g.*, *Ryckeley v. Callaway*, 412 S.E.2d 826, 827 (Ga. 1992); *Samsonetti v. City of St. Joseph*, 976 S.W.2d 572, 580 (Mo. App. W.D. 1998) (citing *Gibson v. Brewer*, 952 S.W.2d

others within this district have noted, "a terrorist attack–by its nature–is directed not only at the victims but also at the victims' families." *Heiser*, 466 F. Supp. 2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)).  Therefore, this Court finds that those plaintiffs domiciled in Georgia, Missouri, South Carolina, South Dakota, Washington, and West Virginia at the time of the attack, may bring a claim for IIED under the laws of those states because the attack was directed at them as well as those killed in the attack.[18]

Two other states at issue in this case–Louisiana and Pennsylvania–have narrowly construed their interpretation of what constitutes a valid IIED claim, and have expressly found that the presence element is required for third party plaintiffs to recover.[19]  Accordingly, this Court finds those plaintiffs who were not contemporaneously present at the site of the attack would not be able to recover under either Louisiana or Pennsylvania law for a claim of IIED. Without a valid cause of action under state law, the plaintiffs domiciled in Louisiana and Pennsylvania lack a viable means to redress their injury, and therefore lack standing.

---

239, 249 (Mo. 1997) (en banc)); *Upchurch v. New York Times Co.*, 431 S.E.2d 558, 561 (S.C. 1993) (citing *Christensen v. Superior Court*, 820 P.2d 181 (Cal. 1991)); *Hayes v. Northern Hills General Hospital*, 628 N.W.2d 739, 744 (S.D. 2001); *Reid v. Pierce County*, 961 P.2d 333, 337 (Wash. 1988); *Courtney v. Courtney*, 413 S.E.2d 418, 422 (W. Va. 1991).

[18] *See supra* note 10.

[19] *See Daigrepont v. State Racing Com'n*, 663 So.2d 840, 841 (La. App.1995) (requiring plaintiff's actual presence at the scene of the injury, and not allowing any further interpretation of the provision in the Louisiana Code establishing a cause of action for IIED); *Taylor v. Albert Einstein Medical Center*, 754 A.2d 650, 652-53 (Pa. 2000) (limiting IIED recovery to those plaintiffs "who were present at the time, as distinguished from those who discover later what has occurred," even in those situations where the defendant may be substantially certain that the plaintiff will suffer severe emotional distress as a result of the offensive act).

Accordingly, this Court must regrettably deny and dismiss the claims of those plaintiffs who were domiciled in Louisiana and Pennsylvania at the time of the attack.[20]  The claims brought by the following individuals must be DISMISSED due to lack of standing:

> Deborah Spencer Rhosto, Catherine Bonk, John Bonk Sr., Thomas Bonk, Patricia Kronenbitter, Catherine Bonk Hunt, Kevin Bonk, Marilou Fluegel, Thomas A. Fluegel, Penni Joyce, Robert Fluegel, Julia Bell Hairston, Felicia Hairston, Evans Hairston, Virginia Ellen Hukill, Henry Durban Hukill, Melissa Hukill, Meredith Anne Hukill, Mark Andrew Hukill, Matthew Scott Hukill, Mitchell Charles Hukill, Monte Hukill, Bill Laise, Betty Laise, Kris Laise, Lorraine Macroglou, Bill Macroglou, James Macroglou, Shirley Kirkwood, Carl Kirkwood Sr., Kathy McDonald, Sally Jo Wirick, Storm Jones (a/k/a Shirley Ann Storm Pettry), Edward Joseph McDonough, Sean McDonough, Edward W. McDonough, Carl Arnold Kirkwood Jr., Jeff Kirkwood, Marion DiGiovanni, (Estate of) Luis Rotondo (father), (Estate of) Rose Rotondo, Danielle DiGiovanni, Lisa DiGiovanni, Robert DiGiovanni, (Estate of) Phyllis Santoserre, Larry H. Simpson Sr., Anna Marie Simpson, Renee Eileen Simpson, Sherry Lynn Fiedler, Robert Simpson.

>    2.    *Intentional Infliction of Emotional Distress: Extent of Family Members'*
>
>    *Respective Recovery*

Though many of the states at issue in this case have recognized the existence of IIED claims for family members who were not present at the scene of the injury, this does not necessarily extend the ability to bring an IIED claim to *all* family members.  As the D.C. Circuit has noted previously, Section 46 of the Restatement (Second) of Torts does not extend causes of action beyond members of the victim's "immediate family."  *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 334-35 (D.C. Cir. 2003) (refusing to extend "direct victims" under § 46(1)

---

[20] To the extent that these plaintiffs are relatives to any of the deceased servicemen, it should be noted that the dismissal of these plaintiffs' IIED claims does not hinder these individuals' ability to recover any portion of a wrongful death damages awarded to the estates of those servicemen to which these dismissed plaintiffs may be entitled under North Carolina law.

and "third party victims" under § 46(2) to include nieces and nephews not present at the scene of injury). Accordingly, this Court finds that those members of the families of the servicemen who are not within the immediate family of the serviceman *at the time of the attack* may not recover.

This Court has previously deemed near relatives to include only the victim's spouse, parents, children, and siblings. *See Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2002) (Lamberth, J.), *affirmed sub nom.*, *Bettis*, 315 F.3d at 335. Though the Court does not deny the extreme pain and suffering felt by those outside of this class of individuals, it is necessary to draw such a line at immediate family members in order "to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress." *Heiser*, 466 F. Supp. 2d at 329. Moreover, such a delineation is consistent with the provisions of Section 46 of the Restatement. *See* Restatement (Second) of Torts § 46, cmt. l; *cf. Bettis*, 315 F.3d at 335 (finding that permitting nieces and nephews to recover under § 46(1) would undermine the limitations on recovery of "immediate family" members under § 46(2)). Therefore, those plaintiffs who are not members of this class of individuals in relation to the servicemen cannot recover.[21] Accordingly, the Court must dismiss the claims of the following plaintiffs: Ashley Tutwiler Beamon, David Clark, Michael Clark, Jr., Rebecca Iverson Green, Geraldine Morgan, Pamela Nashton, Natalie Rochwell, (Estate of) Lula Mae Watkins,[22] and

---

[21] Current spouses who were not yet married to an injured servicemen at the time of the attack are not considered "immediate family" for the purposes of recovery. These individuals are therefore among the group of plaintiffs who cannot recover damages sustained as a result of the attack.

