# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| )<br>)<br>IN RE:               )<br>)<br>ISLAMIC REPUBLIC OF IRAN  )<br>TERRORISM LITIGATION    )<br>)<br>) | |

IN RE:

ISLAMIC REPUBLIC OF IRAN
TERRORISM LITIGATION

)
)
)
)
)
)
)    **Civil Action Nos.**
)
)    **01-CV-2094, 01-CV-2684, 02-CV-1811,**
)    **03-CV-1486, 03-CV-1708, 03-CV-1959,**
)    **05-CV-2124, 06-CV-473, 06-CV-516,**
)    **06-CV-596, 06-CV-690, 06-CV-750,**
)    **06-CV-1116, 07-CV-1302, 08-CV-520,**
)    **08-CV-531, 08-CV-1273, 08-CV-1615,**
)    **08 CV-1807, 08-CV-1814**

---

## I.

## TABLE OF CONTENTS

I.  Table of Contents. ............................................................................................ 1

II.  Introduction. .................................................................................................... 3

III.  Discussion. ...................................................................................................... 9

    A.  Historical Overview of the FISA State Sponsor of Terrorism Exception as it
        Relates to Actions Against the Islamic Republic of Iran. ..................................... 13

        1.  The Original State Sponsor of Terrorism Exception to Foreign
            Sovereign Immunity, Section 1605(a)(7) and the Flatow Amendment,
            Section 1605 Note, and Litigation Against Iran for its Provision of
            Material Support to Terrorist Organizations. ............................................ 14

        2.  Setbacks for Plaintiffs: The D.C. Circuit's Decision in *Cicippio-Puleo*. . 22

        3.  The Never-Ending Struggle to Enforce Judgments Against Iran. ............ 27

    B.  Section 1083 of the 2008 NDAA and the Creation of a Terrorism Exception,
        Section 1605A. ................................................................................................ 44

        1.  New Federal Cause of Action. .................................................................. 44

2.      Punitive Damages. ..................................................................... 48

3.      Compensation for Special Masters. ........................................... 49

4.      More Robust Provisions for the Execution of Civil Judgments. .............. 49

C.      Retroactive Application of Section 1605A to Cases Previously Filed Under
        Section 1605(a)(7). ..................................................................... 52

1.      Section 1083(c)(2) – Prior Actions. .......................................... 53

2.      Section 1083(c)(3) – Related Actions. ....................................... 55

3.      The 60-Day Rule – Filing Deadline for Cases Based on Prior Actions
        Under Section 1605(a)(7). .......................................................... 56

4.      Section 1083(c)(2)(B) – Defenses Waived: Res Judicata, Collateral
        Estoppel, and Statute of Limitations Are Deemed Waived to the Extent
        that those Defenses Relate to Claims Litigated in a Prior Action Under
        Section 1605(a)(7). .................................................................... 56

D.      Efforts to Obtain Retroactive Treatment Under the New Terrorism Exception,
        Section 1605A. ........................................................................... 58

E.      Examination of Section 1083(c) of the 2008 NDAA Under Article III of the
        United States Constitution. ........................................................ 62

1.      Principles of Law – The Independence of the Federal Judiciary Under
        Article III and the Finality of Judgments. ................................. 66

2.      Analysis of the Constitutional Question in Light of the Supreme
        Court's Jurisprudence. ............................................................. 76

        a.      Does Section 1083(c)(3) Direct the Reopening of Final
                Judgments Entered Before its Enactment and Therefore
                Contravene Article III as Construed by the Supreme Court in
                *Plaut*? ........................................................................... 77

        b.      Assuming that Section 1083(c)(3) Does Not Direct the
                Reopening of Final judgments, Does the Waiver of Res
                Judicata and Collateral Estoppel Effect of any Prior Terrorism
                FSIA Action Nonetheless Offend Article III because Congress
                has Directed the Courts to Ignore Fundamental and
                Longstanding Judicial Doctrines? ................................... 86

3.      Additional Considerations. ....................................................... 96

F.    Analysis of Whether Actions Under Section 1605(a)(7) Have Qualified for Retroactive Treatment Under Section 1605A. .................................................... 102

    1.    The Belt-and-Suspenders Plaintiffs: Those Who Have Invoked both Section 1083(c)(2) and (c)(3). ................................................................. 104

    2.    The Related-Action Plaintiffs: Those Who Have Filed New Actions Pursuant to Section 1083(c)(3). ............................................................ 115

    3.    The Do-Nothing Plaintiffs: Those Who Have Invoked Neither Section 1083(c)(2) Nor (c)(3) in Their Efforts to Retroactively Claim the New Entitlements Under Section 1605A. ..................................................... 119

    4.    General Guidance for All Cases. ......................................................... 125

G.    Service of New Claims in Pending Cases. ....................................................... 126

H     Guidance for Plaintiffs Who May Wish to Pursue Relief Under Rule 60 of the Federal Rules of Civil Procedure. ..................................................................... 133

I.    Compensation for Special Masters. .................................................................. 137

J.    Motions for Appointment of Receivers. .......................................................... 143

K.    A Call for Meaningful Reform. ........................................................................ 156

L.    An Invitation for the United States to Participate in These Actions. .................. 186

IV.    Conclusion. ................................................................................................................ 187

**II.**

**<ins>INTRODUCTION</ins>**

For more than a decade now, this Court has presided over what has been a twisting and turning course of litigation against the Islamic Republic of Iran under the state sponsor of terrorism exception of the Foreign Sovereign Immunities Act (FSIA).  Despite the best intentions of Congress and moral statements of support from the Executive Branch, the stark reality is that

the plaintiffs in these actions face continuous road blocks and setbacks in what has been an increasingly futile exercise to hold Iran accountable for unspeakable acts of terrorist violence.[1]

The cases against Iran that will be addressed by the Court today involve more than one thousand individual plaintiffs.  Like countless others before them, the plaintiffs in these actions have demonstrated through competent evidence—including the testimony of several prominent experts in the field of national security—that Iran has provided material support to terrorist organizations, like Hezbollah and Hamas, that have orchestrated unconscionable acts of violence that have killed or injured hundreds of Americans.  As a result of these civil actions, Iran faces more than nine billion dollars in liability in the form of court judgments for money damages. Despite plaintiffs' best efforts to execute these court judgments, virtually all have gone unsatisfied.

This consolidated opinion focuses on recent legislative changes in this extraordinary area of the law, as implemented by Congress last term in § 1083 of the 2008 National Defense

---

[1] The Islamic Republic of Iran was designated by the Secretary of State as a state sponsor of terrorism on January 19, 1984.  The State Department maintains a list of countries that have been designated as state sponsors of terrorism on the Department's website.  *See* U.S. Dep't of State, State Sponsors of Terrorism, www.state.gov/s/ct/c14151.htm (last visited Sept. 29, 2009). As noted at the website, countries designated as state sponsors of terrorism are those countries that the Secretary of State has determined "have repeatedly provided support for acts of international terrorism."  *Id.*  The Secretary of State makes that determination and designates state sponsors of terrorism pursuant to three statutory authorities: § 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j); § 620A of the Foreign Assistance Act, 22 U.S.C. § 2371; and § 40(d) of the Arms Export Control Act, 22 U.S.C. § 2780(d).  Three other countries are designated as State Sponsors of Terrorism: Cuba, Sudan, and Syria.  U.S. Dep't of State, *supra* note 1.  In April 2009, the State Department published its annual Country Reports on Terrorism, reporting that "Iran remained the most active state sponsor of terrorism" in 2008. U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM 2008, at 182, *available at* http://www.state.gov/documents/organization/122599.pdf.  "Iran's involvement in the planning of financial support of terrorist attacks throughout the Middle East, Europe, and Central Asia has had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf, and undermined the growth of democracy."  *Id.*

Appropriations Act for Fiscal Year 2008 (2008 NDAA).  *See* Pub. L. No. 110-181, § 1083, 122

Stat. 3, 338–44.  Section 1083 completely repeals the original state sponsor of terrorism

exception—28 U.S.C. § 1605(a)(7)—which was originally enacted in 1996, and enacts in its

place a new exception—28 U.S.C. § 1605A—that is in many ways more favorable to plaintiffs.

This new statute provides, among other reforms, a new federal cause of action against state

sponsors of terrorism and allows for awards of punitive damages in these cases.  Even more

significantly, however, the reforms implemented through § 1083 last year add a number of

measures that are intended to help plaintiffs succeed in enforcing court judgments against state

sponsors of terrorism, such as Iran.

The primary purpose of this opinion is to consider whether and to what extent these

recent changes in the law should apply retroactively to a number of civil actions against Iran that

were filed, and, in many instances, litigated to a final judgment prior to the enactment of the

2008 NDAA.  In this particular instance, Congress has provided express guidance in § 1083(c)

with respect to how § 1605A may be applied retroactively to reach a host of cases that were filed

under the original terrorism exception, § 1605(a)(7).  In considering this retroactivity question,

the Court will address a variety of other legal and procedural issues relating to what may be

another lengthy course of litigation against Iran.

As is often the case in this area of the law that the Supreme Court has called sui generis,

*see Austria v. Altmann*, 541 U.S. 677, 698 (2004), this Court must sometimes confront novel

legal questions, including constitutional issues of first impression.  Today's decision is no

different.  This Court must address whether § 1083(c) impermissibly directs the reopening of

final judgments in violation of Article III of the Constitution.  *See Plaut v. Spendthrift Farm,*

*Inc.*, 514 U.S. 211, 241 (1995).  The Court's attentiveness to this potentially unconstitutional

application of § 1083(c) was heightened significantly by provisions of § 1083(c) that direct

courts to essentially disregard the firmly established judicial doctrines of res judicata and

collateral estoppel with respect to any matters litigated in a prior FSIA terrorism case.

To the extent that § 1083(c) might be construed as directing the reopening of final

judgments entered under the former version of the terrorism exception, § 1605(a)(7), it would

usurp the prerogative of the judiciary to decide cases under Article III and thereby offend the

principle of separation of powers enshrined within our Constitution.  In light of this issue's

significance with respect to ongoing litigation against Iran, this Court addresses the Article III

question in Part E of this opinion.  After careful analysis as set forth below, this Court holds that

the statute withstands constitutional scrutiny.

Today, the Court also reaches an even more fundamental conclusion: Civil litigation

against Iran under the FSIA state sponsor of terrorism exception represents a failed policy.  After

more than a decade spent presiding over these difficult cases, this Court now sees that these

cases do not achieve justice for victims, are not sustainable, and threaten to undermine the

President's foreign policy initiatives during a particularly critical time in our Nation's history.

The truth is that the prospects for recovery upon judgments entered in these cases are extremely

remote.  The amount of Iranian assets currently known to exist with the United States is

approximately 45 million dollars, which is infinitesimal in comparison to the 10 billion dollars in

currently outstanding court judgments.[2]  Beyond the lack of assets available for execution of

judgments, however, these civil actions inevitably must confront deeply entrenched and

---

[2] *See* OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEP'T OF THE TREASURY, TERRORIST ASSETS REPORT 14–15, tbls. 1, 3 (2007) [hereinafter TERRORIST ASSETS REPORT], *available at* http://www.treas.gov/offices/enforcement/ofac/reports/tar2007.pdf.

fundamental understandings of foreign state sovereignty, conflicting multinational treaties and executive agreements, and the exercise of presidential executive power in an ever-changing and increasingly complex world of international affairs.

Unfortunately, the enactment of § 1083 of the 2008 NDAA continues and expands the terrorism exception and its failed policy of civil litigation as the means of redress in these horrific cases.  The availability of new federal claims under § 1605A with punitive damages, when combined with the broad retroactive reach accorded to this new statute, means that liability in the form of billions of dollars more in court judgments will continue to mount and mount quickly.

As a result of these latest reforms, the victims in these cases will now continue in their long struggle in pursuit of justice through costly and time-consuming civil litigation against Iran. They will do this at a time in our Nation's history when the President has taken bold and unprecedented steps in an attempt to improve relations with that foreign power while pressing forward on crucial issues, such as the grave threat of nuclear proliferation posed by Iran. Regrettably, the continuation in § 1083 of the same flawed policy that has failed plaintiffs in these actions for over a decade may only stoke the flames of unrealistic and unmanageable expectations in these terrorism victims who so rightly deserve justice, which may in turn serve only to expose the Administration to an unprecedented burden in its management of United States foreign policy towards Iran.

In view of these considerations, the Court will respectfully urge the President and Congress to seek meaningful reforms in this area of law in the form of a viable alternative to private litigation as the means of redress for the countless deaths and injuries caused by acts of terrorism.  In Part K of the opinion and in the Conclusion, this Court will speak candidly about

the challenges, complexities, and frustrations borne out by these civil actions over the past

decade in an effort to urge our political leaders to act.  If the decade-long history of these FSIA

terrorism actions has revealed anything, it is that the Judiciary cannot resolve the intractable

political dilemmas that frustrate these lawsuits; only Congress and the President can.  Today, at

the start of a new presidential administration—one that has sought engagement with Iran on a

host of critical issues—it may be time for our political leaders here in Washington to seek a fresh

approach.[3]

To assist this Court in these matters going forward, the Court will invite the United States

to participate in these actions by filing a brief in response to the many issues addressed in this

opinion.  The Court encourages the United States to express its views regarding this litigation,

but, more importantly, the Court hopes the Government might take this opportunity to give due

consideration to whether there might be a more viable system of redress for these tragic and

difficult cases.  With the daunting national security challenges that confront the President with

respect to Iran, our political leaders should candidly acknowledge the challenges and pitfalls of

these terrorism lawsuits.  The Court fears that if reforms are not achieved in the near future, these

civil suits against Iran may undermine the President's ability to act at a time when it matters

most.

---

[3] Reaching out to the people of Iran and their leaders, President Obama recently stated: "I would like to speak clearly to Iran's leaders: We have serious differences that have grown over time.  My administration is now committed to diplomacy that addresses the full range of issues before us and to pursuing constructive ties among the United States, Iran, and the international community."  Videotaped Remarks on the Observance of Nowruz, DAILY COMP. PRES. DOC., Mar. 20, 2009.

Today's omnibus opinion consists of twelve parts and is intended to serve a case management function in light of the significant changes in the law relating to these civil suits against Iran.  Thus, today's ruling is consistent with this Court's inherent authority to manage the docket.  *See, e.g.*, *In re Fannie Mae Sec. Litig.*, 552 F.3d. 814, 822 (D.C. Cir. 2009) ("District judges must have authority to manage their dockets, especially during massive litigation . . . .").  A separate order consistent with this opinion will issue this date.

## III.

### DISCUSSION

The Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1330, 1602–1611, is the sole basis of jurisdiction over foreign states in our courts.  *E.g.*, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 157–58 (D. D.C. 2006) (Lamberth, J.).  Enacted in 1976, the FSIA codifies a restrictive theory of foreign state sovereign immunity by which states are generally immune from the jurisdiction of courts of the United States, subject to a few carefully delineated exceptions.  *See, e.g.*, *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488–89 (1983); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002).  In the original FSIA enactment, exceptions to foreign sovereign immunity included cases in which a foreign state had either expressly or implicitly waived its immunity and cases relating to the commercial activities of a foreign sovereign within the United States.  *See* Act of Oct. 21, 1976, Pub. L. No. 94-583, 90 Stat. 2891; *see also* §§ 1605(a), 1605A (codification of current FSIA exceptions); *Verlinden*, 461 U.S. at 488 (discussing key exceptions under the FSIA).

The state sponsor of terrorism exception of the FSIA was first enacted in 1996 as part of Mandatory Victims Restitution Act of 1996, which was itself part of the larger Antiterrorism and

Effective Death Penalty Act of 1996.  Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241

(formerly codified at § 1605(a)(7)).  As noted, however, the original exception at § 1605(a)(7)

was repealed last year by the 2008 NDAA, § 1083(b)(1)(A)(iii), and replaced with a new

exception at § 1605A.  It is unclear why Congress chose to repeal rather than simply amend the

prior statute.  *See* H.R. REP. NO. 110-477, at 1001 (2007) (Conf. Rep.) (discussing § 1605A but

omitting discussion of why Congress repealed, instead of amended, § 1605(a)(7)).  Perhaps

members of Congress wanted to reinforce the significance of their overhaul of the terrorism

exception.  Whatever the case may be, it is important at the outset for this Court to offer some

notes of clarification and historical background information in an effort to avoid any confusion in

the ensuing discussion.

      The Court's analysis today must simultaneously consider two separate and distinct

versions of the terrorism exception of the FSIA—the now-repealed version of the terrorism

exception, § 1605(a)(7), and the new version, § 1605A.  While the prior version of the exception,

§ 1605(a)(7), and the new version, § 1605A, differ in many fundamental respects, it is important

to keep in mind that the basic grant of subject matter jurisdiction for actions against state

sponsors of terrorism remains unchanged.  Thus, it makes little difference whether one refers to

§ 1605(a)(7) or § 1605A when addressing the degree to which foreign sovereign immunity has

been removed, subjecting designated state sponsors of terrorism to lawsuits in our courts.

Indeed, the language eliminating sovereign immunity in the new exception, § 1605A, is virtually

identical to the operative language in § 1605(a)(7).  *Compare* § 1605(a)(7) *with* § 1605A(a)(1).

Accordingly, in those instances in which the Court is merely referring to the grant of subject

matter jurisdiction afforded by the virtue of the FSIA's terrorism exception, it will do so broadly,

without any additional effort to underscore the two different statutes, as the two provisions are in fact indistinguishable in terms of the basic jurisdiction conferring language.

While the grant of subject matter jurisdiction for suits against state sponsors of terrorism is virtually unchanged, the latest version of the terrorism exception, § 1605A, adds substantive rights and remedies that were not available previously.  As noted above, § 1605A is a much more expansive provision, one which provides a federal cause of action, as well as many other statutory entitlements.  These new rights and remedies are the central focus of today's decision. The issue is whether the plaintiffs in actions that were filed, at least initially, under the now-repealed § 1605(a)(7), can now avail themselves of the additional entitlements associated with the new exception, § 1605A.  Thus, to extent that some of these plaintiffs are unable to claim the benefits of the new terrorism law retroactively, then the prior exception, § 1605(a)(7)—even though now repealed—remains viable and indeed is the controlling source of law in their cases. This is consistent with both the guidance provided by Congress in § 1083(c) of the 2008 NDAA and the general presumption against the retroactive application of laws.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) ("The presumption against statutory retroactivity is founded upon sound considerations of general policy and practice, and accords with long held and widely shared expectations about the usual operation of legislation.").  Thus, when dealing with the nuts and bolts of the retroactivity analysis, especially in Part D below where the Court looks individually at each of the 20 cases in this opinion, it is important to keep the two versions of the exception separate and distinct.  As underscored recently by the Court of Appeals for this Circuit, terrorism cases that were filed prior the enactment of the 2008 NDAA, and which do not qualify for retroactive treatment under the new exception, are governed by the prior statute, § 1605(a)(7).  *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C. Cir. 2008), *rev'd on*

*other grounds sub. nom Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009); *accord Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009); *La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 845 (D.C. Cir. 2008); *Owens v. Republic of Sudan*, 531 F.3d 884, 887 (D.C. Cir. 2008).

## A.

**HISTORICAL OVERVIEW OF THE FSIA STATE SPONSOR OF TERRORISM
EXCEPTION AS IT RELATES TO ACTIONS AGAINST
THE ISLAMIC REPUBLIC OF IRAN**

The new terrorism exception—§ 1605A—clears away a number of legal obstacles,

including adverse court rulings, that have stifled plaintiffs' efforts to obtain relief in civil actions

against designated state sponsors of terrorism.  In fact, these reforms are in part a legislative fix

to certain adverse precedent from the D.C. Circuit because "§ 1605A(c) abrogates *Cicippio-

Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), by creating a federal right of

action against foreign states, for which punitive damages may be awarded."  *Simon*, 529 F.3d at

1190.  Thus, to fully grasp the significance these latest reforms, it is important to have some

understanding regarding the manner in which the state sponsor of terrorism exception was

shaped over time through the jurisprudence of this Circuit.  More fundamentally, however, this

historical backdrop is essential to the Court's analysis of the Article III separation-of-powers

issue below in Part E, as well as for the Court's conclusion in Part K that even greater reforms in

the law are necessary.

Accordingly, the Court will now briefly provide a historical overview of the state sponsor

of terrorism exception, as it was originally constituted under § 1605(a)(7) (repealed), and the so-

called Flatow Amendment to that exception, .  This part of the discussion will examine some of

the early litigation against Iran before this Court in cases arising out of Iran's provision of

material support and resources to terrorist organizations, such as Hamas and Hezbollah.  The

important historical background that follows breaks down roughly into three parts.  The Court

will begin with a discussion of *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998)

[hereinafter *Flatow I*] (Lamberth, J.), which was the first case in the country to be decided

against Iran under the state sponsor of terrorism exception.  After discussing this Court's ruling

in *Flatow*, this Court will then review the decision of the D.C. Circuit Court of Appeals in

*Cicippio-Puleo*, 353 F.3d 1024, in which the Court found that neither § 1605(a)(7) nor the

Flatow Amendment furnish a cause of action against a foreign state.  This Court examines the

negative consequences and practical implications of that ruling for plaintiffs in these terrorism

cases.  After examining the fallout from *Cicippio-Puleo*, this Court proceeds to address what has

been the greatest problem for these plaintiffs, and that is the fact that there are simply not

sufficient Iranian assets that are amenable to attachment or execution in satisfaction of judgments

entered against Iran under the FSIA terrorism exception.[4]

1.    **The Original State Sponsor of Terrorism Exception to Foreign Sovereign Immunity,
      Section 1605(a)(7) and the Flatow Amendment, Section 1605 Note, and Litigation
      Against Iran for its Provision of Material Support to Terrorist Organizations**

The state sponsor of terrorism exception to foreign sovereign immunity applies only to

foreign sovereigns officially designated as state sponsors of terrorism by the State Department.

*See* § 1605A(a)(2)(A)(i)(I); § 1605(a)(7)(a) (repealed).  This exception to foreign sovereign

immunity is commonly known as the "terrorism exception."  *See, e.g.*, *Kilburn v. Socialist*

---

[4] For an excellent summary of the litigation and evolution of the law pertaining to the
state sponsor of terrorism exception of the FSIA, see JENNIFER K. ELSEA, CONGRESSIONAL
RESEARCH SERV., SUITS AGAINST TERRORIST STATES BY VICTIMS OF TERRORISM (2008)
[hereinafter SUITS AGAINST TERRORIST STATES], *available at*
http://www.fas.org/sgp/crs/terror/RL31258.pdf.  This Congressional Research Service report on
terrorism lawsuits is the logical starting point for anyone who is hoping to gain a solid grasp of
the development of this area of the law and its many complexities.  In addition to chronicling
important legislative developments, the report captures and summarizes the civil litigation that
has occurred in this Court against Iran under the state sponsor of terrorism exception to the
FSIA.  This Court is grateful to the Congressional Research Service, and to Ms. Elsea in
particular, for their thorough work on this unique and important topic.  This Court has examined
and relied on many of the original source materials identified in the report for additional insight
on these matters beyond the Court's own experience in presiding over dozens of civil actions
against Iran.

*People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  Under the exception,

foreign sovereign immunity is eliminated in two different categories of terrorism cases: (1) those

in which the designated foreign state is alleged to have committed certain acts of terrorism, i.e.,

torture, extrajudicial killing, aircraft sabotage, or hostage taking; and (2) those in which the

designated state is alleged to have provided "material support or resources" for such terrorist

acts.  *See* § 1605A(a)(1); § 1605(a)(7) (repealed).  Thus, a designated state sponsor of terrorism

might be held to account for its specific acts of terrorism, as well as, more broadly speaking, its

"provision of material support or resources" in furtherance of acts of terrorism.  *See*

§ 1605A(a)(1); § 1605(a)(7) (repealed).

The statute is intended to protect American victims of state-sponsored terrorism, and

therefore only United States citizens and nationals may rely on its grant of subject matter

jurisdiction.  *See* § 1605A(a)(1); § 1605(a)(7) (repealed); *see also Acosta v. Islamic Republic of

Iran*, 574 F. Supp. 2d. 15, 25–26 (D.D.C. 2008) (Lamberth, C.J.) (denying claims of victim,

Rabbi Meir Kahane, who had voluntarily renounced his U.S. citizenship years prior to his

assassination by Islamic terrorists).  Thus, the victim or claimant in an action against a state

sponsor of terrorism must have been a United States citizen or national at the time of the incident

that gave rise to his claim(s).  *See Acosta*, 574 F. Supp. 2d at 26.

Most of the actions in this Court against Iran have proceeded under that portion of the

terrorism exception relating to "the provision of material support or resources" for terrorist acts.

*See, e.g.*, *Flatow I*, 999 F. Supp. 1; *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1

(D.D.C. 2000) (Lamberth, J.); *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C.

2006) (Lamberth, J.).  The terrorism exception adopts the definition of "material support or

resources" set forth in the criminal code at 18 U.S.C § 2339A(b)(1):

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

*See* § 1605A(h)(3) (incorporating § 2339A(b)(1) by reference); *see also* § 1605(a)(7) (repealed).

This Court has determined that "the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes 'providing material support and resources' for a terrorist act within the meaning of the [terrorism exception of the FSIA]." *Flatow I*, 999 F. Supp. 1 at 19. Additionally, this Court has found that "a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises in order to satisfy 28 U.S.C. § 1605(a)(7)'s statutory requirements for subject matter jurisdiction." *Id.* In other words, there is no "but-for" causation requirement with respect to cases that rely on the material support component of the terrorism exception to foreign sovereign immunity; "[s]ponsorship of a terrorist group which causes personal injury or death of United States national alone is sufficient to invoke jurisdiction." *Id.*; *see also Kilburn*, 376 F.3d at 1129 (holding that Liyba's actions need not be the "but for" causation of an act of terrorism for the purpose of establishing subject matter jurisdiction under the terrorism exception). Once the requirements for jurisdiction over a foreign state are satisfied under the FSIA, then that foreign state can be held liable in a civil action "in the same manner and to the same extent as a private individual under like circumstances." § 1606.

When the FSIA state sponsor of terrorism exception was first enacted in April of 1996, it was far from clear whether that statute, § 1605(a)(7), in and of itself, served as a basis for an independent federal cause of action against foreign state sponsors of terrorism. While the waiver

of foreign sovereign immunity was clear, and hence the provision authorized courts to serve as a

forum to adjudicate certain terrorism cases, questions remained regarding whether any civil

claims or money damages were available by virtue of that enactment.  To clarify matters,

Congress created what is commonly referred to as the Flatow Amendment, which was enacted a

mere five months after the state sponsor of terrorism exception as part of the Omnibus

Consolidated Appropriations Act, 1997.  *See* Pub. L. 104-208, § 589, 110 (1996), 110 Stat. 3009-

1, 3009-172 (codified at 28 U.S.C. § 1605 note).  The Flatow Amendment provides in pertinent

part that:

> An official, employee, or agent of a foreign state designated as a state
> sponsor of terrorism . . . while acting within the scope of his office, employment,
> or agency shall be liable to a United States national or the national's legal
> representative for personal injury or death caused by acts of that official,
> employee, or agent for which courts of the United States may maintain
> jurisdiction under section 1605(a)(7) of title 28, United States Code [repealed] for
> money damages which may include economic damages, solatium, pain, and
> suffering, and punitive damages if the acts were among those described in section
> 1605(a)(7).

§ 1605 note.

The amendment is named for Alisa Michelle Flatow, a 20-year-old Brandeis University

student from New Jersey who was mortally wounded in a suicide bombing attack on the Gaza

strip in April of 1995.  Alisa Flatow's father, Stephen Flatow, was one of the prime movers

behind the state sponsor of terrorism exception, and he successfully lobbied to have the

amendment incorporated as part of § 1605.  *See, e.g.*, Neely Tucker, *Pain and Suffering;*

*Relatives of Terrorist Victims Race Each Other to Court, but Justice and Money are Both Hard*

*to Find*, WASH. POST, Apr. 6, 2003, at F1 [hereinafter Tucker, *Pain and Suffering*] (recalling

Stephen Flatow's lobbying efforts on behalf of the anti-terrorism legislation); *see also* Ruthanne

M. Deutsch, *Suing State-Sponsors of Terrorism Under the Foreign Sovereign Immunities Act:*

- 17 -

*Giving Life to the Jurisdictional Grant After Cicippio-Puleo*, 38 Int'l Law. 891 (2004) (discussing legislative history of the Flatow Amendment and collecting sources); Suits Against Terrorist States, *supra* note 4, at 5–7 (discussing legislative history of § 1605(a)(7) and Flatow Amendment).

Stephen Flatow filed suit in this Court shortly after the enactment of the Flatow Amendment. As administrator of Alisa Flatow's estate, plaintiff asserted a wrongful death claim and a claim for Alisa's conscious pain and suffering prior to her death. *See Flatow I*, 999 F. Supp. at 27–29. Plaintiff also asserted solatium claims for the mental anguish and grief suffered by the decedent's parents and siblings as a result of her murder by terrorists. *See id.* at 29–32. Plaintiff also sought punitive damages. *See id.* at 32–35. Iran did not enter an appearance in the action and has never appeared in any FSIA terrorism action to date. *See id.* at 6.[5]

The *Flatow* case was the first in the country to be decided against Iran under the terrorism exception to the FSIA. *See* 999 F. Supp. at 6 n.2. In that decision, this Court examined the statutory language of the terrorism exception, § 1605(a)(7), and the Flatow Amendment, § 1605

---

[5] Iran has never appeared in these actions even though it is "an experienced litigant in the United States Federal Court System generally and in this Circuit. *See, e.g.*, *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C. Cir. 1994), *cert. denied* 513 U.S. 1078 (1995); *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990); *Presinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984); *Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329 (9th Cir. 1984); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983)." *Flatow I*, 999 F. Supp. 1 at 6 n.1. Nevertheless, this Court cannot enter a default judgment against a foreign sovereign unless the plaintiff "establishes his claim or right to relief by evidence satisfactory to the Court." 28 U.S.C. § 1608(e). Thus, this Court must carefully review the plaintiff's evidence with respect to both liability and damages.

While Iran has not defended itself in any of the lawsuits under the terrorism exception, Iran has on occasion come to court to prevent plaintiffs from collecting on default judgments entered under that provision. For example, Iran recently prevailed in an action to prevent the attachment of one of its assets here in the United States. *See, e.g.*, *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 129 S. Ct. 1732 (2009).

note, *in pari materia* and found that those provisions collectively established both subject matter jurisdiction and federal causes of actions for civil lawsuits against state sponsors of terrorism. *See id.* at 12–13.  This Court also ruled that the Flatow Amendment was intended to ensure large punitive damage awards against state sponsors of terrorism.  *See id.*  In this Court's view, the express provision of punitive damages in the Flatow Amendment, in conjunction with the provisions's legislative history, including statements by the Amendment's co-sponsors, Representative Jim Saxton and Senator Frank Lautenberg of New Jersey, demonstrated that Congress believed punitive damage awards were absolutely necessary to ensure that civil actions against state sponsors of terrorism would effectively deter those nations from perpetuating international terrorism.  *See id.*  Thus, the Flatow Amendment served as an exception to the general rule, as expressed in § 1606 of the FSIA, that foreign sovereigns are not to be held liable for punitive damages.

During a two-day hearing in March of 1998, plaintiff proceeded in the manner of a non-jury trial.  *Id.* at 6.  The evidence presented to the Court at that time demonstrated by clear and convincing evidence that Iran was the sole source of funding for the Shaqaqi faction of Palestine Islamic Jihad, a small terrorist cell that claimed responsibility for and in fact perpetuated the suicide bombing that gravely wounded Alisa Flatow on April 9, 1995.  *Id.* at 8–9.  The suicide bomber rammed a van full of explosives into the number 36 Egged bus that Alisa and others were traveling in on their way to a Mediterranean resort in the Gush Katif community in Gaza. *Id.* at 7.  The resulting explosion destroyed the bus and sent shrapnel flying in all directions.  *Id.* A piece of that shrapnel pierced Alisa's Flatow's skull and lodged in her brain.  *Id.*  Once Stephen Flatow learned that his daughter had been injured in the attack, he immediately flew to Israel, and he rushed to the Soroka Medial Center, where Alisa was being treated.  Upon his

arrival there, however, the attending physician informed Mr. Flatow that his daughter Alisa "showed no signs of brain activity, that all physical functions relied on life support, and that there was no hope for her recovery." *Id.* at 8.  In emotionally powerful testimony before this Court, Stephen Flatow described the heart-wrenching decision he made to have his daughter's life support terminated and her organs harvested for transplant.  *See id.*

This Court ultimately awarded a total of 22.5 million dollars in compensatory damages.  More significantly, however, the Court also awarded 225 million dollars in punitive damages, approximately three times Iran's annual expenditures on terrorist activities at that time.  *See id.* at 34.  In providing for such a large award of punitive damages against Iran, this Court stressed the importance of such awards as a means to deter states like Iran from supporting terrorist organizations.  The Court stated as follows:

> By creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens.  *This Cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.*

*Id.* at 33 (emphasis added).  The Court also recognized that any punitive damage award would have to be substantial enough to have an appreciable impact in light of Iran's significant annual revenues from oil exports.  *See id.* at 33–34.

At the time the *Flatow* decision was announced, there was a certain degree of energy and optimism surrounding the action.  Senator Frank Lautenberg held a press conference outside this courthouse with Alisa Flatow's parents and their attorneys.  They underscored the importance of the Court's decision as a measure of justice for victims of terrorism, and they stressed the importance of holding state sponsors of terrorism accountable for their support of terrorist

groups.  *See* Bill Miller & Barton Gellman, *Judge Tells Iran to Pay Terrorism Damages; $247*

*Million Award for Family of U.S. Victim in Gaza*, WASH. POST, Mar. 12, 1998, at A1.  Steven

Perles, one of the attorneys for the Flatows, spoke of Iran's wealth and expressed his belief that

the Flatows would "collect the entirety of the judgment."  *See id.*  At the time, the popular

sentiment was that terrorism victims were going to "sue the terrorists out of business."  *See*

Tucker, *Pain and Suffering*, *supra*.  In the years immediately following the *Flatow* decision,

many more plaintiffs relied on the original terrorism exception, § 1605(a)(7), in combination

with the Flatow Amendment, to successfully litigate cases against Iran.  *See, e.g.*, *Stern v.*

*Islamic republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003) (Lamberth, J.); *Hutira v. Islamic*

*Republic of Iran*, 211 F. Supp. 2d 115 (D.D.C. 2002) (Lamberth, J.); *Eisenfeld*, 172 F. Supp. 2d

1.[6]  Large judgments against the state sponsor of terrorism amassed quickly.  Unfortunately, in

most cases, the victories obtained by plaintiffs in this courthouse merely signaled the beginning

of what would become a long, bitter, and often futile quest for justice.

---

[6] Although this Judge ruled in *Flatow* that the Flatow Amendment,1605 note, did furnish
a cause of action against a state sponsor of terrorism, this Judge elected to revisit the issue even
more throughly in *Cronin v. Islamic Republic of Iran*, a case concerning an American Professor
who was taken hostage and tortured by Hizbollah in Beirut, Lebanon in 1984.  *See* 238 F. Supp.
2d 222 (D. D.C. 2002) (Lamberth, J.).  The Court did so in part because the Court of Appeals
had flagged the issue in *Price* by observing that "'the amendment does not list 'foreign states'
among the parties against whom an action may be brought.'"  *Cornin*, 238 F. Supp. 2d at 231
(quoting *Price*, 294 F.3d at 87).  As this Court revisited what was then a crucial question, this
Court observed that a majority of the judges of this Court by that time had ruled that the Flatow
Amendment did provide for a cause of action against a foreign state in cases in which that state is
not entitled to immunity by virtue of the terrorism exception, § 1605(a)(7).  *See id.* at 233
(collecting cases).  Nonetheless, § 1605 note is not a model of clarity, and as Judge Sullivan
pointed out in *Roeder v. Islamic Republic of Iran*, there are a number of valid reasons why
§ 1605 note should not be construed as furnishing substantive claims against foreign states.  *See*
195 F. Supp. 2d 140, 171–175 (holding that Flatow Amendment did not furnish a cause of
action).

2.      **Setbacks for Plaintiffs: The D.C. Circuit's Decision in** *Cicippio-Puleo*

Nearly six years following the *Flatow* decision, and contrary to what this Court and

others had determined, the D.C. Circuit Court of Appeals held that "[p]lainly neither section

§ 1605(a)(7) nor the Flatow Amendment, separately or together, establishes a cause of action

against foreign state sponsors of terrorism."  *Cicippio-Puleo*, 353 F.3d at 1027.  According to the

Court of Appeals, the original terrorism exception to the FSIA, § 1605(a)(7), was "merely a

jurisdiction conferring provision," and therefore it did not create an independent federal cause of

action against a foreign state or its agents.  *Id.* at 1032.  In other words, the prior version of the

terrorism exception, § 1605(a)(7), merely waived foreign sovereign immunity for designated

terrorist states with respect to actions taken by those states in furtherance of international

terrorism, but it did not furnish a legal claim for money damages that a terrorism victim might

then assert in a lawsuit against Iran or any other designated state sponsor of terrorism.  Instead,

plaintiffs in terrorism cases were required to find a cause of action based on some other source of

law.  *Id.* at 1037.

With respect to the Flatow Amendment, § 1605 note, the Court held that the provision

"provides a private right of action only against individual officials, employees, and agents of a

foreign state, but not against the foreign state itself."  *Id.* at 1027.  Thus, the cause of action

furnished by the Flatow Amendment is severely restricted because it applies only to claims

against foreign state officials, employees, and agents, "in their *individual capacities*, as opposed

to their official capacities."  *Id.* at 1034 (emphasis in original).  In reaching its holding, the Court

of Appeals emphasized that a claim against a foreign state official for actions taken within his

official capacity on behalf of a foreign government "'is in substance a claim against the

government itself'"  *Id.* (citations omitted).  As the Court found that neither the plain language

nor the legislative history of the Flatow Amendment suggested that Congress intended to impose liability on foreign governments, plaintiffs were precluded from relying on that provision for either claims against Iran or claims based on acts taken by Iranian officials within the scope of their official duties.  *Id.* at 1034–1036.  After rendering its ruling the *Cicippio-Puleo*, the Court of Appeals remanded the action back to this Court in order to enable plaintiffs in that case to amend their complaint to state a cause of action against Iran "under some other source of law, including state law."  *Id.* at 1036.

As a result of the *Cicippio-Puleo* decision, plaintiffs in FSIA terrorism cases under § 1605(a)(7) began to use that provision as a "'pass-through'" to causes of actions found in state tort law.  *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 83 (D.D.C. 2006) (Lamberth, J.); *see also Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996) (describing how FSIA acts as pass-through to state law by virtue of § 1606) (quoting *Zicherman v. Korean Airlines Co*, 516 U.S. 217, 229 (1996)).  By using the pass-through approach under the earlier version of the terrorism exception, § 1605(a)(7), most terrorism victims who pursued FSIA cases against Iran were in fact able to litigate claims based on the tort law of the state jurisdiction where they were domiciled at the time of the terrorist incident giving rise to the lawsuit.

In the large consolidated case of *Peterson v. Islamic Republic of Iran*, for example, this Court found that Iran furnished money, weapons, training, and guidance to Hezbollah in direct support of a terrorist plot that culminated in large-scale suicide bombing attack on the United States Marine barracks in Beirut, Lebanon on October 23, 1983.  *See* 264 F. Supp. 2d at 47–59 (D.D.C. 2003) [hereinafter *Peterson I*] (Lamberth, J.).[7]  More than 200 American servicemen

---

[7] *Peterson* is consolidated with *Boulos v. Islamic Republic of Iran*, No. 01-CV-2684-RCL (D.D.C.).

lost their lives and countless others were injured in the bombing.  Prior to September 11, 2001, the attack on the Marines in Beirut was the most deadly terrorist attack ever carried out against American citizens.  By examining the claims in that case under a number of sources of state law, this Court awarded to the family members of the deceased servicemen and the injured survivors of the Beirut attack exceeds 2.6 billion dollars and remains one of the largest judgments ever awarded in a FSIA action pursuant to the state sponsor of terrorism exception.  *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 44–45 (D.D.C. 2007) [hereinafter *Peterson II*] (Lamberth, J.).  Like *Peterson*, the majority cases addressed in today's opinion stem from the 1983 bombing of the Marine barracks facility in Beirut, Lebanon.

In another action considered today, *Bennett v. Islamic Republic of Iran*, plaintiffs demonstrated how Iran's financial support of Hamas helped to perpetrate terrorist attacks, including a 2002 suicide bombing incident at Hebrew University in Jerusalem that claimed the life of their 24-year-old daughter.  *See* 507 F. Supp. 2d 117 (D.D.C. 2007) (Lamberth, J.).  In *Bennett*, the plaintiffs relied on California law.  Similarly, in *Beer v. Islamic Republic of Iran*, family members of an American killed in a suicide bombing of a bus in Jerusalem showed how Iran's material support to Hamas in the form of funding, safe haven, training, and weapons, helped to spur on violent suicide attacks in Israel and elsewhere.  574 F. Supp. 2d 1 (D.D.C. 2008) (Lamberth, J.).[8] The plaintiffs in *Beer* relied on New York common law.

---

[8] This Court has also decided FSIA cases arising from Iran-sponsored terrorist attacks that have occurred here in the United States.  *Acosta*, for example, arose out of the assassination of Rabbi Meir Kahane, an Israeli political figure and a founder of the Jewish Defense League, who was gunned down by Islamic Jihadists as he was concluding a lecture in New York City on November 5, 1990.  *See* 574 F. Supp. 2d 15.

But while larger majority of plaintiffs in actions post-*Cicippio-Puelo* were able to use the pass-through approach to find relief, hundreds of others equally dissevering plaintiffs had their claims denied because they were domiciled in jurisdictions that did not afford them a substantive claim.  In the *Peterson* case, for example, some family members of the Marines and other servicemen who were killed in the 1983 terrorist bombing were barred from asserting intentional infliction of emotional distress claims (IIED) because they lacked standing under the applicable state tort law.  Consequently, this Court had to dismiss the IIED claims of family members who were domiciled in either Pennsylvania or Louisiana at the time of the terrorist attack because those jurisdictions would not permit IIED claims by family members who were not physically present at the site of the incident that gave rise to the emotional distress.  *See Peterson II*, 515 F. Supp. 2d at 44–45.  Thus, the Pennsylvania and Louisiana plaintiffs in the *Peterson* action were effectively denied their day in court, and yet they watched as many other similarly situated plaintiffs (including some of their own family members) from different state jurisdictions advanced and ultimately prevailed with their claims for IIED.  For those Pennsylvania and Louisiana plaintiffs who were denied relief as so many others succeeded based on precisely the same kinds of claims, based on the same horrific and unquestionably traumatic incident, the result must have seemed both arbitrary and unfair.

In addition to the unfairness caused by a lack of uniformity in the underlying state sources of law, the pass-through approach proved cumbersome and tedious in practical application.  In a given case based on a single terrorist incident, this Court would usually have to resolve choice of law problems and then proceed through a lengthy analysis of tort claims under the laws of numerous different state jurisdictions.  For example, in the *Heiser* case, a large consolidated action involving the Khobar towers bombing, this Court issued a 209-page opinion

in which it ultimately applied the laws of 11 different state jurisdictions.  *See* 466 F. Supp. 2d

299.  In *Peterson*, this Court had to apply the laws of nearly 40 different jurisdictions in order to

resolve the victims' claims.  *See Peterson II*, 515 F. Supp. 2d 25.  To efficiently manage these

terrorism cases under the pass-through regime imposed by *Cicippio-Puleo*, this Court would

frequently refer the action to special masters after the Court determined under § 1605(a)(7) that

Iran provided material support for a terrorist incident that killed or injured Americans.[9]

   Another consequence of the *Cicippio-Puleo* decision was that the Flatow Amendment

could not serve as independent basis for punitive damages awards against Iran.  As the Court of

Appeals found that the amendment was not intended to provide for claims against foreign states,

the bar on punitive damages in § 1606 of the FSIA remained in tact, even with respect to state

sponsors of terrorism.  Accordingly, large awards of punitive damages, like that which this Court

granted in *Flatow* to deter Iran from sponsorship of terrorist groups, were no longer available in

actions against the state of Iran under § 1605(a)(7).[10]

---

   [9] The application of diverse sources of substantive law to claims in accordance with the
pass-through approach under § 1605(a)(7) may sometimes requires courts to look to foreign
sources of law.  *See Oveissi*, 573 F.3d 835.  In *Oveissi*, the Court of Appeals ruled that this Court
must apply French law to resolve emotional distress and wrongful death claims brought by an
American grandson of General Gholam Oveissi, who was the head of the Iranian armed forces
under the Shah's regime.  General Oveissi was assassinated in France by Hezbollah operatives in
February of 1984.

   [10] In all of the civil actions against the Islamic Republic of Iran considered here today,
Iran's Ministry of Information and Security (MOIS) is also named as a defendant.  One of the
actions also includes the Iranian Islamic Revolutionary Guard Corps (IRGC) as a defendant.  *See
Rimkus v. Islamic Republic of Iran*, No. 06-CV-1116-RCL (D.D.C.).

   As noted, § 1606 of the FSIA provides that foreign states may not be held liable for
punitive damages, and, as a result of *Cicippio-Puleo*, that exemption from punitive damages
applies to state sponsors of terrorism in actions under § 1605(a)(7), notwithstanding the Flatow
Amendment.  Section 1606 also provides, however, that an "agency or instrumentality" of a
foreign state, as opposed to the state itself, may be liable for punitive damages.  Thus, certain

3.      **The Never-Ending Struggle to Enforce Judgments Against Iran**

In the years since the *Flatow* decision, a number of practical, legal, and political obstacles have made it all but impossible for plaintiffs in these FSIA terrorism cases to enforce their default judgments against Iran.  This Court has examined this fundamental and longstanding problem time and again as plaintiffs before this Court have sought, with very little success, to

entities of a foreign government may be liable for punitive damages.  In terrorism cases against Iran in this Court under § 1605(a)(7), plaintiffs have never identified an appropriate Iranian agency that would qualify as an "agency or instrumentality" of Iran for the purpose of a punitive damages award.

In *Roeder v. Islamic Republic of Iran*, a case that was decided only a few months prior to *Cicippio-Puleo*, the Court of Appeals emphasized that it follows a categorical approach when determining whether a foreign governmental entity should be considered "'a foreign state or political subdivision' rather than an 'agency or instrumentality of the nation'" for purposes of the FSIA.  333 F.3d 228, 234 (D.C. Cir. 2003) (quoting *Transaero, Inc. V. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149–50 (D.C. Cir. 1994)).  Under the categorical approach, "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  *Id.*  In *Roeder*, the Court determined that Iran's Ministry of Foreign Affairs is part of the foreign state itself, rather than an "agency of instrumentality" because the Ministry of Foreign Affairs, like a nation's armed forces, is governmental in nature.  *Id.*  Following the *Roeder* decision, this Court found that MOIS must be considered part of the state of Iran itself and is therefore exempt from liability for punitive damages.  *See, e.g.*, *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 n.2 (D.D.C. 2006) (Lamberth, J.).

In *Rimkus*, a case that is addressed in today's consolidated opinion, the plaintiffs asserted claims against IRGC as well as MOIS.  In rendering the decision in *Rimkus*, this Court again followed the categorical approach from *Roeder* and determined that IRGC, like MOIS, is part of the state itself and is therefore exempt from punitive damage under the FSIA.  *See* 575 F. Supp. 2d 181, 198–200 (D.D.C. 2008) (Lamberth, C.J.); *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (concluding that both MOIS and IRGC must be treated as the state of Iran itself for purposes of liability); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (Bates, J.) (same).  Consequently, in the years following *Cicippio-Puleo*, plaintiffs in actions under the original terrorism exception, § 1605(a)(7), lacked a basis for claiming punitive damages in actions arising out of Iran-sponsored terrorism.

Because claims against MOIS or IRGC are not legally distinguishable from claims against Iran itself, this opinion refers to Iran as the only defendant.

locate and attach Iranian Government assets in aid of execution of their civil judgments.  *See, e.g.*, *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152 (D.D.C. 2009) (Lamberth, C.J.); *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268 (D.D.C. 2008) [hereinafter *Peterson III*] (Lamberth, C.J.); *Weinstein v. Islamic Republic of Iran*, 274 F. Supp. 2d 53 (D.D.C. 2003) (Lamberth, J.); *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16 (D.D.C. 1999) [hereinafter *Flatow III*] (Lamberth, J.); *Flatow v. Islamic Republic of Iran*, 74 F. Supp. 2d 18 (D.D.C. 1999) [hereinafter *Flatow II*] (Lamberth, J.).  To even begin to appreciate the difficulties plaintiffs face with respect to locating Iranian property in the United States, it is important to first understand the significance of the Iran-Hostage Crisis and its aftermath and, more specifically, the Algiers Accords, the bilateral executive agreement between Iran and the United States that brought about the settlement of the hostage crisis in 1981.

On November 14, 1979, ten days after the start of the Iran hostage crisis in which Iranian revolutionaries seized the United States embassy in Tehran and took most embassy personnel as hostages, President Carter exercised his powers under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706, and "blocked all property and interests in property of the Government of Iran . . . subject to the jurisdiction of the United States."  Exec. Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979); *see* Transactions Involving Property in Which Iran or Iranian Entities Have an Interest, 31 C.F.R. § 535.201; *see also Dames & Moore v. Regan*, 453 U.S. 654, 662–664 (1981) (discussing the Iran Hostage Crisis and President Carter's actions in response to the Iran hostage crisis pursuant to his authority under the IEEPA).

Approximately five months later, as the hostage crisis continued to wane on, President Carter severed diplomatic relations with Iran, and the State Department assumed custody of all Iran's diplomatic and consular property here in the United States.  *See, e.g.*, *Bennett*, 604 F.

Supp. 2d at 162–66 (discussing the termination of diplomatic relations with Iran and the State Department's assumption of custody over Iran's diplomatic and consular properties within the United States). The hostage crisis was finally resolved when Iran and the United States executed the Algiers Accords on January 19, 1981, and all hostages were released the following day, just moments after President Regan took office. *See* Iran-United States: Settlement of the Hostage Crisis, Jan. 18–20, 1981, 20 I.L.M. 223 [hereinafter Algiers Accords]; *Dames & Moore*, 453 U.S. at 664–65 (discussing the release of the hostages and terms of the Algiers Accords).

As part of the Algiers Accords, the United States agreed in principle to restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979." Algiers Accords, 20 I.L.M. at 223, 224. Additionally, the United States "commit[ted] itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction." *Id.* at 223–224. Iran and the United States further agreed to settle all litigation between the two governments, to include any outstanding litigation between the nationals of the two countries as of January, 19 1981. *Id.* at 223–224, 230–232. To this end, the Algiers Accords established an Iran-U.S. Claims Tribunal in the Hague to arbitrate any claims not settled within six moths. *Id.* at 226, 230–34. Consistent with these commitments to restore Iran's financial position, to facilitate the transfer of Iranian assets, and to have unresolved claims presented to the Iran-Claims Tribunal, the United States agreed to "bring about the transfer" of all Iranian assets held in this country by American banks, with one billion dollars in those assets set aside on account of the Central Bank of Algeria for the payment of any awards entered against Iran by the Claims Tribunal. *Id.* at 225–27. The Claims-Tribunal would also have jurisdiction to revolve disputes between Iran and the United States concerning each other's compliance with the Algiers Accords. *Id.* at 231.

To comply with the terms of the Algiers Accords, President Carter issued, and President Regan subsequently ratified, a series of Executive Orders in which the President unblocked the majority of Iran assets within the jurisdiction of the United States and directed United States banks to transfer all Iranian assets to the Federal Reserve Bank of New York, where they would be held or transferred to Iran as directed by the Secretary of the Treasury.  *See Dames & Moore*, 453 U.S. at 665–66.  Subsequent Executive Orders and treasury regulations have controlled the transfer of Iranian Assets consistent with the Algiers Accords.  *See, e.g.*, Iranian Assets Control Regulations, 31 C.F.R. pt. 535.  Thus, practically speaking, there are simply few assets within the United States that are available for plaintiffs to seize in satisfaction of their judgments under the FSIA terrorism exception.

In *Dames & Moore*, the Supreme Court upheld the validity of actions taken by both President Regan and Carter to settle the Iran Hostage Crisis through the implementation of the Algiers Accords.  453 U.S. 654.  Specifically, the Court examined two issues.  First, the Court addressed the validity of Executive Orders that nullified all attachments and similar encumbrances on Iranian property in the United States and directed the transfer of Iranian assets to the Federal Reserve Bank of New York for ultimate transfer back to Iran under the terms of the Algiers Accords.  Second, the Court addressed Executive Orders that suspended claims pending against Iran in American courts and provided for those claims to be presented to Iran-United States Claims Tribunal for resolution through binding arbitration.

With respect to the termination of attachments on Iran's property and the transfer of Iran's assets, the Court found that Congress had provided in the IEEPA, 50 U.S.C. §§ 1701–1706, specific authorization for the President to take those actions.  *Dames & Moore*, 453 U.S. at 674–75.  Accordingly, the Court relied on the strong presumption of validity traditionally

accorded to such Executive action pursuant to a federal statute, as described in Justice Jackson's famous concurrence in *Youngstown Sheet & Tube Co. V. Sawyer*, 343 U.S. 579 (1952), and held that, in light of this "specific congressional authorization," it could not find that the power exercised by the President had exceeded the bounds of any powers afforded under the Constitution. *Dames & Moore*, 453 U.S. at 675. The Court observed: "A contrary ruling would mean that the Federal Government as a whole lacked the power exercised by the President, and that we are not prepared to say." *Id.* at 674 (citation omitted).

With respect to the suspension of claims, the Court ultimately upheld that action as well, but the Court's rationale was a bit more nuanced. While the Court could not identity a specific authorization from Congress, the Court did find that, over more than two centuries, Congress had either acquiesced in or implicitly approved of the settlement of claims of United States nationals through executive agreement. *See id.* at 675–687. Thus, in light of what the Court deemed as Congress' consent to the President's actions, the Court held that it could not say that the President's actions in suspending claims against Iran exceeded the President's powers. *Id.* at 686.[11]

---

[11]As a leading case on the scope of Federal Power, particularly Executive Power, as exercised in the realm of foreign affairs and national security, and as a case concerning the Algiers Accords and Iran specifically, *Dames & Moore* remains particularly relevant with respect to many of the issues presented in the terrorism cases considered by this Court today. For example, by reaffirming the strong presumption of validity that should attach to actions expressly authorized by both political branches in the area of foreign affairs, *Dames & Moore* lends supports to this Court's ruling in Part E that § 1083(c) does not offend separation-of-powers principles relating to the independence of the judiciary. Additionally, *Dames & Moore* provides a historical perspective that helps to illustrate some of the unique challenges that plaintiffs in FSIA terrorism cases against Iran face as a consequence of executive actions implementing and honoring the terms of Algiers Accords.

More generally, then-Justice Rehnquist's discussion in *Dames & Moore* concerning our nation's rich history and tradition of the use of Executive authority to settle claims between

What few assets of Iran that might be found within jurisdiction of the United States courts since the Algiers Accords are a subject to a dizzying array of statutory and regulatory authorities due in large part to the federal government's obligations under that bilateral executive agreement, but also in part because of the increasing hostility in the relationship between Iran and the United States in the wake of the hostage crisis and the continuous designation of Iran as a state sponsor of terrorism since 1984.  In fact, much like the assets of other state sponsors of terrorism, most of Iran's known property or interests in property are blocked, i.e., frozen, or otherwise regulated under any number of United States sanctions programs.[12]

---

United States nationals and foreign sovereigns, *see* 453 U.S. at 678–687, provides an even broader historical perspective that this Court finds highly instructive for the purposes of today's opinion.  Indeed, as Justice Rehnquist illustrated in his opinion for the Court, the exercise of Federal Power by the President to settle claims of U.S. nationals against foreign sovereigns—a long-standing practice to which the Congress has acquiesced and occasionally supported by legislation—has often proven to be the most effective way to ensure relief to United States Nationals aggrieved by foreign sovereigns.  In Part K of this opinion, this Court relies on the time-honored practice of claims settlement by the Executive, as expressed in *Dames & Moore*, in support of this Court's call for reforms to help victims of Iran-sponsored terrorism find the relief they deserve.

[12] *See* TERRORIST ASSETS REPORT, *supra* note 2, at 2, 10.  The Office of Foreign Assets Control (OFAC) of the Treasury Department administers economic sanction programs relating to terrorists, terrorist organizations, and officially designated state sponsors of terrorism.  Each year, OFAC publishes a report to Congress regarding assets in the United States that belong to terrorist nations and other terrorist actors.  This annual report discusses both blocked and non-blocked assets of Iran, as well assets attributable to other state sponsors of terrorism.  As such, the Terrorist Assets Report is a good reference point for individuals interested in understanding some of the tremendous difficulties terrorism victims face in their efforts to enforce judgments entered against Iran under the FSIA terrorism exception.

According to the CRS, the blocked assets of Iran in the United States "includes property that is blocked under the Iranian Assets Control Regulations, 31 C.F.R. pt. 535, since the hostage crisis was resolved in 1981.  The property blocked in 1981 remains blocked in part because of pending claims before the Iran-U.S. Claims Tribunal." *Id.* at 10.  Other blocked assets include Iran's diplomatic and consular properties here in the United States, as well as any proceeds from the leasing of those properties, which are now managed and maintained by the State Department's Office of Foreign Missions.  *Id.*  "Additionally, other sanction authorities designed

Beyond the imposition of economic sanctions and other regulatory controls, however, the inviolable doctrines of both foreign sovereign immunity and federal sovereign immunity have often precluded the attachment or execution of property that plaintiffs have identified as belonging to Iran.  With respect to foreign sovereign immunity specifically, the FSIA itself has long forestalled plaintiffs' efforts to enforce judgments entered under § 1605(a)(7).  This is largely because, much like foreign sovereigns are generally immune from civil suit under the FSIA, *see* § 1604, any property belonging to a foreign nation is similarly immune from attachment and execution by judgment creditors.  *See* § 1609.  The relevant exceptions to the general rule of immunity from the attachment or execution are listed in § 1610.  Prior to the enactment of last year's reforms in the 2008 NDAA, however, these exceptions to the general rule of immunity for foreign government property were limited almost exclusively to property relating to the commercial activities of the foreign sovereign within the United States.  *See* § 1610(a) and (b).  Given the lack of formal relations between the United States and Iran, these provisions have been of little utility to the judgment creditors of Iran in FSIA terrorism cases.  Thus, the FSIA facilitated a somewhat ironic and perverse outcome because on the one hand, in § 1605(a)(7), it created an opportunity for terrorism victims to sue Iran for money damages, while on the other hand, in §§ 1609 and 1610, it denied these victims the legal means to enforce their court judgments.[13]

---

to address national emergencies distinct from terrorism have also resulted in the blocking of assets in which the Government of Iran has an interest." *Id*.  The report adds that Iran claims "miscellaneous blocked and non-blocked military property that it asserts was in the possession of private entities in the United States when the hostage crisis was resolved in 1981. *Id.* at 12.  The United States disputes Iran's claims and the matters are pending before the Claims-Tribunal. *Id.* at 13.

[13] Another challenge for plaintiffs looking to collect on their judgments in this context is

In addition to the immunity from attachment or execution that the FSIA has long provided to foreign property, assets held within United States Treasury accounts that might otherwise be attributed to Iran are the property of the United States and are therefore exempt from attachment or execution by virtue of the federal government's sovereign immunity. *See Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999); *State of Arizona v. Bowsher*, 935 F.2d 332 (D.C. Cir. 1991). As the Supreme Court held in the seminal case of *Buchanan v. Alexander*, United States sovereign immunity is an extremely broad bar to jurisdiction that prevents creditors from attaching funds held by the United States treasury or its agents. 45 U.S. 20 (1846).

Because the federal government has assumed control over significant portions of what limited Iranian assets remain in the United States, plaintiffs' efforts to enforce judgments under the FSIA have often pitted victims of terrorism against the Executive Branch. Under successive presidential administrations, the Justice Department repeatedly moved to quash writs of attachment issued by judgment creditors of Iran. Two frequently discussed and well-documented examples concern the efforts of Stephen Flatow to enforce his civil judgment, which culminated in litigation against the United States in this Court. *See Flatow II*, 74 F. Supp. 2d 18;

---

that many of the world's leading financial institutions are agencies or instrumentalities of foreign nations and are therefore immune from jurisdiction of the United States Courts under the FSIA. *See* §§ 1603–1604. In *Peterson*, for example, this Court recently quashed writs of attachment issued upon Japan Bank for International Cooperation, Bank of Japan, and the Export Import Bank of Korea. *See Peterson III*, 563 F. Supp. 2d 268. Plaintiffs alleged that these three foreign banks posses Iranian assets, but this Court found that all three banks are foreign state entities that qualify for immunity from jurisdiction under the FSIA. For the same reasons, this Court quashed numerous subpoenas that plaintiffs had issued to those financial institutions and denied plaintiffs' request for the appointment of a receivership for any and all assets of Iran held by those foreign banks.

*Flatow III*, 76 F. Supp. 2d 16.  In both cases, this Court had to deny plaintiff relief and thereby granted the federal government's motion to quash.

In the first case, plaintiff issued writs that purported to attach credits held by the United States for the benefit of Iran, including more than 5 million dollars in the United States Treasury Judgment Fund, which had been earmarked to pay an award issued in Iran's favor by the Iran-United States Claims Tribunal.  *Flatow II*, 74 F. Supp. at 20.  Plaintiff pointed to the Iranian Assets Control Regulations in support of his argument that money in the Treasury Judgment Fund should be considered Iranian property that is potentially subject to attachment and execution under the FSIA, 1610.  *See id.* (citing 31 C.F.R. § 535.311 (1999)).  In rejecting plaintiff's argument, this Court relied on *Buchanan* and *Blue Fox*, and held that funds in the United States Treasury—regardless of whether those funds have been set aside to pay a debt to Iran—remain immune from attachment by virtue of United States sovereign immunity.  *Id.* at 21.  "In other words, funds held in the U.S. Treasury—even though set aside or 'earmarked' for a specific purpose—remain the property of the United States until the government elects to pay them to who they are owed."  *Id.*  Accordingly, as the United States had not waived its sovereign immunity with respect to those funds that had been earmarked to pay a Tribunal Award or other debts to Iran, that money remained exempt from attachment or execution by virtue of federal sovereign immunity.  *Id.* at 23; *see also Weinstein*, 274 F. Supp. 2d at 58 (holding that funds allegedly owed to Iran in the Treasury's Foreign Military Sales (FMS) Program are immune from attachment by virtue of federal sovereign immunity).

In the second case, plaintiff issued writs of attachment upon three parcels of real estate owned by Iran that once served as the Iranian Embassy and as residences and offices for Iran's diplomatic personnel.  *Flatow III*, 76 F. Supp. 2d at 18.  Additionally, plaintiff issued writs of

attachment upon two bank accounts that contained funds generated by the State Department's lease of Iran's diplomatic properties. *Id*. The first of the two accounts was used to pay for the maintenance and repair of Iran's properties. *Id.* at 19. The second account contained all the profits generated as a result of the lease of Iran's foreign mission properties. *Id*.

The United States promptly intervened and moved to quash the writs, arguing that real property and the related banks accounts were immune from attachment under the Foreign Missions Act, the FSIA, the IEEPA, the Vienna Convention on Diplomatic Relations, and Article II of the U.S. Constitution. *Id.* at 19. The plaintiffs countered that because Iran's former embassy properties were being managed and leased out to tenets by the Department of the State under the auspices of the Foreign Missions Act, 22 U.S.C. §§ 4301–4313, the property was being used for a "commercial activity" and therefore satisfied the requirements for attachment under § 1610(a)(7) of the FSIA. *See Flatow III*, 76 F. Supp. 2d. at 21.

Without reaching any of the more fundamental arguments raised by the government's motion to quash, this Court held that the leasing of Iran's real property by the United States did not qualify as a commercial activity in part because the United States' action in taking custody of Iran's property under the authority of the Foreign Missions Act "was decidedly sovereign in nature." *Id.* at 23; *see also Bennett*, 604 F. Supp. 2d at 169 (relying on *Flatow* to grant United States' motion to quash writs of attachment recently issued on Iran's foreign mission properties). For similar reasons, the Court found that the bank account that was used by the State Department's Office of Foreign Missions (OFM) for the maintenance and repair of Iran's real property was also immune from attachment because the funds within that account were expended by OFM in exercise of its statutory prerogative to provide for the upkeep properties that once housed Iran's foreign mission. *Flatow III*, at 24. This Court also found that the other account at

issue, which simply contained the profits earned on the lease of Iran's property, was immune from attachment as a result of federal sovereign immunity. *Id.*

In some frustration, this Court observed in *Flatow* that President Clinton's Administration, including President Clinton himself, had both publicly and privately expressed support for the victims of terrorism and for the plaintiffs in these terrorism cases specifically, and yet the Clinton Justice Department repeatedly fought efforts by these victims to enforce court judgments under the FSIA. *See Flatow II*, 74 F. Supp. 2d at 26; *Flatow III*, 76 F. Supp. 2d at 19–20. Moreover, as will be discussed below, President Clinton twice blocked reforms to the FSIA that would have subjected Iran's blocked assets to attachment and execution. *See infra* pp. 39–40; SUITS AGAINST TERRORIST STATES, *supra* note 4, at 10–12 (discussing President's exercise of waiver authority with respect to provisions that would have permitted attachment and execution upon frozen assets of state sponsors of terrorism); *see also Flatow*, 76 F. Supp. 2d 16 (noting President's first exercise of waiver in the interest of national security of provision that would have permitted attachment of blocked assets). In a letter to the *Washington Post* cited by this Court in two of its published decisions, Stephen Flatow documented his meetings with President Clinton, including private meetings and phone calls, as well as his meetings with other high ranking members of the Clinton Administration. *See* Stephen Flatow, *In This Case, I Can't Be Diplomatic; I Lost a Child to Terrorism; Now I'm Losing U.S. Support*, WASH. POST, Nov. 7, 1999, at B2. Mr. Flatow explained how he grew tremendously frustrated in his long pursuit of justice in which he received statements of support from the Executive Branch, as well as personal assurances of assistance, only to later find that the administration proved to be the most formidable adversary in his efforts to execute judgment upon the blocked assets of Iran. In

reflecting on his experiences some years later, Stephen Flatow referred to his litigation against the United States "as a real cat fight." Tucker, *Pain and Suffering*, *supra*.

As this Court observed how many plaintiffs struggled to enforce their court judgments in FSIA terrorism cases against Iran, this Court began to refer these judgments as "Pyrrhic Victories." *Eisenfeld*, 172 F. Supp. 2d at 9; *Flatow III*, 76 F. Supp. 2d at 27. Moreover, this Court expressed dismay over the fact that the rule of law was being frustrated in these actions. *Eisenfeld*, 172 F. Supp. 2d at 9. Allowing plaintiffs to go forward with suits under § 1605(a)(7) while not freeing up Iran's assets to satisfy those judgments under § 1610, or through the release of blocked assets under United States' control, was a quintessential example of the federal government promising with one hand what it takes away with the other. In fact, it is not uncommon for plaintiffs to receive mixed signals from Congress and the President in this highly-charged political context. *See, e.g.*, *Roeder*, 195 F. Supp. 2d at 145 (observing that the political branches of the Government "should not with one hand express support for the plaintiffs and with the other leave it to this Court to play the role of the messenger of bad news").

In view of the challenges that plaintiffs encountered in their efforts to execute judgments against the assets of state sponsors of terrorism here in the United States, Congress did make a number of efforts on behalf of the victims of terrorism to free up blocked assets for judgments under § 1605(a)(7). The first law enacted as part of this effort to free up assets of state sponsors of terrorism was included in the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. Pub. L. No. 105-277, div. A, tit. I, § 117(a), 112 Stat. 2681-0, 2681-491 (codified at § 1610(f)(1)(A)). That measure created a new exception—§ 1610(f)—which allowed for the first time attachment and execution against blocked assets of state sponsors of

terrorism.[14]  When Congress passed this measure, however, it also provided that the President

could waive the provision "in the interest of national security."  § 1610(f)(3).  Upon signing the

bill into law, President Clinton exercised that waiver authority.  *See* Pres. Determ. No. 99-1, 63

Fed. Reg. 59,201 (Oct. 21, 1998).  In doing so, the President stated:

> Absent my authority to waive section 117's attachment provision, it would effectively eliminate the use of blocked assets of terrorist States in the national security interests of the United States, including denying an important source of leverage.  In addition, section 117 could seriously impair our ability to enter into global claims settlements that are fair to all U.S. claimants, and could result in U.S. taxpayer liability in the event of a contrary claims tribunal judgment.  To the extent possible, I shall construe section 117 in a manner consistent with my constitutional authority and with U.S. international legal obligations, and for the above reasons, I have exercised the waiver authority in the in the national security interest of the United States.

Statement on Signing the Omnibus Consolidated and Emergency Supplemental Appropriations

Act, 1999, 2 PUB. PAPERS 1843, 1847 (Oct. 23, 1998).  Thus, § 1610(f)(1)(A)—which would

have broadly subjected Iranian assets to attachment and execution—was rendered a nullity.[15]

---

[14] Section 1610(f)(1)(A) of the FSIA has not changed in substance since its enactment in 1998.  It was amended slightly by § 1083 of the 2008 NDAA in order to account for the repeal of § 1605(a)(7) and enactment of § 1605A.  The exception now reads as follows:

> Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

[15] The Supreme Court has long recognized the important role that blocked assets can play in a President's efforts to manage a foreign policy crisis.  *See Dames & Moore v. Regan*, 453

The following term, Congress passed the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA), in which Congress again tried to subject blocked assets of state sponsors of terrorism to attachment of execution.  Pub. L. No. 106-386, § 2002, 114 Stat. 1464, 1541.  Specifically, Congress aimed in the VTVPA to resurrect § 1610(f)(1)(A) of the FSIA and thus repealed the waiver authority that was exercised by President Clinton under § 117(d) of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.  *See* § 2002(f)(2).  Oddly enough, however, Congress replaced that earlier waiver provision with a new, and nearly identical provision, that again granted the President the authority to waive § 1610(f)(1)(A) "in the interest of national security."  § 2002(f)(1)(B).  Upon singing the VTVPA into law, the President again exercised the waiver authority, as granted by Congress, which again rendered § 1610 a nullity.  Thus, § 1610(f) remains inapplicable in cases under the FSIA terrorism exception.

More significantly, the VTVPA also directed the Secretary of Treasury to pay the compensatory damages awarded in court judgments to plaintiffs in a limited number of FSIA terrorism cases against Iran or Cuba.  § 2002(a).  With respect to the payment of judgments against Iran specifically, the VTVPA directed the Secretary of Treasury to make those payments out of the rental proceeds that had been accrued as a result of the federal government's lease of

---

U.S. at 673 (1980) (relying on *Propper v. Clark*, 337 U.S. 472, 493 (1949)).  In *Dames & Moore*, the Court emphasized that blocked assets "serve as a 'bargaining chip' to be used when dealing with a hostile country."  453 U.S. at 673.  Notably, the Court also observed how subjecting frozen assets "to attachments, garnishments, and similar encumbrances" would enable "individual claimants throughout the country to minimize or wholly eliminate this 'bargaining chip.'"  *Id.* at 673.  The efforts by Congress to subject the blocked assets of terrorists states to attachment and execution has been one of the most controversial issues pertaining to the FSIA terrorism exception.  The tug of war between Congress and the President over this thorny issue serves as a great example of the ways in which the FSIA terrorism exception and its related enactments constitute a "delicate legislative compromise."  *Price*, 294 F.3d at 86.

Iranian diplomatic and consular property and from appropriated funds "not to exceed the total of the amount in the Iran Foreign Military Sales Program account within the Foreign Military Sales Fund." § 2002(b).[16]  Once an eligible plaintiff accepts a payment of compensatory damages from the United States Treasury on a judgment against Iran, the plaintiff's right to pursue that claim is "fully subrogated" to the United States.  *Id.*  As a result of the VTVPA, precisely ten cases against Iran qualified for payments from the United States Treasury.  *See* TERRORIST ASSETS REPORT, *supra* note 2, at 12–15, app. A (discussing VTVPA program for payment of compensatory damage in judgments entered against Iran and Cuba and listing cases).  *Flatow* was among the cases that qualified, and Stephen Flatow, along with plaintiffs in all of the nine other qualifying cases, opted to have their compensatory damages paid by United States.  *See id.*; *see also* Tucker, *Pain and Suffering*, *supra* (discussing Stephen Flatow's acceptance of payment of compensatory damages from the United States Treasury and his ongoing efforts to enforce the punitive damages portion of his judgment against Iran).  Subsequent legal enactments have expanded the number of cases with judgments against Iran that are eligible for payments from the United States Treasury.  *See* Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, § 686, 116 Stat. 1350, 1411 (2002); Terrorism Risk Insurance Act of 2002 (TIRA), Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337–39.

---

[16] The Foreign Military Sales (FMS) Program account for Iran is a United States Treasury account, subject to federal sovereign immunity, which contains funds relating to military transactions with Iran that pre-date the Iran-hostage crisis and which are currently the subject of ongoing litigation before the Iran-U.S. Claims Tribunal.  *See Weinstein*, 274 F. Supp. 2d (discussing the FMS Program account and holding that federal sovereign immunity bars attachment); TERRORIST ASSETS REPORT, *supra* note 2, at 16–17 (discussing both the VTVPA and the FMS Program account).

In the TRIA, Congress not only expanded the class of plaintiffs eligible for payment from the United States Department of Treasury under the VTVPA, but, even more fundamentally, Congress finally succeeded in subjecting the assets of state sponsors of terrorism to attachment and execution in satisfaction of judgments under § 1605(a)(7).  *See* § 201.  The TRIA provides that "[n]otwithstanding any other provision of law," the blocked assets of a terrorist state are subject to attachment or execution to the extent of any compensatory damages awarded against that state under the FSIA terrorism exception.  *Id.*  The TRIA does, however, continue to exempt diplomatic and consular property from attachment and execution under § 1610.  *See* § 201(d)(2)(B)(ii).  Nonetheless, the TRIA has opened a wide range of blocked assets to attachment and execution by the judgment creditors of state sponsors of terrorism.  Thus, the TRIA appears to represent something of a victory for these terrorism victims—whose interests have been most vigorously advanced by members of Congress—over the longstanding objections of the Executive Branch.

In the case of Iran, however, the simple fact remains that very few blocked assets exist.  In fact, according to OFAC's latest report, there are only 16.8 million dollars in blocked assets relating to Iran.  TERRORIST ASSETS REPORT, *supra* note 2, at 14, tbl. 1.  This amount is inconsequential—a mere drop in the bucket—when compared to the staggering 9.6 billion dollars in outstanding judgments entered against Iran in terrorism cases as of August 2008, which is the last time the Congressional Research Service compiled data on this issue.  *Id.* at 75, app. B, tbl. B-1.  The amount of Iranian non-blocked assets within the United States, as reported to OFAC, is similarly inconsequential in comparison to Iran's liability under the FSIA terrorism

exception.  According to OFAC, the amount of non-blocked Iranian assets is merely 28 million dollars.  *Id.* at 15, tbl. 3.[17]

The billions of dollars in liability that Iran now faces is likely to increase tremendously as a result of the new federal cause of action under § 1605A, which now includes punitive damages. Thus, Congress has continued to fuel expectations in these actions by broadly subjecting Iran to suit for sponsorship of terrorism while simultaneously ignoring the fact that the prospects for recovery are virtually nonexistent.  This fundamental problem is an issue that the Court will explore later in this opinion in Part K below.

---

[17] In fairness, it is important to emphasize here that "there is no requirement for U.S. persons to report non-blocked assets to OFAC."  TERRORIST ASSETS REPORT, *supra* note 2, at 10. Thus, arguably, there could be any number of undisclosed, non-blocked Iranian assets within the jurisdiction of the United States courts.  In light of the lack of formal relations between Iran and the United States, however, the prospect of large sums of Iranian assets being located within the jurisdiction of the federal courts seems remote.

**B.**

**SECTION 1083 OF THE 2008 NDAA AND
THE CREATION OF A NEW TERRORISM EXCEPTION, SECTION 1605A**

In light of the significant setbacks that plaintiffs experienced in actions under

§ 1605(a)(7), Congress implemented a number of major reforms last year.  Section 1083 of

National Defense Appropriations Act (NDAA) completely repeals § 1605(a)(7) and replaces that

provision with a new statute, § 1605A.  As noted above, it is important to keep in mind that the

exception to foreign sovereign immunity under the new provision, § 1605A, is identical to that

which is contained in § 1605(a)(7), but this new law is more comprehensive and more favorable

to plaintiffs because it adds a broad array of substantive rights and remedies that simply were not

available in actions under § 1605(a)(7).

As noted above, § 1605A accomplishes four basic objectives.  This new terrorism statute

(1) furnishes a cause of action against state sponsors of terrorism; (2) makes punitive damages

available in those actions; (3) authorizes compensation for special masters; and (4) implements

new measures designed to facilitate the enforcement of judgments.  Each of these four key

aspects of § 1605A will now be discussed in turn.

**1.	New Federal Cause of Action**

With respect to the first objective, the new law now expressly provides that designated

state sponsors of terrorism may be subject to a federal cause of action for money damages if

those terrorist states cause or otherwise provide material support for an act of terrorism that

results in the death or injury of a United States citizen or national.  *See* § 1605A(c).  This new

federal right of action for money damages abrogates *Cicippio-Puleo*, 353 F.3d 1024, and is a

crucial change in the law for hundreds of FSIA terrorism plaintiffs who were not able to rely on

state tort law to create a cause of action against Iran previously.

Thanks to the enactment of § 1605A, the inconsistent and varied result that was reached

in *Peterson* and in similar cases under § 1605(a)(7) will be avoided in actions going forward

under the new law.  Courts can now work from a single federal cause of action that will ensure a

greater degrees of fairness to FSIA terrorism plaintiffs while furnishing a level of consistency

and uniformity that is critical in matters of foreign relations.[18]

The new cause of action included with the new terrorism exception § 1605A has a new

and expanded statute of limitations.  Specifically, § 1605A(b) provides:

> An action may be brought or maintained under this section if the action is
> commenced, or a related action was commenced under section 1605(a)(7) (before
> the date of the enactment of this section) or [the Flatow Amendment] not later
> than the later of—
>
> (1) 10 years after April 24, 1996; or
>
> (2) 10 years after the date on which the cause of action arose.

§ 1605A(b) (emphasis added).   The prior statute of limitations applicable to actions under

§ 1605(a)(7) was simply 10 years from the date the cause of action arose (leading to a cut-off

date in April 2006), subject, in some instances, to equitable tolling.  *See* § 1605(f) (repealed by

§ 1083(b)).  Accordingly, many new actions that might have been barred by the statute of

limitations for § 1605(a)(7) may now move forward under § 1605A.

---

[18] Unlike § 1605(a)(7), the Flatow Amendment, § 1605 note, was not repealed by § 1083
of the 2008 NDAA.  Thus, technically speaking, the Flatow Amendment remains on the books
even though it was rendered a virtual nullity by the *Cicippio-Puleo* decision.  Moreover, to the
extent that the Flatow Amendment might have any operative effect, the provision is now largely
superfluous in light of the private right of action contained in the new terrorism exception,
§ 1605A.

As § 1605A establishes a new federal cause of action against state sponsors of terrorism, this Court will have to determine what basic principles of law should be applied to resolve claims sounding in tort pursuant to this new private right of action under the FSIA. This is an important issue that many judges of this Court grappled with through the application of the Flatow Amendment in FSIA terrorism cases that reached final judgments prior to the Circuit's ruling in *Cicippio-Puleo*.[19] At that time, judges of this Court frequently referred to "federal common law" as providing the rule of decision for claims under the FSIA. *See, e.g.*, *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (Jackson, J.); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 134 (D.D.C. 2001) (Jackson, J.); *Flatow I*, 999 F. Supp. 1 at 15.

In *Bettis v. Islamic Republic of Iran*, however, which one of the last FSIA terrorism cases decided by the Circuit prior to *Cicippio-Puleo*, the Court of Appeals cautioned trial judges against the use of the term "federal common law." 315 F.3d 325, 333 (D.C. Cir. 2003). The appeal in *Bettis* involved claims for intentional infliction of emotional distress. In examining those claims, the Court warned that the Flatow Amendment did not "'authorize federal courts to fashion a complete body of federal law'" to address the claims of plaintiffs under that statute. *Id.* (*quoting Burks v. Lasker*, 441 U.S. 471, 476 (1979)). Instead of relying on "federal common law," the Court looked to § 46 of the Restatement (Second) of Torts, as well as a number of

---

[19] *See, e.g.*, *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001) (Lambeth, J.) (relying on tort law treatises, including the Restatement (Second) of Torts, as well as leading state court decisions to resolve claims of battery, assault, false imprisonment, and intentional infliction of emotional distress); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001) (Lamberth, J.) (applying the Restatement (Second) of Torts to resolve claims of battery, assault, false imprisonment, and intentional infliction of emotional distress); *Flatow I*, 999 F. Supp. 1 (applying common law standards for wrongful death, survival pain and suffering, and solatium).

secondary source compilations, such as legal encyclopedias, law reviews, and survey of leading state tort law cases. *See id.* at 333–338.

Admittedly, *Bettis* was decided under the Flatow Amendment, but this Court finds nonetheless that *Bettis* should still control now that Congress has clearly established a private right of action against a foreign state sponsor of terrorism for "personal injury or death" in those cases in which terrorism exception to foreign sovereign immunity applies. § 1605A(c). The questions confronted relating to sources of common law for claims sounding in tort under the Flatow Amendment, are, in substance, the same as those that will now confront this Court as result of the new private right of action in § 1605A(c). Thus, the question of what substantive tort law norms should control in these actions is an issue this Court will have to continue to explore in actions under § 1605A, as it once did in actions under the Flatow Amendment prior to *Cicippio-Puleo*.[20]

───────────────

[20] In cautioning against the use of federal common law, the Court of Appeals in *Bettis* relied heavily on § 1606 of the FSIA. That provision provides in relevant part: "As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." The Court reasoned that § 1606 "in effect instructs federal judges to find relevant law, not to make it." 315 F.3d at 333. At this juncture, however, it is unclear whether § 1606 should even apply in cases that rely on the new federal cause of action in § 1605A. For starters, § 1606 by its plain terms applies only to sections § 1605 and § 1607 of the FSIA. Moreover, § 1606 conflicts with § 1605A because it provides that punitive damages are not available in actions against foreign states, whereas § 1605A expressly authorizes punitive damages in cases against state sponsors of terrorism. Notably, Congress did not make any changes or updates to § 1606 when it repealed § 1605(a)(7) in the 2008 NDAA, and yet Congress did include a lengthy list of "Conforming Amendments" in § 1083(b) to ensure that both § 1605A and other reforms relating to terrorism actions, such as § 1610(g), were properly integrated into the larger statutory scheme of the FSIA. Thus, this Court can reasonably infer that Congress' failure to update § 1606 to include a reference to § 1605A evinces Congress intent that those standards pertaining to the scope of foreign state liability in § 1606 do not apply in actions against state sponsors of terrorism under § 1605A.

Consistent with the approach this Court initially took in *Flatow*, some commentators

As this Court views *Bettis* as the as the controlling precedent with respect to application of tort law principles to in cases under the FSIA terrorism exception, this Court will therefore look to that decision as the starting point for the analysis of substantive claims under § 1605A. Consistent with *Bettis*, this Court will rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions.  Today, this Court will issue a separate opinion in the consolidated action of *Heiser v. Islamic Republic of Iran*, No. 00-CV-23290-RCL (D.D.C.), a case concerning the Khobar Towers bombing, in which this Court analyzes new claims for compensatory damages under § 1605A.  Plaintiffs looking for more guidance regarding the standards that this Court will apply to claims under § 1605A should review that decision in conjunction with this omnibus opinion.

## 2.    Punitive Damages

The second key reform found in § 1605A is the availability of punitive damages.  *See* § 1605A(c).  Consequently, the majority of the of the plaintiffs in prior actions under § 1605(a)(7) who were unable to claim punitive damages following the *Cicippio-Puleo* decision will now have an opportunity to do so.  The prospect of large punitive damage awards may help

---

have urged courts to fashion federal common law standards as the substantive rules of decision in cases under the FSIA terrorism exception. *See Deutsch*, *supra*, at 891 (criticizing *Bettis* and urging the adoption of federal common law standards to resolve terrorism claims under the FSIA terrorism exception).  Ms. Deutsch argues that federal common law standards are needed in this area largely because of the unique nature of claims involving acts of international terrorism, the primacy of the federal interest in terrorism cases, and the potential inconsistencies that may result from reliance on state law standards.  In the absence of additional guidance from the Court of Appeals on this issue, this Court is bound to follow the admonishment in *Bettis* and will therefore eschew any reliance on "federal common law."

to deter Iran and other states sponsors of terrorism from their support of international terrorist organizations.

Through the separate opinion and judgment entered in *Heiser*, this Court awards plaintiffs in that action punitive damages under § 1605A(c)). In doing so, the Court reaffirms the principles first articulated in *Flatow* with respect to awards of punitive damages against Iran. Other plaintiffs who now seek punitive damages under § 1605A should review this Court's discussion of punitive damages in *Flatow* and look to the opinion issued today in *Heiser*.

**3.     Compensation for Special Masters**

Over the years, a number of attorneys have been appointed by this Court to serve as special masters to assist the Court in determining money damage awards for the many individual plaintiffs and estates represented on this Court's sizable docket of civil actions against Iran. The work completed by these officers of the Court is extraordinarily tedious and time-consuming, and, until recently, the special masters were not entitled to any compensation for their efforts. In last year's NDAA, however, Congress directed that special masters in cases against designated states sponsors of terrorism should receive compensation for their work, and thus the new terrorism exception now provides that special masters should be reimbursed for their work from the Attorney General's Victims of Crime Fund. *See* § 1605A(e).

**4.     More Robust Provisions for the Execution of Civil Judgments**

Like many prior legislative enactments relating to civil suits against designated state sponsors of terrorism, the new terrorism exception in combination with certain other reforms achieved through § 1083 takes aim at what is perhaps the most fundamental problem confronting these actions: the inability of plaintiffs to execute their civil judgments against Iran. As noted above, *supra*, most plaintiffs in FSIA terrorism cases have been thwarted in their efforts to

execute civil judgments in part because there are few Iranian Government assets within the jurisdiction of the United States Courts. What little that does exist is generally immune from attachment or execution under § 1609. Additionally, in the past plaintiffs have encountered the problem of United States sovereign immunity because most property or interests in property within the United States that might be attributed to state sponsors of terrorism are subject to federal regulatory control, or are, in a number of instances, within the possession of the federal government. *See, e.g.*, *Weinstein*, 274 F. Supp. 2d 53.

In an apparent effort to overcome some of the challenges relating to the execution of judgments, § 1605A entitles plaintiffs to what are in effect automatic pre-judgment liens on property belonging to a designated state sponsor of terrorism.[21] In addition to these new pre-judgment attachment procedures, any actions filed or otherwise maintained under § 1605A may benefit from certain reforms to § 1610, which is the section of the FSIA that prescribes the limited circumstances in which the property of a foreign state may be subject to attachment or execution upon a civil judgment. Specifically, § 1083 of the 2008 NDAA adds to § 1610 new provisions that are plainly intended to limit the application of foreign sovereign immunity or

---

[21] The procedure in § 1605A(g) entitles plaintiffs to file notices of lis pendens. Generally speaking, a notice of lis pendens concerns specific property belonging to a party involved in civil litigation. *See generally*, 51 AM. JUR. 2D *Lis Pendens* § 2. The lis pendens notice serves to alert third parties that any rights concerning the noticed property are subject to the outcome of the civil litigation. *See generally id.* While it is not technically a lien, the legal effect of a properly filed notice of lis pendens is that any third-party purchaser who receives title to the noticed property is bound by the outcome of the civil case, without any additional rights to that property. *See generally id.* Lis pendens is a creature of state law that has never before been available through the federal courts. Consistent with the new statutory entitlement contained in § 1605A(g), this Court recently approved a form and procedures for plaintiffs to file notices of lis pendens in the consolidated action of *Heiser v. the Islamic Republic of Iran*, No. 00-CV-2329-RCL (D.D.C.) and *Campbell v. Islamic Republic of Iran*, 01-CV-2104-RCL (D.D.C.). *See Heiser*, No. 00-CV-2329-RCL (D.D.C.), Dk. ## 144–145; *Campbell*, 01-CV-2104-RCL (D.D.C.), Dk. ## 132, 135.

United States sovereign immunity as defenses to attachment or execution with respect to property belonging to designated states sponsors of terrorism.  *See* § 1083(b) ("Conforming Amendments") (codified at § 1610(g)).  The full implications of § 1610(g) are far from clear. Only time will tell whether § 1610(g) will enable plaintiffs going forward with actions under § 1605A to experience greater success in executing civil judgments against Iranian assets.  Given the scarcity of assets and the difficulty of locating what assets might be available—it seems unlikely that this provision will be of great utility to plaintiffs.  Suffice it to note, however, these latest additions to the FSIA demonstrate that Congress remains focused on eliminating those barriers that have made it nearly impossible for plaintiffs in these actions to execute civil judgments against Iran or other state sponsors of terrorism.

## C.

## RETROACTIVE APPLICATION OF SECTION 1605A TO
## CASES PREVIOUSLY FILED UNDER SECTION 1605(a)(7)

Today the Court must determine whether the new terrorism exception should be applied

retroactively to reach cases that were originally filed under § 1605(a)(7) prior to enactment of the

new statute, § 1605A.  In this instance, Congress has in § 1083(c) of the 2008 NDAA provided

guidance with respect to the retroactive reach of this new provision of law, and so the Court's

analysis begins with that statutory guidance.  *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 575–

584 (2006) (applying "ordinary principles of statutory construction" to determine whether the

Detainee Treatment Act should operate retroactively); *Landgraf*, 511 U.S. at 271 (noting that

when "Congress has expressly prescribed the statute's proper reach[,] there is no need to resort to

judicial default rules").  Section § 1083 contains a number of subsections, but two are especially

critical for purposes of this Court's analysis.  These are subsections (c)(2) and (c)(3), which set

forth the qualifying conditions and procedures that must be fulfilled before a prior action under

§ 1605(a)(7) may be eligible to proceed under the new terrorism law, § 1605A.

Subsection (c)(2) refers to "Prior Actions," but this subsection actually concerns a

relatively narrow category of prior cases, all of which are probably best characterized as pending

cases.  Pending in this instance means cases that were awaiting a disposition by a court at the

time of the 2008 NDAA's enactment.  This includes actions that were on direct appeal and those

with unresolved postjudgment motions.

The next subsection, (c)(3), referring to "Related Actions," reaches a far broader category

of cases, including many that simply were not pending with the courts in any form at the time the

2008 NDAA became law.  This is because the plain terms of the related-actions provisions in

subsection (c)(3) specify that if an action was timely commenced under § 1605(a)(7), then "*any other action arising out of the same act or incident may be brought under section 1605A*" § 1083(c)(3) (emphasis added).  Thus, the heading of § 1083(c)—"Application to Pending Cases"—is something of a misnomer because, in reality, § 1083(c) may encompass cases that are not pending at all—meaning prior actions that have since reached final judgment and are no longer before the courts in any form.

Additionally, there are two other aspects of § 1083(c) that are critical to today's analysis.  First, the statute sets up limitation periods or filing deadlines for plaintiffs desiring to take advantage of the newly enacted terrorism statute.  *See* § 1083(c)(2)(C), (c)(3).  Second, in a section of the statute referred to as "Defense Waived," the enactment provides that the defenses of res judicata and collateral estoppel are waived to the extent that such defenses are based on a claim that was presented in a prior FSIA terrorism case under § 1605(a)(7).  *See* § 1083(c)(2)(B).

As each of these provisions within § 1083(c) are central to today's decision, the Court will now review the specifics of each of these statutory mandates in turn.

**1.      Section 1083(c)(2) – "Prior Actions"**

In accordance with the procedures in § 1083(c)(2), a "prior action" that was timely commenced under either § 1605(a)(7) or the Flatow Amendment is eligible to proceed under the new statute, § 1605A, if three straightforward criteria are satisfied.  Specifically, the plaintiff must demonstrate the prior action: (1) relied on § 1605(a)(7) or the Flatow Amendment as creating a cause of action, (2) has "been adversely affected on the grounds that either or both of those provisions failed to create a cause of action against the state," and (3) as of the date of the enactment of the 2008 NDAA, the case was "before the court[] in any form, including on appeal or motion under Rule 60(b) of the Federal Rules of Civil Procedure."  § 1083(c)(2)(A)(ii)–(iv).

If these requirements are met, then "the action shall, on motion made by plaintiffs to the United

States district court where the action was initially brought, or judgment in the action was

originally entered, be given effect as if the action had originally been filed under section

1605A(c) of title 28, United States Code."  § 1083(c)(2)(A)(iv).  This subsection also

contemplates that the plaintiff may chose to "refile" his action, rather than make a motion.  *See*

§ 1083(c)(2)(C).

     In another action before this Court, Syria argued recently that plaintiffs who filed actions

under § 1605(a)(7) following the Court of Appeals' decision in *Cicippio-Puleo*, or after June 16,

2004, are precluded from taking advantage of § 1083(c)(2) because, as Syria reads the statute,

such plaintiffs could not have reasonably relied on § 1605(a)(7) or the Flatow Amendment, as

*Cicippio-Puleo* made plain that those provisions do not furnish a cause of action against a

foreign state.  *See Gates v. Syrian Arab Republic*, No. 06-CV-1500-RMC, 2009 WL 2562660

(D.D.C. Aug. 20, 2009) (Collyer, J.).  In this Court's view, however, such an interpretation of

§ 1083(c)(2)(A) is a crabbed reading of the statute, which, if accepted, would frustrate the broad

remedial purposes Congress sought to achieve through the enactment of § 1083.  In fact, the

House Conference Report that accompanied § 1083 strongly suggests that Congress envisioned

an expansive retroactive reach for § 1605A as a means to overcome the many setbacks plaintiffs

encountered under § 1605(a)(7) and the Flatow Amendment.  That report states: "The provision

would allow any case previously brought under the state sponsor of terrorism exception to the

FSIA under the section 1605(a)(7), or under section 101(c) of Public Law 101-208 [the Flatow

Amendment], and which is still before a court, to be refiled as if the original claim has been filed

under the provisions of this section."  H.R. REP. NO. 110-477, at 1001 (2007) (Conf. Rep.).

Accordingly, this Court construes § 1083(c)(2)(A) broadly, consistent with the remedial

purposes of the new anti-terrorism enactment, to include actions adversely impacted by *Cicippio-Puleo*, regardless of when those actions were filed.  For similar reasons, this Court reads the requirement that the prior actions must be adversely impacted on the grounds that § 1605(a)(7) and the Flatow Amendment failed to establish a cause of action against a foreign state to include those instances in which plaintiffs failed to recover punitive damages, a critical component of these terrorism actions.

**2.      Section 1083(c)(3) – "Related Actions"**

        Section 1083(c)(3), the provision concerning "related actions" offers another method by which certain prior actions may be filed with the Court as new actions under § 1605A. Specifically, § 1083(c)(3) provides that "[i]f an action arising out of an act or incident has been timely commenced under section 1605(a)(7) . . . , any other action arising out of the same act or incident may be brought under section 1605A."  As this Court has recognized in prior decisions, § 1083(c)(3) enables plaintiffs who achieved final judgments under the former terrorism exception, § 1605(a)(7), to pursue new federal causes of action under § 1605A based on the same prior act or incident.  In *Bodoff*, for example, this Court determined that plaintiff was not entitled to relief under § 1083(c)(2) because the case was not before the court in any form, but in reaching that conclusion, this Court emphasized that plaintiff had the right to file a new action, pursuant to § 1083(c)(3).  *See* 567 F. Supp. 2d 141, 142–43 (D.D.C. 2008) (Lamberth, C.J.). Thus, § 1083(c)(3) offers an avenue of relief in those cases that reached final judgment some years prior to the enactment of the 2008 NDAA and therefore are less likely to be "before the court[] in any form," as required for treatment on motion under § 1083(c)(2).

        Additionally, § 1083(c) allows plaintiffs in a prior action under § 1605(a)(7) to file an action under the new law, § 1605A, as a related case to any other pending action that was timely

commenced under § 1605(a)(7) and based on the same terrorist act or incident.  In other words, plaintiffs' right to proceed under the new section is not tied exclusively to their prior action; plaintiffs may identify other cases that are pending under § 1605(a)(7) that are based on the same act or incident.

3.      **The 60-Day Rule – Filing Deadline for Cases Based on Prior Actions Under Section 1605(a)(7)**

No matter how plaintiffs wish to qualify their prior actions under the new terrorism exception, § 1605A—that is, regardless of whether they seek to do so pursuant to § 1083(c)(2) or whether they opt to file a new action pursuant § 1083(c)(3)—plaintiffs have only a limited window of opportunity to elect the benefits of the new statute.  Plaintiffs who hope to gain the benefits of the new law by filing a motion or by refiling pursuant to § 1083(c)(2), must file their motions "within the 60-day period beginning on the date of the enactment of the [2008 NDAA]," or no later than March 28, 2008.  § 1083(c)(2)(c).  Plaintiffs who wish to file a new action as a related case"—as related to either their own prior action under § 1605(a)(7) or some other case based on the same act or incident—pursuant to § 1083(c)(3), must do so no later than 60 days after the entry of judgment in the original action or within 60 days after the date of the enactment of the 2008 NDAA, whichever is later.  § 1083 (c)(3).

4.      **Section 1083(c)(2)(B) – "Defenses Waived": Res Judicata, Collateral Estoppel, and Statute of Limitations Are Deemed Waived to the Extent that those Defenses Relate to Claims Litigated in a Prior Action Under Section 1605(a)(7)**

Subsection § 1083(c)(2)(B), referred to as "Defenses Waived," purports to limit "[t]he defenses of res judicata, collateral estoppel, and limitation period" in any new action under § 1605A.  Specifically, the statute provides that any defense based on either the doctrines of res judicata or collateral estoppel or the limitation period shall be deemed waived to the extent that

the new action under § 1605A relies, either in whole or in part, on an earlier terrorism case

brought under the prior version of the terrorism exception, § 1605(a)(7).  *See* § 1083(c)(2)(B).

This waiver applies to cases that are converted to § 1605A on motion, consistent with

§ 1083(c)(2)(A), as well as to any other prior cases that are "refiled under [§] 1605A(c)."  In

other words, prior judgments under the state sponsor terrorism exception to the FSIA,

§ 1605(a)(7) are not to be given any preclusive effect in new actions brought under the current

version of the terrorism exception, § 1605A.

**D.**

## EFFORTS TO OBTAIN RETROACTIVE TREATMENT UNDER
## THE NEW TERRORISM EXCEPTION, SECTION 1605A

In view of the language that Congress has included within § 1083(c)—both with respect to the criteria defining whether a claim is eligible for treatment under the new terrorism section, § 1605A, as well as the time limits for electing treatment under the new statute—this Court is not persuaded by any reading of § 1083 that would have § 1605A apply automatically to prior terrorism cases under § 1605(a)(7).  While some counsel before this Court may have glossed over the requirements within § 1083(c), it is the duty of this Court "to give effect, if possible, to every clause and word of a statute."  *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (quotation and citation omitted).  This Court presumes that Congress "says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 252–54 (1992).  These time-honored cannons of statutory construction are particularly critical in this context because the FSIA terrorism exception is a "delicate legislative compromise" that balances a host of competing foreign policy considerations.  *See Price*, 294 F.3d at 89.  More fundamentally, however, this Court never presumes that a law applies retroactively; instead, Congress must clearly instruct courts as to whether and to what extent a new law is to apply to cases that preceded its enactment.  *See Plaut*, 514 U.S. at 237.  In this case, Congress has done just that by setting forth specific parameters in § 1083(c).

Thus, the framework established by § 1083(c) is the template that this Court must apply when determining whether prior actions under the old exception for state sponsors of terrorism, § 1605(a)(7), are entitled to go forward as new actions under the recently enacted § 1605A with all the benefits that new section entails.  Consistent with § 1083, this Court has held on prior

occasions that the latest revision of the state sponsor of terrorism exception to sovereign immunity, § 1605A does not have automatic, retroactive application to cases filed under the now-repealed § 1605(a)(7).  *See Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 204 n.1 (D.D.C. 2008) (Lamberth, C.J.); *Beer*, 574 F. Supp. 2d at 5 n.1.  Similarly our Court of Appeals observed recently that failure to adhere to those procedures means that the prior action remains under § 1605(a)(7), rather than § 1605A, and thus plaintiffs are not entitled to any of the benefits of the new enactment under those circumstances.  *See Simon*, 529 F.3d at 1192; *see also Oveissi*, 573 F.3d 835 (holding that § 1605A provides a federal cause of action for those plaintiffs who meet the statutory criteria).

Notwithstanding the guidance offered in § 1083(c), as well as recent decisions that have applied those provisions to prior terrorism cases, it appears to this Court that there is some degree of confusion among counsel regarding the scope and application of § 1083(c) to FSIA cases that were previously filed against Iran under the former version of the terrorism exception, § 1605(a)(7).  In their efforts to avail themselves of the new provision, § 1605A, counsel for plaintiffs in many of these prior actions have taken a variety of different approaches, as § 1083(c) contemplates, but some attorneys have pursued seemingly conflicting tactics.  For instance, some attorneys have invoked (c)(2) as well as (c)(3) in their efforts to qualify a single earlier action under § 1605A.  Perhaps this sort of move should be viewed by the Court as something of a "belt and suspenders" approach that has been taken out an abundance of caution.  Other attorneys have relied on § 1083(c)(3) exclusively, by filing new complaints that assert the right to now pursue a federal cause of action under § 1605A.  Many of the new complaints, however, do little more than regurgitate the very same state tort law claims that plaintiffs

litigated in prior FSIA terrorism actions in accordance with the *Cicippio-Puleo* precedent under
§ 1605(a)(7).

Numerous other attorneys have missed the filing deadlines imposed by the 2008 NDAA,
and thus it appears that these individuals were laboring under the false assumption that § 1083 of
the 2008 NDAA made the new terrorism exception applied automatically to their terrorism cases.
As will be discussed in the analysis that follows, at least one attorney claims that his reading of
§ 1083 led him to conclude that § 1605A applied retroactively to his cases.  Other attorneys have
not claimed as much, but they have filed motions that appear to rest on the erroneous assumption
that § 1083 somehow makes § 1605A retroactive to any cases under § 1605(a)(7) that were
pending as of the date § 1605A was enacted.  For instance, this Court recently denied several
motions requesting that this Court provide for payment to the special masters who assisted this
Court with the determination of damages in the large consolidated action of *Peterson v. Islamic
Republic of Iran*.  *See* No. 01-CV-2094-RCL (D.D.C.), Dk. # 430.  While § 1605A now includes
a provision enabling special masters in FSIA terrorism cases to receive payment for their
services in certain instances, *see* § 1605A(e), no similar entitlement exists for actions like
*Peterson*, which remain under § 1605(a)(7).  Counsel in *Peterson* never addressed the
retroactivity issues; it appears that they simply presupposed that any relief included in the new
law, § 1605A, applied automatically to their case.  As counsel failed to follow the procedures in
§1083(c), this Court had to deny those motions seeking payment of the special masters.

In sum, there is in this Court's view, a good deal of confusion regarding how parties
should avail themselves of the benefits of the new statute.  Having to deny relief to so many
plaintiffs is particularly regrettable in light of the fact that the recent reforms to the FSIA, as
enacted through § 1083, are plainly intended to help these victims of terrorism.  It is therefore the

hope of this Court that today's decision and the articulation of the statutory framework of

§ 1083(c) may lend greater clarity to this area for counsel prosecuting these important actions.[22]

It should be noted at the outset that there are both winners and losers in today's omnibus opinion.

While a number of cases have not obtained retroactive treatment under the new terrorism statute,

many in fact have.  At this juncture, however, guidance from this Court across this range of cases

should lend the greatest degree of clarity to these matters for the benefit of all plaintiffs, and that

in turn should help facilitate litigation going forward.  The bottom line is that there should no

more confusion, guesswork, or misguided notions regarding the retroactive application of

§ 1605A.  If counsel for plaintiffs in these action have in good faith misunderstood or misapplied

§ 1083(c) to their respective actions—and are time-barred from taking advantage of the new state

sponsor of terrorism exception—then they may consider filing a motion for relief under Rule 60

and consistent with the guidance provided by the Court in Part G of this opinion.

---

[22] This is not to say that all counsel with cases pending against Iran in this Court have failed to adhere to procedures set forth in § 1083(c).  That is certainly not the case.  Some attorneys have managed to get it right, and this Court has recently granted a number of motions permitting prior actions under § 1605(a)(7) to go forward under § 1605A.  *See, e.g.*, *Spencer v. Islamic Republic of Iran*, 06-CV-750-RCL (D.D.C.), Dk. # 20; *Heiser v. Islamic Republic of Iran*, 00-CV-2329-RCL (D.D.C.), Dk. #143**.**  As noted *supra*, p. 47, this Court issues a separate opinion today in *Heiser* in which this Court analyzes new claims for both compensatory and punitive damages under § 1605A.  As the Court has determined that plaintiffs are entitled to relief under the new statute, the Court will also enter a judgment for plaintiffs in *Heiser* pursuant to § 1605A.

## E.

### EXAMINATION OF SECTION 1083(c) OF THE 2008 NDAA UNDER ARTICLE III OF THE UNITED STATES CONSTITUTION

Before proceeding any further, however, there is a critical threshold matter that this Court must address and that is the question of whether § 1083(c) directs the reopening of final judgments in violation of Article III of the United States Constitution. *See Plaut*, 514 U.S. at 241; *see also Miller v. French*, 530 U.S. 327, 344 (2000). In this instance, the Court is troubled by the related-case provisions of § 1083(c)(3), to the extent that those measures enable individuals who litigated FSIA actions against Iran previously to now file new cases against Iran under § 1605A. For similar reasons, the Court is troubled by § 1083(c)(2)(B) ("Defenses Waived") which directs that in any new action under § 1605 courts must deem as waived "[t]he defenses of res judicata and collateral estoppel" with respect to any claims that were brought previously under § 1605(a)(7). The question presented is whether these particular legislative enactments abrogate final judgments in a manner that the Supreme Court has determined is "repugnant to the text, structure, and traditions of Article III." *Plaut*, 530 U.S. at 217–18. As no court has had the opportunity to address this issue, it now confronts this Court as a substantial question of first impression, and one of great and immediate consequence to hundreds of plaintiffs who have filed new actions against Iran consistent with the related-case procedures of § 1083(c).

Examining the constitutionality of an act of Congress requires a journey into treacherous waters, to say the least. It is at these times that a mere district judge would prefer to take refuge in the doctrine of "constitutional avoidance" or "constitutional doubt" rather than engage in a confrontation on such fundamental matters. *See, e.g.*, *Boumediene v. Bush*, 128 S. Ct. 2229, 271

(2008); *French,* 530 U.S. at 341; *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008); *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 592 F. Supp. 2d 127 (D.D.C. 2009) (Lamberth, C.J.).  Consistent with this cardinal rule of statutory construction, courts are obligated to construe legislative enactments in a manner that avoids constitutional questions whenever there is a saving construction that is "not plainly contrary to the intent of Congress."  *French*, 530 U.S. at 341 (*quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1985)).

Regrettably, the constitutional question is presented squarely and unavoidably in this case.  The import of § 1083(c)(3) and § 1083(c)(2)(B) could not be clearer: An individual who received a final judgment in a prior case against Iran, under an earlier version of the FSIA state sponsor of terror exception, § 1605(a)(7), is now permitted to file a new action against Iran under the current version of the terrorism exception, § 1605A.  Moreover, this Court is instructed that it may not give any preclusive effect to its prior judgment, even though the prior action was based on the very same act or incident.  Thus, there is a legitimate question of whether this enactment offends deeply entrenched constitutional principles relating to the separation of powers and the ability of the judiciary to function independently without interference from the political process. *See, e.g.*, *United States v. Klein*, 80 U.S. 128, 147 (1871) (emphasizing that the powers afforded to the Congress and the Courts under the Constitution must be kept separate and distinct).  This Court must not shirk from its duty, where, as here, the question of the constitutional validity of an act of Congress is starkly presented.  *French*, 530 U.S. at 341 (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986))); *see also Boumediene*, 128 S. Ct. at 2271 ("We cannot ignore the text and purpose of a statute in order to save it."); *Citizens for*

*Responsibility and Ethics in Washington*, 592 F. Supp. 2d at 131 ("[I]n the absence of statutory ambiguity the constitutional avoidance doctrine has no place.").

There are other important considerations that militate in favor of this Court addressing the constitutional question in this case. More than a decade ago when this Court first considered the "novel enactments" of the FSIA terrorism exception, § 1605(a)(7) and the Flatow Amendment, § 1605 note, this Court underscored its "special role in the development of foreign sovereign immunity jurisprudence." *Flatow I*, 999 F. Supp. at 6 (citing 28 U.S.C. 1391 (f)(4)) (providing that this Court is a designated venue for actions brought against a foreign state or political subdivision thereof"). Consistent with this role, this Court undertook in *Flatow* "a systemic review of the dispositive legal issues," including a number of constitutional issues, in an effort to ensure that the plaintiff was fully entitled to relief under the law. *Id*. The plaintiffs before the Court today certainly deserve no less. In light of the substantial personal, financial, and emotional investments that these victims have made in these cases over the years, this Court simply cannot afford to overlook potential legal infirmities that could prove fatal to their cause. Thus, similar to *Flatow*, and consistent with this Court's historical role in the development of jurisprudence under the FSIA, this Court should examine carefully whether the latest terrorism exception, § 1605A, can be applied retroactively to cases that were litigated to a final judgment under § 1605(a)(7) in a manner that comports with Article III of the Constitution.

More fundamentally, however, the Court is mindful that these FSIA actions under the state sponsor of terror exception involve a handful of rogue nations, who, like Iran, have had an extremely rocky relationship with the United States. On the other side of this difficult problem, are hundreds of victims of international terrorism who have long suffered, and who desperately hope to see Iran held accountable for its role in perpetuating terrorist acts that have destroyed

countless lives.  In this highly charged and inevitably political context—and especially where the offending nation is in default—this Court needs to be extremely leery of overreaching by Congress.  It is also out of respect for the principle of comity between nations that this Court must assure itself that any lawsuit against a foreign power, no matter how unpopular that foreign sovereign may be, is an action that comports with our Constitution.[23]  It is precisely at these challenging moments that our Courts must be ever vigilant to uphold the rule of law and take full stock of our Article III responsibility "to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

In candor, this Court is not the first to observe that certain parts of § 1083(c) might suffer from constitutional infirmities in violation of the principles expounded by the Supreme Court in its jurisprudence concerning the independent authority of Article III courts to decide civil cases. The potential infirmities analyzed here were first noted by Jennifer Elsea in the report she authored for the Congressional Research Service.  *See* SUITS AGAINST TERRORIST STATES, *supra* note 4, at 61.[24]  The issue presented here today is troubling, but, this Court is of the view that § 1083(c)(3) and § 1083(c)(2)(B) withstand constitutional scrutiny.

---

[23] By working from the general proposition that foreign sovereigns should be immune from suit in our courts, *see* § 1604, the FSIA builds from the principle of comity among nations. Moreover, this time-honored principle is reinforced throughout the FSIA.  Even in cases in which a foreign state is in default, the Court may not enter judgment unless the plaintiff "establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).

[24] The Court's analysis of the Article III question is limited to the procedures for related actions in § 1083(c)(3).  Specifically not considered are the procedures for prior actions in § 1083(c)(2).  For the sake of argument, this Court assumes that § 1083(c)(2) does not raise any constitutional issues under Article III because that subsection reaches only those cases that were "before the court[] in any form" at the time of the enactment of the 2008 NDAA.  As will be discussed in further detail in this part of the opinion, the Supreme Court has made clear that Article III is not offended when courts are directed to apply changes in the law to pending cases,

1.      **Principles of Law – The Independence of the Federal Judiciary Under Article III and the Finality of Judgments**

More than two centuries of Supreme Court jurisprudence has reinforced the basic

understanding that the Federal Judiciary has sole responsibility for deciding cases and

controversies arising under the federal law. *See, e.g.*, *Hayburn's Case*, 2 U.S. 408 (1792); *Klein*,

80 U.S. 128; *Plaut*, 514 U.S. 211. As Justice Scalia observed in *Plaut*:

---

including those on direct appeal. *See Plaut*, 514 U.S. at 227. Thus, to the extent that § 1083(c)(2) reaches cases that were in fact "pending" under § 1605(a)(7) at the time the new terrorism exception was enacted, the constitutional issue regarding the finality of Article III court judgments is not implicated. The problem, however, is that it is not entirely clear what constitutes the range of cases that might qualify as "pending cases" for Article III purposes, as it was not necessary for the Supreme Court to fully explore this issue in *Plaut*.

The Court's opinion in *Plaut* strongly suggests that a "pending case" under Article III is one that is simply awaiting either the entry of a final judgment in district court or the outcome of a direct appeal. *See id.* If this common sense definition is applied here, then § 1083(c)(2), much like § 1083(c)(3), might also present some constitutional concerns. Section 1083(c)(2) provides that cases that were "before the courts *in any form*, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure" may be eligible for treatment under the new law. *See* § 1083(c)(2)(A)(iv) (emphasis added). While the broad categorization of "in any form" undoubtedly includes cases that are actually "pending" consistent with *Plaut*, it may also reach back to closed cases that just happen to be before the court in some form because of ongoing litigation relating to efforts to enforce the judgment. In this default context involving Iran, it is not uncommon for the Court to preside over extensive postjudgment litigation with respect to efforts to enforce judgments. The *Peterson* action is a prime example. *See* No. 01-CV-2094, Dk. # 434 (Memorandum Opinion and Order denying motions to appoint receivers for various Iranian assets); *Bennett*, 604 F. Supp. 2d 152 (granting motion to quash five writs of attachment issued against the property that once comprised the Iranian embassy here in Washington, DC).

This Court is satisfied, however, that it need not subject § 1083(c)(2) to scrutiny under Article III because the Court finds today that even § 1083(c)(3)—which has far greater retroactive reach than § 1083(c)(2)—does not offend the principle of the finality of court judgments. Consequently, if there is no Article III problem with the related-actions procedures of § 1083(c)(3), which enable a plaintiff to file as a new action under § 1605A a case that was previously closed under § 1605(a)(7), and which was not "pending" before this court in any sense when the 2008 NDAA was enacted, then, *a fortiori*, the procedures in § 1083(c)(2) concerning prior actions that are still before the court in some form must also withstand scrutiny.

> The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that "a judgment conclusively resolves the case" because "'a judicial power'" is one to render dispositive judgments.

*Plaut*, 514 U.S. at 218–19 (quoting Frank J. Easterbrook, *Presidential Review*, 40 CASE W. RES. L. REV. 905, 926 (1990)) (emphasis in original).  Thus, a case submitted to the federal judiciary and resolved in a final judgment is settled conclusively and may not be reversed, undone, or otherwise revisited as a result of subsequent actions taken by the political branches.

In *Hayburn's Case*, five out the six Supreme Court justices, while sitting in their capacities as circuit judges, considered a federal statute that gave the Secretary of War complete discretion to either accept or reject Circuit Court findings regarding the appropriate amounts of pensions owed to Revolutionary War Veterans.  The Justices explained in a recorded opinion how they each found that the statute violated the separation of powers established by the Constitution.  The Justices noted that the statute allowed for court judgments to be "revised and controlled by the legislature, and by an office in the executive department," a practice "deemed radically inconsistent with the independence of that judicial power which is vested in the courts." 2 U.S. at 410.

Following the Civil War, the Supreme Court decided the *Klein* case in which the Court rejected an effort by the Congress to "prescribe rules of decision to the Judicial Department of the Government in cases pending before it."  80 U.S. at 146.  At issue in *Klein* was a measure by Congress intended to direct the outcome in certain cases brought by former confederates who sought compensation for property that was either captured by the United States Government or abandoned during the course of the War.  Congress had originally provided, by statute, that such

cases would be decided by the Court of Claims.  The right to recovery depended on proof to the satisfaction of the court demonstrating that the claimant both owned the property at issue and had not supported the rebellion in any way.  *Id.* at 131.  In deciding such cases, the Court of Claims determined that a presidential pardon was sufficient to cure claimants of their participation in the rebellion.  *Id.* at 132–33.  The Supreme Court expressly affirmed that principle, holding that the pardon showed the claimant "was innocent in law as though he had never participated [in the rebellion], and that his property was purged of whatever offence he had committed and relieved of any penalty that he might have occurred."  *Id.* at 133 (*citing United States v. Padelford*, 76 U.S. 531 (1870)).

Shortly thereafter, Congress sought to abrogate the Supreme Court's ruling.  Congress passed a new statute providing that the courts were no longer permitted to consider a pardon as evidence curing a claimant of his participation in the rebellion.  *Id.* at 133–34.  Instead, courts were instructed to deem the pardon as conclusive proof that the claimant had supported the rebellion, and, moreover, once proof of a claimant's pardon was furnished by either party, the Court would cease to have jurisdiction over the case and was therefore required to dismiss the action accordingly.  *Id.* at 134.

In holding that Congress had exceeded its authority under the Constitution, the Supreme Court stated:

> We must think that Congress has inadvertently passed the limit which separates the legislature from the judicial power.
>
> It is of vital importance that these powers be kept distinct.  The Constitution provides that the judicial power of the United States shall be vested in one Supreme Court and such inferior courts as the Congress shall from time to time ordain and establish.
>
> .   .   .

> Congress has already provided that the Supreme Court shall have jurisdiction of the judgments of the Court of Claims on appeal.  Can it prescribe a rule in conformity with which the court must deny to itself the jurisdiction thus conferred, because and only because its decision, in accordance with settled law, must be adverse to the Government and favorable to the suitor.  The question seems to answer itself.

> The rule prescribed is also liable to just exception as impairing the effect of a pardon, and thus infringing on the constitutional power of the Executive.

*Id.* at 147.

The precise meaning of *Klein* is subject to much debate in part because the Court's decision appears to rest as much on the principle that Congress cannot nullify the President's authority under Article II as much as it is based on any sense that the Congress had interferred with the Judicial Department's authority to independently decide cases under Article III.  *See generally* ERWIN CHEMERINSKY, FEDERAL JURISDICTION 183–88 (3d ed. 1999); *see also Nat'l Coalition to Save Our Mall v. Norton*, 269 F.3d 1092, 1096–1098 (D.C. Cir. 2001) (noting that "*Klein*'s exact meaning is far from clear" and discussing differing interpretations).  While the full implications of *Klein* will likely be subject to debate for years to come, the Supreme Court has recognized that, at a minimum, *Klein* stands for the proposition that Congress cannot dictate a rule of decision to courts in pending cases without amending the underlying substantive law.  *Plaut*, 514 U.S. at 218 ("Whatever the precise scope of *Klein*, however, later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'") (quoting *Robertson v. Seattle Audobon Soc'y*, 503 U.S. 429, 441 (1992)); *accord French*, 530 U.S. at 349.

The Supreme Court has decided two cases in which it has considered federal statutes that waived res judicata and collateral estoppel in civil actions.  *See United States v. Sioux Nation*, 448 U.S. 371 (1980); *Cherokee Nation v. United States*, 270 U.S. 476 (1926).  Both cases,

however, concerned a waiver of those preclusion defenses by the United States Government in

ongoing litigation with Indian tribes.  Neither of those decisions required the Court to examine

whether or to what extent Congress may pass a statute waiving res judicata or *collateral estoppel*

as defenses by parties other than the Federal Government, such as private litigants or foreign

governments, and the Court did not express any views on the matter.

      In *Cherokee Nation*, the Court reviewed the passage of a special act by Congress that

permitted the Court of Claims to adjudicate Cherokee claims against the United States

Government that were previously considered in a prior action that the Court had decided several

years earlier.  270 U.S. at 485–86.  In declining to give res judicata effect to the prior

adjudication, the Court stressed that Congress has the authority to deem the prior judgment as

waived in actions against the Federal Government.  *Id.* at 486.

      More than half a century later, the Court considered a similar issue in the case of *Sioux

Nation*.  The Sioux alleged that their ouster from the Black Hills of South Dakota by the United

States during the late 1800s amounted to a taking under the Fifth Amendment for which just

compensation was due.  *See* 448 U.S. at 384.  The question was subject to considerable litigation

over a period of several decade, and Congress consistently passed legislation in an effort to help

the Indians press their claim against the federal government.  At each step of the way, the Sioux

Indians were opposed in litigation by the Executive Branch.

      At the end of the first wave of litigation in 1942, the Court of Claims first ruled against

the Indians on the merits, holding that the Sioux had merely presented "a moral claim not

protected by the Just Compensation Clause."  *Id.* at 384.  Subsequent to that decision, Congress

established the Indian Claims Commission, which again considered the Sioux Indians' Takings

Clause claim regarding the Black Hills and ultimately decided the question in favor of the

Indians.  *Id.* at 384–85.  The Federal Government then appealed the Commission's ruling to the

Court of Claims.  *Id.*  Without reaching the merits, the Court of Claims ruled that the Sioux

Indians' claim against the Federal Government was barred by the res judicata effect of the

Court's 1942 decision.  Shortly after the Court's ruling, Congress passed special legislation

directing the Court of Claims to reconsider the Takings Clause question *de novo* and without

regard to the defenses of res judicata and collateral estoppel.  *See id.* at 390.  Following that

special enactment by Congress, the Court of Claims promptly reconsidered the Sioux Indian case

on the merits and found in favor the Indians.  *Id.* at 380–390.  The Supreme Court granted the

Federal Government's petition for certiorari.

In a lengthy opinion, the Supreme Court considered carefully whether Congress has

"inadvertently passed the limit which separates the legislative from the judicial power" by

directing the Court of Claims to reconsider the Sioux Indians' taking case.  *Id.* at 392 (quoting

*Klein*, 80 U.S. at 147).  In holding that Congress had not encroached on the independent powers

of the Judiciary under Article III, the Court relied heavily—if not exclusively—on its prior

decision in *Cherokee Nation*.  The Court stated:

> The Holding in *Cherokee Nation* that Congress has the power to waive the
> res judicata effect of a prior judgment entered in the Government's favor on a
> claim against the United States is dispositive of the question here.  Moreover, that
> holding is consistent with a substantial body of precedent affirming the broad
> Constitutional power of Congress to define and "to pay the Debts . . . of the
> United States."  U.S. CONST. art. I., § 8, cl. 1.  That precedent speaks directly to
> the separation-of-powers objections discussed above.

*Sioux Nation* , 448 U.S. at 397.  The Court emphasized, that consistent with *Cherokee*

*Nation*, numerous cases throughout history "have recognized or acted upon Congress'

power to waive the defense of res judicata to claims against the United States."  *Id.* at 398

n.24 (collecting cases).

Despite the Court's conclusion that the issue was resolved by the waiver principles announced in *Cherokee Nation*, the majority did examine the *Klein* precedent in some detail. The Court explained that unlike the statute that was found unconstitutional in *Klein*, the waiver of res judicata with respect to actions brought by the Cherokee and Sioux Nations did not amount to an effort by Congress to control the outcome of those cases on the merits. *Id.* at 404–407. According to the Court, Congress was merely providing a "forum so that a new judicial review of the Black Hills claim could take place." *Id.* at 407.

Justice Rehnquist vigorously dissented. Among other points, he argued that the legislature had impermissibly taken on a judicial function by directing the rehearing of a case that had reached a final judgment. *See id.* at 428–32 (Rehnquist, J., dissenting). The Justice noted that Congress' broad powers to pay public debts under Article I had nothing to do with the question of whether Congress could direct the federal courts to rehear cases that courts had already heard and decided pursuant to the judiciary's own independent authority under Article III. *See id.* at 429. The Justice suggested that if Congress truly wanted to pay debts owed to Indians, then it could simply do so consistent with its authority to make such appropriations under Article I. *See id.* at 429–32. It was offensive to the Constitution, however, for Congress to insist that Courts keep hearing cases until Congress received the outcome it desired. *Id.* at 430–32. Moreover, Justice Rehnquist emphasized that res judicata is a long-standing judicial doctrine that may be exercised sua sponte by Courts consistent with the obligation to efficiently manage the business that comes before the them. *Id.* at 432–33.

The very next term, the Supreme Court emphasized that res judicata is "a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S.

394, 401 (1981) (quoting *Hart Steel Co. v. R.R. Supply Co.*, 244 U.S. 294, 299 (1917)).  The

Supreme Court has since stated that the *Cherokee Nation* and *Sioux Nation* decisions are narrow

rulings that merely stand for the proposition that the doctrine of separation of powers is not

offended when Congress waives res judicata effect with respect to a "judgment entered in the

Government's favor on a claim against the United States."  *Plaut*, 514 U.S. at 230 (quoting *Sioux*

*Nation*, 448 U.S. at 397).[25]

In the watershed case of *Plaut v. Spendthrift Farm*, the Supreme Court reviewed its

Article III separation-of-powers jurisprudence spanning more than three centuries—from

*Hayburn's* case to *Sioux Nation*—and held that Congress may not direct the reopening of final

judgments in civil actions for money damages.  514 U.S. at 218–219.  At issue in *Plaut* was an

act of Congress that allowed plaintiffs to reinstate stock fraud cases that had been dismissed

previously as time-barred.  The dismissals were required by a set of companion Supreme Court

decisions in which the Court construed the limitation period for such stock fraud actions and then

determined that its ruling on the matter would be applied retroactively to pending cases.  *Id.* at

214 (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991); *James*

*B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991)).  A few months after those decisions

were issued on June 20, 1991, Congress passed a law directing that plaintiffs who had their

claims dismissed as time-barred were allowed to reinstate their actions under the limitation

period that would have been applicable to their claims on June 19, 1991.  *Id.*  Thus, the statute

purported to save all those cases that were dismissed as a result of the Supreme Court's rulings.

---

[25] Even though the Supreme Court acknowledged in *Sioux Nation* that Congress has the
power to waive the defense of res judicata to claims against the United States, this Court is not
aware of any decision in which the Supreme Court has upheld the waiver of res judicata with
respect to claims against a third party, which is the case presented here.

The Court found that the statute clearly presented a separations-of-power issue because the enactment provided in plain terms that an individual who had received a final judgment of dismissal could nonetheless "reinstate" his previously dismissed case. *Id.* at 215–217. Writing for the Court, Justice Scalia stressed that the finality of judgments issued by Article III Courts and the separation of powers under the Constitution were the fundamental principles implicated by the case. In light of those fundamental principles, neither the motive of Congress nor the manner in which it sought to have Article III courts revisit the final judgments were relevant to the Court's determination. *Id.* at 227–28. "The issue here is not the validity of the source of the legal rule that produced the Article III judgments, but rather the immunity from legislative abrogation of the judgments themselves." *Id.* at 230. Justice Scalia elaborated on this point for the Court:

> To be sure, [the statute] reopens (or directs the reopening of) final judgments in a whole class of cases rather than in a particular suit. We do not see how that makes any difference. The separation-of-powers violation here, if there is any, consists of depriving judicial judgments of the conclusive effect that they had when they were announced, not of acting in a manner—viz., with particular rather than general effect—that is unusual (though, we must note, not impossible) for a legislature. To be sure, a general statute such as this one may reduce the perception that legislative interference with judicial judgments was prompted by individual favoritism; but it is legislative interference with judicial judgments nonetheless. Not favoritism, nor even corruption, but *power* is the object of the separation-of-powers prohibition. The prohibition is violated when an individual final judgment is legislatively rescinded for even the *very best* of reasons, such as the legislature's genuine conviction (supported by all the law professors in the land) that the judgment was wrong; and it is violated 40 times over when 40 final judgments are legislatively dissolved.

*Id.* at 227–228 (emphasis in original). Thus, the fundamental question, and perhaps the only question, that was critical to the Court's holding in *Plaut* was whether the statute had directed the reopening of final judgments entered prior to the statute's enactment.

In defining final judgment for the purpose of its analysis under Article III, the Court was careful to explain that a final judgment is one in which the time for appeal has expired. *Id.* at 226–227. Thus, the Court emphasized that courts must apply new law retroactively to any pending cases, including those on appeal, when Congress clearly instructs the Courts to do so. *Id.* at 226 (citing *United States v. Schooner Peggy*, 5 U.S. 103 (1801); *Landgraf*, 511 U.S. at 273–280). As the Court explained, Article III creates a single judicial department, and thus no judgment in a case is truly the final judgment of the Article III Judiciary until all potential appeals have either been foregone or exhausted. *Id.* at 227. Accordingly, separation of powers concerns are generally not implicated when Congress directs that a new law should be applied to cases still pending anywhere within the federal judiciary, including on appeal.

The Court concluded its opinion by underscoring the very remarkable and unique nature of the statute Congress had enacted in its effort to "reinstate" certain stock fraud actions that the Court had previously dismissed. The Court stated:

> We know of no previous instance in which Congress has enacted retroactive legislation requiring an Article III court to set aside a final judgment, and for good reason. The Constitution's separation of legislative and judicial powers denies it the Authority to do so. [The statute] is unconstitutional to the extent that it requires federal courts to reopen final judgments entered before its enactment.

*Id.* at 241.[26]

---

[26] In *Miller v. French* the Court revisited *Plaut* in a case involving an act of Congress that in effect required a district court to revisit a remedial injunction issued against a state correctional facility. 530 U.S. 327. The Court held that the statute did not offend any separations of powers principles. *Id.* at 350. In reaching that conclusion, the Court emphasized that the Article III principle emphasized in *Plaut* regarding the finality of civil judgments for money damages does not apply to the same degree with respect to a court order issuing an equitable remedy like an injunction or other kinds of prospective relief. *Id.* at 347–48. The Court also stressed, that, unlike judgments for money damages, court orders providing for prospective relief are "subject to the continuing supervisory jurisdiction of the court, and

Thus, the Court's holding in *Plaut* appears based at least in part on the truly extraordinary nature of Congress' action in directing the Article III Courts to set aside final judgments entered in certain stock fraud actions prior the legislation's enactment.

## 2.      Analysis of the Constitutional Question in Light of the Supreme Court's Jurisprudence

In view of the Supreme Court's jurisprudence in this area, the fundamental question remains whether § 1083(c) violates Article III to the extent that it applies to FSIA terrorism cases that were terminated in final judgments under § 1605(a)(7).  This Court is the view that the Article III question presented in this case, requires the consideration of two distinct but related issues, each of which, when considered either individually or in concert with one another, may lead to the conclusion that § 1083(c) is unconstitutional as applied to prior FSIA actions.  The first question is whether § 1083(c)(3) calls for the reopening of final judgments entered before its enactment and therefore contravenes Article III as construed by the Supreme Court in *Plaut*.  The second question is assuming that § 1083(c)(3) does not direct the reopening of final judgments, does § 1083(c)(2)—the waiver of res judicata and collateral estoppel effect of any prior terrorism FSIA action—nonetheless offend Article III because Congress has directed the Courts to ignore fundamental and longstanding judicial doctrine.  Both issues are constitutional questions of first impression.

---

therefore may be altered according to subsequent changes in the law."  *Id.* at 347 (citation omitted).

a.      **Does Section 1083(c)(3) Direct the Reopening of Final Judgments Entered Before its Enactment and Therefore Contravene Article III as Construed by the Supreme Court in *Plaut*?**

Applying the principles articulated by the Supreme Court in *Plaut*, this Court is of the view that § 1083 (c) does not violate Article III of the United States Constitution.  Critical to this decision today is this Court's understanding that by enacting § 1083—thereby repealing § 1605(a)(7) and replacing it with § 1605A—Congress and the President have accomplished a fundamental change in substantive federal law with respect to civil actions against state sponsors of terrorism.  The former terrorism exception to the FSIA, § 1605(a)(7), which still controls in certain actions, *see Simon*, 529 F.3d at 1192, is "merely a jurisdiction conferring provision" devoid of any substantive law claims against foreign states.  *Cicippio-Puleo*, 333 F.3d at 1032. The new terrorism exception, § 1605A, is a fundamentally different law, however, because it creates a federal cause of action against foreign states, *see* § 1605A(c), thereby allowing for new actions that simply were not available to terrorism victims prior to the enactment of § 1083 last year.  Accordingly, this case is distinguishable from *Plaut*, in which the statute the Supreme Court found unconstitutional made no changes in substantive law and, in fact, was nothing more than a directive instructing courts to reopen stock fraud actions that had been previously dismissed as time-barred.

The change in federal substantive law that has occurred in this case should not be understated.  As our Circuit first observed in the case of *Cicippio-Puleo*: "Plainly, neither section 1605(a)(7) nor the Flatow Amendment, separately or together, establishes a cause of action against foreign state sponsors of terrorism."  353 F.3d at 1027.  As a mere jurisdiction conferring statute, § 1605(a)(7) does little more than offer a pass-through to causes of actions that may exist under state law or other sources of law.  *Bodoff*, 424 F. Supp. 2d at 83.  In practical application

- 77 -

before this Court, plaintiffs in actions under § 1605(a)(7) have relied on state tort law as the
source of law for substantive causes of actions. *See, e.g.*, *Rimkus*, 575 F. Supp. 2d at 196–99
(applying Missouri law); *Peterson II*, 515 F. Supp. 2d at 41–60 (applying laws from 34 different
state jurisdictions, the District of Columbia, and the Philippines); *Greenbaum v. Islamic Republic
of Iran*, 451 F. Supp. 2d 90, 101–108 (D.D.C. 2006) (Lamberth, J.) (applying California and
New Jersey law); *Prevatt*, 421 F. Supp. 2d at 159–162 (D.D.C. 2006) (Lamberth, J.) (applying
Georgia law).

The reliance on state tort law in the "pass-through" mechanism of § 1605(a)(7) has
resulted in a total lack of uniformity in civil cases under that provision. Moreover, the lack of
uniformity in turn has caused a certain degree of unfairness to plaintiffs, as the differences in tort
law among the many state and territorial jurisdictions has naturally resulted in significant
disparities with respect to the availability of relief for similarity situated plaintiffs. Given the
unbending supremacy of the federal government in matters of foreign relations, combined with
the basic aim of the anti-terrorism provision—which is to hold state sponsors of terror
accountable for their role in perpetuating terrorist acts that have injured or killed Americans—
this Court has long thought it odd that Congress chose to, in effect, rely on state tort law to
achieve its national objectives. Ordinarily, individual state laws must "yield to the National
Government's policy, given the 'concern for uniformity in this country's dealings with foreign
nations' that animated the Constitution's allocation of foreign relations power to the National
Government in the first place." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (*quoting
Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n. 25 (1964)). Why then, for purposes
of liability under the state sponsor of terror exception, should it matter at all which particular
State in the Union the American plaintiff happens to hail from? But that is precisely the kind of

perverse result that § 1605(a)(7) mandates.  In *Peterson*, for example, hundreds of plaintiffs, all victims of the Marine barracks bombing in Lebanon, and all Americans, sought relief for a variety of claims.  *Peterson II*, 515 F. Supp. 25.  Many family members hoped to receive compensation for their emotional distress, and many were successful, but many others with precisely the same kinds of emotional distress cases, had no recovery whatsoever because they happened to be domiciled in a state that denied them standing to assert such claims.  *See id.* at 44–45.  With § 1605(a)(7), Congress sent something of a mixed message: The United States is serious about deterring states sponsors of terrorism and compensating victims, but only to the extent that our individual state jurisdictions allow.  If you happen to live in a state that will not permit you a substantive claim for relief, so be it.

Rather than leave the substantive law for actions under the FSIA terrorism exception at the disposal of the 50 individual states and numerous other territories, this Court expressed the view in *Flatow* that the preferable approach would have been to have a federal cause of action consistent with the traditional principle of uniformity in this Country's dealings with foreign nations.  *See* 999 F. Supp. 1 at 15.  In the *Cicippio-Puleo* decision, the Court of Appeals even noted how a federal cause of action might better achieve the goals of § 1605(a)(7).  The Court stated:

> Clearly, Congress's authorization of a cause of action against officials, employees, and agents of a foreign state was a significant step toward providing a judicial forum for the compensation of terrorism victims.  *Recognizing a federal cause of action against foreign states undoubtedly would be an even greater step toward that end, but it is a step Congress has yet to take.  And it is for Congress, not the courts, to decide when a cause of action should lie against foreign states.*

353 F.3d at 1036 (emphasis added).  Thus, this Court and our Circuit both stressed how a federal

cause of action against foreign states could help to further the purposes of the state sponsor of

terrorism exception to foreign sovereign immunity.[27]

Congress was listening, and it of course responded by implementing a cause of action

within the new version of the terrorism exception, § 1605A, through the passage of the § 1083 of

the 2008 NDAA.  By doing so, Congress completely changed the landscape with respect to

actions against state sponsors of terror.  This latest version of the terrorism exception is not a

mere jurisdiction conferring or "pass-through" statute, but rather it is a source of substantive

federal law—a uniform federal standard designed to hold rogue nations accountable for their

promotion of terrorists acts.

But as fundamental as this shift to federal law surely is, § 1605A also contains a broad

array of substantive rights and remedies that simply were not available under § 1605(a)(7).  As

emphasized in the introduction to this opinion, the changes implemented through § 1083 are in

effect a new statutory regime designed to accomplish a variety of objectives in addition to the

creation of a new federal cause of action.  Unlike its predecessor exception, § 1605A includes,

among other new entitlements, the availability of punitive damages against foreign states, *see*

§ 1605A(c), the ability to assert pretrial liens on property, *see* § 1605A(g), and plaintiffs in

actions under this new exception may take advantage of new restrictions on the types of

---

[27] As noted above in Part A, *supra*, in *Flatow I*, this Court actually read § 1605(a)(7) as
providing for a federal cause of action against foreign state sponsors of terror, and "in the interest
of promoting uniformity with respect to liability determinations" this Court chose to "employ
interstitial federal common law" to determine liability and damages.  999 F. Supp. at 15.
Regardless of our different views on the issue at the time, both this Court's decision in *Flatow I*
and the Circuit's decision in *Cicippio-Puleo* nonetheless highlighted the potential advantages of
a federal cause of action in this area.

immunities that have historically protected the properties of foreign states from attachment and execution, *see* § 1610(g).  Thus, § 1605A not only creates a new substantive federal claim, but it includes greater remedies, more robust judgment enforcement provisions, and other mechanisms intended to better promote and execute the federal interest in deterring terrorist attacks and compensating victims.  Consequently, § 1605A is qualitatively distinct, and, frankly, many times removed from the mere "pass-through" mechanism of § 1605(a)(7).

Ultimately, § 1083—in both its design and practical application—does not portend to achieve an overruling or abrogation of final judgments under § 1605(a)(7), and thus Congress in this case has not sought to impose a legislative veto of court rulings of the kind that the Supreme Court rejected in both *Plaut* and *Klein*.  Nothing in § 1083 directs this Court to revisit or reopen any judgments entered under § 1605(a)(7).  Indeed, that sort of action is not even contemplated by the statute.  Section 1083(a) simply repeals § 1605(a)(7) entirely and replaces it with the new provision § 1605A.  Noticeably absent from § 1083 are any procedures or directives that might instruct this Court to re-look, reopen, or otherwise abrogate any judgments entered on the basis of state tort law in accordance with the "pass-through" regime of § 1605(a)(7); those prior judgments remain intact as final judgments.  Rather than revisiting prior cases under the old "pass-through" system of § 1605(a)(7), § 1083 is geared instead toward bringing into existence a whole new statutory regime—one that has as its cornerstone a new federal cause of action against foreign states, for which punitive damages may be awarded.

Some may argue that this Court is merely embracing form over substance here, and, thus they might suggest that this Court has limited *Plaut* or otherwise given that decision much too narrow of an application with respect to § 1083(c).  They might argue that, regardless of whatever differences might exist between causes of actions based in state tort law under

§ 1605(a)(7) and the new federal cause of actions authorized under § 1605A(c), the fundamental

problem is that § 1083(c) offers a mechanism by which a previously determined tort case against

Iran may be resurrected from the dead and brought back into court disguised as a new federal

claim under federal law.  Thus, some may believe today's ruling rests on an overly narrow or

technical view of the definition of cause of action, and, consequently, attaches too much

significance to the change from state law to federal law with respect to the determination of

liability in these actions.  *See Apotex v. FDA*, 393 F.3d 210, (D.C. Cir. 2004) (holding that, for

claims preclusion purposes, "[w]hether two cases implicate the same cause of action turns on

whether they share the same 'nucleus of facts'") (citations omitted).

Absent further guidance from the Supreme Court or from this Circuit, however, it is not

up to this Court to expand upon the basic holding in *Plaut*—that a statute is unconstitutional as a

violation of the separations of power to the extent that it requires the reopening of a final

judgment for money damages.  514 U.S. at 240.  As no reopening of a final judgment under

§ 1605(a)(7) occurs by virtue of our courts honoring the terms of § 1083(c), that statute

withstands scrutiny under the controlling precedent.  To rule otherwise, would require this Court

to reach well beyond existing precedent, and that is something this trial judge is loathe to do.

Even if the fundamental shift away from the jurisdiction-conferring approach of

§ 1605(a)(7) is viewed as little more than a than a change in the rule of decision for liability in

federal terrorism actions, Congress in this instance has amended all the underlying law by virtue

of its complete repeal of § 1605(a)(7) and substitution of § 1605A.  Accordingly, this case does

not run afoul of *Klein* in the way the Supreme Court has construed that foundational decision.

*See Plaut*, 514 U.S. at 218; *see also Klein*, 80 U.S. at 146.  Moreover, the kind of across-the-

board change in the terrorism exception that Congress undertook and ultimately accomplished

with the passage of § 1083 is not the kind that embodies or otherwise enhances the risk that certain politically connected groups might twist the lawmaking process into a tool for the unraveling of disfavored civil judgments. *See Plaut*, 514 U.S. at 219–226 (noting how the Nation's founders viewed finality of court judgments as a safeguard against the risk that politically connected groups might use the legislative process to unravel civil court judgments); *see also id.* at 240–247 (stressing that the Article III principle of finality in civil judgments is generally intended to prevent the legislative process from being used to direct the reopening of specific civil judgments) (Breyer, J., concurring).

Moreover, while the question of whether the statute impacts the outcome of a civil case on the merits is not a central consideration, *see id.* at 228–29, it is worth noting that § 1083(c), much like the enactments that were upheld in *Cherokee Nation* and *Sioux Nation*, and in sharp contrast to the enactment struck down in *Klein*, does not dictate the outcome of a case on the merits. *See Sioux Nation*, 448 U.S. at 405; *Cherokee Nation*, 270 U.S. at 486; *Klein*, 80 U.S. at 146. Plaintiffs still must prove that they are entitled to relief under the new terrorism enactment, §1605A(c). There is no guarantee that federal law will provide relief to plaintiffs any more or less than state tort law might have in an action under § 1605(a)(7).

Finally, this Court is not convinced that the principles announced in *Plaut* apply with the same degree of force in actions under the FSIA. As the Supreme Court observed in *Austria v. Altmann*, FSIA questions are sui generis. 541 U.S. at 697. To begin with, the FSIA is a far-reaching, retrospective law—the statute reaches conduct by foreign powers that long predates its enactment and it directly addresses sensitive matters of foreign relations, which, as the Court emphasized, are inherently subject to "current political realities and relationships." *Id.* at 696. It is beyond question that foreign relations matters are soundly committed to the political branches.

*Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 311 (1918); *see also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (holding that the Federal Government's powers over foreign affairs differ "in origin and essential character" from its powers over domestic law matters). And while neither the retrospective nature of the FSIA, nor the fact that it directly concerns our relationships with foreign nations, is enough to justify a usurpation of the federal courts' powers and responsibilities under Article III, there must be at least be some recognition—as there was in *Altmann*—that the political branches have greater authority and leeway with respect to decisions apportioning the liability of foreign nations.

In the realm of foreign affairs, our Courts must attach a strong presumption of validity to actions in which both the Congress and President are in agreement. *See Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981); *see also Youngstown Sheet & Tube*, 343 U.S. at 637 (Jackson, J., concurring). As our Circuit has emphasized time and again, the FSIA terrorism exception represents a "delicate legislative compromise." *See Price*, 294 F.3d at 89; *accord Cicippio-Puleo*, 353 F.3d at 1035. Here, § 1083 represents precisely the kind of "delicate legislative compromise" involving foreign affairs that is best left to the political branches of our Federal Government. Indeed, President Bush vetoed the first attempt by Congress to enact § 1605A. *See* Memorandum to the House of Representatives Returning Without Approval the "National Defense Authorization Act for Fiscal Year 2008," 43 WEEKLY COMP. PRES. DOC. 1641 (Dec. 28, 2007). At that time, the President expressed concerns about how these reforms to the FSIA terrorism exception would negatively impact Iraq's economy and reconstruction efforts as the United States worked to help that nation rebuild. *See id.* Shortly thereafter, Congress redrafted its proposed legislation to accommodate the President's concerns by adding a provision that authorized the President to waive any part of § 1083 with respect to Iraq. *See* § 1083(d). As a

result, the President signed § 1083 into law on January 28, 2008, *see* Pub. L. No. 110-181, thereby enacting the sweeping reforms to the FSIA contained in § 1605A.[28]  When, as here, both the President and Congress—the two branches vested with responsibility for our conduct of foreign affairs—are working together toward a common foreign policy objective, the Judicial Branch should be extremely hesitant about intervening in a way that would unravel those efforts.

Under the former version of the terrorism exception, § 1605(a)(7), Congress and the President had in a sense left an important federal policy relating to state sponsors of terrorism to the many diverse substantive bodies of law within state and territorial jurisdictions.  The new law, §1605A, however, demonstrates that both Congress and the President have come to an agreement that this federal policy aimed at deterring foreign state sponsors of terror should now fall squarely under federal law and control.  Moreover, Congress and the President have greatly expanded the range of remedies and legal processes available in these federal actions.  It may well be that Iran will not be pleased with the changes implemented by § 1083, but whatever concerns Iran may have are best addressed through diplomatic channels.

Important questions concerning how best to deal with state sponsors of terrorism will most certainly be a topic of ongoing debate and discussion between the Legislative and Executive Branches for many years to come.  With the enactment of § 1083, the political branches have ordained a fundamental shift in policy pertaining to state sponsors of terrorism.  In recognition of these significant reforms, this Court cannot say that § 1083 offends Article III of the Constitution to extent that this new law offers certain victims of state-sponsored terrorism an

---

[28] The President immediately exercised the waiver in § 1083(d) and waived the entire section with respect to Iraq.  *See* Pres. Determ. No. 2008-9, 73 Fed. Reg. 6571 (Jan. 28, 2008); *see also Republic of Iraq v. Beaty*, 129 S. Ct. 2183, 2191–2193 (June 8, 2009) (discussing President's waiver of § 1083 concerning Iraq.)

opportunity to lay claim to new federal rights and remedies in actions under the FSIA.  While it

is the Federal Judiciary that decides individual cases and controversies arising under federal law,

it is our political branches that ultimately bear full responsibility for our relations with foreign

powers.

    **b.**        **<u>Assuming that Section 1083(c)(3) Does Not Direct the Reopening of Final</u>**
**<u>judgments, Does the Waiver of the Res Judicata or Collateral Estoppel Effect</u>**
**<u>of an Prior Terrorism FSIA Action Nonetheless Offend Article III because</u>**
**<u>Congress has Directed the Courts to Ignore Fundamental and Longstanding</u>**
**<u>Judicial Doctrines?</u>**

Having decided that § 1083(c)(3) does not direct the reopening of final judgments in

violation of Article III, this Court is of the view that the waiver of res judicata and collateral

estoppel in § 1083(c)(2)(B) should also withstand Constitutional scrutiny under the narrow facts

of these cases.  In this Court's opinion, the holding that there is not prohibited reopening of final

judgments—because any terrorism action brought under § 1605A is fundamentally different

from an action under § 1605(a)(7)—largely resolves any question regarding the constitutional

validity of Congress' decision to waive the preclusive effect (if there is any) of a prior court

adjudication under § 1605(a)(7).  In practical terms, this Court recognizes that the issue of

whether a statute violates the constitutional prohibition against Congress directing the reopening

of final civil judgments for money damages, is really an issue that is separate and apart from the

question of when and to what extent the preclusion doctrines—res judicata and collateral

estoppel—should apply in a given case.  Nonetheless, these two important questions raise

overlapping concerns and are in many ways inextricably connected.  Thus, this Court finds that

some additional scrutiny of the statute is warranted with regard to the waiver of claim and issue

preclusion defenses in § 1083(c)(2)(B).

Generally speaking, the doctrine of res judicata precludes the parties from relitigating claims only when the parties previously litigated the claims or could have litigated them in a prior civil action that reached a final judgment on the merits. *See, e.g*, *Allen v. McCurry*, 449 U.S. 90, 414 (1980); *Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002). The related doctrine of collateral estoppel provides that parties may be precluded from litigating any issue of fact or law that was previously resolved by a court in the course of reaching a final judgment in another action between those parties. *See, e.g.*, *McCurry*, 449 U.S. at 415; *U.S. Postal Serv. v. Am. Postal Workers Union*, 553 F.3d 686, 696 (D.C. Cir. 2009).

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent lawsuit between the same parties or privies.'" *Montana v. United States*, 440 U.S. 147, 153 (1979) (quoting *S. Pac. R.R. Co. v. United States*, 168 U.S. 1, 48–49 (1897)). Both doctrines serve to "relieve parties of the cost of and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id*. at 153–54 (1979). Thus, the primary purpose served by the doctrines of res judicata and collateral estoppel is the preservation of the finality of judgments. *See, e.g.*, *Crist v. Bretz*, 437 U.S. 28, 33 (1978). More fundamentally, however, the Supreme Court has stated that the "[a]pplication of res judicata and collateral estoppel is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions." *Montana*, 440 U.S. at 154 (citing *Southern Pacific Railroad Co.*, 168 U.S. at 49; *Hart Steel and Railroad Supply Co.*, 244 U.S. 294 (1917)). Thus, a statutory directive instructing courts to waive res judicata and collateral estoppel may raise separation of powers concerns under Article III.

Indeed, in *Plaut*, the Supreme Court suggested that a waiver of res judicata that is not subject to "the control of the courts themselves" might raise separations-of-powers issues. 514 U.S. at 232–33; *see also Sioux Nation*, 448 U.S. at 432–434 (Rehnquist, J., dissenting). The language waiver res judicata at issue is particularly troublesome because, as noted previously, *supra*, only two Supreme Court decisions have considered a waiver of that doctrine by Congress, and both decisions involved cases brought against the United States by Indian tribes. *See Sioux Nation*, 448 U.S. 317; *Cherokee Nation*, 270 U.S. 476. And, as underscored by the Supreme Court more recently in *Plaut*, those two decisions are narrowly tailored to the specific facts of those cases—meaning the basic proposition established by those rulings is simply that Congress may "waive the res judicata effect of a prior judgment entered in the Government's favor on a claim against the United States." 514 U.S. at 230. In fact, the Court pointed to Justice Rehnquist's dissent in *Sioux Nation*, and emphasized that Court had yet to consider whether Congress could prohibit the Federal Judiciary from applying the doctrine of res judicata in specific cases. The Court wrote:

> The statute at issue in *United States v. Sioux Nation* seemingly prohibited courts from raising the res judicata defense sua sponte. The Court did not address that point; as far as it appears it saw no reason to raise the defense on its own. Of course the unexplained silences of our decisions lack precedential weight.

*Id.* at 232 n.6 (citations omitted).

The bottom line is that both *Sioux Nation* or *Cherokee Nation* leave open the question of whether Congress may waive res judicata or collateral estoppel with respect to a litigant other than the Federal Government —but this is precisely what Congress has sought to achieve with § 1083(c)(2)(B). By its terms, that statutory provision requires this Court to ignore any defense of res judicata or collateral estoppel that Iran may wish to assert in a new action under § 1605A.

Because res judicata and collateral estoppel are long held judicial doctrines that are central to the judiciary's purpose in rendering final judgments in civil cases, this Court is inclined to agree with the opinion expressed by Justice Rehnquist in *Sioux Nation*.  It seems to this Court that Congress has little business directing whether or when those judicial doctrines should be invoked any more than this Judge should play a role in directing federal appropriations.  This Court, however, must, at least in this particular instance, separate out the question of whether there has been some effort by the legislative branch to claim those salutary judicial doctrines in pursuit of their own legislative ends, from the more fundamental question of whether there has in fact been a prohibited reopening of final judgments for money damages in contravention of *Plaut*, the Supreme Court's last word on this matter.  While the two issues may be overlapping at times, they are nonetheless distinct.  For Article III purposes, the question is not necessarily whether the preclusion doctrines of res judicata or collateral estoppel have been invoked by the Legislative Branch; it is simply whether Congress has in effect directed the reopening of final judgments for money damages.  Here, that sort of Article III violation—albeit in the most technical sense—has not occurred.[29]  Accordingly, this judge cannot say that the waiver of res judicata or collateral estoppel are offensive under the circumstances presented in this case.[30]

---

[29] It might very well be a different case if Congress had directed that res judicata and collateral estoppel are waived in any cases brought under the very same cause of action.  The appropriate example here would be if Congress had directed the Courts to reinstate, under §1605(a)(7), all the claims that this Court and others had previously dismissed under that very same provision.  As Congress in this case has seen fit to create an entirely new cause of action under § 1605A, and has repealed § 1605(a)(7) outright, this Court need not reach that more difficult issue.

[30] In light of the Court's cautionary remarks regarding *Sioux Nation* in the *Plaut* decision, the Supreme Court may one day take the opportunity to consider and decide whether res judicata,

Moreover, this Court is of the view that—regardless of Congress' wishes on the matter—it simply would not be appropriate for this Court to give res judicata or collateral estoppel effect to a prior action under § 1605(a)(7).  With respect to res judicata, that doctrine cannot be applied, where, as here, the claims now being asserted could not have been raised in the prior litigation. *See, e.g.*, *McCurry*, 449 U.S. at 414*; Montana*, 440 U.S. at 154*; Nat'l Res. Def. Council v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008); *Drake*, 291 F.3d at 417.  Prior to the enactment of the 2008 NDAA last year, § 1605A and the new federal cause of action it creates did not exist in any shape or form.  As our Circuit has emphasized, res judicata "does not bar a litigant from doing in the present what he had no opportunity to do in the past."  *Drake*, 291 F.3d at 67.  Accordingly, res judicata, as a doctrine, does not afford preclusive effect to those cases presented here that were litigated in accordance with state law under § 1605(a)(7) at a time when no federal cause of action existed.[31]

---

and perhaps even collateral estoppel, are so intrinsic or central to the Federal Judiciary's responsibilities under Article III that Congress should not limit the ability of the Courts to independently apply those doctrines.  It is not the role of this trial court, however, to reach beyond the essential holdings within the Supreme Court's decisions.  Those decisions are binding on this Court until the Supreme Court rules otherwise.

[31] It is true that subsequent changes in decisional law or case law is normally not sufficient to overcome res judicata.  *E.g.*, *Moitie*, 452 U.S. at 398 (holding that res judicata effect "of a final unappealed judgment on the merits is not altered by the fact that the judgment may have been wrong or rested on a legal principle that is subsequently overruled in another case"); *Hardison v. Alexander*, 655 F.2d 1281, 1288–89 (D.C. Cir. 1981) (holding that res judicata is not overcome by a subsequent change in the law of the Circuit); *accord Apotex*, 393 F.3d at 218.  A change in the applicable case law, however, must be distinguished from a change in statutory law.  Many Circuits have recognized that a change in statutory law can be sufficient to overcome res judicata.  *See Alvear-Velez v. Mukasey*, 540 F.3d 672, 678–80 (7th Cir. 2008) (collecting and discussing cases from the Circuits and holding that res judicata does not necessarily apply when the change in the law "is statutory in nature, as opposed to a change in case law").

Similarly, with respect to collateral estoppel, our Circuit has recently emphasized that issue preclusion is generally not appropriate when the legal context has changed.  *See U.S. Postal Serv.*, 553 F.3d at 696; *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 522 F.3d 443, 447 (D.C. Cir. 2008).  The decisions of our Circuit build on the Supreme Court's decision in *Montana v United States*, in which the Court observed that a "a change in the controlling legal principles" may be sufficient to prevent the application of collateral estoppel.  440 U.S. at 161. As emphasized throughout this opinion, the enactment of § 1083 of the 2008 NDAA altered the entire legal context pertaining to litigation against state sponsors of terrorism because the underlying substantive legal basis for the such actions has been shifted from state law to federal law.  As the legal analysis in these actions will now be determined by a uniform federal standard—rather than the laws of numerous state and territorial jurisdictions—the collateral estoppel doctrine should not be invoked in any of the new actions proceeding under § 1605A(c).

More fundamentally speaking, many of the purposes served by the preclusion doctrines are not as easily realized in this sui generis context involving civil actions against foreign states. In the domestic law context, private citizens involved in civil litigation may certainly achieve settled expectations that are reinforced and well served by the application of preclusion doctrines, but the same cannot be said of foreign states acting within the vast international arena. As *Altmann* underscored, foreign states order their affairs primarily on the basis of their understanding of how present political realties within the global sphere might influence their standing vis-à-vis other nations.  *See* 541 U.S. at 696; *see also Price*, 294 F.3d at 97 ("Relations between nations in the international community are seldom governed by the domestic law of one state or the other.") (citing Lori Fisler Damrosch, *Foreign States and the Constitution*, 73 VA. L. REV. 483, 520 (1987).  Thus, while individual lawsuits by United States citizens and nationals

against state sponsors of terrorism may have some bearing on how rogue nations, like Iran, might perceive and manage their relations with the United States, it strains credulity to assert that Iran has any reliance interests or settled expectations with respect to prior civil actions litigated against it under § 1605(a)(7).  Indeed, the notion is almost laughable because that nation has never appeared in any of the terrorism actions that have been litigated against it in this Court.

Finally, applying any of the preclusion doctrines with respect to actions that were previously litigated to a final judgment under the former version of the state sponsor of terrorism exception, would completely undermine the purpose behind the most recent enactment § 1605A. As noted, *supra*, Part B, the new statute aims to provide a uniform federal cause of action in *lieu* of the old "pass-through" regime under § 1605(a)(7) that was viewed as unjust and ineffective largely because it was beholden to the laws of the many state and territorial jurisdictions.  Thus, the application by courts of preclusion defenses in new actions under § 1605A would lead to a result entirely at odds with the aim of the new statute because our courts, by granting preclusive effect to prior judicial determinations under state law, would, practically speaking, allow those individual state sources of law to again control outcomes in civil actions against state sponsors of terror.  Such a perverse result should be avoided, especially in this foreign affairs context in which both the President and Congress have expressed a clear policy preference in favor of a uniform federal standard.  *See Dames & Moore*, 453 U.S. at 668–69 (1981) (suggesting that Courts should be extremely hesitant about undermining foreign policy initiatives when both Congress and the President are in agreement); *Garamendi*, 539 U.S. at 414–15 (emphasizing that state law touching on foreign policy matters must give way to federal policy in the light of the strong need for uniformity in this country's dealings with foreign sovereigns); *Alvear-Valez*, 540

F.3d 672 (stating that preclusion doctrines should not be applied when doing so would frustrate Congress' purpose for changes in the statutory law).

In sum, where, as in this case, Congress and the President have provided for a new federal cause of action against a foreign state, application of res judicata or collateral estoppel with respect to prior actions that relied on the "pass-through" regime of § 1605(a)(7) would be inconsistent with the Judiciary's own principles regarding the application of those salutary preclusion doctrines. Thus, under the circumstances presented here, the wavier of res judicata and collateral estoppel expressed in § 1083(c)(2)(B) is perhaps best understood as nothing more than a poor choice of statutory language that is merely intended to reinforce the understanding that Congress and the President have accomplished a fundamental change in public policy with respect to actions against state sponsors of terrorism.

As a caveat to this analysis, this Court wishes to stress that this decision does not consider whether the waiver of basic and long-established common law defenses in § 1083(c)(2)(B) might offend the Due Process Clause, as some commentators have suggested recently. *See* SUITS AGAINST TERRORIST STATES, *supra* note 4, at 6, 61 nn. 231–232; Debra M. Strauss, *Reaching out to the International Community: Civil Lawsuits as the Common Ground in the Battle Against Terrorism*, 19 DUKE J. COMP. & INT'L L. 307 (2009). Technically speaking, it is an open question whether a foreign state is even entitled to Due Process under the Fifth Amendment because the Supreme Court expressly declined to consider the question in *Republic of Argentina v. Weltover, Inc.*, and has not revisited the issue since. 504 U.S. 607, 619 (1992). Both the Court of Appeals in *Price* and this Court in *Flatow* have emphasized how the Supreme Court has never squarely addressed this matter. *See Price*, 294 F.3d at 97; *Flatow I*, 999 F. Supp. 1 at 19. Nonetheless, this Court finds that—unlike the Article III question—the issue of

whether the statutory waiver of preclusion defenses like res judicata offends the Due Process

Clause is not ripe for consideration at this time.

In contrast to the Article III question, which speaks to the power of this Court to decide

cases independently, free from interference from the political branches, the Due Process issue (if

there is any) speaks to the degree of fairness to which Iran may or may not be entitled as a party

named in these FSIA terrorism cases.  To the extent that there is an argument that the statutory

waiver of res judicata or collateral estoppel amounts to a violation of Due Process with respect to

the treatment of Iran as a civil defendant, that argument is best articulated in the first instance by

Iran itself.  As emphasized, *supra*, n. 5, Iran is an experienced litigant in this Court and

throughout the federal courts generally, but the Iranian Government has elected not to defend

itself during the merits phases of these actions.  It should also be stressed again here that Iran has

appeared repeatedly before the federal courts during the postjudgment phases of these actions,

and has successfully defeated efforts by plaintiffs to execute the default civil judgments entered

against the Government of Iran.  *See, e.g.*, *Ministry of Defense and Support for the Armed Forces

of the Islamic Republic of Iran v. Elahi*, 129 S. Ct. 1732 (April 21, 2009) (demonstrating how

Iran litigated an action from the district court all the way through to the Supreme Court and

thereby prevented certain FSIA judgment creditors from attaching one of its assets here in the

United States).  In view of these facts, this Court sees no reason to sua sponte examine whether

the waiver of preclusion doctrines in new actions under § 1605A might somehow compromise

purported Due Process rights of that foreign sovereign.  This Court is certainly not interested in

affording constitutional rights to Iran, especially when Iran has not asserted its right to defend

itself in the actions filed here.

Thus, the only constitutional issue considered today has nothing to do with Due Process and everything to do with the separation of powers and the independent authority of the Article III judiciary to conclusively resolve cases and controversies.  Accordingly, this Court has scrutinized the statutory waiver of res judicata and collateral estoppel in § 1083(c)(2)(B) only to consider whether that measure—either in isolation or in concert with § 1083(c)(3)—amounts to a prohibited usurpation of judicial power by Congress.  This basic question does not implicate a legal defense of Iran so much as it concerns the delicate system of checks and balances envisioned under our Constitution and, ultimately, the authority and integrity of this Court.  No other constitutional issues warrant the Court's attention at this time.

Moreover, this Court is rather dubious of any suggestion that Due Process would prevent or otherwise limit the application of § 1083(c) to matters that were previously litigated to final judgments against Iran under § 1605(a)(7).  As the D.C. Circuit held in *Price*, "foreign nations are external to the constitutional compact[,]" and therefore foreign states do not have Due Process rights.  294 F.3d at 97.  In its extensive analysis of the issue, the Court of Appeals relied heavily on the Supreme Court's decision in *South Carolina v. Katzenbach*, in which the Court held that the "'the word 'person' in the context of the Due Process Clause of the Fifth Amendment, cannot, by any reasonable measure of interpretation, be expanded to encompass the States of the Union.'"  383 U.S. 301, 323–24 (1966), *quoted in Price*, 294 F.3d at 96. Accordingly, as Court of Appeals explained that "it would be highly incongruous to afford greater Fifth Amendment rights to foreign nations, who are entirely alien to our constitutional system, than are afforded to the states, who help make up the very fabric of that system." *Price*, 294 F.3d at 97.  Four years earlier, in the *Flatow* decision, this Court reached the precisely the same conclusion for similar reasons.  *Flatow I*, 999 F. Supp. 1 at 19–21.

In *Price*, the D.C. Circuit also underscored several practical problems with respect to the extension of Due Process rights to foreign nations. The Court observed, for example, that the freezing of assets of foreign nations by Congress and the President, or the imposition of sanctions, might be challenged as deprivations of property without due process of law. *Price*, 294 F.3d at 100. "The courts would be called upon to adjudicate these sensitive questions, which could in turn tie the hands of the other branches as they sought to respond to foreign policy crises. The Constitution does not demand this." *Id.* at 99 (citations omitted). For all the sound reasons expressed by the Court of Appeals in *Price*, this Court finds it unlikely that the Supreme Court would extend Due Process protections to foreign states like Iran. The clear weight of authority suggests otherwise.

**3.       Additional Considerations**

There are other aspects of § 1083 of the 2008 NDAA that—while not directly at issue here—nonetheless give this Court pause and lead it to question whether today's ruling finding no Constitutional infirmities with respect to § 1083(c) is truly the right decision. For instance, within the new terrorism exception, § 1605A, which is implemented at § 1083(a), Congress suggests that this Court should rehear "Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia." *See* § 1605A(a)(2)(B)). The case that the statute is referring to in this instance is *Roeder v. Islamic Republic of Iran*, an action that Judge Sullivan dismissed in April 2002 because it was barred by the Algiers Accords. 195 F. Supp. 2d 140 (D.D.C. 2002) (Sullivan, J.), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003).

*Roeder* concerns the more than 50 U.S. diplomatic and military personnel taken hostage, held captive, and tortured at the U.S. Embassy in Tehran from 1979 through 1981. The victims and their loved ones brought a class action lawsuit under the prior version of the state sponsor of

terrorism exception, § 1605(a)(7).  As the litigation moved forward, it became clear that the

action was barred by the Algiers Accords.  Once this became apparent, and as dismissal of the

case was imminent, Congress passed legislation instructing Judge Sullivan to go forward with

the case, and to do so notwithstanding the unmistakable fact that the action was plainly barred

under the terms of the Algiers Accords.[32]

Needless to say, Judge Sullivan found himself facing an Article III problem in the *Roeder*

case.  Judge Sullivan was able to avoid the Constitutional question, however, because Congress

had not clearly expressed its intent to abrogate the Algiers Accords, as is required before Courts

will hold that an international agreement is abrogated by a subsequent act of Congress.  *See id.* at

145 ("Ultimately, however, this Court need not resolve these important Constitutional questions

because while Congress' intent to interfere with this litigation was clear, its intent to abrogate the

Algiers Accords was not.").  Thus, Judge Sullivan was able to dismiss the action on the narrow

ground that the Algiers Accords remained intact as binding legal authority and therefore required

dismissal of any claims arising out of the Iran hostage taking.  *Id.* at 178–183.[33]

Judge Sullivan also went to some length in his opinion to explain that, while our Court

cannot ignore or refuse to give effect to the Algiers Accords, both Congress and the President

have the authority to abrogate them, if they so desire.  *Id.* at 183–84.  The opinion could not have

---

[32] Following the entry of default judgment with respect to liability, and on the eve of the date set for trial on the issue of damages, the United States intervened as a matter of right under Fed. R. Civ. Pro. 24(a) and moved the Court to dismiss the case.  *See Roeder*, 195 F. Supp. 2d at 150–52, 154–59.

[33] While Judge Sullivan was able to avoid the Article III constitutional question, he did so in an exceedingly thoughtful and careful manner.  *See id.* at 163–67.  This Court is grateful to Judge Sullivan for his excellent opinion and thoughtful discussion of the jurisprudence relevant to the consideration of the difficult issues Courts must inevitably face when confronted with the possibility of overreaching by Congress in violation of Article III.

been any clearer on this point.  To date, however, neither branch has taken such action; the political consequences are likely too great, but that is precisely why it is a decision best left to the political branches, and not the Courts.  *See id.* at 145.[34]

Unfortunately, § 1605A(a)(2)(B) suggests that at least some members of Congress still believe that Judge Sullivan should decide the Iran hostage case, notwithstanding the Court's determination that the action is barred by the Algiers Accords.  Indeed, consistent with § 1605A(a)(2)(B) plaintiffs in *Roeder* have filed a new action in this Court.  *See Roeder v. Islamic Republic of Iran*, No. 08-CV-487-RCL (D.D.C.), Dk. #1 (Complaint filed Mar. 21, 2008).[35]  Despite these realities, however, this Court refuses to believe members of Congress—in a nation of committed to the rule of law—would willingly direct our Courts to turn a blind eye to our longstanding and binding international agreements.  That certainly cannot be the case, especially now when our current administration appears committed more than ever to the spirit of international engagement and cooperation.

---

[34] Some members of Congress sharply criticized the administration for its role in urging the dismissal of the Iran hostages' case and have flatly rejected the notion that the Algiers Accord bars the victims' claims.  For example, Senator Tom Harkin of Iowa issued a statement in 2001 in which he proclaimed: "The Algiers Accord is not a treaty and was never submitted to the Congress for ratification.  It is a kidnapping and ransom agreement that entered into under duress while the Ayatollah was threatening to put the Americans on trial as 'spies' and execute them."  *See* Patrick Goodenough, *Carter Era Agreement Again Cited in Bid to Block Iran Hostage Lawsuit*, CYBERCAST NEWS SERV., Apr. 23, 2009, http://www.cnsnews.com/Public/Content/Article.aspx?rsrcid=47064.

[35] As it did in the prior action under § 1605(a)(7), the United States has again intervened under Fed. R. Civ. Pro. 24(a) and has filed a Motion to dismiss the action, arguing that the plaintiffs' claims remains barred by the Algiers Accords.  *See Roeder*, No. 08-CV-487-RCL (D.D.C.), Dk. # 23 (Motion to Intervene as Defendant, filed by the United States Apr. 21, 2009), Dk. # 24 (Minute Order, entered May 5, 2009, granting Government's Motion to Intervene), Dk. # 26 (Motion to Dismiss, filed by the United States May 5, 2009).

Nonetheless, the troubling language does suggest that perhaps certain interest groups were able to tuck the offensive language into the voluminous Defense Appropriations Act, realizing that perhaps it might not receive the same level of scrutiny there. The meddlesome draftsmanship might be easy enough to dismiss as an empty political gesture, if it were not for the Article III problem. Our Courts are here to uphold the rule of law and will not serve as ready accomplices in what appears as yet another political maneuver designed to make an end run around important international obligations.

Suffice it to note, what appears to this Court as an effort in § 1083 by Congress to reopen a specific case that was previously dismissed as barred by the Algiers Accords is extremely troubling. As a result, this Judge must now think long and hard about whether the questionable aspects of § 1083(c) considered in this decision should be viewed as nothing more than a vehicle to reopen an array of cases against Iran that were already litigated to final judgment prior to this new enactment. Congress has made some difficult constitutional questions even more difficult.

In the end, however, this Court is of the view that if it can it come to rest in its determination that § 1083(c)—to the extent that it allows cases closed under § 1605(a)(7) to now move forward as new actions under § 1605A—can withstand Constitutional scrutiny on its own terms, and thus any language outside of that particular section should not alter this Court's conclusion. To hold otherwise, would effectively bootstrap one Constitutional issue to another. Moreover, relying on language pertaining to the other litigation not pending before this judge, runs the risk of presenting an advisory opinion and one that might interfere with a case pending before another Article III judge in this courthouse. In this case, that would be a particularly undesirable result. As noted, Judge Sullivan produced an exceptional opinion addressing the fundamental problem with Congress' efforts to create a cause of action for the victims of the Iran

Hostage crisis, and there is no doubt that Judge Sullivan can appropriately address that question again in the event that the issue becomes ripe for consideration once more.

This Court is also troubled by the way in which a large defense appropriations bill was used in this instance to effectuate an overhaul of the substantive law governing lawsuits against foreign sovereigns.  Like Judge Sullivan observed in *Roeder*, however, this Judge too recognizes that Congress is free to accomplish changes in substantive law through an appropriations bill. *See Roeder*, 195 F. Supp. 2d at 184 (citing *Robertson*, 503 U.S. at 440).  Nonetheless, as Justice Scalia noted in *Plaut*, the independence of Article III courts serves a fundamental purpose in our system of limited government guarded by checks and balances.  The judiciary's independent authority to decide cases with finality protects against the risk that influential groups might use —indeed exploit—the legislative process to make an end run around civil judgments that they find adverse to their own personal interests or desires.  *See Plaut*, 514 U.S. at 219–226.  This Court has a suspicion that is precisely what may have occurred in this case.  To be sure, there are many aspects of § 1083 of the 2008 NDAA are remarkable much like the statute that did not withstand Constitutional scrutiny in *Plaut*.  In the end, however, this Court cannot allow its suspicion to shift the analysis of these important issues away from the plain text of the statute before it.

In sum, this Court holds that § 1083(c) withstands constitutional scrutiny because that provision does not require the reopening of final judgments issued under § 1605(a)(7).  Critical to today's ruling is the Court's determination that the political branches of our government have in essence wiped the slate clean by creating an entirely new statutory provision that is chock full of rights and remedies that never existed under § 1605(a)(7).  In so holding, this Court recognizes that this ruling may rest on a narrow view of the terms cause of action and judgment.

Absent some clear authority suggesting a contrary result, however, it is not the province of this Court to expand existing Supreme Court precedent.

**F.**

**ANALYSIS OF WHETHER ACTIONS UNDER SECTION 1605(a)(7) HAVE QUALIFIED FOR RETROACTIVE TREATMENT UNDER SECTION 1605A**

With the statutory framework of § 1083(c) of the 2008 NDAA to guide the analysis, this Court now examines those efforts by a variety of counsel in these Iran cases to bring their prior actions under § 1605(a)(7) within the ambit of the new enactment, § 1605A.  The cases this Court will examine here break down into roughly three categories, and so the analysis will be framed accordingly.  The first category of cases are those in which counsel for plaintiffs have taken a "belt and suspenders" approach by invoking both § 1083(c)(2) and (c)(3).  In these instances, plaintiffs' counsel have not only filed motions under subsection (c)(2) seeking to have their prior actions under § 1605(a)(7) given effect as if these actions had been filed under § 1605A originally, but they have also filed new actions entirely, relying on the related case procedures of (c)(3) and citing in their complaint, the new terrorism exception, § 1605A.  The second category of cases involves those actions in which plaintiffs' counsel rely only on § 1083(c)(3), and so the attorneys in these actions have simply filed new actions under § 1605A as related actions to their prior cases, or as related to other cases pending under § 1605(a)(7) based on the same act or incident.  The third category of cases are those in which plaintiffs' counsel have failed to invoke either § 1083(c)(2) or (c)(3), and yet, strangely, the attorneys in this category of cases have nonetheless filed motions that presume the right to relief under § 1605A.  Without saying as much, it appears that counsel in this last category of cases have operated under the flawed assumption that § 1605A is automatically retroactive to their cases.

With few exceptions, each of the cases addressed below represents two separate civil actions on this Court's docket, even though the two docketed actions are based on the same act

or incident and involve the same plaintiffs and defendants.  This odd posture with respect to these matters did not come about because plaintiffs wished to be duplicative or believed that there is some tactical advantage in maintaining two actions based on the same act or incident. Quite the contrary, what has occurred here in many instances is that plaintiffs' counsel—whether they were required to or not—invoked the procedures of § 1083(c)(3), thereby filing their prior cases as new actions under § 1605A, instead of simply filing a motion, pursuant to § 1083(c)(2), that would have enabled this Court to treat their original action as if it was filed under § 1605A, as Congress intended.

As will be underscored in the Court's analysis of these FSIA terrorism cases, § 1083(c)(3) pertaining to related actions—as it may be invoked for certain cases that were previously filed under § 1605(a)(7)—is really a vehicle best reserved for those cases that had reached a final judgment and were not before the courts at time of the enactment of the 2008 NDAA.  In other words, it is best reserved for those civil actions that were never eligible for § 1083(c)(2) and therefore could not have been simply transformed on motion into an action under § 1605A.  More liberal use of § 1083(c)(3), invites unnecessary duplication of effort, requiring this Court to maintain two nearly identical actions on the docket—one under § 1605(a)(7) and one under § 1605A—by the very same plaintiffs, at approximately the same time, and will inevitably require this Court to flip back and forth between dozens of related cases involving hundreds upon hundreds of repeat plaintiffs.  Suffice it to say, such a result wastes time and resources, and invites great confusion.  Thus, as this Court understands the new statute, § 1083(c)(3) is the appropriate avenue for relief in those cases that reached final judgment sometime prior to the enactment of the 2008 NDAA and which were not "before the court[] in any form," as required for treatment on motion pursuant to § 1083(c)(2).  With these initial

observations in mind, this Court turns its attention toward many of the individual terrorism actions now pending against Iran.

1.      **The "Belt and Suspenders" Plaintiffs: Those Who Have Invoked Both Section 1083(c)(2) and (c)(3)**

Nine of the 20 cases considered today fall within the "belt and suspenders" category.  As noted, this category of cases involves prior actions under § 1605(a)(7) in which counsel have sought to obtain retroactive treatment under the new terrorism exception by filing both a motion under § 1083(c)(2) and a new complaint consistent with (c)(3).  To the extent the use of these dual approaches leads to duplicative actions on the docket, this Court will exercise its docket management prerogative as appropriate to stay the most recently filed actions, pending resolution of efforts by counsel to move forward on motion in accordance with § 1083(c)(2).  These actions are addressed here in chronological order

*Kirschenbaum, 03-CV-1708 and 08-CV-1814.*  These cases arise out a suicide bombing in Jerusalem and were brought under § 1605(a)(7).  Plaintiffs are an American citizen injured in that attack and several of his family members.  An opinion was published and judgment was entered in favor of all plaintiffs on August 26, 2008.  *Kirschenbaum*, 572 F. Supp. 2d 200.  In reaching that judgment, this Court found liability against Iran based on the underlying causes of action, which were all based on state tort law, and then awarded compensatory damages but declined to award any punitive damages against Iran.  *Id.* at 204 n.1.  In making that determination, this Court stressed that § 1605A does not have automatic, retroactive application to cases that were filed under § 1605(a)(7), and because plaintiffs had failed to follow the procedures in § 1083(c), punitive damages were not available.  *Id.*

***Kirschenbaum's Motion Pursuant to Section 1083(c)(2).*** Shortly after the judgment, plaintiffs sought reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure and requested leave to file a motion *nunc pro tunc* under § 1083(c)(2), thereby enabling plaintiffs to proceed under the new terrorism exception § 1605A. *Kirschenbaum*, No. 03-CV-170-RCL (D.D.C.), Dk. # 32. Counsel for plaintiffs argues that, based on a careful analysis of the entire § 1083, he honestly but mistakenly concluded that § 1605A applied retroactively to his case.

Beginning his analysis with § 1083(c)(2), counsel claims he believed that particular provision did not apply to his clients because, in his view, these plaintiffs were not "adversely affected on the ground that 28 U.S.C. § 1605(a)(7) failed to create a cause of action against a foreign state," as § 1083(c)(2)(iii) expressly requires. Dk. # 32, at 3. Counsel explains that the law recognizes a clear distinction between a "cause of action"—essentially the right to bring a civil suit—and the special remedy of punitive damages that may be awarded in certain kinds of lawsuits. *Id.* at 3–4. Counsel relies on a variety of legal authorities, including treatises and case precedent from many other jurisdictions, all of which support the proposition that a cause of action is necessarily separate and distinct from punitive damages. Indeed, as counsel asserts, punitive damages are dependent entirely on the underlying cause of action and cannot exist independently of an underlying claim. *Id.*; *see, e.g.*, *Burke v. Deere & Co.*, 6 F.3d 497, 511 (8th Cir. 1993) ("[T]here is no separate cause of action for punitive damages under Iowa law . . . .").

Additionally, plaintiffs' counsel notes that the language in (c)(2)(iii) regarding the failure "to create a cause of action against a foreign state" appears to specifically address the problems encountered by certain plaintiffs in the *Peterson* litigation involving the 1983 bombing of the United States Marine barracks in Beirut, Lebanon. *Id.* at 4. In that case, for instance, a large number of plaintiffs with claims under § 1605(a)(7) were in fact barred from even presenting a

cause of action by the applicable state tort law of certain jurisdictions.  *See, e.g.*, *Peterson II*, 515 F. Supp. 2d at 44–45 (denying certain emotional distress claims of plaintiffs from Pennsylvania on the ground that they did not have standing to bring such claims under Pennsylvanian law). Counsel suggests that some of the legislative history, specifically statements from Senator Arlen Specter, reinforces the view that the (c)(2) provision was intended to apply only to plaintiffs, who, like the Pennsylvania litigants and others in *Peterson*, were barred from presenting their claims for recovery under the former pass-through regime that existed pursuant to § 1605(a)(7). Dk. # 32, at 4.

Thus, counsel reads § 1083(c)(2) in light of the legal distinction between an underlying cause of action and the special remedy of punitive damages, and thereby argues that he determined, in good faith, that he was not entitled to rely on (c)(2) because all the plaintiffs in his case had succeeded in their underlying causes of action under § 1605(a)(7).  Consistent with this argument, counsel stresses that his clients neither need nor desire to pursue new claims under federal law; instead, their only request at this time is the additional remedy of punitive damages against Iran, as the new law, § 1605A, now makes available.

With respect to availability of § 1083(c)(3), plaintiffs again relies on the distinction between an action and damages.  Counsel states:

> Plaintiffs did not interpret § 1083(c)(3) to apply to the instant case, especially where the original complaint already included a demand for punitive damages against the Defendant.  [Section] 1083(c)(3) states that "any other action arising out of the same act or incident may be brought under section 1605A."  Under Plaintiffs' interpretation of the word "action" this provision did not cover a situation such as Plaintiffs' where the only difference was in damages, and there was no separate action to bring.

Dk. # 32, at 5 (citations omitted).  Accordingly, plaintiff ultimately concluded that neither

§ 1083(c)(2) nor (c)(3) governing the applicability of § 1605A to pending cases applied to the

*Kirshenbaum* case.

Having determined that his clients had no recourse under § 1083(c), counsel claims that

he finally reached the conclusion that actions like *Kirschenbaum* must fall under § 1605A

automatically because of the language within § 1605A(b) that provides "an action may

be . . . *maintained* under this section if the action is commenced . . . under section 1605(a)(7)

(before the date of the enactment of this section)." § 1605A(b) (emphasis added).

While today's decision makes clear that this Court finds counsel's interpretation of

§ 1083 unpersuasive, counsel's reading of the statute is not unreasonable.  To be sure, this new

enactment is hardly a model of clarity and is "somewhat disjointed in its organization," as

counsel observes.  On a matter of first impression, such as was presented by this new statute,

reasonable legal minds can, and often do, differ in their interpretations.  This Court appreciates

counsel's candor, insightful analysis, and prompt action in this matter.

At this time, however, the Court must deny the motion for reconsideration under Rule

59(e).  This Court is not inclined to overlook a deadline for filing motions that Congress has

imposed by statute.  The 60-day time limit in § 1083(c)(2) is what Congress directed, and

counsel has not provided this Court with any case precedent or other authority to suggest that this

Court may override or waive the time limit for filing imposed by Congress under the

circumstances presented here.  Absent such authority, this Court is compelled to abide by the

time limit Congress imposed.  Accordingly, plaintiffs' motion will be denied, as will the motion

requesting a hearing on this matter (*Kirschenbaum*, No. 03-CV-170-RCL (D.D.C.), Dk. # 33).  A

separate order denying these motions will issue this date.  If, however, counsel is able to find

some authority that might permit this Court to grant relief, notwithstanding the deadline imposed by statute, then Counsel may wish to file another motion for reconsideration under Rule 59(e) or a motion under Rule 60(b) seeking relief from today's order.  Any motion and argument under Rule 60(b) should comply with the guidance expressed in Part G below.

*Kirschenbaum's New Action Pursuant to § 1083(c)(3).*  About a month after filing their motion for reconsideration, plaintiffs also filed an action under § 1605A in accordance with the related case procedures set forth in § 1083(c)(3).  *See Kirschenbaum*, No. 08-CV-1814-RCL (D.D.C.), Dk. # 3 (filed Oct. 17, 2008).  This new action complies with the procedures in § 1083(c)(3) because it relates to plaintiffs' prior case under § 1605(a)(7), and the complaint in this new action was filed with 60 days of "the date of entry of judgment in the original action." *See* § 1083(c)(3)(A).  Accordingly, this new case may proceed under § 1605A as a related action. The Court observes, however, that the complaint in this new action continues to assert New York common law as the source of plaintiffs claims against Iran, but reliance on state law is no longer necessary or appropriate under § 1605A because it expressly provides plaintiffs with a federal cause of action.  Moreover, as plaintiffs in this new action previously succeeded with claims under New York law by utilizing the pass-through approach in their prior action under § 1605(a)(7), the doctrine of double recovery would likely bar or severely limit plaintiffs' efforts to claim additional compensatory damages in this new case under § 1605A.  *See, e.g.*, *Consol. Edison Co. of N.Y., Inc., v. Bodman*, 445 F.3d 338, 451 (D.C. Cir. 2006); *Peterson II*, 515 F. Supp. 2d at 40 n.7.  As counsel stressed in their Rule 59(e) motion, however, plaintiffs are not seeking additional compensatory damages in this action.  Instead, plaintiffs are now proceeding under § 1605A in order to claim punitive damages, which were not available under § 1605(a)(7).

Accordingly, determining an award of punitive damages in this new action will not require this Court to consider any double recovery problems.

***Beer, 06-CV-473 and 08-CV-1807.*** These cases arise out of the suicide bombing of a bus in Jerusalem on June 11, 2003. Plaintiffs are family members of one of the victims, the late Alan Beer, who was killed in that bombing. Plaintiffs in this action are represented by the same attorney who is handling the *Kirschenbaum* case, and therefore it should come as no surprise that the issues and arguments presented in this action are identical to those addressed above.

This Court issued an opinion and entered a judgment in favor of the plaintiffs on August 26, 2008. *See Beer*, 574 F. Supp. 2d 1. As in the *Kirschenbaum* case, this Court denied punitive damages because plaintiffs' action fell under § 1605(a)(7), not § 1605A. On September 10, 2008, plaintiffs filed a motion pursuant to Rule 59(e) for reconsideration and requested leave to file a motion *nunc pro tunc* under § 1083(c)(2) to enable plaintiffs to proceed under § 1605A. *Beer*, No. 06-CV-473-RCL (D.D.C.), Dk. # 30. That motion is in all critical respects identical to the motion for reconsideration filed in the *Kirschenbaum* action. Also like *Kirschenbaum*, plaintiffs in this case have made an additional effort to move forward under the new law by filing a new action in accordance with the related case procedures set forth in § 1083(c)(3). Incorporating by reference the analysis applied to the *Kirschenbaum* case above, this Court addresses both the motion and the newly filed action.

***Beer's Motion Pursuant to § 1083(c)(2).*** For the reasons expressed above, this motion for reconsideration (*id.* Dk. # 31) must be denied at this time. If plaintiffs wish for this Court to reconsider the judgment and decide whether to grant leave for plaintiffs to proceed under § 1083(c)(2) on motion, then counsel must direct this Court to some authority suggesting that this Court need not comply with a time limit imposed by Congress under the circumstances

presented here.  The motion for a hearing on this matter, *id.*, will also be denied in a separate order issued this date.

***Beer's New Action Pursuant to Section 1083(c)(3).***  Plaintiffs also filed a new action under § 1605A on October 17, 2008, *see Beer*, 08-CV-1708-RCL (D.D.C.), in accordance with the procedures for related actions under § 1083(c)(3).  Like the plaintiffs in *Kirschenbaum*, plaintiffs in this case have met the requirement of § 1083(c)(3) and therefore may proceed under § 1605A as a related action.  The Court again observes, however, that the complaint in this new action continues to assert New York common law as the source of plaintiffs' claims against Iran.  In light of the new federal cause of action in § 1605A reliance on state law is no longer necessary or appropriate.  Moreover, much like *Kirschenbaum*, the plaintiffs in this new action also succeeded previously with claims under New York law by utilizing the pass-through approach in their prior case under § 1605(a)(7).  Thus, as noted above, the doctrine of double recovery should bar or severely limit plaintiffs' efforts to claim additional compensatory damages in this new case under § 1605A.  As counsel stressed in their Rule 59(e) motion, however, plaintiffs are not seeking additional compensatory damages in this action.  Instead, plaintiffs are now proceeding under § 1605A in order to claim punitive damages, which were not available under § 1605(a)(7).  Accordingly, determining an award of punitive damages in this new action will not require this Court to consider any double recovery problems.

***Haim, 02-CV-1811 and 08-CV-520.***  These cases arise from the same terrorist attack that claimed the life of Alisa Flatow.  As noted in Part A, *supra*, a suicide bomber belonging to and acting on behalf of the Palestine Islamic Jihad drove a van loaded with explosives into the passenger bus traveling on the Gaza Strip on April 9, 1995, and the resulting explosion destroyed the bus and killed eight of the passengers.  Many others were injured in the explosion.  The

plaintiffs in these actions are a United States citizen who was injured in that attack and members of his family.  They first brought an action under § 1605(a)(7) on September, 12, 2002. Plaintiffs achieved a final judgment in their favor on March 24, 2006.  *See Haim*, 425 F. Supp. 2d 56.  As that case was under § 1605(a)(7), no punitive damages were awarded against Iran. *See id.* at 71.

Like plaintiffs in *Kirschenbaum* and *Beer*, plaintiffs in this action have taken a belt and suspenders approach in their efforts to take advantage of the new law, § 1605A.  Following the enactment of the 2008 NDAA, plaintiffs first filed a new action, *Haim*, No. 08-CV-520-RCL (D.D.C.), on March 26, 2008, in accordance with the related cases provisions of § 1083(c)(3), thereby seeking punitive damages against Iran under the revised terrorism exception, § 1605A. Plaintiffs also filed a motion in their original action in an effort to obtain treatment under § 1605A by using the procedures in § 1083(c)(2).  *See Haim*, 02-CV-1811-RCL (D.D.C.), Dk. # 32.  As their prior case was no longer "before the court[] in any form" at the time of the enactment of the 2008 NDAA (January, 28, 2008), this Court denied the motion.  *See Haim v. Islamic Republic*, 567 F. Supp. 2d 146 (D.D.C 2008) (Lamberth, C.J.).

Unlike a number of other cases addressed by the Court today, *Haim* was never eligible for treatment under § 1083(c)(2).  Accordingly, the only way plaintiffs in this case can claim the benefits of § 1605A is through the related case provisions in § 1083(c)(3).  Plaintiffs filed their new action within 60 days of the enactment of the 2008 NDAA, and therefore plaintiffs have properly applied the related case provisions of § 1083(c)(3) in this instance.  As plaintiffs have taken the appropriate steps to avail themselves of § 1605A, no further action is required of the Court at this time.

*Bland, 05-CV-2124.*  This civil action was filed under § 1605(a)(7) and arises out of the bombing of the United States Marine barracks in Beirut, Lebanon on October 23, 1983.  *See Bland*, No. 05-CV-2124-RCL (D.D.C.), Dk. # 2 (Complaint).  There are nearly 100 plaintiffs in this action, including numerous estates of those service members killed in the terrorist attack and dozens of family members of those who were killed or injured during the terrorist incident.  On December 6, 2006, this Court took judicial notice of the findings of fact and conclusions of law in the *Peterson* action, which also concerns the Marine barracks bombing, *see Peterson I*, 264 F. Supp. 2d 47, and entered judgment in favor of the Plaintiffs and against Iran with respect to all issues of liability.  *Bland*, No. 05-CV-2124-RCL (D.D.C.), Dk. # 16.  This Court then referred this action to a special master for consideration of plaintiffs' claims for damages.  *See id.* Dk. ## 15–16.

On March 10, 2008, and while this action was still pending with the special master under § 1605(a)(7), counsel for plaintiff timely filed a motion seeking to proceed in their action under the newly-enacted terrorism exception, § 1605A.  *See id.* Dk. # 17.  As counsel followed the proper procedures and qualified for retroactive treatment in accordance with § 1083(c)(2), this Court granted the motion, thereby enabling plaintiffs to taken advantage of the new statute in their claims before the special master.  *See id.* Dk. # 19.  While plaintiffs' motion was still under consideration, however, and apparently out of an abundance of caution, counsel added the plaintiffs from this case to a complaint in a new action, styled *Brown v. Islamic Republic for Iran*, which is discussed below and also arises from the Marine barracks bombing incident.  *See Brown*, 08-CV-531-RCL (D.D.C.), Dk. # 1 (Complaint, filed Mar. 27, 2008).  As will be discussed in more detail below, the *Brown* action includes plaintiffs from one another action, *Spencer v. Islamic Republic of Iran*, No. 06-CV-750-RCL (D.D.C.), which, like *Bland*, has

qualified for treatment under § 1605A in accordance with the requirements of § 1083(c)(2) and arises out the Marine barracks bombing.  Plaintiffs in *Bland*, *Spencer*, and now *Brown*, are all are represented by the same counsel, and thus counsel have taken a belt and suspenders approach by filing a new action in their cases, *Bland* and *Spencer*, that were eligible—and in fact qualified for—retroactive treatment under the terms of § 1605A.

To date, *Bland* is still pending with the special master.  At a status conference set by the Court in accordance with this opinion and by separate order issued this date, this Court will see what must be done to sort out the claims and move matters forward on behalf of these Marine barracks bombings plaintiffs that are now spread out among three actions under § 1605A.

***Spencer, 06-CV-750.***  This action also arises out of the Marine barracks bombing and was originally filed on April 24, 2006 under the § 1605(a)(7).  *See Spencer*, No. 06-CV-750-RCL (D.D.C.), Dk. # 3 (Complaint).  As the plaintiffs in this action are represented by the same counsel as plaintiffs in *Bland*, the issues and procedural history of this case largely mirror those discussed in *Bland* above.  On October 10, 2007, this Court took judicial notice of the findings of fact and conclusions of law in the *Peterson* action, which also concerns the Marine barracks bombing, *see Peterson I*, 264 F. Supp. 2d 47 (D.D.C. 2003), and entered judgment in favor of the plaintiffs and against Iran with respect to all issues of liability, *Spencer*, No. 06-CV-750-RCL (D.D.C.), Dk. # 18.  At that time the Court, referred this action to a special master for consideration of plaintiffs' claims for damages.  *See id*.

On March 10, 2008, and while this action was still pending with the special master under § 1605(a)(7), counsel for plaintiffs timely filed a motion, pursuant to § 1083(c)(2), seeking to proceed in their action under the newly enacted terrorism exception, § 1605A.  *See id*. Dk. # 19. As counsel followed the proper procedures and qualified for retroactive treatment in accordance

with § 1083(c)(2), this Court granted the motion, thereby enabling plaintiffs to taken advantage of the new statute in their claims before the special master. *See id.* Dk. # 20.  While plaintiffs' motion was still under consideration, however, counsel also added the plaintiffs from this case to a complaint in a new action, styled *Brown v. Islamic Republic for Iran*, which is discussed below and also arises from the Marine barracks bombing incident.  *See Brown*, No. 08-CV-531-RCL (D.D.C.), Dk. # 1 (Complaint, filed Mar. 27, 2008).  As noted above, the *Brown* action also includes plaintiffs from *Bland*, and the plaintiffs in *Bland*, *Spencer*, and now *Brown*, are all are represented by the same counsel.  Thus, it appears that counsel have taken a belt and suspenders approach by filing a new action for the plaintiffs in their cases, *Bland* and *Spencer*, even those plaintiffs were eligible for—and in fact qualified for—retroactive treatment on motion in accordance with § 1083(c)(2).

*Spencer* is still pending with the special master.  At the status conference set by the Court in accordance with this opinion and by separate order issued this date, this Court will see what must be done to sort out the claims and move matters forward under § 1605A.

**Brown, 08-CV-531.**  As noted, the new case of *Brown v. Islamic Republic of Iran*, No. 08-CV-531-RCL (D.D.C.), includes plaintiffs from both *Bland and Spencer*, as discussed above. Accordingly, those plaintiffs who are now proceeding under § 1605A in their original cases, either *Bland* or *Spencer*, should be dismissed from the *Brown* action.  To the extent that there any new plaintiffs in the *Brown* action, those plaintiffs may, of course, proceed in this new case.

Currently, service of process in *Brown* is being carried out through diplomatic channels, as that is the standard procedure in these actions against Iran.  *See* § 1608(a).  Once that process is completed, counsel for plaintiffs shall provide this Court with the names of all plaintiffs in *Brown* who appear in either the *Bland* or *Spencer* cases.  As these plaintiffs now have the right to

proceed under § 1605A in their original actions, they must be dismissed from this new action.

Along with the list of names identifying the duplicative plaintiffs, counsel shall furnish the Court

with a proposed order of dismissal of those plaintiffs.  If these plaintiffs have any reason to

oppose being dismissed from the *Brown* case, such opposition shall be filed with the Court at

that time.  An order consistent with the guidance expressed herein shall issue this date.

**2.      The "Related Action" Plaintiffs: Those Who Have Filed New Actions Pursuant to Section 1083(c)(3)**

The next five civil cases to be addressed by the Court today are those in which counsel

have invoked the procedures for related actions in § 1083(c).  By doing so, plaintiffs' counsel

have filed a new case under § 1605A as a "related action."  Consistent with § 1083(c)(3) the new

action must be related to either the plaintiffs' own prior action under § 1605(a)(7) or to some

other currently pending action that is based on the same underlying terrorist incident.  The Court

will now examine these actions in chronological order.

*Rimkus, 06-CV-1116 and 08-CV-1615.*  These cases arise from the bombing of the

Kobar Towers, a residential military complex operated by the United States Air Force in

Dhahran, Saudi Arabia.  Plaintiff is the father of one of the 19 servicemen killed in that terrorist

attack.  On August 26, 2008, this Court issued an opinion and entered judgment in favor of

plaintiff in accordance with § 1605(a)(7).  *See Rimkus*, 575 F. Supp. 2d 181.  Even though his

action was pending at the time the 2008 NDAA was enacted, plaintiff never moved the Court,

pursuant to § 1083(c)(2), to treat his case as if it were filed under the new law, § 1605A.  Instead

of following those straightforward procedures, plaintiff opted to file what he has styled as a

"Complaint For Punitive Damages Pursuant to Section § 1083(c)(3)."  *See Rimkis*, No. 08-CV-

1615-RCL (D.D.C.).  The only purpose of this new action is affix punitive damages against Iran for the claims that were litigated previously in *Rimkis*, No. 06-CV-1116-RCL (D.D.C.).

Notwithstanding the questionable validity of a complaint for punitive damages, plaintiff was undoubtedly entitled to relief under § 1083 (c)(3) when he filed it.  Similarly, plaintiff was also eligible for treatment on motion as the litigation in his prior action, No. 06-CV-1116-RCL, wound to a close.  While plaintiff's new complaint for punitive damages under § 1083(c)(3) is not the best or most straightforward way to achieve the relief plaintiff desires, it was filed in a timely manner and with recognition of the applicable procedures in § 1083(c).  In view of these considerations, plaintiff's new case, No. 08-CV-1615-RCL, is permitted to proceed under § 1605A.

**Bonk, 08-CV-1273.**  This action, like many considered today, emanates from the terrorist bombing of the United States Marine Barracks in Beirut, Lebanon on October 23, 1983.  The plaintiffs in this action were all originally part of the large consolidated action *Peterson v. Islamic Republic of Iran*, No. 01-CV-2094-RCL (D.D.C.).  As noted Part A, *supra*, *Peterson* was brought under § 1605(a)(7), the case proceeded to trial, and this Court ultimately awarded damages to most of the plaintiffs in the case.  *See Peterson II*, 515 F. Supp. 2d 25.

*Bonk* is a new case that was filed several months ago by the plaintiffs who were dismissed from the *Peterson* action because the applicable state tort law—specifically Louisiana and Pennsylvania law—did not provide them standing to assert their claims for the intentional infliction of emotional distress.  *See id.* at 45.  *Bonk* is brought in accordance with § 1083(c)(3) as a related action to several other cases that were timely commenced under § 1605(a)(7).  Plaintiffs point to the cases of *Valore*, No. 03-CV-1959-RCL (D.D.C.); *Bland*, No. 05-CV-2124-RCL (D.D.C.); and *Davis*, No. 07-CV-1302-RCL (D.D.C.), all of which are open cases pending

against Iran, and all of which arise from the bombing of the Marine barracks in Lebanon.  As these plaintiffs seek relief based on that same terrorist incident, § 1083(c)(3) by its plain terms authorizes them to file this new action under § 1605A.  Accordingly, *Bonk* has been filed properly as a related action, and so these plaintiffs who were dismissed from *Peterson* my now move forward with their claims under § 1605A.

All that said, however, this Court is somewhat baffled by the approach taken by counsel here.  As the *Peterson* action was on appeal at the time of the enactment of the 2008 NDAA, counsel could have simply moved this Court, pursuant to § 1083(c)(2), to treat the *Peterson* case as if it were filed under § 1605A.  Had counsel made such a motion within 60 days of the enactment of the 2008 NDAA, this Court could have easily revisited and reconsidered the claims of the Pennsylvania and Louisiana plaintiffs within their original consolidated case, and that, of course, would have avoided the need to file this new civil action.  Converting *Peterson* to an action under § 1605A would have enabled this Court to give effect to many of the other advantages of the new statute, such as the increased availability of punitive damages, within the confines of the original *Peterson* case and for the benefit of all of the hundreds of plaintiffs in that action.

Perhaps counsel in *Peterson* did not believe that the appeal by the Pennsylvania and Louisiana plaintiffs—a small subset of the nearly one thousand plaintiffs in *Peterson*—was sufficient to satisfy the requirement that the action be "before the court[] in any form, *including on appeal*" for treatment on motion under § 1605A.  § 1083(c)(2)(iv) (emphasis added).[36]

---

[36] Approximately one month after the enactment of the 2008 NDAA, on February 27, 2008, the plaintiffs now included in *Bonk* had their appeal dismissed without prejudice by the Court of Appeals.  In a subsequent filing by counsel in *Peterson*, counsel for plaintiffs informed this Court that the dismissal without prejudice was on their own motion.  *See Peterson*, No. 01-

Perhaps counsel in *Peterson* also reached a conclusion, similar to that reached by counsel in *Kirschenbaum* and *Beer*, that certain aspects of the statute were automatically retroactive and therefore did not implicate the provisions of § 1083(c).  Whatever the reasons for the apparent confusion, counsel would do well to consider whether they have a good faith basis for a motion under Rule 60(b).  In considering such a motion, plaintiffs should take heed of the guidance provided in Part E, *infra*, of this opinion.

*Valore, 03-CV-1959.*  This action is one of the many other cases in addition to *Peterson* that arises from the terrorist bombing of the United States Marine Barracks in Beirut, Lebanon in 1983.  The case involves nearly fifty plaintiffs, and it is currently an open case, as the Court is awaiting the recommendations from the special masters with respect to the issue of damages.  As this was an open case with the Court at the time the 2008 NDAA was enacted, plaintiffs were eligible to convert their action to § 1605A on motion in accordance with the procedures specified in § 1083(c)(2).  Several weeks ago, however, plaintiffs filed an amended complaint.  *See Valore*, No. 03-CV-1959-RCl (D.D.C.), Dk. # 27.  While the complaint is very similar to the original complaint in the sense that it continues to rely on District Columbia law for wrongful death and survivorship claims, it adds § 1605A as the basis for a variety of tort claims, including battery, intentional infliction of emotional distress, and the derivative claim of loss of solatium.  To the extent that the complaint continues to assert District of Columbia law, this Court has in the past recognized that the laws of this District are an appropriate model for the development of a federal standard with respect to liability in actions against state sponsors of terrorism.  *Flatow*

CV-2094, Dk. # 388, at 2 (Plaintiffs' Motion and Memorandum in Support of Extension to File a Supplemental Memorandum in Support of Plaintiffs' Motion Pursuant to Fed. R. Civ. Pro. 59(e), filed July 28, 2008).

*I*, 999 F. Supp. at 15, n.6.  Thus, the Court is of the view that the plaintiffs' amended complaint sufficiently comports with the related case filing procedures of § 1083(c)(3), and thus this action may now proceed under § 1605A.  Moreover, as this action is a pending case that was eligible for treatment under § 1083(c)(2), this Court will exercise it prerogative to manage the docket by treating this case as if it were converted on motion.

     ***Davis, 07-CV-1302*.**  This is the last action the Court will address in this section and it too stems from the terrorist bombing of the Marine barracks in Beirut.  This case involves more than 200 plaintiffs.  The complaint has been amended several times and it appears that a sizable number of the plaintiffs in this action are those who had their claims dismissed without prejudice from the *Peterson* case due to lack of evidence.  *See Peterson II*, 515 F. Supp. 2d at 46–47.  Many of the other plaintiffs in this action, however, appear to be coming before the Court for the first time.  To lend some clarity to this matter going forward, counsel for plaintiff shall file a separate document with the Court that identifies all the plaintiffs in this new action who were dismissed from *Peterson* and list the grounds for each of those dismissals.  Additionally, counsel should be certain to identify in a like manner any other plaintiffs who may have appeared in any of the other prior actions arising from the Marine barracks bombing.  A separate order consistent with this guidance shall issue this date.

**3.**      **The "Do-Nothing" Plaintiffs: Those Who Have Invoked Neither Section 1083(c)(2) Nor (c)(3) in Their Efforts to Retroactively Claim the New Entitlements Under Section 1605A**

     The last five actions considered today are those in which plaintiffs' counsel have not seen fit to invoke either § 1083(c)(2) or (c)(3) in their efforts to claim the entitlements available in terrorism cases under § 1605A.  In most of these actions, however, plaintiffs' counsel have

proceeded as if § 1605A is automatically retroactive to prior terrorism actions under § 1605(a)(7).  Each of these cases will now be addressed in chronological order.

   ***Peterson, 01-CV-2094 and 01-CV-2684.***   As noted throughout this opinion, this case arises out the suicide bombing of the United States Marine Barracks facility in Beirut, Lebanon in 1983.  This large consolidated case is essentially the lead action of the cases filed based on the Beirut attack, and with nearly 1000 plaintiffs, it is by far the largest of the group.  As noted above in the discussion concerning *Bonk*, No. 08-CV-1273-RCL (D.D.C.), *supra*, and at other points throughout today's decision, counsel for plaintiffs in this large action never filed a motion pursuant to § 1083(c)(2) and they have not filed a new action under § 1083.  As will be made clear in both Parts H and I of this opinion, counsel for plaintiffs have, however, filed numerous motions that have presumed the right to relief under § 1605A.  For example, they filed several motions for payments to the special masters under § 1605A(e), which this Court ultimately denied.  *See Peterson*, 01-CV-2094-RCL (D.D.C.), Dk. # 430 (Memorandum Opinion and Order, issued Jan. 5, 2009).  Similarly, plaintiffs' counsel filed numerous motions seeking appointment of receivers to locate and take hold of a variety of Iranian assets.  *See, e.g.*, *id.* Dk. ## 251, 259, 404.  All of the motions for receivers, however, were premised on the new provisions in § 1610(g) that purport to limit the availability of sovereign immunity defenses in efforts by plaintiffs to satisfy judgments entered under the new law, § 1605A.  Accordingly, this Court has denied all motions for the appointment of receivers in *Peterson*.  *See, e.g.*, *id.* Dk. #434 (Memorandum Opinion and Order, dated Mar. 31, 2009, denying all motions for receivers).

   As plaintiffs' counsel have not complied with the requirements set forth in § 1083(c), the action remains under § 1605(a)(7).  At this juncture, counsel in *Peterson* may want to consider filing an amended complaint, consistent with the procedures for related actions in § 1083(c), and

similar to that which was filed in *Valore*, *supra*, as there are several cases still pending with the special masters that relate to the Marine Barracks Bombing and which were timely commenced under § 1605(a)(7).  *Valore*, *supra*; *Bland*, *supra*; *Spencer*, *supra*; *Arnold*, *infra*; *and Murphy*, *infra* are five good examples of actions arising out of the Beirut Bombing that were commenced under § 1605(a)(7).

When considering whether to file an amended complaint pursuant to § 1083(c)(3), counsel also look to the new action they filed on behalf of the Pennsylvania and Louisiana plaintiffs in *Bonk*, *supra*.  As noted, counsel have properly invoked the related case procedures for those plaintiffs.  The complaint filed in *Bonk* is a good example in that it not only expressly identifies the related case provision of § 1083(c)(3), but it also identifies pending actions on this Court's docket that the *Bonk* action relates to.  Additionally, in the event that counsel file such an amended complaint, counsel should address what impact, if any, the *Bonk* action will have on *Peterson* going forward.  Absent use of the procedures for related cases, counsel should consider this Court's guidance below in Part G with respect to a motion pursuant to Rule 60(b).

**Bennett, 03-CV-1486.**  This case concerns a suicide bombing at Hebrew University in Jerusalem in July of 2002.  The bombing claimed the life of Marla Ann Bennett, an American citizen and a resident of California.  Marla's parents filed an action under § 1605(a)(7).  Plaintiffs ultimately demonstrated that Iran provided material support to Hamas in furtherance of terrorist objectives, including suicide bombing attacks in Israel, including the one that claimed their daughter's life in July of 2002.  *See Bennett*, 507 F. Supp. 2d 117.  Plaintiffs were awarded a judgment in excess of 12 million dollars.  To date, that judgment remains unsatisfied.

Recently, this Court quashed five writs attachment issued by plaintiffs against properties that once comprised the Iranian Embassy compound here in Washington, DC.  *See Bennett*, 604

F. Supp. 2d 152.  In one of the arguments in support of that motion, plaintiffs stated that § 1610(g) renders Iran's former diplomatic properties subject to attachment.  In one of their arguments in support of the writs of attachment, plaintiffs asserted that § 1610(g) strips away any immunity that might otherwise exempt that former embassy from attachment and execution upon a civil judgment.  In quashing the writs of attachment, this Court noted that plaintiffs could not take advantage of the new measures in § 1610(g) because they never elected to proceed under the new terrorism exception, § 1605A.  *Id.* at 162.  Moreover, this Court observed that a plain reading of § 1610(g) offers no indication that Congress intended to eliminate the immunity that has long been afforded to diplomatic properties, like Iran's former embassy here in the United States, that are maintained in protective custody by the State Department pursuant to the Foreign Missions Act.  *Id.*  While this Court is not convinced that there any reading of § 1610(g) that would permit plaintiffs to attach any of the properties that once comprise the Iranian Embassy, plaintiffs may certainly hope to avail themselves of § 1610(g) in pursuit of other Iranian assets. For this reason, plaintiffs' counsel should consider the guidance in Part G and weigh options for moving forward in the postjudgment phase of this action.

   *Murphy, 06-CV-596.*  This action, like so many others on this Court's docket, arises out of the Marine barracks bombing.  It was filed on March 31, 2006 under § 1605(a)(7).  *See Murphy*, No. 06-CV-596-RCL (D.D.C.), Dk. # 1 (Complaint).  Plaintiffs include the estate of a United States Marine killed in that attack and several other Marines who were injured in the explosions.  *See id.*  On October 10, 2007, this Court took judicial notice of the findings of fact and conclusion of law in the *Peterson* action, and entered judgment in favor of the plaintiffs and against Iran with respect to all issues of liability.  *Id.* Dk. #27.  This Court also referred this case to special masters for consideration of the plaintiffs' claims for damages.  *See id.*

To date, this action remains pending with the special masters.  Notably, counsel for plaintiffs in this case have not taken any action to qualify their case for treatment under § 1605A.  Accordingly, this action remains under § 1605(a)(7).  As the 60-day window in which counsel for plaintiffs could have filed a motion to bring this action under § 1605A has long since passed, *see* § 1083(c)(2), counsel may want to consider a motion under Rule 60, as discussed in Part G, or, alternately, the related case procedures in § 1083(c)(3).  At any rate, the few claims presented in this case have been pending for nearly two years, and thus this Court will want to determine at a status conference what must be done to enter final judgment in this action in due course.

*O'Brien, 06-CV-690.*  This action also arises out of the Marine barracks bombing.  It was filed on April 17, 2006 under § 1605(a)(7).  *See O'Brien*, 06-CV-690-RCL (D.D.C.), Dk. # 3, (Complaint).  Plaintiffs include several United States Marines who were injured in that attack and several of their family members.  For over a year, plaintiffs' counsel sought to effect service of process by mailing the summons and complaint to the Iranian Ministry of Information and Security and Tehran.  *See id.* Dk. ## 3–11.  Those efforts proved unsuccessful, and thus plaintiffs moved this Court for an order authorizing service though diplomatic channels, consistent with § 1608(4).  *Id.* Dk. #12.  This Court granted that motion on October 12, 2007, and service of process is now being carried out through the Department of State.  *See Id.* Dk. #14.

Notably, counsel for plaintiffs in this case have not taken any action to qualify their case for treatment under § 1605A.  Accordingly, this action remains under § 1605(a)(7).  As the 60-day window in which counsel for plaintiffs could have filed a motion to bring this action under § 1605A has long since passed, *see* § 1083(c)(2), counsel may want to consider a motion under Rule 60, as discussed in Part G, or, alternately, the related case procedures in § 1083(c)(3).

*Arnold, 06-CV-516.*   This case is another one of the many actions arising out of the bombing of the Marine barracks in Beirut, Lebanon.  This case, like *Valore* above, was filed under § 1605(a)(7) and is now pending with the special masters.  Like both *Peterson* and *Valore*, this action was eligible for the procedures in § 1083(c)(2) that would have permitted this Court, on motion by the plaintiffs, to treat this action as if it was filed under § 1605A.  As the 60-day period in which plaintiffs counsel could have filed such a motion has passed, plaintiffs' only remaining option is to invoke the procedures for related actions in § 1083(c)(3).

A few points should be stressed in connection with the issue of whether this action might obtain retroactive treatment under § 1605A.  First, plaintiffs' counsel have not filed any motions seeking entitlements under the § 1605A.  As this case is still pending with the special masters, however, this observation is not all that surprising because the kinds of postjudgment motions and actions undertaken by counsel in *Peterson* and *Bennett* would obviously be premature at this stage in the case.  Nonetheless, most of the attorneys in this case are also counsel in *Bennett* and *Peterson*, and thus they are the same attorneys who appear have taken the erroneous view that § 1605A is automatically retroactive.  Thus, in the interest of judicial economy, and in furtherance of the docket management function of this opinion, this Court has elected to address this case now, as it appears that the same issues that have challenged *Peterson* and *Bennett* above are likely to apply here.  What is surprising about this case is that the lead counsel in this action is also lead counsel in *Valore*, as discussed above, in which counsel actually filed a new complaint under § 1605A pursuant to the procedures for related actions in § 1083(c)(3).  The inconsistency in the approaches taken by counsel in these two actions is rather curious and seems to this Court to underscore the degree of confusion among counsel with respect to how they might ensure that § 1605A is applied retroactively to actions originally filed under § 1605(a)(7).

The Court hopes that this opinion, and the analysis in the part of the discussion in particular, serves to eliminate any further confusion going forward.

4.     **General Guidance for All Cases**

As has become evident during the course of the Court's analysis here, many of these cases are very large actions involving hundreds of plaintiffs each.  In view of the recent wave of new actions under § 1605A, the Court encourages counsel in these new matters to identify those plaintiffs who pursued claims in a prior case under § 1605(a)(7).  It would be helpful for the Court to know at the outset of a new action which plaintiffs, if any, appeared previously, in what cases, as well as the ultimate disposition of the prior claims.  Counsel can provide this information through a separate filing, or, going forward, counsel may simply identify the earlier plaintiffs within the complaint.  The Court recognizes and appreciates that counsel for some of the plaintiffs have already taken this proactive approach in the filing of their new complaints under § 1605A.  As plaintiffs well know, these cases can go on for quite some time and often require the assistance of special masters to assist the Court in culling through voluminous data with respect to the losses suffered by these hundreds of victims of terrorism.  Providing the Court with the appropriate reference points in any new filings, will greatly assist with the management of this massive body of litigation and avoid delay in providing appropriate redress to the plaintiffs.

## G.

## SERVICE OF NEW CLAIMS IN PENDING CASES

Because § 1605A applies retroactively to Court actions under § 1605(a)(7), this Court

must now decide whether and to what extent new claims asserted under § 1605A should be

served on Iran pursuant to § 1608 of the FSIA, which is the statutory provision that governs

service on foreign states.  As there is no question that new civil actions under § 1605A, such as

*Brown* and *Bonk*, *supra*, must be served on Iran, the Court's analysis here is concerned strictly

with cases that were pending under § 1605(a)(7) but which have now been converted to

§ 1605A, either on motion, consistent with § 1083(c)(2) of the 2008 NDAA, or through the filing

of an amended complaint, consistent with the procedures for related actions under § 1083(c)(3).

With respect to these actions, this Court holds that service of claims is not required under § 1608

of the FSIA.

The question of whether new federally based claims under § 1605A should be served on

Iran under the unique circumstances presented here appears to be a matter of first impression.

This Court finds, however, that principles espoused in two prior decisions of this Court,

*Dammarell v. Islamic Republic of Iran*, 370 F. Supp. 2d 218 (D.D.C. 2005) (Bates, J.), and

*Bodoff*, 424 F. Supp. 2d 74, guide the resolution of this matter and strongly suggest that service

is not required in actions that were pending under § 1605(a)(7) and which have since been

converted to § 1605A through the procedures in § 1083(c) of the 2008 NDAA.

In *Dammarell*, Iran was found in default for failing to appear and plaintiffs' substantive

claims were initially considered by the Court under § 1605(a)(7) and the Flatow Amendment,

§ 1605 note.  370 F. Supp. 2d 218.  As the action was pending, the Court of Appeals ruled in

both *Cicippio-Puleo*, 353 F.3d 1024, and *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir.

2004), that § 1605(a)(7) and the Flatow Amendment do not furnish a cause of action against foreign states.  In so ruling, however, the Court of Appeals suggested that other sources of law, including state common law or statutory law, might furnish viable claims for plaintiffs in actions pursuant § 1605(a)(7).  *See Dammarell*, 370 F. Supp. 2d at 220 (quoting *Acree*, 370 F.3d at 59); *see also* Part A, *supra*, (discussing *Cicippio-Puleo* and *Acree* and the use of § 1605(a)(7) as a pass-through to causes of actions found in state law).  Consequently, Judge Bates instructed plaintiffs to file an amended complaint identifying particular causes of action based on state common law or statutory law.  *Dammarell*, 370 F. Supp. 2d at 221.  Thereafter, plaintiffs filed a motion in which they sought, among other relief, an order stating that they were not required to serve the amended complaint on Iran pursuant to § 1608.  *Id.*

After considering supplemental briefing on the issue, Judge Bates held that service of an amended complaint is not required by § 1608 where "the defendant foreign state has failed to appear, and is therefore in default, and where the amendment does not add any claims but instead clarifies existing claims."  *Id.* at 224.  In reaching this holding, Judge Bates carefully reviewed both the text and legislative history of § 1608, finding that both supported the conclusion that the statute "is concerned with service of the initial complaint that commences the lawsuit, and not with the ensuing pleadings or papers."  *Id.*  Moreover, Judge Bate noted that his decision to dispense with service under § 1608 was consistent with Federal Rule of Civil Procedure Rule 5(a), which requires service of "new claims" on a party in default.  *Id.* (citing FED. R. CIV. P. 5(a)).  Judge Bates reasoned that simply identifying the specific sources of state law that would furnish causes of action in plaintiffs' case under the FSIA terrorism exception should not constitute "new claims" within the meaning of Rule 5.  *Id.*  In Judge Bates's view, the amended complaint would simply clarify existing claims under § 1605(a)(7).  Thus, *Dammarell* appears to

rest, at least in part, on the view that changes in the substantive rules of decision governing these actions against state sponsors of terrorism does not amount to the creation of new claims for purposes of the service requirements under the Federal Rules.

In *Bodoff*, this Judge reached a decision that is largely consistent with Judge Bates's ruling. *See* 424 F. Supp. 2d 74. As in *Dammarell*, Iran was in default, and the plaintiffs in *Bodoff* initially proceeded with federal claims under § 1605(a)(7) and the Flatow Amendment. However, plaintiffs failed to amend their complaint to identify state law causes of action following the D.C. Circuit's decisions in *Cicippio-Puleo* and *Acree*. *Id.* at 78. In ruling that the plaintiffs were not required to amend their complaint, this Court stated:

> [P]laintiffs' original complaint is sufficiently detailed to provide fair notice of the claims: it delineates the claims asserted and relief requested. For purposes of the complaint, it is not significant that the source of the law underlying the cause of action may have changed. Courts have not construed the pleading requirements of [Fed. R. Civ. P.] 8 to require a plaintiff to recite specific source(s) of law in a complaint. *See MacIntosh v. [Bldg.] Owners & Managers Ass'n Int'l*, 355 F. Supp. 2d 223, 228 (D.D.C. 2005) (Sullivan, J.) (citing FED. R. CIV. P. 8(f) for the proposition that "pleadings shall be construed so as to do substantial justice").

*Bodoff*, 424 F. Supp. 2d at 78. Thus, similar to *Dammarell*, this Court found that a defendant foreign state in default need not receive an amended complaint when the amendment would merely reflect a change in the source of substantive law applicable to the Court's adjudication of a case under the FSIA terrorism exception. *Id.*; *accord Prevatt*, 421 F. Supp. 2d at 155.

The situation presented in *Dammarell* and *Bodoff* following the Court of Appeals' decisions in *Cicippio-Puleo* and *Acree* is analogous to the situation the Court finds itself in today. Instead of shifting from federal law to state law, however, the Court is now shifting away from state law under § 1605(a)(7) to federal law under § 1605A. Now, as emphasized in Parts B and E, *supra*, it is certainly not insignificant for purpose of this Court's adjudication that claims

under § 1605A are based on federal law, and are thus subject to a federal analytical framework, whether it is considered federal common law or otherwise. The simple fact remains, however, that these new claims are nonetheless actions for personal injury or death, which sound in tort, and which are based on the same underlying terrorist act or incident as the failed state law claims that were originally advanced under § 1605(a)(7). Additionally, plaintiffs in all the actions considered today sought punitive damages in their complaint under § 1605(a)(7), and plaintiffs have consistently pressed for such relief in their prosecution of these cases.

Thus, consistent with *Dammarell* and *Bodoff*, even though actions converted to § 1605A are now presenting what are new claims in the sense that the substantive law is now federal law, they need not be considered as new claims for purposes of the pleading requirements applicable to these actions. This determination is consistent with the requirements of § 1608, which requires little more than "notice of the suit" and concerns the initiation of an action against a foreign state, rather than any intermediate filings in the case. Similarly, this ruling is consistent the notions of fair play and substantial justice embraced by the liberal concept of "notice pleading" under the Federal Rules of Civil Procedure. *See, e.g.*, *Hanson v. Hoffmann*, 628 F.2d 42, 53 (D.C. Cir. 1980). In these pending cases under § 1605A, Iran has sufficient notice of the nature of the suit and the type of claims against it. While the source of law applicable to these terrorism actions sounding in tort under the FSIA has changed, nothing else has.[37]

---

[37] Out of concern that some parties may read this part of the decision concerning service of claims too broadly, this Court wishes to stress that this is a sui generis context. Today's ruling is limited to the circumstances of these actions, which are pending suits against a foreign state in default in which the substantive source of law for personal injury and wrongful death claims has been converted, by retroactive application of a new federal statute, from state law sources to federal law. In reaching this determination today, this Court is particularly mindful of the distinct requirements in § 1608 for service of process on a foreign state. It would therefore not be prudent for either this Court or the parties before it to assume that today's holding or the

As an important caveat to today's ruling, it must be noted that Judge Collyer recently held in circumstances identical to those presented here that a new claim asserted under § 1605A must be served on the foreign state defendant.  *See Gates*, 2009 WL 2562660, at *9.  In *Gates*, plaintiffs made a motion, pursuant to § 1083(c)(2), to convert their pending case under § 1605(a)(7) to an action under § 1605A.  Judge Collyer ruled, however, that the new claim had to be served on Syria before plaintiffs could proceed under the terms of the new statute.  *Id.* at *9–10.

This Judge respectfully disagrees with Judge Collyer for several reasons.  As an initial matter, it is not entirely clear whether Rule 5 should even apply in actions against foreign state sponsors of terrorism, as there are specific requirements governing service on a foreign state in § 1608 of the FSIA.  Assuming, however, that Rule 5(a)(2) is generally applicable in actions involving foreign states, the plain language of that provision indicates that it should not apply to new claims asserted on motion by way of § 1083(c)(2).  Rule 5(a)(2) reads as follows: "No service is required on a party who is in default for failing to appear.  But a *pleading* that asserts a new claim for relief against such a party must be served on that party under Rule 4."  FED. R. CIV. P. 5(a)(2) (emphasis added).  Thus, by its very terms, Rule 5(a)(2) applies only to new claims presented in a "pleading" and therefore should not apply when plaintiffs are proceeding on motion under § 1083(c)(2).

For those who might suggest that this Court's determination hinges on a technical or overly narrow interpretation of Rule 5, this Court adds that there is a clear distinction between pleadings and motions with respect to civil practice in the federal courts.  Rule 7 provides that

---

underlying rationale should apply with any force in civil actions involving ordinary civil litigants.

the following documents are considered pleadings: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court considers one, a reply to an answer." FED. R. CIV. P. 7(a).  Motions, however, are specifically excluded from the list of "pleadings" in Rule 7(a).  In fact, a motion is described separately under Rule 7(b), as "a request for an order."  FED. R. CIV. P. 7(b); *see also Structural Concrete Prods. v. Clarendon Am. Ins. Co.*, 244 F.R.D. 317, 321 (E.D. Va. 2007) (emphasizing that a motion is not a pleading and citing Rule 7(a)).

Additionally, the text of § 1083(c)(2) warrants consideration.  Under the terms of that provision, when the requisite conditions are satisfied in a pending case under § 1605(a)(7), the action "*shall[] on motion made by the plaintiffs . . . be given effect as if the  action had originally been filed under section 1605A(c)*."  § 1083(c)(2)(A)(iv) (emphasis added).  Thus, by its plain terms, § 1083 indicates that no further action—under Rule 5 or otherwise—should be required of plaintiffs before their case may move forward under § 1605.  More fundamentally, however, as emphasized above, this Court does not find that a change in the rule of decision applicable to personal injury or wrongful death claims under the FSIA terrorism exception results in new claims of relief for purposes of the pleading requirements in these cases.

In light of the foregoing, this Court holds that service of new federal claims is not required under § 1608 of the FSIA in actions that were pending under § 1605(a)(7) and have since converted to § 1605A in accordance with § 1083 of the 2008 NDAA.  In an abundance of caution, however, counsel might well consider serving Iran with their new claims that now fall under § 1605A.  Needless to state, however, reasonable judges can, and apparently do, differ on this issue, which suggests counsel may want to take the cautious approach by serving their

§ 1605A claims on Iran.  Service of process is a jurisdictional requirement, and thus on this issue

of first impression, counsel is well advised to take the most cautious approach.

**H.**

**GUIDANCE FOR PLAINTIFFS WHO MAY WISH TO PURSUE RELIEF UNDER
RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Today's decision is likely to have negative consequences for many of these FSIA

plaintiffs—all of whom are victims of terrorism perpetrated by Iran.  For years now, these

victims—individually and as representatives of the deceased—have come before this Court in

the hopes of holding Iran to account for its sponsorship of terrorist organizations and their

relentless attacks on innocents.  In short, these victims hope to find justice.  That goal, however,

has proven very elusive, and today's decision will undoubtedly come as yet another setback for

many of these FSIA plaintiffs who have not been able to take advantage of the new terrorism

exception, § 1605A.  That enactment, which was intended to aid them specifically, with its new

language providing for a federal cause of action and punitive damages against Iran, as well as

enhanced measures for the enforcement of judgments, simply will not extend to a number of

plaintiffs addressed here.  This is an undeniable fact that deeply troubles the Court.

This Court is particularly concerned that counsel for at least some of the plaintiffs who

have failed to quality for treatment under § 1605A, appear to have been laboring under an

erroneous view of the law, as provided by section 1083 of the 2008 NDAA.  Some, like counsel

for the plaintiffs in *Beer* and *Kirschenbaum*, may have erroneously, but in good faith, believed

that they were not bound by certain procedures in § 1083(c) because they were not seeking to

assert a new cause of action, but were merely looking to take advantage of other entitlements

within §1605A, such as the right to an award of punitive damages against Iran directly.  It may

well be that counsel in other actions also had their own good faith reasons for failing to adhere to

the requisite procedures.  Whatever those reasons may be, the indisputable fact is that many

different attorneys before this Court, representing plaintiffs in a diverse range of cases against

Iran, have failed to take the necessary steps to bring their actions under § 1605A.  Whether and

to what extent this result stems from strategic choices, misunderstandings of the law, tactical

blunders or omissions, or other reasons, is difficult for this Court to say.  It does appear,

however, that at least some of these apparent failures to qualify actions under § 1605A are due to

misunderstanding or misapplication of the statutory language within § 1083.

    As this Court has recognized here today, § 1083 is hardly a model of clarity and the

requirements and conditions with respect to "Pending Cases" are presented in a disjointed

manner.  *See* Part C, *supra*.  Moreover, counsel for most plaintiffs in these actions had only 60

days from the enactment of § 1083 in which they had to elect to proceed under § 1605A.  During

those first two critical months of the statute's existence, there was not sufficient opportunity for

the courts of this Circuit to examine § 1083 in written opinions that counsel might have looked to

in an effort to better understand the statute.  Indeed, the leading decision on this matter, *Simon v.

Iraq*, was not decided until June 2008, nearly three months after the 60 day window of

opportunity had passed for most plaintiffs.  529 F.3d 1187.  Thus, the lack of clarity with respect

to the statutory language in this instance was compounded by a lack of decisional law that might

have otherwise aided counsel in their efforts.

    In view of the very real potential for injustice these statutory issues of first impression

may work for plaintiffs, this Court hereby emphasizes that the denial of relief under § 1605A is

without prejudice.  Plaintiffs may want to consider whether this Court has authority under Rule

60(b) to grant relief under the circumstances presented by their respective cases.  As this Court

has recognized in the past, Rule 60(b) is a powerful tool that grants judges broad authority to

accomplish justice in certain limited circumstances.  *See Bryson v. Gere*, 268 F. Supp. 2d 46, 53

(D.D.C. 2003) (Lamberth, J.).  It is well established that a

> district judge, who is in the best position to discern and assess all the facts, is
> vested with a large measure of discretion in deciding whether to grant a Rule
> 60(b) motion, and the district court's grant or denial of relief under Rule 60(b),
> unless rooted in an error of law, may be reversed only for abuse of discretion.

*Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988) (citing

*Browder v. Director*, 434 U.S. 257, 263 n.7 (1978)).

Plaintiffs should be cautioned, however, that they will have to overcome a significant

burden under Rule 60(b).  To be clear, this Court expresses no view with respect any potential

motion seeking relief under Rule 60(b) for any of the groups of plaintiffs who have suffered

adverse consequences as a result of the Court's action today.  It is, of course, the responsibility of

counsel—not of this Court—to articulate what grounds, if any, exist for Rule 60 relief within the

parameters set by that rule, as applied to the specific circumstances in their respective cases.

Whether counsel assert reasons of "mistake, inadvertence, surprise, or excusable neglect" under

(b)(1) or "any other reason that justifies relief" under (b)(6), empty rhetoric or *post hoc*

justifications will not suffice.  This Court's discretion is not unfettered.  *See Kramer v. Gates*,

481 F.3d 788, 792 (D.C. Cir. 2007) (reversing district judge's decision to grant relief to plaintiffs

pursuant to Rule 60(b)(6)).  Nothing in today's decision should be read as an invitation to "take a

mulligan." *Id.*

Regardless of what part of Rule 60(b) may be relied upon, this Court would certainly

have to consider the length of time that has passed since the enactment of the 2008 NDAA over

one year ago.  Perhaps more importantly, however, this Court would have to factor into its

analysis the passage of time since June of last year, when our Court of Appeals issued its

decision in *Simon*, which construed § 1083, the very provision at issue here today.  S*ee* 529 F.3d at 1192.  This is to say nothing of the numerous opinions published by this Court last July and August that applied § 1083(c) to a number of prior actions filed under § 1605(a)(7).  *See, e.g.*, *Bodoff*, 567 F. Supp. 2d 141 (D.D.C. 2008) (Lamberth, C.J.); *Stethem v. Islamic Republic of Iran*, 568 F. Supp. 2d 1 (D.D.C. 2008) (Lamberth, C.J.).  Counsel who have not moved promptly to see that their actions fall under § 1605A will have to explain to the Court why they have not seen fit to file for relief prior to now.

Additionally, counsel for plaintiffs interested in pursuing relief under Rule 60 must also detail how their prior actions under § 1605(a)(7) would have fit within the framework established by § 1083(c) and therefore qualified for treatment under the new terrorism exception, § 1605A.  In so doing, plaintiffs should hone in Parts B and C, *supra*, of the discussion section of this opinion.  In particular, plaintiffs who would rely on the § 1083(c)(3) concerning related actions need to carefully and specifically identify the new federal causes of action, presumably based on federal common law as applied in FSIA actions.  *See, e.g.*, *Flatow I*, 999 F. Supp. at 15.  This type of detailed analysis with respect to the merits of the underlying claims is necessary to ensure that any decision granting relief under Rule 60(b) "will not be an empty exercise of futile gesture."  *See Norman v. United States*, 467 F.3d 773, 775 (D.C. Cir. 2006) (quoting *Murray v. District of Columbia*, 52 F.3d 353, 355 D.C. Cir. 1995)).

Finally, plaintiffs who believe in good faith that they can assert a basis for relief under Rule 60 should heed these words and act with dispatch.  Whether this Court can in fact grant Rule 60 relief to plaintiffs who did not timely comply with § 1083(c)(2) of the 2008 NDAA should also be briefed by the parties and will of course have to be addressed by this Court before rendering any rulings on the matter.

# I.

## COMPENSATION FOR SPECIAL MASTERS

In the course of addressing the variety of issues presented by these civil actions, this Court considered, and ultimately denied, three motions requesting that certain special masters receive compensation for the work that they completed on behalf of the Court in the large consolidated case of *Peterson v. Islamic Republic of Iran*. *See* No. 01-CV-2094-RCL (D.D.C.), Dk. # 430. The special masters have rendered crucial assistance by helping the Court to determine the appropriate amount of monetary damages for hundreds and hundreds of plaintiffs. As alluded to earlier in this opinion, calculating damages in an action like *Peterson* is not an easy task. The special masters are required to review hundreds, if not thousands of documents, including economic reports and deposition testimony. Needless to say, the work required of the special masters to achieve justice in these terrorism cases demands great attention to detail and is extraordinarily time-consuming.

In *Peterson*, the three special masters who were denied payment were but a few of the more than one dozen special masters who have been called upon by this Court to examine hundreds of claims in that large consolidated case and in many other large actions under § 1605(a)(7). These three special masters alone performed more than eight months worth of work in *Peterson*. *See* No. 01-CV-2094-RCL (D.D.C.), Dk. ## 242, 243, 245. Had this Court been required to take on the functions preformed by these special maters, the work of this Court with respect to numerous other pending civil and criminal cases would have come screeching to a halt.

But the sheer volume of the endeavor surely pales in comparison to the emotional toll that such work extracts from these individuals who have worked diligently to achieve justice for

victims of terrorism.  This Court listened first-hand to some of the heart-wrenching stories of the victims during live testimony in the bench trial in *Peterson*.  The testimony in that case, as in others, was extraordinarily powerful.  As a human being and a fellow American, it is difficult not to be moved by a sense of sorrow and grief for these victims who have long suffered.  This is a basic reality that is true in all of these horrific cases from *Flatow* to *Peterson*.  While this Court is sometimes spared all the intimate and excruciatingly painful details of the lives that have been shattered, the special masters are not.  It is their job to undertake a very thorough, painstaking review of all the relevant testimony, medical evidence, economic reports, and other evidence in order to make clear, accurate recommendations to this Court.  In going about their important work in these actions, these special masters learn over and over again of the senseless carnage— the horrific deaths and grievous injuries—and of the real and often very personal ways that the deliberate slaughtering of innocents inflicts deep emotional wounds.  During a recent status conference, counsel in *Peterson* spoke of how some of the special masters experienced a sort of emotional fatigue.  A special master in another action also spoke at that time about the emotional toll that his responsibilities have exerted on him personally.  Thus, it is important to keep in mind that the special masters are handling emotionally wrenching matters as they revisit acts of carnage over and over again and hear the stories of hundreds of Americans whose lives will never be the same.

It was therefore with some regret that this Court was not able to afford compensation to several of the special masters in *Peterson*.  The specific provision at issue was § 1605A(e), which provides:

(e) SPECIAL MASTERS.—

(1) IN GENERAL.—The courts of the United States may appoint special masters to hear damage claims brought under this section.

(2) TRANSFER OF FUNDS.—The Attorney General shall transfer, from funds available for the program under section 1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c) to the Administrator of the United States district court in which any case is pending which has been brought or maintained under this section such funds as may be required to cover the costs of special masters appointed under paragraph (1).  Any amount paid in compensation to any such special master shall constitute an item of court costs.

The three motions for payment, as noted above in Part D, *supra*, were based on the erroneous assumption that this new provision allowing for compensation, which did not exist prior to the enactment of the 2008 NDAA, somehow automatically and retroactively applied to their case.  In denying relief, this Court emphasized that the special masters in *Peterson* are not entitled to the benefits of the new statute because plaintiffs have not taken appropriate action, consistent with § 1083(c), to convert their case to an action under § 1605A.  Thus, the new statutory entitlements do not apply to their case, which remains under the former state sponsor of terrorism exception—Section 1605(a)(7).

The Court was very careful to render the most narrow ruling possible; the determination that the special masters have not qualified for payment from the Victims of Crime Fund hinged exclusively on the fact that the plaintiffs had failed to follow the requisite procedures in § 1083(c).  That ruling stands.  Note, however, that the Court did not address the prospect of retroactivity problems or other arguments that the United States presented in a brief submitted on the issue by invitation of this Court.  *See Peterson*, No. 01-CV-2094-RCL (D.D.C.), Dk. # 389. The Court declined to comment on those issues at the time of its ruling because this Court anticipated that a Rule 60(b) motion or other action by plaintiffs in *Peterson* might otherwise

permit these plaintiffs to move forward under § 1605A, and that, in turn, might require this Court to revisit the issue of compensation for the special masters.

Having had an opportunity recently to take a close look at the issue of retroactivity, this Court is not convinced that any sort of retroactively problem would serve as a bar to payment of the special masters in these cases.  It is difficult for this Court to conceive of how § 1605A(e) operates retroactively in the disfavored sense by impairing previously established rights of the parties or by imposing new duties with respect to past conduct.  *See Altmann*, 541 U.S. at 694. Moreover, § 1083(c), provides a clear mechanism by which cases that were previously decided or pending under § 1605(a)(7) may be brought within the reach of the revised terrorism exception § 1605A, and so this Court need not resort to speculation or judicial default rules to infer Congress' intent in that regard.  *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1191 (D.C. Cir. 2008), *rev'd on other grounds sub. nom Beaty*, 129 S. Ct. 2183.  More fundamentally, however, to the extent that retroactivity analysis should apply, affording payment to the special masters is, in this Court's view, much more akin to the court ordering payment of attorneys' fees, which are collateral to the litigation and therefore do not trigger retroactivity concerns.  *See Landgraf*, 511 U.S. at 277.

This Court must also keep in mind that Congress has exceedingly broad power to acknowledge and pay debts under Article I, Section 8, Clause 1 of the Constitution.  *Sioux Nation*, 448 U.S. at 397.  With § 1083 of the 2008 NDAA, Congress has plainly acknowledged the services rendered by the special masters, and, through the enactment of § 1605A(e) provided a means, consistent with the legislature's Article I powers of the purse, to compensate the special masters for service previously rendered in terrorism cases.  Thus, assuming the procedures in § 1083(c) are complied with, or assuming that there is some way for plaintiffs to overcome the

procedural deficiencies in their cases by way of Rule 60(b) motion, or otherwise, this Court sees no reason why it would not have authority to issue an order directing that the special masters receive payment from the Victims of Crime Fund.

Recently, plaintiffs in *Peterson* filed a new motion for payments to the special masters. *See* No. 01-CV-2094-RCL (D.D.C.), Dk. # 435. This most recent motion seeks payment for nine of the special masters, to include two of the special masters who were denied payment previously as a result of the Court's denial of the three prior motions for payment under § 1605A(e). *See id.* Dk. # 430. The current motion seeks more than $ 200,000 in total payments.

In contrast to the prior motions, the current motion does not rely on the new authorization in § 1605A(e) for payments from the Victims of Crime Fund, and it does not request or otherwise require the expenditure of government funds. Instead, plaintiffs have made arrangements to have a private organization known as the Peace Through Law Foundation, Inc. pay the nine special masters directly. Dk. # 436. Under the terms of the arrangement that the plaintiffs have asked this Court to endorse, the Peace Through Law Foundation, Inc. will first remit payments to the special masters directly. *Id.* Following those payments, and only after satisfactory proof of the payments is submitted to this Court, this Court will then enter a money judgment against Iran and in favor of plaintiffs for the total amount paid by the Peace Through Law Foundation, Inc. *Id.* Plaintiffs also ask that this Court include in its initial order directing the payments that the plaintiffs are to repay the Peace Through Law Foundation, Inc. once they collect on the judgment entered under the terms of compensation scheme proposed in their current motion. *Id.*

This Court appreciates the persistency, hard work, and creativity of counsel in their efforts to obtain compensation for the special masters. In this Court's view, the special masters

have rendered a great service not only to the plaintiffs and this Court but also to the nation as a whole.[38]   In light of today's opinion, however, it is not appropriate for this Court to consider the novel approach proposed by the plaintiffs at this time.   It seems to this Court that the most prudent course of action at this juncture is to allow counsel to first determine whether, consistent with the guidance offered in this opinion, they might be able to qualify the *Peterson* action for retroactive treatment under § 1605A.   If that can be achieved, then the special masters may have recourse to the Victims of Crime Fund, consistent with the plain terms of § 1605A(e)(2), rather through the privately subsidized subrogation scheme that plaintiffs have proposed in their most recent motion.   For this reason, the current motion for payment of the special masters will denied without prejudice in a separate order issued this date.[39]

---

[38] One of the Special Masters included in the current motion, Judge Howard P. Rives of Florida, passed away shortly after concluding his work.   The Court is grateful for Judge Rives's assistance and expresses it condolences to Judge Rives's family.

[39] The Court expresses no opinion at this time regarding the reasonableness of the requested payments.

## J.

## MOTIONS FOR APPOINTMENT OF RECEIVERS

This Court also recently denied three motions for the appointment of receivers in *Peterson*. *See* No. 01-CV-2094-RCL (D.D.C.), Dk. # 434. Like the motions for payments to the special masters discussed above, these three motions for receivers were based on the erroneous assumption that the *Peterson* action should automatically fall under § 1605A. Two of the motions for appointment of receivers, *id.* Dk. #3 251, 259, sought what counsel referred to as "broad-based" receiverships that would have operated under a sweeping mandate to seek out and take hold of a wide range of Iranian Government assets. *See* Dk. ## 251, at 7; 259, at 4. The first of these two broad-based receiverships urged by plaintiffs would have sought possession of any assets of Iran held by financial institutions within the United States. *See* Dk. # 251. The second broad-based receivership urged by the plaintiffs would have sought possession of "all oil, natural gas, petroleum, hydro-carbon and similar revenues due to and in favor of the Islamic Republic of Iran." *See* Dk. # 259, at 1.[40]

In each of the two motions, plaintiffs recommended that this Court appoint three members of the Gavel Consulting Group to serve as the receivers. The three individuals proposed by plaintiffs were Eugene R. Sullivan, Retired Chief Judge of the United States Court

---

[40] One of the three motions, *Peterson*, No. 01-CV-2094-RCL (D.D.C.), Dk. #404, concerned specific assets held by a financial institution in New York. That matter remains under seal and subject to a protective order in part because plaintiffs have alleged that Iran is the beneficial owner of approximately two billion dollars in specific debt securities. These securities have been restrained and are subject to ongoing garnishment action initiated by plaintiffs in the United States District Court for the Southern District of New York. This section of today's opinion concerning the prior motions for receivers concerns only the two broad-based requests, Dk. ## 251 and 259, and does not speak to plaintiffs' prior effort to establish a receivership for the interests in securities identified in the action in New York.

of Appeals for the Armed Forces; Stanley Sporkin, Retired United States District Court Judge for

the District of Columbia and Former General Counsel to the Central Intelligence Agency; and

Louis Freeh, Former Director of the Federal Bureau of Investigation and Former United States

District Court Judge for the Southern District of New York.  *See* Dk. ## 251, at 4; 259, at 4.

Plaintiffs noted that "[e]ach one of these individuals are former federal judges, all with

backgrounds in national security, military, and intelligence matters, and all of them would be

more than capable of performing this assignment, and meeting the expectations of all parties."

Dk. ## 251, at 22; 259, at 26.  Thus, plaintiffs' two motions would have effectively established

one large receivership headed by members of the Gavel Consulting Group and with sweeping

powers to identify, take possession of, and liquidate a host of undisclosed Iranian Government

assets.  Plaintiffs argued that a properly appointed receivership in their case would have the

authority to demand possession of any of Iran's assets located within the jurisdiction of the

United States Courts.[41]

---

[41] Plaintiffs rely on a variety of different publicly available sources of information concerning Iranian assets.  With respect to the receivership proposed for Iran Assets in United States banks, plaintiffs observe that the Terrorist Assets Report, which is published periodically by the United States Treasury Department's Office of Foreign Asset Control, indicates that upwards of 49 million dollars in non-blocked funds belonging to Iran may currently be in the possession of United States financial institutions.  *See* Dk. # 251, at 5, Ex. D.  Similarly, with respect to oil, gas, and hydrocarbon revenues, plaintiffs observe that various Government reports, including reports prepared by the Energy Information Administration of the United States Department of Energy, confirm that Iran earns billions and billions of dollars each year as a result of its diversified oil and gas industries.  *See id.* at 4–9.  Similarly, plaintiffs point to a number of cases that have been litigated before the Iran-U.S. Claims Tribunal over payments or other assets owed to Iran's oil and gas industries.  *See id.* at 5–9, Exs. E–I.  While acknowledging that most of Iran's oil assets are located in other foreign countries and outside the jurisdiction of the United States, plaintiffs nonetheless stress that a receivership for these assets would "not be futile" because certain subsidiaries or other entities connected with Iran's state-run enterprises might "have some type of nexus in and to the United States, and therefore might be subject to United States jurisdiction."  *Id. at* 15.  In fact, plaintiffs identify eight specific oil

In support of their motions, plaintiffs relied on § 1610(g), a new FSIA provision that was enacted in conjunction with § 1605A last year.  *See* § 1083(b).  As noted above, § 1610(g) is intended to limit the application of sovereign immunity defenses that have often protected Iran's property from attachment and execution upon civil judgments entered under the terrorism exception.  As enacted through § 1083(b) of the 2008 NDAA, 1610(g) reads as follows:

(g) PROPERTY IN CERTAIN ACTIONS.—

(1) IN GENERAL.—Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

(A) the level of economic control over the property by the Government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs

(D) whether the government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States Courts while avoiding its obligations.

(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE.—

Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from

---

companies that they believe can and should be reached by the receivership they propose.  *Id.* at 1, 15.

> attachment in aid of execution, or execution, upon a judgment entered
> under [§] 1605A because the property is regulated by the United States
> Government by reason of action taken against that foreign state under the
> Trading With the Enemy Act or the International Emergency Powers Act.

Plaintiffs argue that this new provision removes Iran's sovereign immunity with respect to its property, as well as any United States sovereign immunity that might otherwise apply, and that therefore Iran's assets "are now subject to clear levy and execution." *See, e.g.*, Dk. # 259, at 4. Consistent with this Court's prior decision denying the special masters motions under § 1605A(e), this Court denied the motions for receivers on the narrow basis that plaintiffs had failed to follow the necessary steps, pursuant to § 1083(c), to obtain treatment under the new terrorism exception. *See* Dk. # 434, at 3. The Court was careful in its ruling not to express any view with respect to the merits of plaintiffs' argument concerning the utility of § 1610(g), as a means to enforce a judgment under § 1605A, as that question was not ripe for consideration. As the Court explained:

> Whatever might be said of § 1610(g), the simple fact is that provision does not
> apply here. By its express terms, § 1610(g) applies only to "judgments entered
> under [§] 1605A." Notably, plaintiffs could have converted their judgment under
> § 1605(a)(7) into a new action under § 1605A. *See* § 1083(c). Plaintiffs failed to
> do so.

Dk. # 434, at 3. Thus, plaintiffs' action remains under § 1605(a)(7), they are not entitled to take advantage of any of the new limitations in immunities pertaining to Iran's assets that might otherwise facilitate efforts to satisfy their 2.5 billion dollar judgment against Iran.

In the event that the *Peterson* action were to qualify for treatment under § 1605A as the result of a motion pursuant to Rule 60, or through some other approach, this Court could of course reconsider the plaintiffs' motions for receivers. The Court is well aware of the outstanding professional reputations of the three individuals that plaintiffs proposed to oversee a

receivership in their case.  The depth of the experience that these three former judges would

bring to the table, especially in light of their backgrounds in national security matters, could

certainly prove advantageous to plaintiffs.  Thus, there is at least some possibility that the sort of

broad-based receivership that plaintiffs envisioned for their case might offer them a better chance

to overcome some of the challenges that have thus far prevented these terrorism victims from

obtaining the compensation they deserve.  This Court will keep an open mind about the potential

for a receivership in the event that this issue comes up for consideration again under the new

terrorism exception, § 1605A.

      In the interest of both candor and fairness to plaintiffs, however, the Court wishes to offer

some additional guidance on this unique matter.  As this Court has emphasized on several

occasions in this very case, "the appointment of a receivership is 'an equitable remedy of rather

drastic nature.'"  Dk. # 434, at 3 (*quoting Peterson III*, 563 F. Supp. 2d 268) (citations omitted).

For this reason, the Court must proceed cautiously and will take a critical view of any renewed

motions for the appointment of receivers.  Among other issues, this Court will need to consider

what the realistic probability is that a broad-based receivership would actually succeed in efforts

to take hold of Iranian government assets of sufficient value to compensate plaintiffs.  On this

critical issue, the Court might solicit the opinions of whatever experts the plaintiffs propose to

serve as the receivers in their case.  Government reports and generalized assertions about the

wealth of Iran simply do not provide an adequate basis for this Court to make an assessment of

whether there are sufficient assets of Iran available for turnover to a receivership in the sweeping

manner that plaintiffs have envisioned.  This Court will also have take a closer look at § 1610(g)

and consider in what ways this new provision might apply in legal proceedings to seize Iranian

assets in satisfaction of judgments in terrorism cases under § 1605A.  It is not at all clear to this Court that § 1610(g) is the panacea that the plaintiffs believe it is.

Second, this Court is mindful that in some cases the costs associated with the receivership can actually exceed the value of the funds that the receivers might make available to satisfy the plaintiffs' money judgment.  As a consequence, the Court is dragged into a long, costly, and futile exercise that is entirely inconsistent with the basic purpose of a receivership.  In view of this potential problem, this Court would undoubtedly want to get some idea of what costs— whether attorneys' fees, expenses, or others—would be associated with any proposed receivership and how those costs would compare with any success the proposed receivers might anticipate with respect to the obtainment of Iranian assets to compensate the actual plaintiffs.

Third, in reviewing any equitable considerations that may or may not militate in favor of a receivership, this Court would want to gauge the potential impact on similarly situated plaintiffs in the many FSIA terrorism cases that have been litigated against Iran in this Court. While there are nearly one thousand plaintiffs in *Peterson*, there are also hundreds of other victims of Iran-sponsored terrorism who are equally challenged in their ability to enforce judgments against Iran.  What should not be overlooked here is that it is for the most part a small, local, and highly specialized bar that handles the vast majority of these cases.  Indeed, the attorneys in *Peterson* serve as counsel in many of the other Iran actions in this Court and vice versa.  Thus, it seems to this Court that if certain members of this specialized bar believe that a receivership offers plaintiffs the best chance of collecting on their judgment, then fairness might dictate that such a receivership should work for the benefit of all the plaintiffs as a class, rather than just a select group in a single action.

Most importantly, this Court must bear in mind that the receivership that plaintiffs have urged with respect to Iran's assets is rather extraordinary and unprecedented. It is therefore difficult to contemplate all the practical and legal implications of such a drastic measure, but the establishment of any kind of receivership in the *Peterson* case would likely have a significant and negative impact on the to ability of the President to conduct foreign relations with Iran. More problematically, the sort of receivership that the plaintiffs have proposed in the *Peterson* case might serve as a precedent that would prove troublesome with respect to our relations with other foreign sovereigns. The very thought of imposing a receivership on another foreign sovereign seems to conflict with the principles of comity and mutual respect that have traditionally governed our relations with foreign powers.

With respect to these larger concerns relating to principles of foreign sovereignty and the conduct of foreign relations, this Court should note that there was another motion for the appointment of receivers in *Peterson* that this Court found very troubling. Specifically, plaintiffs asked this Court to establish a receivership to take the place of Iran at the Iran-United States Claims Tribunal ("Tribunal") established by the Algiers Accords. *See Peterson*, No. 01-CV-2094-RCL (D.D.C.), Dk. # 260. This remarkable and unprecedented proposal by plaintiffs called for court-appointed receivers vested with, among other powers, the authority to "prosecute all Tribunal claims in the name of Iran." *Id.* at 2. As part of this truly extraordinary request, plaintiffs asked the Court to "specifically authorize" the receivers to go before the Tribunal in The Hague, Netherlands in order to dispose of Iran's claims "in any manner which may include settlement, resolution, dismissal" without any requirement to consult with or report to Iran in that process. *Id.* Accordingly, the receivership envisioned by plaintiffs would have received authorization from this Court to replace Iran's lawyers at the Tribunal with counsel appointed by

the receivership.  *Id.* at 3, 17.  Counsel on behalf of the receivership would then continue to

advance Iran's claims at the Tribunal, and they would attempt to engage in settlement

negotiations with the United States in an effort to convince the United States Government to pay

the plaintiffs' multi-billion dollar judgment against the Islamic Republic Iran.  *Id.* at 2, 12, 17,

24–25.[42]

While plaintiffs' motion was pending, the United States filed a Statement of Interest in

the matter.  Dk. # 432.  The United States asserted that the receivership proposed by the

plaintiffs' is squarely foreclosed by the sovereign immunity of the United States, as well as the

basic understanding under our Constitution that "the operation and implementation of

international agreements is a matter left to the exclusive province of the political branches."  *Id.*

at 3.  In response, plaintiffs promptly withdrew their motion.  *Peterson*, No. 01-CV-2094-RCL

(D.D.C.), Dk. # 433.  In their notice of withdrawal to this Court, plaintiffs state:

> The statement of interest filed by the United States raises certain issues
> which indicate that the court should deny Plaintiffs' motion based upon the
> court's prior rulings, the impact upon the interest of the United States, the
> sovereign immunity of the United States, issues which relate to FSIA,
> international geopolitical concerns, issues which arise out of the U.S.-Iran Claims
> Tribunal, public policy, and the like.  This list is descriptive and illustrative only.

*Id.* at 1.  While not expressly conceding as much, the notice of withdrawal suggests that counsel

for plaintiffs came to the realization that their motion was not likely to succeed.

The authorities and legal arguments presented by the United States in this matter clearly

demonstrate why this Court cannot appoint a receivership to oust Iran from the Tribunal.  A few

of the points raised by the United States are worth reinforcing at this time, however, in the

---

[42] Counsel argued that the substitution of Iran with a receivership "might prompt a faster
settlement (albeit at a discount) in which the beneficiaries of the settlement would be the victims
of terror, and not the terrorist."  Dk. # 260, at 12.

interest of ensuring that these controlling legal principles are fully considered by plaintiffs'

counsel in any additional requests for extraordinary relief.[43]   First and foremost, a critical legal

doctrine that is almost always implicated in this context is the sovereign immunity of the United

States.   The sovereign immunity of the United States is an exceedingly broad jurisdictional bar

that precludes attempts by creditors to obtain government funds or property to collect on a debt.

*See, e.g.*, *Blue Fox*, 525 U.S. at 264.   More to the point, this Court has previously rejected an

effort to attach United States Treasury funds that were earmarked for the payment of a Tribunal

award to Iran.   As noted in Part A, *supra*, in *Flatow* this Court ruled that "funds held in the U.S.

Treasury—even though set aside or 'earmarked' for a specific purpose—remain the property of

the United States until the government elects to pay them *to whom they are owed*."   *Flatow III*,

74 F. Supp. 2d 18 at 21 (D.D.C. 1999) (Lamberth, J.) (emphasis added) (citing *Buchanan*, 45

U.S. at 21; *Blue Fox*, 525 U.S. 255)).

Plaintiffs attempted to distinguish *Flatow* in their submission to this Court.   They argued

that, in contrast to plaintiff's effort to go directly after United States Treasury Funds through

writs of attachment in *Flatow*, receivers would merely "stand in the shoes of Iran" and would

simply receive whatever funds the United States might designate for payment to Iran in

satisfaction of Tribunal Awards in Iran's favor or in settlement of Iran's pending claims.   Dk. #

260, at p. 12, 24.   Accordingly, the plaintiffs claimed that the mere creation of a receivership to

oust Iran-U.S. Claims Tribunal would not implicate any issues of United States sovereign

immunity unless and until the receivers found it necessary to further action in the Courts to

---

[43] The Court should also note that plaintiffs and the United States stipulated to a
withdrawal of plaintiffs' motion without prejudice.  *See* Dk. # 433, at 2.  The notice of
withdrawal also suggests that plaintiffs are considering filing another motion regarding the Iran-
U.S. Claims Tribunal.

enforce Iran's awards and claims against the United States**.**  *Id.* at 7, 24–25.  Plaintiffs' argument wholly lacked merit.  As this Court emphasized to these very plaintiffs previously, they may not use receivers "to do *indirectly* what they cannot do *directly."*  *Peterson III*, 563 F. Supp. 2d at 278 (emphasis in original).  As the funds within the United States Treasury are immune from the jurisdiction of this Court, this Court is therefore without jurisdiction to appoint receivers whose express objective would be to take hold of any of those funds that the United States might, within its discretion, use to resolve Tribunal Claims with Iran.  Simply put, to allow court-appointed receivers on behalf of the plaintiffs to inject themselves into a process involving payments from the United States Government to Iran would violate the basic purpose of sovereign immunity, as the powers of this Court would be harnessed in a way that would burden the United States in the exercise of its broad discretion to appropriate and allocate federal dollars as it deems fit.

Even if § 1610(g)(2) were to apply in this case—and it does not—this new measure would not alter the analysis.  Section § 1610(g)(2) by it plain terms speaks only to funds that were originally held by a state sponsor of terrorism but which later came under the control of the United States by virtue of Executive Orders blocking those assets pursuant to the Trading With the Enemy Act or the International Emergency Economics Powers Act.  There is no indication, however, that Congress intended to waive the sovereign immunity of the United States with respect to the Federal Government's own funds within the United States Treasury.  Accordingly, § 1610(g)(2) simply does not reach these federal dollars, which the political branches of our Government may, within their discretion, decide to disperse to Iran consistent with the United States' obligations to settle claims under the terms of the Algiers Accord.

Moving beyond the controlling legal precedent that squarely forecloses the relief requested by plaintiffs, this Court finds utterly disturbing the way in which plaintiffs' counsel

described in some detail their strange vision of how receivers might invoke the powers of this Article III court to assert control over Iran's affairs before an international tribunal. *See* Dk. # 260, at 15–21.  In a rather bizarre and perverse twist of events, counsel would have the Court oversee receivers as they advanced Iran's claims against the United States.  Plaintiffs' counsel candidly acknowledged that the ultimate objective of this proposed scheme was to leverage the powers of this Court through the appointment of a receivership in order to pressure the United States into settling its claims with Iran, at least up to the amounts needed to satisfy plaintiffs' 2.5 Billion dollar judgment.  Plaintiffs' counsel actually referred to this perverse result as an "elegant outcome." *Id.* at 21.

Putting aside the enormous practical and political obstacles that a receivership conceived to take Iran's place at the Tribunal would instantly confront, this Court is simply without authority to assert any level of control or supervision over the affairs of an international body established to resolve disputes between two sovereign nations.  As the United States correctly observed, this Federal Court may not involve itself in the operation or implementation of a bilateral agreement between the United States and Iran.  *See Dk.* # 432, at 12–16 (Statement of Interest by the United States).  As bilateral agreements that resolved a crisis between two foreign powers, the Algiers Accords are precisely the sort of international agreements that depend exclusively on the political branches for its implementation and enforcement.  *See, e.g.*, *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 14 (D.D.C. 2004); *Kucinich v. Bush*, 236 F. Supp. 2d, 1, 16 (D.D.C. 2002)*; Antolok v. United States*, 873 F.2d 369, 380 (D.C. Cir. 1989); *see also Dames & Moore*, 453 U.S. at 664 (describing how the United States and Iran entered into the Algiers Accords and established the Iran-United States Claims Tribunal to bring about an end to the hostage crisis).

Plaintiffs' proposal for the appointment of a receivership to oust Iran from the U.S.-Iran Claims Tribunal illustrates how litigation in these FSIA terrorism cases can run amuck as plaintiffs desperately seek out ways to enforce their court-judgments.  The default judgment context of these actions only adds to this problem, as there is a risk that unopposed counsel may at times overreach and float meritless, even preposterous arguments.  In the end, however, these postjudgment actions—no matter how creative or vigorously pursued—hardly ever net results for plaintiffs, and yet these actions frequently threaten the foreign policy interests of the United States while consuming significant amounts of court time and other resources.

This Court is grateful for the well-crafted statement of interest that apparently brought counsel to their senses and ultimately saved this Court some valuable time and energy.  For this reason, this Court will solicit the views of the United States before considering any further motions for the appointment of receivers in any of these terrorism cases pending against Iran. This Court also appreciates that plaintiffs' counsel ultimately withdrew their motion when confronted with clear legal authority that precluded the relief they sought.  This Court wishes to remind plaintiffs' counsel, however, that before they file any motion in this Court, they have a duty to fully consider any controlling legal authority—including adverse precedent—that may be dispositive of the relief they request.

There is one statement, however, in the plaintiffs' notice of withdrawal that this Court finds rather heartening.  Plaintiffs note that the executive and legislative branches may be able to offer "alternative remedies" and that the type of relief sought through plaintiffs' proposed receivership "may be pursued through an alternative forum, or pursued after addressing the issues raised by the United States."  Perhaps plaintiffs have come to realize—as this Court has— that only the political branches have the authority to grant the kinds of extraordinary relief that

the victims in these actions require.  This Court hopes that there may indeed be some real

opportunities in the near future for the plaintiffs in *Peterson* and in other cases to work closely

with our political leaders, including those in the new administration, to move beyond civil

litigation in the Courts as a means to achieve the justice that these victims of terrorism so rightly

deserve.  Unless these actions are to exist in perpetuity as empty promises—which drain the

resources of our courts and undercut the foreign affairs prerogative of the President—then some

alterative to the private litigation approach must be found.  Frankly, plaintiffs have waited far too

long for meaningful reforms, and they have exhausted themselves in a seemingly endless quest

for justice.  The time for real reform is now, and it is to this critical issue that the Court now

turns.

# K.

## A CALL FOR MEANINGFUL REFORM

The most difficult issues confronting this unique area of the law relate to how plaintiffs in these FSIA terrorism cases might enforce their court judgments against the Islamic Republic of Iran.  While this highly charged topic of debate has been the subject of numerous legislative proposals and enactments over the last decade—and is again the subject of many of the most recent reforms implemented by the 2008 NDAA—very little has been achieved.  Today, the overwhelming majority of successful FSIA plaintiffs with judgments against Iran still have not received the relief that our courts have determined they are entitled to under the law.[44]

In speaking to this critical issue today in light of the nineteen civil actions addressed in this opinion—and the more than one thousand American victims of Iran-sponsored terrorism that these actions represent—the Court fully appreciates first and foremost the delicate nature of the political compromise the FSIA terrorism exception embodies.  "While such legislation had long

---

[44] This Court's observations and comments in this part of the opinion and throughout relate only to civil actions against the Iran under the FSIA terrorism exception.  The Court therefore does not express any views with respect to the viability of actions against other state sponsors of terrorism.  While it appears that similar issues as those that impact actions against Iran may also be present in civil actions against other state sponsors of terrorism under either § 1605(a)(7) or § 1605A, cases against Iran face a number of unique challenges, such as the Algiers Accords and the establishment of the Iran-United States Claims Tribunal, which make it particularly difficult for plaintiffs to recover in these actions.  Finally, the vast majority of cases that have been filed in this Court under the FSIA terrorism exception, have been filed against Iran.  Thus, this Court does not want to assume problems or issues in other FSIA terrorism cases in which it has much more limited experience.

Additionally, it should be noted that the Court's opinion today concerns only the FSIA terrorism exception.  This Court does not address the Antiterrorism Act, 18 U.S.C. §§ 2331–38; the Torture Victim Protection Act, 28 U.S.C. § 1350 note; the Alien Tort Claims Act, 28 U.S.C. § 1350; or any other civil statutes that may permit civil actions for personal injury or death caused by terrorist acts.

been sought by victims' groups, it had been consistently resisted by the executive branch." *See Price*, 294 F.3d at 89 (citations omitted). As our Court of Appeals has emphasized, certain features of the terrorism exception "reveal the delicate legislative compromise out of which it was born." *Id.* Among these is the restriction providing that only "state sponsors of terrorism," as officially designated by the State Department, may be subject to suit under the terms of the statute. *Id.* (citing § 1605(a)(7)(A) (repealed)). Additionally, only United States nationals are entitled to file lawsuits under the statute, and the offending state must be given a reasonable opportunity to arbitrate any claims based on an incident that occurred within its borders. *Id.* (citing § 1605(a)(7)(B) (repealed)).

In this Court's view, however, the compromise is perhaps best evinced by the resistance of the Executive Branch to legislation permitting the execution of court judgments through assets of state sponsors of terrorism. As discussed in Part A, *supra*, the enforcement of judgments through the attachment and execution of the assets of terrorist states, whether those assets are blocked or not, has been a particularly controversial issue, and it is one that has been tackled continuously in legislative enactments almost since the inception of the FSIA terrorism exception ten years ago. For instance, the enactment of the VTVPA, the TRIA, and now § 1083 of the 2008 NDAA, which provides the most sweeping judgment enforcement authority to date, illustrates the gradual progress that terrorism victims have achieved though Congress over the Executive Branch in their efforts to obtain more power to enforce judgments under the FSIA terrorism exception. Thus, § 1083 is just the latest chapter in what has been a longstanding political debate over how best to achieve some measure of justice for these victims.[45]

---

[45] Executive Branch resistance to legislation permitting the enforcement of judgments through the assets of terrorist states is probably best documented in SUITS AGAINST TERRORIST

In view of the incremental nature of these reforms as meted out through the political process over the years, perhaps the Court's words here will make little difference.  This Court is certainly mindful of its limited authority under Article III, and this Court certainly does not wish to wade into the politics of these matters, but it is precisely because this Court's authority is so very limited in this context that this Court has grown increasingly frustrated by the way the political process has treated the terrorism victims in these cases under the FSIA.  The experience of this Court in presiding over these actions for over a decade now has revealed that the political compromise achieved through the FSIA terrorism exception and its related enactments is superficial, filled with contradictions, and utterly in denial of practical and political realities—to say nothing of separation-of-powers problems—that courts can do little to address.  Moreover, if this Court's experience in any indicator, the most recent reforms in § 1083 are not only destined to fail, but these new measures may even make matters worse.

To be sure, the changes to the FSIA enacted through § 1083 of the 2008 NDAA appear, on the surface at least, to be extraordinarily advantageous to plaintiffs.  The direct cause of action contained in the new terrorism exception § 1605A will make it easier for most plaintiffs to file and litigate cases against Iran, and the availability of punitive damages in these actions creates a tremendous incentive for these lawsuits.  With respect to the substantial problems plaintiffs in these actions have encountered in their efforts to execute judgments, the provision allowing for prejudgment liens of lis pendens, *see* § 1605A(g), and the new measures added to § 1610 that purport to limit the applicability of both foreign sovereign immunity and United States sovereign

---

STATES, *supra* note 4, at 7–23.

immunity are the most significant legislative initiatives to date that aim to overcome the inability of plaintiffs to execute judgments against Iran.

From the bench of this Article III Judge, however, what the Court sees in § 1083 is not so much meaningful reform, but rather the continuation of a failed policy and an expansion of the empty promise that the FSIA terrorism exception has come to represent.  Through the enactment of § 1083, the political branches have promoted or otherwise acquiesced in subjecting Iran to sweeping liability while simultaneously overlooking the proverbial elephant in the room—and that is the fact that these judgments are largely unenforceable due to the scarcity of Iranian assets within the jurisdiction of the United States courts.  As noted Part A, *supra*, few Iranian assets remain with the jurisdiction of the United States courts since the transfer of those assets out of the United States was accomplished in 1981 in fulfillment of the Federal Government's obligations under the terms of Algiers Accords.  OFAC's latest report on blocked assets indicates that the total value of blocked assets relating to Iran in the United States is approximately 16.8 million dollars, an infinitesimal amount in comparison to the more than 9.6 billion dollars in civil judgments against Iran under the FSIA terrorism exception.  *See* TERRORIST ASSETS REPORT, *supra* note 2, at 14, tbl. 1.  Similarly, OFAC's records suggest that there are very few non-blocked assets within the United States—perhaps no more than 28 million dollars worth.  *See id.* at 15, tbl. 3.

Even if one assumes, however, that there are sufficient Iranian assets within the jurisdiction United States courts to satisfy the billions of dollars in judgments entered in these civil suits, proceedings before this District Court have revealed that whatever non-blocked assets might be found may be held by certain large financial institutions that are in fact agencies of instrumentalities of other foreign nations, which are in and of themselves subject to sovereign

immunity under the FSIA.  *See* § 1604.  Indeed, this is precisely the problem that foiled

plaintiffs' efforts to enforce their judgment in *Peterson*; it is the sovereign immunity from

jurisdiction afforded to the financial entities of other foreign states—and not of Iran—that

frequently frustrates recovery.  *See Peterson III*, 563 F. Supp. 2d 268 (quashing writs of

attachment issued against Japan Bank for International Cooperation, the Bank of Japan, and the

Export and Import Bank of Korea).

Moreover, plaintiffs still have the burden of proving Iranian ownership—whether

beneficial or otherwise—of the assets at issue, which can be extraordinary challenging in this

context.[46]  In this regard, this Court observes that § 1610(g) expressly protects the rights of third

parties in actions to levy or execute upon a judgment entered against Iran.  Section 1610(g)(3)

states:

> Nothing in this subsection shall be construed to supersede the authority of a court
> to prevent appropriately the impairment of an interest held by a person who is not
> liable in the action giving rise to the judgment in property subject to attachment in
> aid of execution or execution upon such judgment.

Thus, the tremendous complexities and challenges with respect to proving Iranian ownership of

the assets in this thorny context are likely to persist.

Finally, United States sovereign immunity will remain an issue under § 1610(g), as

nothing prevents the President from seizing Iranian assets and vesting title to them in the U.S.

Treasury, as Presidents have often done in the interest of important foreign policy objectives.[47]

---

[46] *See Flatow v. Islamic Republic of Iran*, 67 F. Supp. 2d 535 (D. Md 1999) (quashing
writs of attachment issued against the Alavi Foundation and rejecting argument that this
separately incorporated entity should be considered an agent or alter ego of the Iranian
Government).  For more detailed analysis of the difficulties of establishing foreign state
ownership in these actions, see SUITS AGAINST TERRORIST STATES, *supra* note 4, at 54–59.

[47] *See, e.g.*, *Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 246 (2d Cir. 2003).  In *Smith*,

Accordingly, the language in § 1610(g)(2) purporting to render United States sovereign immunity "inapplicable" may be of utility because, while it speaks to sovereign immunity that might be inferred by virtue of the Federal Government's regulation of assets under either the Trading with the Enemy Act or the International Emergency Economic Powers Act, it does not abrogate United States sovereign immunity with respect to funds held in the United States treasury.[48]

In terms of real and tangible property that Iran owns in the United States, much of it was once used for diplomatic or consular purposes by Iran and is therefore subject to the Vienna Conventions on Diplomatic and Consular Relations.  This property is thus immune from

---

the Court held that certain blocked assets of Iraq were not susceptible to attachment because the President had, in the interest of national security, confiscated those assets and vested title to those assets in the United States Treasury.

[48] This Court is not overlooking the possibility of execution of judgments through enforcement proceedings in foreign jurisdictions, as least one scholar has recently suggested as a still-viable means of recovery in these actions.  *See* Strauss, *supra*, at 307 (arguing for broader, multilateral approach to suits against sponsors of terrorism with leadership from the United Nations and other international organizations, and involving courts worldwide, that would enable victims of terrorism to more effectively execute civil judgments in foreign jurisdictions).  The possibility of widespread enforcement of these terrorism judgments in foreign jurisdictions is a difficult prospect in these actions, as Professor Strauss concedes.  *See id.* at 325–327 (discussing reluctance of foreign courts to honor U.S. terrorism judgments; *see also* Michael T. Kotlarczyk, Note, *"The Provision of Material Support and Resources" and Lawsuits Against State Sponsors of Terrorism*, 96 GEO. L. J. 2029 (2008).  Mr. Kotlarczyk discusses the difficulties in enforcing judgments against liable states respect and stresses how terrorism cases under the FSIA terrorism exception lack legitimacy under international law.  Kotlarczyk, *supra* note 48, at 2044–47.  "The United States remains essentially alone in international law in applying the jurisdiction of its civil courts to actions performed overseas by foreign sovereigns." *Id.* at 2047.

More fundamentally, however, the continued focus in Congress on the private litigation model, and ad hoc litigation fixes around the failed concept, may be limiting the opportunity for the types proposals that can result in more meaningful and systemic reforms.  In short, the focus on the terrorism exception is a distraction from the long-term, practical, and political dilemmas that challenge this area of the law.

attachment and execution because it is currently being held in protective custody by the

Department of State under the auspices of the Foreign Mission Act.  *See, e.g.*, *Bennett*, 604 F.

Supp. 2d 152.[49]

In sum, § 1610(g) is unlikely to be the cure-all that some plaintiffs perceive it to be.  As

with past measures intended to help victims execute judgments, a myriad of legal issues still

await to befuddle plaintiffs at every turn.  Thus, these victims will continue to struggle in their

attempts to execute court judgments, whether those efforts involve the very limited disclosed

Iranian assets known to OFAC or other yet-undisclosed Iranian property that may or may not be

within the jurisdiction of the courts of the United States.[50]

The lack of available Iranian assets to satisfy court judgments has contributed to a rather

harsh and unseemly unfairness in these actions because a few dozen plaintiffs in the earliest

---

[49] Recent OFAC estimates indicate that the total value of Iran's diplomatic property, to include any remaining furnishings for that property, is unlikely to exceed 23.2 million dollars. Again, this figure represents little more than a drop in the bucket when compared to the nearly 10 billion dollars owed judgment creditors of Iran under the FSIA terrorism exception.

[50] The Court recognizes that plaintiffs are optimistic that § 1610(g) is a tool that will finally enable them to execute judgments, and it appears that some victims have invested a great deal of emotional stock in this provision.  *See* Strauss, *supra*, at 331–336, 354–355 (discussing § 1083 of the 2008 NDAA, and in particular the measures now codified at § 1610(g), and observing positive reactions expressed by the victims upon the signing of the law).  As Professors Strauss observes: "Victims of terrorism and their families have praised the new law and voiced their intention to put it quickly to action." *Id.* at 335.  Professor Strauss quotes Lynn Derbyshire, who serves as national spokesperson for the victims of the Beirut Marine Corps Barracks Bombing, as stating: "'Our focus now turns back to the court system, where we intend to move vigorously and rapidly to identify and attach the $2.6 billion in Iranian assets' awarded by the U.S. Court to the victims and their families.'" *Id.*  It is precisely because these victims appear to have placed so much emotional stock in this provision, however, that this Judge finds that it is important to speak candidly about the continuing problems that await these victims in their efforts to execute judgments in these cases.  This Court believes it is especially important to engage in an honest dialog with these victims who have waited so long for justice; it hopes our political leaders will do the same.

cases managed to obtain compensation for their losses, but hundreds of other equally deserving victims of terrorism—including the more than one thousand plaintiffs in the actions considered in today's decision—have gotten nothing.  As noted in Part A, *supra*, the VTPVA directed the Secretary of the Treasury to pay the compensatory damages portion of court judgments entered in a select number of cases against Iran.  Under the terms of the VTPVA, payments of compensatory damages in qualifying cases were made from either funds that had accrued as a result of the Federal Government lease of Iran's diplomatic and consular properties or from appropriated funds up to the total amount of funds contained in Iran's FMS Program account.  Ultimately, plaintiffs in 16 cases against Iran received payments of compensatory damages.  *See* SUITS AGAINST TERRORIST STATES, supra note 4, at p. 11–23, app. A.  By as early as 2004, however, the funds made available for payment to plaintiffs under the VTVPA were totally exhausted and the program has not been continued.  *Id.* at app. A.

Thus, there has not only been a race to this federal courthouse in these civil actions, but there also appears to have been something of a race across the street to Capitol Hill.  In the end, the terrorism victims who had access to a Congressman or a Senator—or who could otherwise afford to spend the time or money to lobby Congress—obtained millions of dollars in compensation under the VTVPA program, but those victims who were not able to get in early and gain access to Congress have been left to fend for themselves.  This inequitable result is not only unseemly, it is just plain wrong.[51]

---

[51] *Washington Post* Staff Writer Neely Tucker has reported extensively on terrorism lawsuits in this Courthouse and on suits against Iran in particular.  *See, e.g.*, Neely Tucker, *Iran Hostages Seek Suit's Reinstatement; Case Reflects Hill-White House Divide*, WASH. POST, May 13, 2003, at A10; Neely Tucker, *Iran Stands on Trial in 1983 Suicide Bombing in Beirut*, WASH. POST, Apr. 8, 2003, at A9.  Mr. Tucker's work *Pain and Suffering; Relatives of Terrorist Victims Race Each Other to the Court, but Justice and Money are Both Hard to Find*, *supra*, is

The harsh reality is that the promise of relief in these actions—if there ever was one—is more distant and seemingly illusory today than it was when this exercise started more than a decade ago, when judgment creditors in these terrorism cases first encountered resistance in their efforts to execute judgments against Iran.  The reforms enacted through § 1083 of the 2008 NDAA to the FSIA terrorism exception and related provisions in § 1610 are in all likelihood destined to fail because these changes remain premised on the same flawed private litigation concept that has proven unworkable since the original terrorism exception was first enacted in 1996.  In fact, the availability of punitive damages under § 1605A, when combined with the authorization in § 1083(c) for claims that were compromised or failed on state law grounds under § 1605(a)(7) to now be reinstated as federal causes of action under § 1605A, means that both the total amount of liability and the overall quantity of civil judgments against Iran is likely to increase exponentially, and in short order.  Indeed, in the immediate aftermath of the enactment of § 1083, dozens of new cases against Iran were filed in this Court.  With virtually no Iranian assets within the jurisdiction of our courts to satisfy judgments in these many additional cases, the great travesty in all this is that our political branches have essentially told victims of terrorism to continue their long march to justice down a path that leads to nowhere.

---

particularly insightful.  In it, Mr. Tucker chronicles the plight of terrorism victims, to include Stephen Flatow and many others, in their struggles to achieve justice though civil lawsuits under the FSIA terrorism exception.  Mr. Tucker reports on interviews with these victims, which adds a human touch that is often missing in the discussion of these terrorism lawsuits.  More significantly, Mr. Tucker's article highlights the perils, contradictions, and unintended consequences that victims face in these actions.  His reporting on the race to the courthouse and Congress, in which victims compete against each other for what limited assets might be available, that helped this Court to see the inherent and unseemly unfairness that these actions create among the victims.

Beyond the scarcity of Iranian assets, however, there are a number of other fundamental problems that confront these actions against Iran under the FSIA terrorism exception.  In terms of United States foreign policy and national security objectives, one of the perverse outcomes of Congress' legislative victories over the Executive Branch is that what limited resources might have served as a bargaining chip that the President could have used in dealings with Iran are now subject to depletion as a result of the TRIA.  These frozen assets, once at the disposal of the President in his management of foreign policy crises under the IEEPA and other authorities, are now largely subject to the jurisdiction of the Article III courts to be divided up among what few plaintiffs first lay claim to them in satisfaction of judgments under § 1605(a)(7) or § 1605A.[52]

Finally, because of the potential for these lawsuits to interfere with the foreign policy prerogatives of the President, another fundamental problem is that these actions have often pitted victims of terrorism against the Executive Branch, engendering a tremendous amount of acrimony in these victims toward the Federal Government, and, at times, the President.  Beyond the wrangling back and forth over legislative initiatives intended to aid victims in these lawsuits—which is best exemplified by the blocked assets issue, discussed Part A, *supra*,—the victims in these cases often face stiff resistance in court from Department of Justice lawyers.  In fact, in the absence of Iran, which never shows to defend itself in these actions, the Federal Government has turned out to be the number one adversary of these victims in litigation before this Court.

---

[52] Another troubling aspect of litigation under the FSIA terrorism exception is that it appears to have spurred on reciprocal lawsuits in the courts of Iran against the United States for actions allegedly committed against Iran and its citizens by United States agencies and officials. *See* Tucker, *Pain and Suffering*, *supra* (discussing antiterrorism lawsuits in the Iranian courts against the United States).

As noted in Part E, *supra*, the victims of the Iran hostage crisis—and their backers in Congress—have been opposed repeatedly by the Federal Government in their efforts to sue Iran in this Court.  The administration has consistently maintained that such a lawsuit is barred by the Algiers Accords.  Similarly, as noted in Part A, *supra*, successive presidential administrations have intervened to quash writs of attachment issued by judgment creditors of Iran against Iranian diplomatic properties here in Washington, DC and against other assets under the control of either the Department of State or the Department of Treasury.  Thus, victims of Iran-sponsored terrorism have grown increasingly frustrated as the Department of Justice has repeatedly opposed them in this context and defeated them in litigation.  This frustration has been exacerbated by the fact that many high-level Executive officials, to include the President at times, have expressed sympathy for these victims and have even made public pronouncements of support for their cause, thereby sending mixed, and even outright contradictory signals.

The Executive Branch, in its dealings with Congress and in litigation before this Court, often takes the position that these actions threaten to undermine United States foreign policy and national security interests, both with respect to Iran specifically, as well as with respect to our relations with other nations more broadly.  The victims in these cases counter with what are often extremely emotional retorts to the Executive Branch's opposition.  In frustration and anger, the victims, their lawyers, and even some members of Congress, have unfairly accused the Administration of defending Iran and siding with terrorists.  While such extreme rhetoric undoubtedly reveals the depth of the frustration experienced by the victims in these civil actions against Iran, it inaccurately characterizes the position of the Executive Branch and the true nature of the interests at stake in these important actions.  What the victims, their attorneys, and backers in Congress apparently fail to see, or perhaps conveniently overlook, is that these actions

frequently run into direct conflict with other sources of law, including bilateral Executive agreements, multilateral treaty obligations, and numerous other statutory and regulatory authorities relating to foreign policy and the President's powers to manage national security crises.

Nonetheless, the victims in these lawsuits are right to feel abandoned and frustrated to a certain extent.  After all, these Americans are merely pursuing justice under the terms of a federal statute that, twice now, the Congress has passed and two Presidents have signed.  Yet, in taking action in accordance with that federal law, these victims are all too frequently stopped in their tracks by their own Government, which quickly and poignantly reveals in open Court, that the promise of justice that they thought they had achieved in the FSIA terrorism exception is nothing more than an illusion.

In the end, both the victims of terrorism and the Federal Government each have valid concerns—and both sides are ultimately seeking to achieve the same broad objectives of holding terrorists accountable and eliminating terrorism against United States nationals—but the private litigation model for resolving these terrorism claims has had the very unfortunate consequence of casting the United States Government and American victims of terrorism as constant and bitter adversaries.  This cold reality will undoubtedly continue under § 1605A.

As Congress usually backs the victims in their desire to press forward with lawsuits against Iran in the courts, the FSIA terrorism exception has had another unfortunate consequence of turning these already extraordinary lawsuits against a foreign power into high stakes contests between the two political branches.  As this inter-branch feud over terrorism suits has heated up over the years, the Executive Branch and Congress have in essence waged a war by proxy against one another through these FSIA terrorism lawsuits.  As difficult separation-of-powers

problems and other challenging legal questions loom large in these supercharged actions, the victims are often relegated to the role of bystanders, stuck in the middle, caught up, and emotionally torn up in the cross-fire of an inter-branch political feud turned-litigation event.

But it is not only the victims who are caught up in the middle of this volatile political mix; this Court itself is also stuck in the middle and forced to referee these highly charged and highly political disputes. Like the victims, this Court finds itself relegated to the role of a powerless and frustrated bystander at times because under Article III this Court has neither foreign affairs powers nor any of the plenary authorities that are rightly vested in the political branches under our Constitution. It is these powers of governance, and not the powers of the courts, that must be used to help these victims overcome the significant challenges they face. Thus, this Court is caught in something of a political quagmire in which it is called upon to consume judicial resources chewing on novel legal issues and jurisprudential problems while carefully dodging delicate political questions. All the while the victims in these actions are no closer to justice. More fundamentally, respect for this Court and for the rule of law are undermined as judges in these actions are cast as the perennial bearers of bad news and as the designated apologists for the meaningless charade that our the political branches have created.

All these problems might be easy enough to ignore, if it were not for the real people involved. As this Court and others continue to wrestle with and mete out judicial solutions to the variety of legal issues that stem from this delicate political compromise that is the terrorism exception to foreign sovereign immunity, it can be all too easy to lose sight of the human beings whose lives have been torn apart. These victims have poured much of their emotional energy and time, to say nothing of their financial resources, into these civil cases in the hope of finding justice for themselves and for the loved ones they have lost due to terrorist violence. Over the

last decade, this Court has listened to live testimony of these victims in dozens of tragic cases, and this Court will not forget—and no one familiar with the harsh and intimate details of these cases could ever forget—the stories these victims have to tell of lives destroyed by unjustifiable violence committed against them or their family members and against the laws of all civilized nations.

These Americans pour their hearts out in these actions, and yet with more than ten years gone by now, the notion of suing the terrorists out of business has not been realized, and the vast majority of victims have not collected so much as a dime on their court judgments against Iran. In fact, as discussed Part A, *supra*, it was almost ten years ago to this date that this Court regrettably had to deny some of Stephen Flatow's first efforts to execute his civil judgment. This Court held that Mr. Flatow could not attach certain Iranian diplomatic property and related bank accounts. *See Flatow III*, 76 F. Supp. 2d 16. Following that tough decision, the *Washington Post* published an editorial in which it called for the repeal of the FSIA terrorism exception. The *Post* stated in part:

> Judge Lamberth quashed an effort by a man whose daughter was killed in a suicide bombing in the Gaza Strip to satisfy a judgment he had obtained against Iran by tapping such frozen assets as that country's old embassy. The opinion is not just, but it is correct. The executive branch's ability to conduct foreign policy simply must trump the right of any individual plaintiff to collect money damages against a sovereign state.
>
> .   .   .
>
> The administration and Congress both deserve blame for a law that is, in large measure, a lie. Because frozen assets—whether consular or otherwise—are tools of foreign policy, the executive branch has to resist their being turned over to private plaintiffs. Congress never should have passed, nor President Clinton signed, a law that could only offer Mr. Flatow justice by depriving the administration of control over important instruments of foreign policy. This law should be repealed.

Editorial, WASH. POST, Dec. 26, 1999, at B6.

While this Court will not go so far as to call for an outright repeal of the terrorism exception, this Judge has come to the conclusion, after careful deliberation and reflection, that substantial reforms in the law are needed with respect to civil actions against Iran.  This judge has taken a special interest in these cases since their inception, and after presiding over these actions for over ten years now, this Court has grown increasingly troubled by the fact that no matter how hard they struggle—and struggle they must—it is virtually impossible for the victims in these terrorism cases to collect on the civil judgments entered against Iran in this Court.

Thus, as a measure devised to achieve justice for victims, the FSIA terrorism exception has failed, and judged by the plaintiffs before the Court today, it has failed one thousand times over and seems all but certain to fail again, unless a real—rather than a superficial and politically convenient solution—is found, and found soon.  Our political branches should not continue to tell victims of terrorism to come into this Court in search of justice for unspeakable harms that they have suffered at the hands of terrorists when our political leaders know, or should know, that these lawsuits will not offer redress of any kind for the vast majority of victims in these actions against Iran.  In fact, to the extent any of the judgments have been paid in these cases, those payments have come from U.S. Treasury funds under the VTVPA, and these costs may ultimately be borne by U.S. taxpayer.  Thus, Iran has not been held accountable and the vast majority of victims have not received compensation of any kind.  In the final analysis, the terrorism exception is at best an empty promise, and at worst, it is a provision that has demoralized—and in some ways exploited—these victims of horrific acts of violence.

By other important measures, the private litigation model as a means to resolve terrorism cases against Iran has not achieved success.  It has not deterred Iran.  Today, Iran is still the world's foremost sponsor of terrorism, and the same oppressive regime is in power and appears

committed to staying in power at all costs.  United States relations with Iran remain openly

hostile, and it appears that this is likely to continue into the foreseeable future.  Thus, if the goals

of the FSIA terrorism exception are justice in terms of compensation for victim and

accountability for Iran, as well as deterrence of Iran from its material support for terrorists, civil

litigation against Iran has not brought our nation any closer to these goals today than we were

when the terrorism exception was first enacted in 1996.  Yet, in addition to imposing tremendous

costs on the victims who have invested their hopes, time, money, and emotions into these

lawsuits, civil litigation against Iran in this context has undermined the President's ability to

handle some of our most sensitive foreign relations matters, exposed the United States to

reciprocal lawsuits in Iran, and wastefully consumed the resources of our Courts here at home.

Now today, in 2009, and ten years after this Court first found itself in the disquieting

predicament of having to quash the first efforts of victims to enforce judgments achieved in this

Court under the original version of the FSIA terrorism exception, this Court finds itself

committed to a new round of litigation under the terms of § 1083 of the 2008 NDAA and a new,

and supposedly improved, FSIA terrorism exception, § 1605A.  Candidly, this Court has grown

increasingly frustrated as the political branches have now enabled new lawsuits and new claims

against Iran to populate this Court's docket without first addressing the more fundamental

problems that will again condemn these actions, if successful before this Court, to the status of

"Pyrrhic victories."  Quite simply, this is déjà vu all over again.

The new terrorism exception § 1605A—much like § 1605(a)(7) before it—is in many

respects a lie.  The truth is, as long as civil litigation is the means by which our political branches

choose to redress the harms suffered as a result of terrorism sponsored by Iran, the victims in

these cases will continue to be unwitting participants in a meaningless charade.  And let no one

forget that both political branches are responsible for this problem, as Congress drafted both the original and the most recent version of the state sponsor of terrorism exception, and now two different Presidents, one Democrat, and one Republican, signed these provisions into law. Accordingly, the frustrations and anger of the victims in these actions, which are often manifested in emotional outbursts and extreme rhetoric directed toward the Executive, are in many ways a direct result of the overblown expectations that the political branches have themselves created.

What this Court hopes our political branches will realize and appreciate today is that it is extraordinarily difficult to tell these victims that the rights and remedies they believe they are entitled to under the FSIA terrorism exception either do not exist or cannot be enforced. These victims have been waiting for years, and, in many cases, decades, for justice. How much longer should this meaningless kabuki dance continue?

This is not the first time that this Court has been critical of the FSIA terrorism exception and nothing said here is all that original. Numerous commentators in the legal community, among others, have called for the repeal of the terrorism exception or have otherwise proposed significant reforms intended to improve this provision of law that virtually all recognize has not achieved redress for victims of terrorism.[53] More significantly, there have been some efforts at

---

[53] *See, e.g.*, Kotlarczyk, *supra* note 48, at 2030 (arguing that the "provision of material support and resources" clause of the FSIA terrorism exception should be eliminated thereby limiting suits to those case in which the state or its officials have directly participated in a specified act of terrorism); Keith Sealing, *"State Sponsors of Terrorism" Is a Question, Not an Answer: The Terrorism Amendment to the FSIA Makes Less Sense Now Than it Did Before 9/11*, 38 TEX. INT'L L.J. 119, 122 (2003) (arguing for the outright repeal of the FSIA terrorism exception); Jonathan Fischbach, Note, *The Empty Pot at the End of the Rainbow: Confronting "Hallow-Rights Legislation" After Flatow*, 87 CORNELL L. REV. 1001 (arguing that, in addition to the existing jurisdictional requirements for an action under the FSIA terrorism exception, jurisdiction should also be predicated on a court determination that there are sufficient assets

systemic reforms introduced in Congress in recent years in the form of proposals for alternative

compensations scheme that shift away from the private litigation paradigm.  Most of these

proposals would have established what would in essence function as a government insurance

program in which qualifying victims of terrorism and their loved ones could file claims with the

government for compensation.  To date, none of these proposals has gotten any traction on

Capitol Hill.[54]

Perhaps nothing said here can add to what has already been stated by legal commentators,

critics, and those that have explored alternative proposals on the Hill and in other policy-making

circles, but unlike political leaders, academic pundits, and media commentators, this Court has

the benefit of years of experience—difficult experience—with these cases.  By just looking at

these actions on the Court's docket, this Court sees today all too clearly just how unsustainable

these actions have become.  Our political branches have opened the floodgates to even greater

numbers of actions against Iran and have added the lure of punitive damage awards.  Reforms

are needed now before things get out of hand.  This Court senses the enactment of § 1083, which

greatly expands the failed private litigation concept and all its pitfalls, while combined with the

start of a new Administration—one which has promoted a policy of engagement with Iran and

---

available to satisfy any money judgment awarded in such an action).  *But see* Strauss, *supra*, at
307 (arguing that a multilateral strategy focused on both the freezing of assets and civil litigation
against terrorist groups and states would serve as the most effective deterrent of international
terrorism and would best ensure justice for terrorism victims).

[54] The proposals introduced in Congress recently, including a comprehensive alternative
compensation scheme proposed by Bush Administration, are well documented in SUITS AGAINST
TERRORIST STATES, *supra* note 4, at 20, 23, 47.  *See also* Kotlarczyk, *supra* note 48, at 2044
(suggesting a terrorism victim compensation fund similar to the September 11th Victim
Compensation Fund as an alternative to civil actions under the FSIA state sponsor of terrorism
exception).

with the Middle East more broadly—may offer something of a perfect storm, which may perhaps serve as the perfect opportunity to accomplish something meaningful for the victims in these tragic cases.

Looking back on these matters now, the Court cannot help but see the wisdom in two of Justice Rehnquist's opinions, both of which formed part of this Court's analysis of issues addressed earlier in today's decision, *see* Parts A & E, *supra*, and appear particularly relevant now to the Court's request of our political leaders to find meaningful reform.  The first is Justice Rehnquist's opinion for the Court in *Dames & Moore*, 453 U.S. 654, and the second is the Justice's dissenting opinion in *Sioux Nation*, 448 U.S. 371.

*Dames & Moore* is most relevant for a number of reasons.  Historically speaking, the decision documents the Iran Hostage Crisis and upholds the Algiers Accords and related Executive actions taken to bring about the end of that crisis, including, most importantly, the transfer of Iranian assets outside the jurisdiction of the United States courts and the settlement of claims of United States nationals.  Thus, *Dames & Moore* reveals the inviolability of the Algiers Accords and related Executive actions as large stumbling blocks standing in the way of meaningful redress of terrorism claims against Iran.  More significantly, Justice Rehnquist's opinion for the Court underscores the very limited powers of Article III Courts to resolve issues relating to a foreign policy crisis and places emphasis on the role of Executive power and discretion in the resolution of sensitive matters with hostile nations like Iran.  Indeed, since the implementation of the Algiers Accords, the ability of the political branches—particularly the Executive—to manage our hostile relations with Iran has been in a constant state of tension with the desire of United States nationals to assert claims against Iran for acts of terrorism.  This is an inherent tension under our Constitution that this Court is not at liberty to resolve.

Finally, what this Court sees as an essential take-away from *Dames & Moore* is the discussion of the history of the longstanding practice of Executive claims settlement as a means to redress claims of United States nationals against foreign sovereigns.  As Justice Rehnquist's discussion points out, Executive settlement of claims is a practice that reaches far back to the time of President George Washington, and numerous other American Presidents have exercised this authority consistently throughout our history.  *See* 453 U.S. at 679–688.  Moreover, as the Court's opinion observes, Executive claims settlement is a practice that has been reinforced by Congress though statutes establishing claims settlement commissions, such as the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, 22 U.S.C. §§ 1621–1645o.  *See Dames & Moore*, 453 U.S. at 680–81.  Historically speaking, claims settlement by the Executive has often proven to be the only effective means of redress of those claims that originate during a period of strained relations with another nation.

Thus, while private litigation is now authorized under the FSIA against state sponsors of terrorism, Executive action is historically an important and necessary practice to ensure relief for United States nationals who have suffered at the hands of an unfriendly foreign government. Courts can only function at the margins on these matters, if at all.  Indeed, in comparison to the long-standing tradition of Executive settlement of claims, these private terrorism suits represent a novel and unprecedented experiment, and one that has failed.

This brings the Court to Justice Rehnquist's dissent in *Sioux Nation*, which he penned in the term immediately prior to that in which he wrote the opinion for the Court in *Dames & Moore v. Regan*.  As discussed Part E, *supra*, *Sioux Nation*, involved a no less challenging and difficult context—the mistreatment of the Sioux Indians and their divestment from their lands in the Black Hills of South Dakota.  The Court's opinion in the case recounts this American tragedy

in painstaking detail.  *See* 448 U.S. at 374–384.  Like many difficult political issues, the failure

to address that injustice apparently had much to do with money, as the Sioux Indians were

claiming upwards of a billion dollars in compensation for the land and mineral rights they lost, as

compounded over time.  *See id.* at 390.

　　As noted in Part E, *supra*, *Sioux Nation* involved a claim under the Taking Clause of the

Fifth Amendment.  The Sioux Indians claimed that their ouster from their lands in the Blacks

Hills by the Federal Government in 1877 violated the terms of the Fort Laramie Treaty of 1868

and therefore amounted to a taking for which just compensation was owed.  *See* 448 U.S. at 384.

Over a series of decades, Congress intervened on no less than three occasions in order to allow

the Sioux to press their case against the Federal Government.  *See id.* at 384–90.  These efforts

were consistently opposed by the Executive Branch.

　　At the culmination of the first action brought by the Sioux Nation in 1942, the Court of

Claims ruled squarely against the Indians, holding that the Sioux had merely presented "a moral

claim not protected by the Just Compensation Clause."  *See id.* at 384.  Thereafter, Congress

established the Indian Claims Commission, and the Sioux Indians then resubmitted their Black

Hills takings clause claim to that body.  *Id.* at 384–85.  After the Commission ruled in favor of

the Sioux, the Federal Government appealed to the Court of Claims.  *Id.* at 386–87.  Without

reaching the merits of the issue, the Court of Claims held that the Sioux Indian's takings claim

was barred by the res judicata effect of its 1942 decision.  *Id.* at 387.  In the meantime, however,

Congress again passed special legislation in favor of the Sioux Indians in which Congress

directed the Court of Claims to hear the Sioux Indians claim "[n]otwithstanding any other

provisions of law . . . [and] without regard to the defense of res judicata or collateral estoppel."

*Id.* at 389, 391.  Pursuant to that special enactment, the Court of Claims promptly reheard the

Sioux Indians' case on the merits and ultimately decided in their favor.  *Id.* at 389–390.  The

Supreme Court granted the Federal Government's petition for a writ of certiorari to in order to

review constitutional "questions not only of long-standing concern to the Sioux, but also of

significant economic import to the Government."  *Id.* at 390.

In a narrowly crafted decision, the Supreme Court ruled that the doctrine of separation of

powers did not prevent the reinstatement of the Sioux Indians claim on the grounds that

Congress was free, if it wished to do so, to waive the res judicata effect of the prior judicial

decision in the Government's favor.  *Id.* at 407.  The Court found that the Federal Government

had effectively waived those defenses though the special legislation allowing the Sioux Nation

case to be reinstated.  *See id.* at 406–407.  In so doing, the Court emphasized Congress' broad

powers to acknowledge and pay debts under the Constitution.  *See id.* at 397 (citing U.S. Const.,

Art. I, § 8, cl. 1).  On the merits, the Court upheld the Court of Claims' determination that the

Government actions amounted to a taking in violation of the Fifth Amendment and the Court's

award of compensation, plus interest, in favor of the Sioux.  *Id.* at 432–424.

As stressed in Part E, *supra*, Justice Rehnquist mounted a vigorous dissent.  *See* 448 U.S.

at 424–437.  At the heart of Justice Rehnquist's dissent in *Sioux Nation* was the basic sense that

Congress should not be permitted to co-opt the judicial powers of the Article III Courts to

resolve a claim decided previously in a manner not to its liking.  *See id.* at 427–32.  The Justice

stated, "Congress may not attempt to shift its legislative responsibilities and satisfy its

constituents by discarding final judgments and ordering new trials."  *Id.* at 431–432.  According

to Justice Rehnquist, if Congress really wanted to achieve justice for the Indians, it could have

simply passed legislation providing the sizable compensation owed.  Unlike the majority of the

Court at that time, Justice Rehnquist would hold that Congress had impermissibly attempted to

usurp judicial power by reopening a case that was previously resolved in a final judgment—albeit unfavorably to the Indians—long ago.  *Id.* at 424–25.

The parallels between the factual circumstances surrounding the claim of the Sioux Indians against the Federal Government and those that now afflict the claims of victims of state-sponsored terrorism in actions under the FSIA terrorism actions are remarkably striking.  Similar to the *Sioux Nation* case, the difficult problems confronting these FSIA terrorism cases have been foisted upon the Article III Courts in part because of a lack of real consensus between our co-equal political branches of Government on how to deal with this controversial topic.  Much like the takings claim of the Sioux, Congress persistently pushes for the litigation of claims of terrorism victims in the Federal Courts, where these victims are opposed by the Federal Government and encounter adverse court rulings.

In the dicey political context of these terrorism cases, that message of Justice Rehnquist's dissent in *Sioux Nation* reads clarion clear: If Congress and the President are serious about finding redress of the injustices suffered by these terrorism victims, then they should pull together to find meaningful, workable solutions, rather than finding new and creative ways to push these tragic claims back onto the Courts.  The private litigation has not worked, and simply is not workable, in this highly sensitive context involving affairs with a hostile nation.  It is the plenary powers of governance, and not the powers of the courts, that must be used to help these victims overcome the significant challenges they face.

Even though the President has lost much of his "bargaining chip" with respect to Iran because of the depletion of blocked assets under the VTVPA and the TRIA, there is still room for the President to reassert his prerogative in foreign affairs in this sensitive context.  In light of the scarcity of Iranian assets and the tension in United States relations with Iran, the President

might consider renewing efforts to move forward with the establishment of a terrorism claims settlement commission, like those that have been introduced in Congress in recent years.  This would be consistent with longstanding historical practice as described in *Dames & Moore v. Regan*.

To succeed, however, any proposal in this area will have to do more than simply provide compensation to victims.  Experience in these actions has demonstrated convincingly to this Court that what these victims truly want is justice.  This point was underscored poignantly in live testimony in this Court during the trial in *Peterson* case involving the bombing of the Marine Barrack in Beirut.  In finding Iran liable for that terrorist attack, this Court recounted some of the testimony.  When Lt. Col Howard Gerlach of the United States Marine Corps, who was paralyzed in the attack, was asked about what he hoped to achieve by participating in these actions, he answered:

> Well, I guess there's three words: accountability, deterrence and justice.  And they are interrelated.  The accountability, and I swear it was on Sunday, I was listening to a rerun of one of the TV—I don't know, Meet the Press or whatever, but Vice President Cheney was talking and he was saying that they, the terrorists feel that they can do things with impunity, and he said ever since the Marines in '83.  Yes, there hasn't been any accountability.

> Deterrence effect is, in some way, and this is also what he was talking about, was one thing we have to go after—and I think I'm stating this correctly; this is what I heard, is the funding.  It's the funding.  Even on the radio coming over here, we heard some talk about funding for terrorist organizations.

> Then the third thing is the justice, and this refers to the people, a good portion of [whom] are in this room. . . .  They lost a large chunk of their lives, young Marines, sons, husbands, fathers, brothers.  They were attempting to do a noble thing.  They went as peacekeepers in the tradition of this country. . . .  [W]e weren't trying to conquer land, we weren't trying to get anything for ourselves; we were really trying in a humanitarian way to help those people in Lebanon.  I think this is . . . the day in court, literally and figuratively speaking, for recognition of just how great these guys were.

*Peterson I*, 264 F. Supp. 2d at 63–64.

On this salient point, this Court recognizes again today, as it did in *Peterson* in 2003, that "there is little that the Court can do to add to the eloquent words" of witnesses who came to this Court in an effort to "achieve some small measure of justice." *Id.* at 64. It would indeed be naive and insulting to the victims to suggest that these difficult cases can be resolved through cash pay outs from our Federal Government. Nothing could be further from the truth. Justice requires accountably for Iran, and a claims authority that simply doles out compensation to victims will not achieve that end any more than actions before this Court will.[55]

The accountability aspect of the justice these victims seek certainly does not admit of any easy answers, and this is precisely the sort of challenging question that is best left to the capable minds in the Administration and in Congress. It seems to this Court, however, that such a commission might include administrative law judges within the Executive Branch who could adjudicate claims under the terrorism exception and the body of law around it, as modified for such administrative proceedings. Through that process, the Executive Branch could obtain a thorough record of these horrific cases with the active participation of the victims, and thus these matters could then be more easily presented to the policy makers within the Executive Branch who are in the best position to hold Iran accountable. To enhance the prospect of accountability in these matters, the record from hearings on these case could then be published in an annual report to both Congress and the President and made available publicly to the citizens at large in an effort to keep these matters in focus.

---

[55] *But see* Kotlarczyk, supra note 48, at 2044 (suggesting that a compensation fund similar to the September 11th Fund might be the most appropriate way to redress terrorism claims.)

Another advantage of a claims commission process within the Executive Branch is that Executive departments, and particularly the Department of State, have superior access to data and information that can help verify these terrorist incidents, and determine more reliably to what extent Iran may have played a role in supporting a particular act of terrorism.  With the benefit of such data, the findings of a terrorism claims commission might carry more weight with the State Department and the President during periods of negotiations with Iran and thus further advance the prospect of settlement with Iran down the road.  Similarly, the Executive Branch through the Treasury Department, particularly OFAC, is in the best position to locate assets of Iran in the United States, including unblocked assets.  Accordingly, if it is empowered to do so, such a commission would be most capable of tracking down these assets and could more effectively liquidate them in satisfaction of claims, which would provide real accountability and might also defray the costs of the commission.

Finally, the commission might work on an ongoing basis to make recommendations on how best to structure a large settlement with Iran, and perhaps other state sponsors of terrorism as well, in the event of normalization.  Whatever the case may be, the commission will have to conduct itself in an open and transparent manner, use all available renounces to verify and document terrorist incidents, speak candidly with the victims, and work aggressively on their behalf.  Such a terrorism commission, if well resourced and able to report independently on its findings to both political branches of Government, should provide victims of terrorism with a better opportunity for meaningful redress of their claims.

The need for substantial reforms with respect to terrorism lawsuits has become even more apparent over the last several months.  As the events in Iran since that country's presidential election in June have revealed, the affairs of that nation are tremendously complex.  There are

forces for both good and evil in that society, and there are those who want reform and a new day

for Iran, and for its relations with the larger international community.  While that day is still

undoubtedly a long ways off, we cannot ignore its promise.  And while we must decry and

condemn the current regime and its use of terror in furtherance of its political objectives—we

cannot forget the courage of the people, including women and young people, who took to the

streets of Tehran and elsewhere in the hope of a better day.

　　　What we have seen from the citizens of Iran is inspiring and brings a brief flicker of hope

for a lasting peace and a chance to settle grievances—real or perceived—whatever they may be.

It is in that process of normalization, whenever and however it might occur, that there is the best

chance for achieving justice for all those who have suffered over the last thirty years.

Regrettably, the same cannot be said of the FSIA terrorism exception—whether § 1605(a)(7) or

§ 1605A.  Frankly, these measures are politically superficial and overly simplistic solutions to

much deeper problems.  These measures are empty political gestures that offer no justice for so

many victims who—whether intentionally or not—have been exploited by the politics of these

terrorism lawsuits.

　　　There is an important dialogue occurring in our nation over how best to deal with

terrorism, including state sponsors of terrorism like Iran, but neither tough rhetoric nor large,

unenforceable court judgments will help to resolve these extraordinarily sensitive and complex

matters.  By fanning flames and fueling unrealistic exceptions, these court actions do not

contribute to a productive dialogue.  These actions may even add to the atmosphere of tension

and hostility between Iran and the United States that moves that rogue country further down the

path of isolation and paranoia, thereby contributing to the conditions that strengthen and further

the ends of a regime that seems determined to do us in.  Certainly, these actions under the FSIA

terrorism exception do nothing to enhance the President's ability to carefully and intelligently respond to a host of sensitive matters pertaining to our relations with Iran, and there are indeed many substantial competing considerations in this context. The most paramount of these is the grave risk of nuclear proliferation.

Make no mistake about it, terrorism is a grave threat to our society. Our citizens will continue to be targeted precisely because they are Americans.[56] The White House may have declared the war on terrorism over,[57] but the threat of terrorism remains very real, and Americans will continue to suffer casualties as a result of this insidious and murderous evil. These victims certainly deserve justice, but the private litigation approach to redress is unsustainable and works at cross purposes of the President's foreign policy initiatives other developments that may lead to lasting change and peace. Nothing that occurs in this Court can achieve those ends.

Thus, today's decision is merely a roadmap for the long road ahead that awaits these victims in renewed litigation before this Court under the FSIA terrorism exception, a provision

---

[56]     Terrorists attack American targets more often than those of any other country. America's pre-eminent role in the world guarantees that this will continue to be the case, and the threat of attacks creating massive casualties is growing. If the United States is to protect itself, if it is to remain a world leader, this nation must develop and continuously refine sound counterterrorism policies appropriate to the rapidly changing world around us."

NAT'L COMM'N ON TERRORISM, COUNTERING THE CHANGING THREAT OF INTERNATIONAL TERRORISM, at iii (2008), *available at* http://www.gpo.gov/nct/nct1.pdf.

[57] The Administration has apparently decided to stop using the phrase "war on terrorism." *See* John Brennan, Assistant to the President for Homeland Sec. and Counterterrorism, A New Approach for Safeguarding Americans, Address at the Center for Strategic and International Studies (Aug. 6, 2009) ("[T]he president does not describe this as a 'war on terrorism.'") (transcript available at http://csis.org/files/attachments/090806_brennan_transcript.pdf); *see also* John Ward, *U.S. No Longer at War with "Terrorism"; Administration Deems Terms from Bush Era Unacceptable*, WASH. TIMES, Aug. 7, 2009, at A1.

of law that so far has gotten the victims of terrorism no closer to the justice they seek.[58]  What this Court really hopes for, however, is that some of our political leaders may read this opinion and consider the experiences of this Court in a broader effort to obtain meaningful reform.  Our political leaders must find a way to muster the commitment and courage it will take to address the fundamental problems—the roadblocks—that will continue to undermine the efforts of these victims to find justice in new lawsuits under § 1605A.  This meaningless charade under the FSIA has gone on far too long.  It is high time for our political leaders to consider the flaws of this private litigation experience and address the deeper political problems that this Court has no authority to resolve.

This Court's experience with these terrorism lawsuits might not offer any immediate answers, but it may lend some valuable insights, and thus this Court hopes these insights—these lessons learned—will assist in a larger dialogue about reform.  Is there a better way to address these important terrorism cases and achieve justice for the victims?  It is in this spirit that today's decision is offered.  This opinion is in no way intended as a criticism of the victims and their noble efforts, but as a call to action for their cause.  If the President and Congress are able to candidly acknowledge the both the legitimate grievances of the terrorism victims and the fundamental problems that undercut the private litigation model long embraced by FSIA terrorism exception, they can undoubtedly develop a workable system of redress for these tragic cases.  Key Executive Branch officials, including the Secretary of State, the Attorney General,

---

[58] This opinion speaks only to 20 pending cases, which is only a fraction of the number now pending against Iran in this Court.  This judge has several more not included in this opinion, and there dozens of others representing billions in potential liability for Iran that are now pending with other judges of this Court.

and the Secretary of the Treasury, among others will likely prove crucial to the success of such an undertaking.

Whatever measures might be advanced to aid terrorism victims in this context should neither limit the President's ability to extend his hand nor encourage Iran to continue to clench its fist.  Now more than ever, it is important for our President to be able to speak with one voice and to marshal the full measure of American power and diplomacy in search of better relations with Iran in the interest of all Americans.  This Court is concerned, however, that if these unsustainable civil actions continue to fan flames and exhaust terrorism victims who have already suffered enough, judgments entered by this Court will continue to undermine the President's ability to address sensitive matters of national security and will do so at crucial times when the President's ability to act is likely to matter most.

**L.**

**AN INVITATION FOR THE UNITED STATES**
**TO PARTICIPATE IN THESE ACTIONS**

This Court has found on past occasions that the appearance of the United States in actions against Iran has greatly assisted the Court.  The United States often brings to light additional, relevant legal authorities and arguments bearing on the questions presented and generally provides the kind of broader perspective that this Court must have when addressing cases against foreign sovereigns.  For these reasons, the United States will be invited to file a brief within 60 days in which the United States may express its views regarding any of the issues raised by this consolidated opinion and the accompanying order.  Filing a brief by invitation of this Court will not prejudice the United States with respect to any submissions it may wish to make in response to specific filings by plaintiffs in any of the civil actions addressed today.

Additionally, in an effort to further the case-management function of this opinion, this Court will hold a series of status conferences for all the civil cases addressed in this decision.  The United States will be invited to attend the status conferences along with the parties.  The Court anticipates holding similar status conferences in these cases approximately every 60 days thereafter to ensure that these matters remain on track.  Many of these cases have been languishing on the Court's docket for quite some time, and thus the Court is eager to bring these matters to conclusion as expeditiously as possible.  The clerk will contact counsel for plaintiffs and the United States to schedule a time on the Court's docket that is convenient for all parties.

# IV.

## CONCLUSION

Nearly thirty years ago, the Hostage Crisis began as Islamic students seized the United States Embassy in Tehran and took more than 50 Americans as hostages.  For over four hundred long and painful days, Americans looked on with shock and horror as they followed the nightly news coverage of the events in Tehran.  It seemed as if our whole nation was being held hostage.  On the eve of Ronald Reagan's Inauguration, the hostage standoff was finally settled peacefully through the conclusion of the Algiers Accords on January 19, 1981.  All American hostages were released the following day, only moments after President Reagan took the oath of office.  Little did we know at that time that the Hostage Crisis merely signaled the beginning of what would become an increasingly hostile era of relations between the Islamic Republic of Iran and the United States.

Less than three years later, in Beirut, Lebanon, more than two hundred United States Marines and numerous other uniformed service members, most of whom were asleep in their barracks, would die in a tremendously powerful explosion—the result of a highly sophisticated and carefully executed suicide bombing orchestrated by Hezbollah operatives acting with training, guidance, and other material support from Iran's Ministry of Information and Security.  By January 1984, Iran was designated as a state sponsor of terrorism by the State Department.  In the years that followed, Iran's material support for terrorism would lead to unprecedented suicide bombing attacks throughout the Gaza Strip and Israel.  Schools and buses were frequent targets of the terrorist perpetrators of these attacks—unjustified killings of innocents in contravention of all the laws of humanity—which have claimed the lives of many bright young American men and women.

Since 1996, the civil cases brought under the FSIA state sponsor of terrorism exception have chronicled the senseless violence and carnage that have dotted the last three decades of hostile relations between the Islamic Republic of Iran and the United States.  These terrorism cases are the tragic stories of the many victims—like the more than one thousand victims represented here today—who have suffered dearly as a result of a campaign of terror that has included hostage takings, torture, suicide bombings, and assassinations.

Regrettably, the tragedies represented by these cases under the FSIA terrorism exception have been compounded by what has turned into a long and often futile quest for justice under this novel provision of law.  The reality is that the FSIA terrorism exception, as applied by our Article III Courts of limited jurisdiction and powers, has not provided the victims the relief they deserve.  Instead of finding justice, most of these plaintiffs have found themselves holding unenforceable judgments.  They have faced years of costly, emotionally draining, and time-consuming postjudgment litigation.  They have often been opposed by the Executive Branch, and their struggles have rarely produced positive results.  Similarly, these victims have fought in the halls of Congress for *ad hoc* and often ineffectual legislative fixes in an effort to give some real teeth to this failed provision of law.

This Court commends Stephen Flatow, Deborah Peterson, and the many others who have bravely pursued justice under the terrorism exception.  They have brought to light to an important issue, and their cases in the courts provide an important historical record concerning all those who have been injured or killed as a result of state-sponsored terrorism.  Our Nation has been served by their efforts.  It is out of respect and appreciation for these victims—and out of observance of the frustrations that experience with this terrorism law has borne out over time in proceedings before this Court—that this Court expresses the view that these FSIA terrorism

actions cannot achieve justice as intended.  In the long and difficult process that this Court has

witnessed over the last decade, these cases have consumed substantial judicial resources while

achieving few tangible results for the victims.  The problems encountered by the Flatows a

decade ago are the same problems experienced by Deborah Peterson today.  More

fundamentally, the rule of law is being frustrated in what now seems to be an increasingly

counterproductive and largely academic exercise.

For the sake of these terrorism victims, however, and for the sake of our Nation as a

whole, these actions should not continue on as academic exercises.  The stakes are far too high,

both in terms of the losses sustained, and in terms of the larger foreign policy interests of the

United States.

To be sure, the current regime in Iran is apparently not going away any time soon and the

problem of state-sponsored terrorism will be with us for years to come, and long after the judges

of this Court who have presided over this grand experiment have passed from the bench.  But

these are complicated matters.  If anything, the events of the last few months and weeks have

underscored the depth of that complexity.  There are forces for evil in that country, as there are in

any nation, but there are also forces for good, and with that there is a glimmer of hope for a

better future.

Meanwhile, here at home, the reforms implemented as part of § 1083 of the 2008 NDAA

last year—which are just now being implemented in individual cases here today—will not, in

this Court's humble opinion, lend much support to the cause of these victims or their long march

toward justice.  These most recent reforms, like others before them, are premised on the same

failed private-litigation model that has, in effect, doomed these actions from the start.  These

terrorism cases—whether under § 1605(a)(7) or § 1605A—are likely to face the same obstacles

discussed in this opinion, such as the Algiers Accords, limited assets to satisfy judgments, conflicting laws and regulations, and the President's foreign policy prerogative, among others. These are intractable problems that are more often political, rather than jurisprudential, and so it seems that the new § 1605A, although well intentioned, is destined to prolong and perhaps aggravate the ways in which the same intractable issues have continuously foiled plaintiffs in these cases time and again.  Today, more than a decade after these suits began—and with the majority of Iran's blocked assets depleted to pay for earlier judgments—the hope for justice under the terrorism exception is growing increasingly distant and unobtainable.

But these difficult realities should not give license to those who would rather ignore the plight of American victims of terrorism.  Instead, this Court sincerely hopes that today, on the dawn of a new presidential administration—one that remains committed to a policy of engagement with Iran and the Middle East as whole—that the President, the Secretary of State, the Attorney General, the Secretary of the Treasury, and leaders in Congress will look at these matters and look for ways to make real change.  The President should be commended for his work to foster a dialogue with the Middle East generally and the Muslim world specifically.  In light of this fresh and inspiring approach, perhaps today more than ever there is hope for real reform.

The challenges that confront the President with respect to our relations with Iran are as daunting as ever, and thus this Court must leave it to the experts in the political branches to consider whether a balanced and meaningful political compromise can be reached with respect to these difficult terrorism cases.  It seems to this judge that it is time for a new approach, and perhaps it is time to think more systematically about how these cases can work in concert, rather

than in conflict, with a broader strategy towards the goals of better relations with the Muslim world, peace in the Middle East, and the eradication of terrorism.

To all the plaintiffs, this Court wishes to stress that it, as always, will endeavor to see to it that plaintiffs in these actions get all the relief to which they are entitled under the law. This Court continues to hope that one day soon justice might be achieved.

**ROYCE C. LAMBERTH**

**CHIEF JUDGE**
**U.S. DISTRICT COURT**
**WASHINGTON, D.C.**

**SEPTEMBER 30, 2009**