## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEBORAH D. PETERSON, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Case No. 01-cv-2094 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

This is a dispute between attorneys over who will reap the rewards of a sprawling litigation against the Islamic Republic of Iran (Iran) under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act (FSIA). Nearly a decade ago, this Court lamented the "contentious road blocks and setbacks in what has been an increasingly futile exercise to hold Iran accountable for unspeakable acts of terrorist violence." *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31, 35 (D.D.C. 2009). In spite of the difficulties FSIA plaintiffs have historically had in obtaining and enforcing judgments against state sponsors of terrorism—difficulties too often chronicled by this Court—plaintiffs here managed to obtain judgments against Iran totaling in billions of dollars. Now, after more than fifteen years of litigation, plaintiffs' attorneys are eager to collect their fees.

In short, attorneys David Cook and Jay Glenn have filed notices of attorney's charging liens [ECF Nos. 525, 528, 533, & 538], claiming they are entitled to a share of the contingent attorney's fees from the plaintiffs' recovery. Before this Court are plaintiffs' emergency motions to quash those liens [ECF Nos. 539 & 542]. This Court also considers Cook's Counter Motion to Compel

Arbitration [ECF No. 544]. For the reasons discussed below this Court will **GRANT** the motion to quash Cook's lien, **GRANT** the motion to quash Glenn's lien, and **DENY** the motion to compel arbitration.

## II.    BACKGROUND

Plaintiffs here are victims of the October 23, 1983 bombing of a United States Marine Corps barracks in Beirut, Lebanon. With help from Iran, suicide bombers from Hezbollah murdered 241 American servicemen and injured several more. This Court presided over a consolidated action by nearly one thousand plaintiffs consisting of the victims, their families, and the representatives of their estates. On September 7, 2007, this Court found Iran liable for damages because they provided material support and assistance to Hezbollah. Iran did not appear here, and default judgment was entered in favor of the plaintiffs in the amount of more than $2 billion.

In 2013, plaintiffs successfully brought an action to seize Iranian assets in the United States District Court for the Southern District of New York. That court ordered the turnover of $1.75 billion in assets held by Citibank N.A., cash bonds that Bank Markazi—the Central Bank of Iran— held in an account through an intermediary. The court's order created a qualified settlement fund (QSF trust) and transferred the seized funds to a trustee—the Honorable Stanley Sporkin—for the benefit of the plaintiffs. The court's order was affirmed by both the Second Circuit[1] and the United States Supreme Court.[2]

Plaintiffs were represented before this Court by the Fay Law Group, PA, Thomas Fortune Fay, the Perles Law Firm, P.C., and Steven R. Perles (collectively, "Fay and Perles"). The contingency agreement is set forth below in full:

---

[1] *Peterson v. Islamic Republic of Iran*, 758 F.3d 185 (2014).
[2] *Bank Markazi v. Peterson*, 136 S.Ct. 1310 (2016).

I, _____, _____, on their own behalf hereby retain and employ Fay & Perles (Attorneys) to represent them in the litigation and recovery or settlement of all claims and causes of action against The Islamic Republic of Iran, The Iranian Ministry of Information and Security, and their associates and agents with regard to the October 23, 1983 bombing of the Marine Corps Barracks in Beirut, Lebanon.

Client agrees to pay to said Attorneys a fee which will be computed as follows: (1) 33 1/3 % of the total gross recovery before deduction of any fees, liens or charges of any type; and (2) an amount equal to the necessary expenses in the preparation, domestic and foreign litigation, lobbying efforts, and administration of the case. This fee is contingent upon collection and to the extent of collection only. The percentage attorneys fee above described will be distributed to each of the Attorneys in an equal share. The "necessary expenses" portion of the attorneys fee will be distributed in the proportion which that attorney's expenses bears to the total expenses of the attorneys.

Client shall have no liability for any expenses in connection with the preparation, prosecution and administration of the claim, the above provision relating solely to the computation of the attorneys' fee. The Attorneys will, under no circumstances, represent to any vendor, supplier of services or contractor with regard to services, that they are incurring expenses on behalf of or chargeable to the credit of the Client and all such expenses shall be the sole obligation of the Attorneys and not in any manner the legal obligation of the Client. Under no circumstances shall any part of the attorneys' fee be considered to be a loan from the Attorneys to the Clients. The fees due the Attorneys shall constitute a lien upon any proceeds realized having priority before all other liens on any sums realized from this claim.