[22] According to the special master's report, Lula Mae Watkins was the legal guardian of Jerryl Shropshire. There is no evidence, however, of a formal order terminating the rights of Jerryl's natural parents. *See* Ga. Stat. Ann. 15-11-93 (2007). Absent such an order, "there is no Georgia law under which the loss of parental power also results in the parent's loss of a right to

Simon Watkins.

> 3.     *Claims That Must Be Dismissed Due to Lack of Evidence and*
>
>        *Participation*

"[T]he entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6

(D.C. Cir. 2005).  Personal Jurisdiction must still be determined before entering default judgment

against an absent defendant.  *Id.*  As standing must be determined prior to and independent of any

determination of a court's jurisdiction,[23] so too must standing be determined before a court enters

default judgment against an absent defendant.

With respect to standing, the trial court has power "to allow or to require the plaintiff to

supply, by amendment to the complaint or by affidavits, further particularized allegations of fact

deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does

not adequately appear from all materials of record, the complaint must be dismissed." *Warth v.*

*Seldin*, 422 U.S. 490, 501-02 (1975).

After an evidentiary hearing before this Court establishing the defendants' complicity in

bringing about the attacks, the Court designated special masters to hear each of the plaintiffs'

respective claims, so that damages might be determined.  As is unfortunately sometimes the case

in a situation with as far-reaching an effect as this, certain family members of the deceased and

_____

inherit as an heir from a child's estate." *Blackstone v. Blackstone*, 639 S.E.2d 369, 370 (Ga. Ct.
App. Nov. 21, 2006).  This is true even if the parents have failed to provide any support for the
child during the child's lifetime.  *Id.* at 371.  Accordingly, the estate of Lula Mae Watkins may
not recover for damages arising out of Jerryl's death because she is not a parent or other
immediate family member under Georgia law.  Likewise, Geraldine Morgan and Simon
Watkins–as Lula Mae's granddaughter and son, respectively–may also not recover.

[23] *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. at 91.

injured servicemen–family members who undoubtedly shared equally in the grief and suffering

caused by the tragic deaths of their loved ones–could not be located or were unable to present

evidence before this Court and its designated special masters to establish a valid claim for

damages.  Without evidence supporting their claims of intentional infliction of emotional

distress, the Court cannot determine at this time whether these individuals have sufficient

standing to bring a claim.  Accordingly, the claims from the following individuals shall be

DISMISSED WITHOUT PREJUDICE due to lack of evidence:

> Marvin Albright, Jr., Mirequrn Albright, Shertara Albright, Anthony Banks (son), Michael Banks, Taiarra Banks, Lori Berry, Christopher Burnette, Gwen D. Burnette, Mecot Camara Jr., Dale Comes, Tommy Comes, Kimberly Crop, Connie Burnette Decker, Erin Dolphin, Frederick Douglass, Christopher Eaves, India Eaves, Sylvia Jean Eaves, Charles Frye Jr., Gina Frye, Lialani Frye, Lincoln Frye, Randall Frye, Gerald Foister, Joseph Garner, Justina Garner, Penny Garner, Reva Garner, Karl Goodman, Barbara Haskell, Richard Haskell, Jordan Hlywiak, Taylor Hlywiak, Mendy Leigh Hunt, Jack Darrell Hunt, Marcy Elizabeth Hunt, Molly Faye Hunt, Carol Livingston, (Estate of) Manuel Massa Sr., Chadwick Matthews, Debra Matthews, Drew Matthews, Deborah Meurer, Shirley Douglass Miller, Elvera Mitchell, Robert Mitchell, (Estate of) Betty Lou Price, Timothy Price, Jeremy Rivers, Paul Rivers (son), Sandra Rivers, Carol Schak, George Schak, Lynne M. Spencer, Patrice Washington, (Estate of) Dorothy Williams, George Robinson Williams, Kevin Coker Williams, Bill Williamson, Debra Wise, Gwen Woodcock.

The Court will now turn its attention to those remaining claims that must be dismissed for

reasons not yet specified within this opinion.

### 4.     *Other Remaining Claims That Must Be Dismissed*

#### a.     *Claim of Bobby Wallace*

Under Oklahoma law, a non-adopted stepchild is not considered "issue" or a "child" for

purposes of inheritance.  *See* Okla. Stat. Ann. tit. 84, § 213 (2007); *cf.* Green v. Wilson, 240 P.

1051, 1052 (Okla. 1925) (finding that, under § 213, estate of deceased intestate is inherited by

surviving spouse and legitimate children, *and adopted child* surviving inherits as if born in wedlock).  In light of the disparate treatment of adoptive and non-adoptive children in terms of inheritance, it stands to reason that non-adoptive stepparents of stepchildren would be treated differently under Oklahoma law than stepparents who adopt those stepchildren.  Accordingly, under Oklahoma law, a stepfather would not be able to inherit from or through his non-adopted stepson; likewise, nor would he be able to recover damages as a result of the stepson's death.  Accordingly, this Court finds that Bobby Wallace, as Stephen Eugene Spencer's non-adoptive stepfather, may not recover for IIED resulting from Stephen's death in the attack, and his claim must be DISMISSED.

> b.      *Claim of Herbert Persky*

As the stepfather to Timothy R. McMahon, Herbert Persky has brought an IIED claim against the defendants.  Based on the evidence presented to the Court, however, Mr. Persky may not recover for IIED due to the fact that, as a stepparent, Mr. Persky lacks standing to bring such a claim.

As this Court has previously noted, Texas has adopted Section 46 of the Restatement (Second) of Torts in establishing a cause of action for IIED.  *Heiser*, 466 F. Supp. 2d at 333.  Moreover, the Texas Supreme Court has remained silent on the issue of whether a plaintiff's presence is required in order for a third party to recover for IIED.  *Id.*  Accordingly, this Court has found that the near relatives of a victim who were not present at the time of the attack would still be able to recover for IIED under Texas law.  *Id.*  Therefore, Mr. Persky may only recover for IIED if he is considered a near relative under Texas law.