Client understands that Fay & Perles are lead counsel and co-counsel in a number of actions against the Islamic Republic of Iran, that most of these cases have judgments, and all are in a more advanced procedural posture than this case. Client further understands that although the Attorneys have been successful in the past in prosecuting cases under the Foreign Sovereign Immunities Act, collection may depend upon factors beyond their control, including, but not limited to, statutory amendments and the foreign relations of the United States. Attorneys will assert their best efforts but cannot guarantee success.

Fay and Perles Contingent Retainer Agreement [ECF No. 539-2]. Fay and Perles argue that this agreement authorized them to employ other attorneys to assist them in their efforts, but did not authorize counsel to obligate the plaintiffs to pay fees of any other attorney employed. Pls.' Mem. in Supp. of Em. Mot. to Quash Cook's Lien 3 [ECF No. 539-1].

Fay and Perles engaged Jay Glenn to prove the plaintiffs' damages to a Special Master. Glenn asserts that, pursuant to a written agreement signed in 2003, Fay and Perles agreed to pay Glenn 3% of the gross amounts collected on judgments for plaintiffs represented before the Special Master. Decl. of Glenn Exhibit 1 [ECF No. 546-1]. Further, Glenn asserts that Fay and Perles orally agreed to pay an additional one-third of amounts collected on plaintiffs referred by Glenn. Decl. of Glenn ¶ 11 [ECF No. 546]. Glenn claims to have represented 103 plaintiffs before the Special Master, resulting in a combined award of over $309 million. Mem. in Opp'n to Em. Mot. to Quash Glenn's Lien 2 [ECF No. 545]. The referred plaintiffs were allegedly awarded $111,750,000.00. Decl of Glenn Exhibit 10 at p. 3 [ECF No. 546-16]. In contrast, Fay and Perles claim Glenn's only agreement was with Fay and Perles themselves; they deny that the oral agreement existed and argue that Glenn is not entitled to a charging lien. Mem. in Support of Pls.' Em. Mot to Quash Glenn's Lien 3 [ECF No. 542-1] ("Glenn has no contract with Plaintiffs and no lien in [sic] can exist.").

Fay and Perles similarly engaged David Cook "to represent the [p]laintiffs above referred to in order to effect a collection of the amounts due [in this action]." *See* Cook Agreement ¶ 3 [ECF No. 539-3]. Cook agreed to bear all expenses while pursuing collection on the judgment. *Id.* ¶ 6. "To the extent of the recovery by the Collection Service, the recovery shall first be subject to reimbursement of costs and expenses, and thereafter, subject to the fees due the Collection Service." *Id.* According to the agreement, the fee due the collection service was "a contingency fee of 10% on any net recovery, as received." *Id.* ¶ 7. "Net recovery is defined as the total recovery less costs of enforcement incurred by the Collection Service." *Id.* "In the event of any collection, the funds shall be remitted to a joint escrow account from which the contracting parties will disburse funds as they deem fit, however, the Collection Service shall be able to deduct their fees

and expenses before remitting the funds to [Fay and Perles] who serve as the agent and repository for any collections." *Id.* ¶ 9. "In the event of any disputes by and among any of the attorneys, or all of the same, and the clients, and all of the same, such disputes shall be resolved by way of binding arbitration . . . ." *Id.* ¶ 5.

Glenn and Cook each filed a notice of charging lien asserting a property interest in the QSF trust. Specifically, Glenn asserts a charging lien "for the purpose of securing Glenn's fee claims of: (a) 3% of the respective gross amounts collected on behalf of the 103 plaintiffs in this action . . . to which Glenn is entitled pursuant to an agreement between Glenn and [Fay and Perles]; and (b) 11.11% of the respective gross amounts collected on behalf of the 40 plaintiffs in this action . . . to which Glenn is entitled pursuant to agreements between Glenn, [Fay and Perles], and the respective plaintiffs; plus (c) unreimbursed costs and expenses due Glenn of $15,288.56." Glenn's Am. Notice of Charging Lien [ECF No. 538]. Cook also asserts a charging lien "for the purposes of securing the fee claim of 10% of the gross proceeds guaranteed under that certain written contract dated April 5 and 6, 2008 by and between [Cook] and the Plaintiffs." Cook's Notice of Charging Lien [ECF No. 533].