Under Texas law, however, stepparents that do not adopt a child are not deemed the same

as natural parents for purposes of inheriting from that child.  Tex. Civ. Prac. & Rem.Code Ann. §

71.004(a) (Vernon 1997) (stating that only the victim's surviving spouse, children, and parents of

the deceased may recover for the victim's wrongful death).  "A stepparent who takes no steps to

legally adopt his stepchild does not qualify as a parent for purposes of Texas's wrongful death

statute."  *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 578 (S.D. Tex. 2003) (citing

*Boudreaux v. Texas & N.O.R. Co.*, 78 S.W.2d 641 (Tex.Civ.App.-Beaumont 1935, writ ref'd)).

In this case, notwithstanding the relationship that Mr. Persky had with Mr. McMahon,

there is no evidence that Mr. Persky legally adopted Mr. McMahon.  Accordingly, Mr. Persky is

not considered a parent for purposes of being able to recover for pain and suffering as a result of

his stepson's untimely death.  Therefore, Mr. Persky does not have standing to bring a claim for

IIED in this case, and his claim must be DISMISSED.

#### c.      Claims of Sandra Bianco and Sandra Karen Bianco

Under New Jersey law, a natural birth parent may recover for and inherit from and

through their child.  Once that child is legally adopted by another parent, however, the natural

parent's privileges and obligations cease, "including the right of the natural parents and their

kindred to take and inherit intestate personal and real property from and through the person

adopted."  N.J. Stat. Ann. 2A: 22-3(b) (2007) (emphasis added).  Moreover, upon adoption all

rights, privileges and obligations normally bestowed upon natural parents-including the right to

take and inherit from and through the adopted child-become bestowed upon the adoptive parent

instead, who is treated in the eyes of the law "as if the person adopted had been born to them in

lawful wedlock . . . ."  N.J. Stat. Ann. 2A: 22-3(c) (2007).

Here, Sandra Bianco (natural mother to serviceman Richard Andrew Fluegel) and Ms.

Bianco's daughter Sandra Karen Bianco (Richard's half-sister) seek under respective IIED claims

to recover pain and suffering damages arising out of Richard's death.  Richard, however, is

survived by his natural father Thomas A. Fluegel, his adoptive mother Marilou Fluegel, and his

full blood siblings Penni Joyce and Robert Fluegel.  Therefore, though Ms. Bianco is Richard's

natural mother, she may nonetheless not recover for pain and suffering from Richard's death

because, under New Jersey law, Ms. Bianco's entitlement to take and recover from or through her

son ceased once Richard was adopted by Marilou Fluegel.  Therefore, the privilege of recovering

as a mother to Richard for the pain and suffering associated with Richard's death has been

bestowed upon Marilou Fluegel due to the fact that she legally adopted Richard.  Therefore, this

Court must DISMISS Sandra Bianco's claim for IIED for lack of standing.

For similar reasons, this Court must also dismiss Sandra Karen Bianco's claim for IIED

for lack of standing.  As noted previously, the privileges and obligations of the natural parent and

their kindred ceases upon the child's adoption by another parent.  Therefore, as kindred to Sandra

Bianco, Sandra Karen Bianco may not recover damages associated with Richard Fluegel's death,

and her claim must also be DISMISSED.

*d.*     *Claims of Donald Rockwell, Charles Corry and Michael Clark Jr.*

Donald Rockwell (stepbrother to Michael Caleb Sauls), Charles Corry (brother-in-law to

Eric Glenn Washington), and Michael Clark, Jr. (brother-in-law to James Baynard) seek to

recover for IIED in this case as step-siblings of the deceased servicemen.  Under Virginia law,

however, only blood siblings and adoptive step-siblings qualify as siblings for purposes of

recovering damages resulting from a victim's wrongful death.  *See Brown v. Brown*, 309 S.E.2d

586, 590 (Va. 1983).  Individuals are siblings to another individual only if they are of the same

parental origin as their sibling, or if they are adopted by a shared parent.  *Id.* (citing *Jones v. Jones*, 530 P.2d 34 (Ore. 1974) (declining to expand class entitled to recovery as direct beneficiaries under wrongful death statute beyond spouse and children of decedent so as to include as dependents-such as non-adopted stepchildren-a person to whom decedent had no legal obligation of support).  Non-adopted step-siblings do not qualify as siblings because they are not of the same origin as their step-sibling, nor deemed of the same origin as their step-sibling under the law because they were not legally adopted.  *Brown*, 309 S.E.2d at 590.  Therefore, in Virginia non-adoptive step-siblings may not recover for pain and suffering arising out of an IIED claim because they are not deemed siblings under the law.  *Cf. id.*  A fortiori, a sibling-in-law-who has virtually no chance of being either adopted or of the same parental origin as the victim-may not recover for pain and suffering arising out of an IIED claim.

In this case, there is no evidence that Donald Rockwell was an adopted stepbrother to Michael Caleb Sauls.  Therefore, Mr. Rockwell's claim for IIED fails for lack of standing, and must therefore be denied.  Similarly, Messrs. Corry and Clark's claims must also be denied because, as a siblings-in-law, neither is deemed a sibling under the law.  Accordingly, this Court finds that none of these three plaintiffs may recover for IIED as a sibling under Virginia law, and each of their IIED claims must be DISMISSED.

e.  *Victoria Prevatt-Wood*

Victoria Prevatt-Wood has already brought a claim against the defendants for conduct arising out of this attack.  *See Prevatt*, 421 F. Supp. 2d at 152.  Ms. Prevatt-Wood was awarded $2.5 million by this Court for her pain and suffering associated with the loss of her brother, Victor Mark Prevatt.  *Id.* at 161.  To allow her to seek additional damages would grant her

impermissible double recovery.  Accordingly, her claim in this action must be DISMISSED.

### f.      Mary Jackowski

Mary Jackowski, stepmother to deceased serviceman James Jackowski, seeks to recover

for IIED for the death of James.  Under New York law, however, "[n]either step-children nor

step-parents inherit property from each other."  Erie County Bd. of Social Welfare v. Schneider

163 N.Y.S.2d 184, 186 (N.Y. Child Ct. 1957).  Therefore, Mary Jackowski may only recover for

the death of James if she legally adopted James.  There is no evidence in this case, however,

indicating that James was legally adopted by Mary.  Therefore, she has no standing to bring a

claim for damages arising out of the death of her stepson.  Accordingly, the claim brought by

Mary Jackowski must be DISMISSED.