Fay and Perles moved to quash those charging liens. Specifically, Fay and Perles argue that this Court does not have jurisdiction over the liens or funds at issue here because the corpus—the QSF trust—is being administered in New York pursuant to orders issued by the SDNY court. Em. Mot. to Quash Glenn's Lien 2 [ECF No. 542]; Em. Mot. to Quash Cook's Lien 3 [ECF No. 539]. Further, they argue that Glenn's lien should be quashed because no agreement existed between Glenn and the plaintiffs here. Em. Mot. to Quash Glenn's Lien 2 [ECF No. 542]. Thus, because this is a dispute between attorneys rather than a dispute between attorneys and client, a charging lien is improper. *Id.* Similarly, Fay and Perles argue that Cook's lien should be quashed because

he never appeared in the SDNY case that lead to recovery, and instead was terminated for incompetence. Em. Mot. to Quash Cook's Lien 2, ¶ 4 [ECF No. 539]. Further, Fay and Perles argue that "Cook has no right to lien any property of the Plaintiffs because he does not have a written agreement with the Plaintiffs." Mem. in Support of Pls.' Em. Mot. to Quash Cook's Lien 6 [ECF No. 539-1].

Glenn argues that his charging lien is valid because he represented the 103 plaintiffs pursuant to the 2003 written agreement, an additional oral agreement, and the 40 retainer agreements he executed on behalf of Fay and Perles. Mem. in Opp'n to Pls.' Em. Mot. to Quash Glenn's Lien 4-6 [ECF No. 545]. Cook argues that, while he did not appear in the SDNY action, he retained New York attorneys to secure the Bank Markazi assets. Id. at 8. Cook also argues, similarly to Glenn, that the plaintiffs here were also parties to Cook's retainer agreement with Fay and Perles. Mem. in Opp'n to Pls.' Mot. to Quash Cook's Lien 9-14 [ECF No. 543]. In other words, Cook argues that plaintiffs authorized Fay and Perles to hire third-party service providers who would be paid an additional contingency fee out of the recovered judgment. Id. at 10-11. Thus, Cook argues he had a contingency agreement with plaintiffs themselves and not merely with Fay and Perles. Id. at 16. Finally, Cook argues that the question of whether Cook is entitled to some or all of his fee should be decided by an arbitrator pursuant to the arbitration clause in the retainer agreement. Id. at 5; Counter Mot. and Mot. to Compel 5 [ECF No. 544]. Cook asks this Court to compel arbitration of his claims against Fay and Perles, order the appearance of plaintiffs at that arbitration, and order the QSF trustee to withhold 10% of the funds from distribution pending the outcome of the arbitration. Id. at 19.

### III.   STANDARDS

The existence and effect of an attorney's lien is governed by the law of the place in which the contract between the attorney and client is to be performed. 7 Am. Jur. 2d *Attorneys at Law* § 351 (1980). The District of Columbia has no statute setting out attorney's liens; rather, D.C. relies on the common law. *See Wolf v. Sherman*, 682 A.2d 194, 197 (D.C. 1996). The "charging lien" arises when an attorney obtains a judgment or decree for a client, and has been characterized as "merely a claim to the equitable interference by the court to have that judgment held as security for his debt [the attorneys' charges against the client]." *Id.* at 197 (quoting *Lyman v. Campbell,* 182 F.2d 700, 701–02 (D.C. Cir. 1950)). Unlike the retaining lien, the charging lien is not dependent on possession of a corpus. *Id.*

In order for a charging lien to attach, "it is indispensable that there exist between the client and his attorney an agreement from which the conclusion may reasonably be reached that they contracted with the understanding that the attorney's charges were to be paid out of the judgment recovered." *Id.* Whether written or verbal, an unmistakable contingency agreement between a client and his attorney gives rise to an equitable attorney's charging lien. *See District of Columbia Redevelopment Land Agency v. Dowdey,* 618 A.2d 153, 160 (D.C. 1992) (finding an undisputed oral contract between an attorney and his clients that the attorney would be paid out of the recovered funds sufficient to support an equitable lien). However, if no agreement exists between a client and an attorney, there is no basis for inferring the intent necessary giving rise to such an equitable lien. *See Democratic Cent. Comm. v. Washington Metro Area Transit Comm'n*, 941 F.2d 1217 (D.C. 1991) (finding that an associate counsel with no agreement with the client could not satisfy the common law requirements for an attorney's lien).