### g.      Stepparents and Step-siblings of Donald H. Vallone, Jr.

Charles Phelps (stepfather to Donald H. Vallone, Jr.) and Charles Phelps, Jr. (stepbrother

to Donald H. Vallone, Jr.), Donna Beresford Vallone (stepmother to Donald H. Vallone, Jr.),

William Beresford (stepbrother to Donald H. Vallone, Jr.), Susan Beresford Vallone (stepsister to

Donald H. Vallone, Jr.), Natalie Lewis (stepsister to Donald H. Vallone, Jr.), and Michael

Beresford (stepbrother to Donald H. Vallone, Jr.) each seek recovery for IIED associated with the

death of serviceman Donald H. Vallone, Jr. in the attack at issue.  As this Court has previously

found in *Heiser*, however, under California law, a stepparent lacks standing to recover for

intentional infliction of emotional distress in connection with a stepchild's death, where the

stepparent had not legally adopted the stepchild, and there was no indication that the stepparent

would have adopted the stepchild but for a legal impediment. *Heiser*, 466 F. Supp. 2d at 309-10

(citing Cal Civ. Proc. Code § 377.60; Cal. Prob. Code § 6402).

In this case, there is no evidence that either of the stepparents of Donald H. Vallone, Jr.

legally adopted Donald H. Vallone, Jr., nor is there evidence that either would have adopted

Donald but for a legal impediment.  Accordingly, neither Charles Phelps nor Donna Beresford

Vallone has standing to bring a claim for damages arising out of the death of their stepson,

Donald H. Vallone, Jr.  Therefore, the claim brought by Charles Phelps and Donna Beresford

Vallone must be DISMISSED.  By this same logic, and because the viability of the claims

brought by the birth children of stepparents of the deceased (consequently, stepsiblings to the

deceased) is dependent upon the viability of their parents' claim, the claims brought by Charles

Phelps, Jr., William Beresford, Susan Beresford Vallone, Natalie Lewis Vallone, and Michael

Beresford must also be DISMISSED due to a lack of standing to bring the claim.

h.    *Donald Calloway*

Donald Calloway, brother-in-law to deceased serviceman Jess W. Beamon, seeks

recovery for IIED arising out of his brother-in-law's death in the attack.  Under Florida law,

however, only plaintiffs who are the spouse, child, sibling, or parent of a decedent have standing

to recover for intentional infliction of emotional distress even though plaintiffs were not present

at the scene.  *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App. 1991).  Siblings-in-

law do not fall within this category of eligible plaintifs.  Accordingly, the claim brought by

Donald Calloway must be DISMISSED for lack of standing.

i.    *Richard Mason*

Richard Mason, stepfather to deceased serviceman Russell Cyzick, seeks to recover for

IIED arising out of his stepson's death in the attack.  Under West Virginia law, damages arising

out of the death of an individual may be awarded to the surviving spouse and children of the

decedent, including adopted children and stepchildren, as well as the decedent's siblings, parents and any persons who were financially dependent upon the decedent at the time of his or her death.  *See* W. Va. Code §§ 55-7-5, 55-7-6(b) (2007).  Further, under West Virginia law, an individual qualifies as a "legal parent" if that individual is "defined as a parent, by law, on the basis of biological relationship, presumed biological relationship, legal adoption or other recognized grounds, [such as financial dependence]."  W. Va. Code, § 48-1-232 (2007).  In this case, the evidence shows that Russell Cyzick's birth mother married Richard Mason when Russell was nearly eighteen years old.  There is no evidence that Russell was either legally adopted or financially dependent upon Richard Mason during what was left of his minor years.  Accordingly, Richard Mason lacks standing to bring a claim because he is not a "legal parent" under West Virginia law.  Therefore, this Court finds that Richard Mason's IIED claim must be DISMISSED.

        5.    *Individuals with Valid Intentional Infliction of Emotional Distress Claims*

Accordingly, the Court finds that the individuals listed in Appendix A to this opinion may bring intentional infliction of emotional distress claims.  *See* Appendix A.

The Court will now turn its attention to damages for these IIED claims, as well as those claims for battery and wrongful death.

II.    *Damages*

A.    Damages Framework

The validity of each claim having been assessed, the Court can now turn to the respective amounts of damages associated with each valid claim before this Court.  Under the FSIA, a "foreign state shall be liable in the same manner and to the same extent as a private individual

under like circumstances."  28 U.S.C. § 1606.  Therefore, plaintiffs are entitled to the typical

array of compensatory damages that may be awarded against tortfeasors in the plaintiffs'

respective domiciliary states.  "In determining the appropriate compensatory damages for each

plaintiff's pain and suffering, this Court is guided not only by prior decisions awarding damages

for pain and suffering, but also by those which awarded damages for solatium."  *Haim*, 425 F.

Supp. 2d at 71.  This Court has previously looked to the nature of the relationship between the

family member and the victim in order to help determine the amount of each award.  *See Blais*,

459 F. Supp. 2d at 59-60; *Haim* 425 F. Supp. 2d at 75.[24]   Parents of victims typically receive

awards similar in amount to those awarded to children of the victim.  *See generally Heiser*, 466

F. Supp. 2d at 271-356 (awarding children and parents of a terrorist attack decedents $5 million

in pain and suffering damages).  This award for parents and children of the decedents is typically

smaller than the award for pain and suffering damages provided to spouses, but is larger than

awards of pain and suffering damages to siblings.  *See id.* (awarding spouses of decedents $8

million in pain and suffering damages, while awarding siblings to decedents $2.5 million).

Moreover, "families of victims who have died are typically awarded greater damages than

families of victims who remain alive."  *Blais*, 459 F. Supp. 2d at 60 (quoting *Haim*, 425 F. Supp.

2d at 75).

     This Court finds that the damages framework set forth in *Heiser* to be an appropriate

_____

[24] As noted previously, damages for pain and suffering have traditionally been available
to those members of the decedent serviceman's near relatives, which consists of his or her
immediate family.  *See supra* Section I.C.2.  "This Court defines one's immediate family as his
spouse, parents, siblings, and children.  This definition is consistent with the traditional
understanding of one's immediate family."  *Jenco*, 154 F. Supp. 2d at 36 n.8.

measure of damages for those family members of victims who died in this attack.[25]  The Court

finds that the framework detailed in *Blais* is appropriate to help determine damages for those

surviving servicemen and their families seeking redress.  *See Blais*, 459 F. Supp. 2d at 59.[26]

Accordingly, unless otherwise specifically addressed in Section B below, *see infra*

Section II.B., the Court finds that the following damages amounts for pain and suffering shall be

awarded to the plaintiffs who this Court deems to have standing to bring a valid cause of action.