"Attorney's liens are asserted by counsel against the client." *Id.* The trend of modern decisions "is to protect the right of the attorney to receive compensation [from a client] for his services." *Wolf,* 682 A.2d at 201 (quoting *Elam v. Monarch Life Ins. Co,* 598 A.2d 1167, 1170 (D.C. 1991)). While "[d]ebts payable by clients to attorneys should in general be subject to the same rules that normally apply to other debtor-creditor relationships," the D.C. Court of Appeals has been clear: an underlying client-attorney agreement is "indispensable." *Id.*

The Federal Arbitration Act (FAA) declares arbitration agreements in contracts involving commerce "valid, irrevocable, and enforceable," unless the terms are unenforceable under general contract doctrine. 9 U.S.C. § 9; *Doctor's Assocs. Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). The FAA therefore evinces a strong policy in favoring arbitration, requiring courts to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation. *" Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). "The FAA thereby places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (internal citations omitted). Critically, however, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); *see also Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so."). "Accordingly, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

## IV.   ANALYSIS

At the outset, this Court notes that the merits of Glenn and Cook's claims regarding whether or how much they should be compensated for their work, or Fay and Perles' claims that Glenn and Cook did not fulfill their obligations, are not before this Court. **To reiterate, this Court does not now determine whether or how much the attorneys here will be compensated**. What is before this Court is 1) the question of whether Glenn and/or Cook are entitled to an equitable interest in plaintiffs' recovery, and 2) the question of whether Cook may compel arbitration of his disputes with Fay and Perles. This Court takes those questions—and only those questions—in turn.

### a.   Motions to Quash

Before this Court may address the assertion of liens here, it must address Fay and Perles' claim that this Court lacks jurisdiction because QSF trust exists in New York. Quoting *Thurston v. Bullowa*, Fay and Perles claim that a charging lien "can only be enforced against a fund in the control of the court, recovered in the cause in which the attorney's fees are incurred."[3] Thus, they argue, no lien can arise in the District of Columbia because there are no funds under the control of the court. Pls.' Reply to Glenn's Mem in Opp'n to Pls.' Mot to Quash Glenn's Lien 6 [ECF No. 551]. This Court disagrees.

The lien in *Thurston* was "no longer under the control of the court" because it had been wrongfully assigned to another attorney in satisfaction of a judgment. *Thurston*, 42 App. D.C. at 23. "No judgment was entered and no money paid into court as the result of the compromise; hence there was nothing against which an attorney's lien could be enforced." *Id.* Here, though, this Court entered judgment against Iran, and the QSF trust consists of funds seized for the satisfaction of

---

[3] 42 App. D.C. 18, 23-24 (D.C. Cir. 1914), *overruled on other grounds*, *Pink v. Farrington*, 92 F.2d 465 (D.C. Cir. 1937).

that judgment. This Court rejects the argument that this Court is precluded from enforcing an otherwise proper attorney's charging lien because the funds to satisfy that judgment were seized in another jurisdiction.

It is well settled that federal courts generally have ancillary jurisdiction over attorney fee disputes, which may be adjudicated after a dismissal or final judgment in the original underlying action. *See, e.g., Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991). Further, the rationale for permitting attorneys to assert a charging lien is to protect an attorney's claim of compensation for services rendered before the court. *Wolf*, 682 A.2d at 198. It is "merely a claim to the equitable interference by the court to have that judgment held as a security for his debt." *Id.* This Circuit has long allowed attorneys to intervene in the underlying case to protect their interests, recognizing that charging liens "arise[] out of the underlying action and relate[] back to the inception of the action." *Martens v. Hadley Memorial Hosp.*, 753 F. Supp. 371 (D.D.C. 1990) (citing *Friedman v. Harris*, 158 F.2d 187 (D.C. Cir. 1946); *accord, Continental Casualty Co. v. Kelly*, 106 F.2d 841 (D.C. Cir. 1939)). The D.C. Circuit has also recognized a "continuing jurisdictional basis premised upon this Court's inherent power to affect the distribution of judgment proceeds." *Id.* Therefore, the true question is whether there are any properly asserted claims before the Court. This Court addresses those claims below, but it is not prepared to generally relinquish the jurisdictional authority to determine attorney fee disputes or to enforce a properly asserted attorney's lien, particularly when the power to enforce such liens exists to protect the attorneys who have litigated before this Court.