First, in terms of lost wages due the servicemen in this case, the Court hereby ADOPTS all of the

financial calculations and recommendations made by the special masters as to lost wages.[27]

Those calculations for lost wages shall be specified in Appendix B to this opinion.  Second,

unless otherwise specified in Section B below, the Court finds that the awards for pain and

suffering to the servicemen are appropriate and hereby ADOPTS them.  Third, the Court finds

---

[25] In *Heiser*, family members of the servicemen who were killed in the 1996 Khobar Towers bombing brought various claims against the Islamic Republic of Iran, MOIS, and IRGC for their part in providing material financial and logistical support in bringing about the attack. *Heiser*, 466 F. Supp. 2d at 248-51.  This Court awarded the valid claims brought by spouses of deceased servicemen $8 million in pain and suffering, parents and children of deceased servicemen $5 million, and siblings of deceased servicemen $2.5 million.  *See generally Heiser*, 466 F. Supp. 2d at 271-356.

[26] As this Court stated in *Blais*:
> In cases that involve an attack where the victim survives, and where no captivity occurred, courts typically award a lump sum award based in large part on an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."

*Id.*

[27] As mentioned above, *see supra* note 2, there are a few servicemen who have sought damages for pain and suffering incurred during the time at which they were alive after the attack and the time at which they died.  Those claims will be addressed in Section II.B.1, *infra*.

that the appropriate amount of pain and suffering damages for the spouse of a deceased

serviceman to be $8 million.  Fourth, the Court finds that the appropriate amount of pain and

suffering damages for the parents and children of a deceased serviceman to be $5 million, per

individual.[28]  Fifth, the Court finds that the appropriate pain and suffering damages award for

each sibling in this case to be $2.5 million, per sibling.  Siblings of half-blood to the servicemen

in this case are presumed to recover as a full-blood sibling would–that is, they are entitled to $2.5

million–unless the law of the state in which they were domiciled at the time of the attack states

that they are not entitled to so recover.[29]  Next, the Court finds that the appropriate amount of

damages for family members of surviving servicemen are as follows: spouse ($4 million);

parents ($2.5 million); children ($2.5 million); siblings ($1.25 million).[30]  Unless otherwise

specified below in Section B, to the extent that the special masters have awarded a plaintiff more

or less than the aforementioned respective award amounts based upon the plaintiff's relation to

the serviceman, those amounts shall be altered so as to conform with the respective award

amounts set forth in this paragraph.

---

[28] Each parent and child shall receive this amount.  *See Heiser*, 466 F. Supp. 2d at 271-356.

[29] This Court will address the claims of those half-blood siblings whose award recommendations differ from the permissible awards under the respective state laws, *infra*.  *See infra* Section II.B.3.

[30] The Court recognizes that the parents in *Blais* received $3.5 million for their IIED claims for pain and suffering damages associated with the aftermath of taking care of their son, who survived the attack on the Khobar Towers in 1996.  *See Blais*, 459 F. Supp. 2d at 60.  This exceptional award was given in light of the extremely severe and continuing nature of their son's maladies, and in light of the facts that their son was in a coma and vegetative state for a period of over five weeks.  *Id.* at 59-60.  Attention was also given to the fact that the parents in *Blais* gave up their jobs in order to take full-time care of their son.  *Id.* at 60.

B.    Special Damages Cases

1.    Pain and Suffering Amount for Deceased Servicemen Who Initially

Survived Attack

The personal representatives and estates of deceased servicemen Alvin Burton Belmer,

Nathaniel Walter Jenkins, Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley have

each sought damages for pain and suffering incurred during the time at which they were alive

after the attack and the time at which they died, in addition to the damages for lost wages and

earnings arising out of their respective wrongful death claims.  Several cases have awarded

damages for the victim's pain and suffering that occurred between the attack and the victim's

death shortly thereafter.  *Haim*, 425 F. Supp. 2d at 71-72 (citing *Eisenfeld v. Islamic Republic of

Iran*, 172 F.Supp.2d 1, 8 (D.D.C.2000) (Lamberth, J.); *Elahi v. Islamic Republic of Iran*, 124

F.Supp.2d 97, 112-13 (D.D.C.2000) (Green, J.).  When the victim endured extreme pain and

suffering for a period of several hours or less, courts in these cases have rather uniformly

awarded $1 million.  *Haim*, 425 F.Supp.2d at 71-72.  This award increases when the period of the

victim's pain is longer.  *Id.* at 72.  In line with this precedent, this Court recently awarded

$500,000 to a serviceman who survived a terrorist attack for 15 minutes, and was in conscious

pain for 10 minutes.

The estate of Alvin Burton Belmer established before the special master that serviceman

Belmer was alive and conscious for nearly eight days (7 days and 20 hours).  The special master

recommended an award of pain and suffering of $15 million.  Though the Court recognizes Mr.

Belmer was under excruciating pain during that period of time, it is not prepared to adopt such a

recommendation.  In light of his nearly eight days of pain and suffering, this Court finds that the

estate of Alvin Burton Belmer should be awarded $7.5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

Similarly, the estate of Nathaniel Walter Jenkins established before a special master that serviceman Jenkins was alive for seven days after the attack.  The special master recommended that Mr. Jenkins be awarded $7 million for pain and suffering undergone by Mr. Jenkins during this period of time.  The Court finds this award amount is appropriate and finds that the estate of Nathaniel Walter Jenkins should be awarded $7 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Luis J. Rotondo established before a special master that serviceman Rotondo was alive for six hours after the attack.  The special master recommended a pain and suffering damages award of $250,000.  In keeping with the precedent set forth in *Haim*, the Court finds that Luis J. Rotondo is entitled to $1 million in pain and suffering damages, in addition to the amount of lost wages he is awarded.