The Court now considers Glenn and Cook's charging liens, and the accompanying motions to quash, in turn.

i. **This Court must quash Glenn's notice of lien because Glenn has not
established an agreement between himself and the plaintiffs here.**

Glenn claims that he was retained by Fay and Perles as a damages attorney pursuant to a

written agreement that provided Glenn would be paid 3% of the gross amount collected from

defendants referred to Glenn, and an amount equal to the necessary expenses incurred by Glenn.

Mem. in Opp'n to Pls.' Em. Mot. to Quash Glenn's Lien 4 [ECF No. 545]. Indeed, Fay and Perles

do not seem to deny that such an agreement existed. Mem. in Supp. of Pls.' Em. Mot. to Quash

Glenn's Lien 1-2 [ECF No. 542-1] ("Glenn was engaged as such a 'damages attorney' to collect

evidence with respect to damages sustained by plaintiffs . . . ."). Rather, they argue Glenn failed

to perform under that agreement and cannot properly assert a charging lien because no contract

existed between Glenn and plaintiffs here. *Id.* at 3.

As noted above, an attorney's lien is asserted by counsel against the client. An underlying

agreement between an attorney and a client is necessary for the attachment of an attorney's lien.

An associate counsel is only entitled to an attorney's lien if the client authorized or ratified his

employment by the principal attorney and agreed to have that associate's fee paid from the

judgment. *See Democratic Cent. Comm. v. Washington Metro Area Transit Comm'n*, 941 F.2d

1217 (D.C. 1991) (citing *Hahn v. Oregon Physicians' Service*, 786 F.2d 1353, 1355 (9th Cir. 1985).

In *Hahn*, lead counsel hired an associate attorney as expressly authorized by a retainer agreement

with his client. 786 F.2d at 1354. The associate would be paid 25% of the lead counsel's recovery

under the retainer agreement. *Id.* The associate asserted an attorney's lien based on both his retainer

with the lead counsel and as a party to the original retainer agreement, since that agreement allowed

the lead counsel to employ other attorneys to assist in the litigation. *Id.* The Ninth Circuit held that

the associate had a claim against the lead counsel, but not the clients. *Id.* at 1355. "[B]ecause no

independent contract between [associate counsel] and [clients] ever existed, [associate counsel]

does not have a right to a lien." *Id.* That finding was cited with approval by the District of Columbia Court of Appeals, and this Court finds no authority allowing a departure from the rule. Therefore, without an independent contract with the plaintiffs, an associate counsel is not entitled to a lien under the laws of the District of Columbia.

Here, Glenn seems to have filed an attorney's lien based on agreement between himself and Fay and Perles, and not based on an agreement between himself and the plaintiffs. Specifically, the 2003 agreement was a retainer agreement between Fay and Perles, as lead counsel, and Glenn, as "Associate Counsel." Decl. of Glenn Exhibit 1 [ECF No. 546-1]. Further, Glenn seems to admit that his fee "could only come from Fay and Perles' own 33 1/3% fee." *Id.* This Court finds that no independent contract existed between Glenn and plaintiffs here.

Glenn further claims to have executed independent engagement agreements with at least 40 plaintiffs, whom he then referred to Fay and Perles. Decl. of Glenn ¶ 12 [ECF No. 546]. Glenn claims this was pursuant to an oral agreement with Fay and Perles in which he would receive an additional one-third of Fay and Perles' one-third contingency (or 11.11% of the gross recovery). Mem. in Opp'n to Pls.' Em. Mot. to Quash Glenn's Lien 6 [ECF No. 545]; Decl. of Glenn ¶ 11 [ECF No. 546]. Whether that oral agreement existed or not—on which this Court does not opine— that agreement was again only between Fay and Perles and Glenn, their associate counsel. This is insufficient to establish an underlying attorney-client agreement justifying a charging lien.