The estate of Larry H. Simpson, Jr. established before a special master that serviceman Simpson was alive for nine years after the attack, living with severe injuries throughout that time. The special master recommended an award of pain and suffering damages of $2 million.  In light of the fact that Mr. Simpson was saddled with injuries from this attack that plagued him until his death, but conscious of the fact that Mr. Simpson appears to have led a somewhat functional life after the attack, the Court finds that Mr. Simpson should be awarded $5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Stephen Tingley established before a special master that serviceman Tingley was alive for a short but unknown amount of time.  The special master recommended a pain and

suffering damages award of $1 million.  Though the Court is certain that Mr. Tingley endured a

great deal of pain during the minimal time he survived the attack, the Court is reluctant to grant

such an award without any definitive proof of a duration of time that Mr. Tingley was alive.

Therefore, this Court finds that Stephen Tingley is entitled to $500,000 in pain and suffering

damages, in addition to the amount of lost wages he is awarded.

2.      Pain and Suffering Amount for Surviving Servicemen

Each of the twenty six surviving servicemen have sought pain and suffering awards

associated with their claims for battery.  In awarding pain and suffering damages, the Court must

take pains to ensure that individuals with similar injuries receive similar awards.  Due to the

large number of plaintiffs represented in this action, the Court needed to enlist the help of many

different special masters to help calculate damages for each of the plaintiffs.  Understandably,

each special master calculated pain and suffering damages differently, which resulted in varying

awards for varying maladies suffered by the surviving servicemen.  Upon examination of the

nature of the injuries of each of the servicemen, the Court makes the following findings about the

pain and suffering damages for the twenty six surviving servicemen arising out of their respective

battery claims:

- •      Marvin Albright suffered compound fracture of his right leg, injuries to the toes
  on his left foot, wounds and scars from shrapnel, in addition to lasting and severe
  psychological harm as a result of the attack.  Therefore, this Court finds that he is
  entitled to $5 million in pain and suffering;

- •      Pablo Arroyo suffered a broken jaw, severe flesh wounds and scars on his arms,
  legs and face, a loss of teeth, and lasting and severe psychological harm as a result

of the attack.  Therefore, this Court finds that he is entitled to $5 million in pain

and suffering;

- Anthony Banks suffered as a result of this attack loss of sight in one eye, a

    perforated right eardrum resulting in some hearing loss, and a shrapnel injury to

    the back of his right thigh.  He also suffered lasting and severe psychological

    problems from the attack.  Therefore, this Court finds that he is entitled to $7.5

    million in pain and suffering;

- Rodney Darrell Burnette was initially thought dead as a result of the attack, and

    was placed in a body bag, buried alive in the morgue for four days until someone

    heard him moaning in pain.  His injuries from the attack include a closed head

    injury, a basilar skull fracture, a facial nerve palsy, rib injuries, a rupturing to the

    timpanic membrane in both ears, and injuries to both feet.  He also suffered

    lasting and severe psychological problems from the attack.  Accordingly, this

    Court finds that he is entitled to $8 million in pain and suffering;

- Glenn Dolphin suffered injuries in the back, arm and head from being hit with

    shrapnel from the attack.  He also suffered lasting and severe psychological

    problems from the attack.  Therefore, the Court finds that he is entitled to $3

    million in pain and suffering;

- Charles Frye was minimally injured from small arms fire occurring just after the

    initial bomb explosion, and has experienced resulting nerve pain and foot

    numbness.  He also suffered lasting and severe psychological problems from the

    attack.  Therefore, this Court finds that he is entitled to $2 million in pain and

suffering, plus $200,000 in loss of earnings suffered;[31]

- Truman Dale Garner suffered as a result of the attack a shrapnel injury to the head, a subdural hematoma, a perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected.  He also suffered lasting and severe psychological problems from the attack.  Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering damages;

- Larry Gerlach suffered severe injuries including a broken neck, which has resulted in permanent quadriplegia.  He also suffered lasting and severe psychological problems from the attack.  Therefore, this Court finds that he is entitled to $12 million in pain and suffering damages;[32]

- Orval Hunt suffered skull fractures, brain bruising, various broken bones in his leg, and an exposed Achilles tendon as a result of the attack.  He also suffered lasting and severe psychological problems from the attack.  Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages;

- Joseph P. Jacobs suffered a shoulder injury, and still suffers from neck, shoulder and back pain to this day.  He also suffered lasting and severe psychological problems from the attack, and has admitted to having problems with alcohol abuse.  Therefore, this Court finds that he is entitled to $5 million in pain and

---

[31] Charles Frye admits that his physical injuries were minimal, and that he suffered severe psychological harm from the attack.

[32] *Cf. Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 12-13 (D.D.C. 2001) (Bryant, J.) (awarding $12 million to plaintiff with permanent and debilitating injuries, including complete deafness and blindness in one eye).

suffering damages;

- Brian Kirkpatrick suffered an eye injury, a perforated left ear drum, broken ribs, various shrapnel wounds, and the lining of his lungs were burned as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages;

- Burnham Matthews suffered a shrapnel wound in the forehead that destroyed the middle part of his nose, cuts to the head and back, and a perforated eardrum as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7 million in pain and suffering damages;

- Timothy Mitchell suffered lacerations to the back of his head, back injuries, and has resulting chronic back pain and headaches as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $3 million in pain and suffering damages, in addition to $1,555,099 in lost wages;

- Lovelle "Darrell" Moore suffered a torn ear, broken leg, damaged foot, and cuts from shrapnel from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7 million in pain and suffering damages, in addition to $1,314,513 in lost wages;

- Jeffrey Nashton suffered a skull fracture, a shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed

lungs, burns on his arms and back, and internal bleeding.  He also suffered lasting

and severe psychological problems from the attack.  Therefore, this Court finds

that he is entitled to $9 million in pain and suffering damages, in addition to

$2,776,632 in lost wages;

- Paul Rivers suffered two broken eardrums, skin lacerations, burned skin, and knee

  damage from the attack.  He also suffered lasting and severe psychological

  problems from the attack.  Therefore, this Court finds that he is entitled to $7

  million in pain and suffering damages;

- Stephen Russell suffered a broken femur, hand and pelvis bone, and was covered

  in cuts and bruises from the attack.  His left foot was turned completely

  backwards.  He also suffered lasting and severe psychological problems from the

  attack.  Therefore, this Court finds that he is entitled to $7.5 million in pain and

  suffering damages, in addition to $1,752,749 in lost wages;

- Dana Spaulding suffered two broken clavicles, a broken middle ear which caused

  internal bleeding and continued vertigo, a punctured lung, bruised kidney, broken

  ribs, a severe laceration across his back, and a loss of his eyelashes.  Moreover in

  the ten days after the attack, Dana was in a coma.  He also suffered lasting and

  severe psychological problems from the attack.  Therefore, this Court finds that he

  is entitled to $8 million in pain and suffering damages, in addition to $1,559,609

  in lost wages;

- Michael Toma suffered various cuts from shrapnel, internal bleeding in his

  urinary system, a deflated left lung, and a permanently damaged right ear drum.