Glenn finally points to 33 executed agreements[4] signed by both Glenn and Fay as evidence of an agreement between Glenn and plaintiffs. *See* Glenn Decl. Exhibits 2A-2G [ECF No. 546].

---

[4] Glenn argues these are indicative of the agreements to all 40 plaintiffs referred to Fay and Perles, but sates he has "not yet been able to locate the executed agreements with the remaining seven Plaintiffs." Decl. of Glenn ¶ 12 n. 2 [ECF No. 546].

He claims to have executed those agreements and forwarded them to Fay along with a "Family Information Sheet" acknowledging his entitlement to the additional fee:

> I located and executed Attorney Client Contracts for _____ [names indicated on Family Information Sheet]. In accordance with prior discussions, I am entitled to an additional contingent fee of 11.11% of any recovery/interest for these [__] claims.

Glenn Decl. Exhibit 4 [ECF No. 546-10].

On the surface, these appear to satisfy the requirement that there must be an attorney-client agreement for an attorney's lien to attach. To justify a charging lien, however, such an agreement must also give rise to the reasonable conclusion "that they contracted with the understanding that the attorney's charges were to be paid out of the judgment recovered." *Wolf*, 682 A.2d at 702. Here, while Glenn signed the contingent retainer agreements, those agreements named only Fay and Perles as recipients of a contingency fee. *See, e.g.,* Decl. of Glenn Exhibit 2A [ECF No. 546-2] ("[Clients] hereby retain and employ Thomas Fortune Fay, Esq. and Steven R. Perles, Esq. (Attorneys) to represent us in the prosecution and recovery or settlement of all claims and causes of action against [Iran]."). Further, there is no indication that any client signed, affirmed, or otherwise acknowledged the additional 11.11% contingency fee referenced in the Family Information Sheets. Finally, Glenn claims that his additional fee came out of Fay and Perles' contingency fee, and not the plaintiffs' recovery.

Based on these observations, this Court finds that Glenn's relationship with the plaintiffs here was similar to that of an associate counsel. Because no underlying agreement exists between Glenn and plaintiffs, this Court finds that Glenn is not entitled to an attorney's lien. While Glenn may have a claim against Fay and Perles based on their agreement, he can assert no charging lien against plaintiffs here. Accordingly, Glenn's notice of charging lien will be quashed.

### ii. This Court must also quash Cook's notice of lien because Cook has not established an agreement between himself and the plaintiffs here.

Cook similarly claims that he entered into a written agreement with plaintiffs to provide collection services in exchange for a contingency fee. Mem. in Opp'n to Pls.' Mot. to Quash Cook's Lien 1-2 [ECF No. 543]. While the retainer agreement is only signed by the attorneys—Fay and Perles and Cook—Cook points to language suggesting that plaintiffs themselves are parties to the agreement:

> WHEREAS, Plaintiffs in the above referred to action [the Peterson Plaintiffs], **through counsel, are desirous of employing the services** of David J. Cook dba Cook Collection Attorneys, San Francisco, California, hereafter referred to as "Cook Collection Services" working with Thomas Fortune Fay, Esq., Fay Law, P.A., Steven R. Perles, Esq., Perles Law Firm, P.C., Allen Rothenberg, Esq., the Law Offices of Allen Louis Rothenberg and Anthony LaSpada, Esq., hereafter referred to as "Litigation Attorneys."

Mem. in Opp'n to Pls. Mot. to Quash Cook's Lien Exhibit D ¶ 3 [ECF No. 543-4] (emphasis added). Cook further argues that the retainer agreement provides that Cook will be paid his fee from the collected funds before any distribution. Mem. in Opp'n at 4 [ECF No. 543]. Together with the argument that plaintiffs here are parties to the agreement, Cook argues that this constitutes an agreement between attorney and client "from which the conclusion may reasonably be reached that they contracted with the understanding that the attorney's charges were to be paid out of the judgment recovered." *Wolf*, 682 A.2d at 197.