He also suffered lasting and severe psychological problems from the attack.
Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering
damages;

- Danny Wheeler suffered soft tissue damage to the chest and sternum area, flash
burns, and lingering back problems, internal maladies and physical scarring.  He
also suffered lasting and severe psychological problems from the attack.
Therefore, this Court finds that he is entitled to $5 million in pain and suffering
damages.

In addition, Frank Comes Jr., Frederick Daniel Eaves, John Hlywiak, John Oliver, and
Craig Joseph Swinson, and Thomas D. Young suffered no physical injuries, and are not required
to do so to recover for IIED under North Carolina law.  *See Dickens v. Puryear*, 276 S.E.2d 325,
332 (N.C. 1981).  Still, each has demonstrated that he has suffered severe and lasting
psychological harm, and may recover damages for that.  Accordingly, the Court finds that each is
entitled to $1.5 million in pain and suffering damages.[33]

3.      Individual Family Member Cases

In certain instances, the special masters were presented with claims from individuals who
were related by half-blood to a deceased serviceman in this case.  This section addresses those
claims under which the special master awarded the half-blood siblings an amount different than
would be permissible under the laws of the half-blood siblings respective states of domicile at the
time of the attack.

---

[33]  In addition to his award for pain and suffering, John Oliver is entitled to $1,777,542 in
lost wages.

a.      Richard J. Wallace

Under Oklahoma law, "[k]indred of the half-blood inherit equally with those of the whole blood in the same degree, unless the inheritance come [sic] to the intestate by descent, devise or gift of some one of his ancestors, in which case all those who are not of the blood of such ancestors must be excluded from such inheritance."  Okla. Stat. Ann. tit. 84, § 222 (2007). Stephen Eugene Spencer's half-brother, Richard J. Wallace, was awarded $1.25 million for pain and suffering arising out of his IIED claim.  By contrast, Stephen's full-blooded brother, Douglas Spencer, was awarded $2.5 million.  Richard J. Wallace did not come into this damages award as a result of descent, devise or a gift of one of his ancestors.  Therefore, this disparity in awards is impermissible under Oklahoma law.  Richard J. Wallace is entitled to the same amount as Douglas Spencer, his half-brother, and therefore should be awarded $2.5 million.

b.      Hilton and Arlington Ferguson

Under Florida law, "[w]hen property descends to the collateral kindred of the intestate and part of the collateral kindred are of the whole blood to the intestate and the other part of the half blood, those of the half blood shall inherit only half as much as those of the whole blood . . . ."  Fla. Stat. Ann. § 732.105 (2007).  Half blood siblings may recover a whole amount only "if all [remaining siblings] are of the half blood . . . ."  Fla. Stat. Ann. § 732.105 (2007).

In this case, Hilton and Arlington Ferguson are half-brothers to serviceman Rodney J. Williams.  Therefore, each may recover only half as much as Mr. Williams' full blood siblings, if there are any.  If there are no full blood siblings, then Hilton and Arlington may recover whole amounts, each.  Here, Mr. Williams is survived by two full blood siblings:  Rhonda and Ronald Williams.  Accordingly, though Hilton and Arlington Ferguson are entitled to recover for pain

and suffering under an IIED claim for the loss of their half-brother, they may only recover half the amount of damages as will be awarded to Rhonda and Ronald Williams.  Therefore, Hilton and Arlington Ferguson may recover $1.25 million each because Rhonda and Ronald Williams are each entitled to recover $2.5 million for pain and suffering damages associated with the untimely loss of their brother.

> c.   Damien Briscoe and Kia Briscoe Jones

Under Maryland law, half-blood siblings are given the same status as full blood siblings of the same degree.  Md. Code Ann., Estates & Trusts § 1-204 (2007).  The special master charged with determining the appropriate amount of pain and suffering damages for relatives of serviceman Davin M. Green, however, recommended that Mr. Green's half-siblings Damien Briscoe and Kia Briscoe Jones be awarded $1.25 million for their pain and suffering associated with Mr. Green's death, while at the same time awarding Mr. Green's full blood siblings $2.5 million for pain and suffering.

This Court finds that this recommended disparity in award does not conform to the requirement that full blood and half blood siblings of the same degree be treated equally under the law.  Accordingly, this Court finds that under Maryland law, Mr. Green's half-siblings are entitled to the same amount of recovery as their full blood sibling counterparts.  This Court has typically found $2.5 million to be an appropriate level of pain and suffering damages under an IIED claim arising out of a terrorist attack.  Accordingly, this Court adopts the special master's damages recommendation of $2.5 million for Mr. Green's full blood siblings, and finds that Mr. Green's half-siblings-Damien Briscoe and Kia Briscoe Jones-are also entitled to $2.5 million in pain and suffering damages in connection with their IIED claim against the defendants.

d.      Darren Keown

Darren Keown is the half-brother of deceased serviceman Thomas Keown.  Darren was

domiciled in Tennessee at the time of the attack.  It has long been recognized under Tennessee

law that full and half-blood siblings may share equally in inheritance and intestate distribution.