Fay and Perles counter that there were only three parties to the Cook agreement: Fay, Perles, and Cook. In other words, they argue that "Cook has no right to lien any property of the Plaintiffs because he does not have a written agreement with the Plaintiffs." Mem. in Supp. of Pls.' Em. Mot. to Quash Cook's Lien 6 [ECF No. 539-1]. This Court agrees. While the language quoted by Cook seems to suggest that plaintiffs were parties to the Cook agreement, that language is

merely a prefatory clause to the actual terms of the agreement. Other language in the agreement

makes it clear that the only parties were the attorney-signatories:

> (15)   Communications.
> The parties shall use their best efforts to keep each other fully informed of all
> actions being taken as quickly as possible and shall not unduly delay any
> communication. By separate cover, the parties shall provide each other with e-mail
> addresses, phone numbers, fax numbers, cell phone numbers or any other means of
> communication. The Collection Service shall keep Litigation Counsel apprised of
> all matters and shall consult with such counsel. All parties covenant to endeavor to
> remain in close contact and return calls or respond to emails as expeditiously as
> circumstances may require. Emails with the notation of "High Value" or "Prompt
> Response Required" indicate an immediate response for the benefit of all parties,
> but this title shall be reserved only to matters of great importance.
>
> (16)   Miscellaneous.
> This agreement binds all parties hereto, their successors and assigns.
>
> IN WITNESS WHEREOF, the parties have set their hands and caused their seals
> to be affixed on the day, month and year below set forth.

Mem. in Opp'n to Pls. Mot. to Quash Cook's Lien Exhibit D ¶ 3 [ECF No. 543-4]. The only

parties to "set their hands and cause[] their seals to be affixed" were Fay, Perles, and Cook. Those

were the only parties to this agreement.

It seems clear to this Court that this agreement was intended to be a retainer agreement

between attorneys, setting out the duties and responsibilities that Cook would undertake in service

to the litigation attorneys, Fay and Perles. Again citing *Democratic Central Committee of the

District of Columbia*, 941 F.2d 1217 (D.C. 1991), Fay and Perles argue that this agreement is best

viewed as an agreement to hire associate counsel. Mem. in Supp. of Pls.' Em. Mot. to Quash

Cook's Lien 5-6 [ECF No. 539-1]. This Court agrees.

Cook seems to argue that D.C. law permits associate attorneys hired by lead counsel to

assert a charging lien when they were hired pursuant to authorization from the clients. However,

DC precedent is clear: "An associate counsel can only obtain an attorney's lien if the client

authorizes or ratifies his employment by the principal attorney and the client agreed to have his associate's fee paid from the judgment." *Democratic Central Committee of the District of Columbia,* 941 F.2d at 1219 (citing *Hahn v. Oregon Physicians' Service,* 786 F.2d 1353, 1355 (9th Cir. 1985)). As noted above, this Court has found no authority allowing a departure from the rule. Therefore, without an independent contract with the plaintiffs, an associate counsel is not entitled to a lien under the laws of the District of Columbia.

Cook argues that the Cook agreement did include plaintiffs and that the terms state the Cook was to be paid a contingency fee. However, based on this Court's analysis of the Cook agreement, the only parties to the agreement were Cook, Fay, and Perles. Therefore, no independent contract existed between Cook and plaintiffs. Further, this Court finds that Cook failed to show that plaintiffs here authorized or ratified Cook's employment or agreed to have Cook's fee paid from their judgment.[5] Accordingly, Cook is not entitled to an attorney's lien.

### b. Cook's motion to compel is improper because plaintiffs did not agree to arbitrate potential disputes with Cook.

Cook also filed a Counter Motion to Compel Arbitration [ECF No. 544] requesting this Court to compel arbitration of the disputes between Cook and plaintiffs regarding compensation under the Cook retainer agreement. Cook also requests an interim stay of 10% of the QSF trust funds from Fay and Perles' share of the proceeds, pending a determination by the arbitrator. Fay and Perles respond that they are currently arbitrating their own dispute with Cook, but that plaintiffs

---

[5] The contract was terminated by letter dated October 3, 2011. Cook argues this was a ratification of the contract and the contingency fee therein. Mem. in Opp'n to Pls. Mot. to Quash Cook's Lien 13-14 [ECF No. 543]. This is nonsensical. Further, even if this termination letter *did* ratify the contract that it purported to terminate—an argument that this Court is surprised Cook was willing to submit in writing—that letter was sent by Fay (cc'd to Perles), on Fay letter head, and signed solely by Fay. Because Cook has failed to show a ratification by the plaintiffs, this Court rejects Cook's argument.

should not be bound to an arbitration agreement to which they were not party. For the reasons already stated, this Court agrees with Fay and Perles.