*Kyle v. Moore*, 35 Tenn. 183 (3 Sneed) (Tenn. 1855).  The special master charged with

determining the appropriate amount of pain and suffering damages for relatives of Thomas

Keown recommended awarding Darren $4 million for pain and suffering, which was similar to

the recommended award for Thomas' full-blooded brothers, Adam, Bobby Jr., and William,

which was also $4 million.  In light of the fact that full-blooded siblings in this case shall be

awarded $2.5 million, however, the award for Adam, Bobby Jr., and William must be reduced to

$2.5 million.  Darren's award must be similarly lowered.  Accordingly, this Court finds that the

pain and suffering award for Darren Keown is $2.5 million.

e.      Kenty Maitland & Alex Griffin

Kenty Maitland is the half-brother of Samuel Maitland, Jr.  Alex Griffin is Samuel

Maitland Jr.'s legally adopted brother.  Both were domiciled in New York at the time of the

attack.  Under New York law, both half-blood siblings and adopted siblings are treated as equals

to full-blooded siblings for purposes of inheritance and recovery.  *See* N.Y. Est. Powers & Trusts

§ 4-1.1(b) (2007); N.Y. Dom. Rel. § 117 (2007).  Accordingly both Kenty Maitland and Alex

Griffin are entitled to recover in the same manner as Samuel's actual full-blooded siblings.  The

special master recommended that Kenty and Alex receive $1 million, each, for pain and suffering

damages.  Samuel's full-blood sister, Shirla Maitland, is entitled to recover $2.5 million in pain

and suffering arising from her IIED claim against the defendants.  Accordingly, this Court finds

that both Kenty Maitland and Alex Griffin are entitled to recover $2.5 million, each, in pain and suffering damages arising out of their respective IIED claims in this case.

     f.  Florene Martine Carter

  Florene Martin Carter is the half-sister of deceased serviceman Charlie Robert Martin. Florene was domiciled in North Carolina at the time of the attack.  Under North Carolina law, half-blood siblings may inherit and recover in the same manner as full-blood siblings.  *Peel v. Corey*, 144 S.E. 559, 562 (N.C. 1928); *Univ. of North Carolina v. Markham*, 93 S.E. 845, 846 (N.C. 1917).  Accordingly, Florene Martin Carter is entitled to recover in the same manner as Charlie's full-blooded siblings would have recovered.  The special master recommended that Florene receive $1.25 million in pain and suffering damages.  Charlie Robert Martin does not have full-blooded siblings.  Still, siblings of deceased servicemen in this action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims against the defendants.  Accordingly, the Court finds that Florene Martin Carter is entitled to $2.5 million in pain and suffering damages arising out of her IIED claim in this action.

     g.  Linda Martin Johnson, Corene Martin Jones, John Martin,
          Gussie Martin Williams, Mary Ellen Thompson

  Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are also half-siblings of deceased serviceman Charlie Robert Martin. Each was domiciled in Georgia at the time of the attack.  Under Georgia law, half-blood siblings inherit equally with whole-blood siblings.  *Bacon v. Smith*, 474 S.E.2d 728, 731-32 (Ga. Ct. App. 1996).  Accordingly, Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are entitled to recover in the same manner as Charlie's full-

blooded siblings would have recovered.  The special master recommended that Linda, Corene,

John, Gussie, and Mary Ellen each receive $1.25 million in pain and suffering damages.  Charlie

Robert Martin does not have full-blooded siblings.  Still, siblings of deceased servicemen in this

action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims

against the defendants.  Accordingly, the Court finds that Linda Martin Johnson, Corene Martin

Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are entitled to $2.5

million in pain and suffering damages, each, arising out of their respective IIED claims in this

action.

h.    Sybil Caeser

Under Florida law, "[w]hen property descends to the collateral kindred of the intestate

and part of the collateral kindred are of the whole blood to the intestate and the other part of the

half blood, those of the half blood shall inherit only half as much as those of the whole blood . . .

."  Fla. Stat. Ann. § 732.105 (2007).  Half blood siblings may recover a whole amount only "if all

[remaining siblings] are of the half blood . . . ."  Fla. Stat. Ann. § 732.105 (2007).

Here, Sybil Caeser is the half-sister of deceased serviceman Johnnie Caesar.  Johnnie,

however, has full-blooded siblings who have also survived him.  Therefore, Sybil Caesar is

entitled to one-half of what Johnnie's full-blooded siblings received.  The full-blood siblings of

Johnnie Caeser received $2.5 million.  Therefore, this Court finds that Sybil Caeser is entitled to

$1.25 million in pain and suffering damages arising out of her IIED claim in this action.

C.    <em>Punitive Damages</em>

Punitive damages, however, are not available against foreign states such as the Islamic

Republic of Iran.  *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 71 (D.D.C. Mar. 24,

2006) (Lamberth, J.). Therefore, plaintiffs' claim for punitive damages against the Islamic

Republic of Iran is DENIED.  Moreover, this Court has previously found on a number of

occasions that punitive damages are not available against MOIS because MOIS is a governmental

entity, and part of the state of Iran itself.  *Heiser*, 466 F. Supp. 2d at 270-71; *Greenbaum v.*

*Islamic Republic of Iran*, 451 F. Supp. 2d 90, 105 & n.1 (D.D.C. Aug. 10, 2006) (Lamberth, J.)

(citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003); *Haim*, 425 F.

Supp. 2d at 71 n.2.  Accordingly, plaintiffs' claim for punitive damages against defendant MOIS

is also DENIED.

## CONCLUSION

This Court is sadly aware that there is little it can do to heal the physical wounds and

emotional scars suffered by the servicemen in this case and their family members.  Though the

attack on the Marine barracks in Beirut, Lebanon occurred nearly twenty four years ago from this

date, it is clear from the testimony presented to this Court and the special masters that the intense

suffering experienced on that day has had a tragically lasting effect on the plaintiffs who have

brought this action.  The fact that almost 1000 individuals sought redress in this action confirms

the sheer number of individuals whose lives were forever altered as a result of this senseless

attack on these courageous servicemen.

Indeed, at a time like this and an era such as ours, it is important to acknowledge the

selfless courage that these–and all–servicemen demonstrated by choosing to take action and

make this world a safer and better place in which to live.  The fact that the servicemen in this

action made the ultimate sacrifice to pursue such a noble cause only serves to further establish

the legacy of these courageous individuals in the annals of history.

Not to be forgotten is the courage demonstrated by the family members who have come forth in bringing this claim.  These individuals, whose hearts and souls were forever broken on October 23, 1983, have waited patiently for nearly a quarter of a century for justice to be done, and to be made whole again.  And though this Court can neither bring back the husbands, sons, fathers and brothers who were lost in this heinous display of violence, nor undo the tragic events of that day, the law offers a meager attempt to make the surviving family members whole, through seeking monetary damages against those who perpetrated this heinous attack.  The Court hopes that this extremely sizeable judgment will serve to aid in the healing process for these plaintiffs, and simultaneously sound an alarm to the defendants that their unlawful attacks on our citizens will not be tolerated.

A separate Order and Judgment consistent with these findings shall issue this date.


SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, September 7, 2007.