As noted above, "[t]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). For the reasons previously discussed, this Court finds that the Cook retainer agreement was an agreement for collection services between Fay and Perles, as litigation counsel, and Cook, as associate counsel. Plaintiffs here were not parties to that agreement and therefore did not agree to arbitrate any potential disputes between Cook and plaintiffs. Plaintiffs here are not required to arbitrate a dispute when they have not agreed to do so.

However, Cook also argues that even if plaintiffs were not parties to the agreement, they should be bound under the law of agency. In short, Cook argues that Fay and Perles had both the actual authority and apparent authority to bind plaintiffs to the arbitration agreement. Mem. in Supp. of Counter Mot. to Compel Arbitration 13-14 [ECF No. 544-1]. Fay and Perles, in contrast, appear to argue that they had the authority to employ other attorneys to assist in the litigation but did not have the authority to bind plaintiffs to arbitration or an additional contingency fee. Mem. in Opp'n to Cook's Request to Compel 7 [ECF No. 547]. This Court again agrees with Fay and Perles.

Actual authority is "the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." RESTATEMENT (SECOND) § 7. Unlike actual authority, apparent authority does not depend upon any manifestation from the principal to her agent, but rather from the principal to the third party. RESTATEMENT (SECOND) § 27, cmt. A (1958). Cook argues that by authorizing Fay and Perles to employ other attorneys, plaintiffs manifested the power to

17

bind plaintiffs to the terms of that retainer. But if plaintiffs' retainer agreement with Fay and Perles made such manifestations, they did so only by implication. This Court finds no evidence that plaintiffs manifested, either to Fay and Perles or to Cook, the power to bind plaintiffs to an arbitration agreement. Thus, Cook has failed to establish actual or apparent authority to bind plaintiffs to an arbitration agreement. This Court cannot enforce an arbitration agreement to which plaintiffs did not agree and were not otherwise bound.

Finally, even if plaintiffs here were bound to the arbitration agreement, it is unclear if Cook actually has a dispute with plaintiffs. Under the FAA, a court is empowered to compel arbitration of a matter pending before it if there is an arbitration agreement governing that dispute. 9 U.S.C. § 3. Similarly, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court [with original jurisdiction] for an order directing that such arbitration." 9 U.S.C. § 4. But there are no such disputes or petitions before this Court. Rather, Cook has injected a motion to compel arbitration after asserting a right to a charging lien against plaintiffs. Even if plaintiffs were subject to an arbitration agreement, this Court could not compel arbitration until those claims are properly before this Court. Accordingly, this Court refuses to compel arbitration.

## V.    CONCLUSION

In sum, the contracts here are between attorneys, not between attorneys and plaintiffs. This Court finds that no agreement existed between the plaintiffs here and the attorneys from which a conclusion may reasonably be reached that they contract with the understanding that the attorney's charges were to be paid out of the judgment recovered. Accordingly, Glenn and Cook are not entitled to charging liens under the law of the District of Columbia.

Regarding Cook's motion to compel arbitration, Cook's dispute here is with Fay and Perles, and not with plaintiffs. No agreement existed between plaintiffs and Cook, and there are no disputes or petitions before this Court which could justify an order to compel arbitration. Therefore, this Court declines to compel plaintiffs' appearance at arbitration.

Finally, this Court unfortunately finds it necessary to remind the parties here that this Court has not decided the merits of any contractual obligations, if they exist, between the plaintiffs and the various attorneys involved in this case. This Court's decision regarding the existence of an equitable lien has no bearing on the enforceability of Glenn or Cook's agreements. The Court's decision here should not be taken as an opportunity to delay plaintiffs' recovery further by twisting the Court's findings into some determination of those claims.

This Court has only determined questions regarding the assertions of equitable attorney's liens and the arbitration agreement. A separate order shall issue regarding those determinations.

Royce C. Lamberth
United States District Judge

DATE: 12/6/16