UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of the Estate<br>of James C. Knipple (Dec.) *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN *et al.*,<br><br>Defendants. | Civil Action: 1:01-cv-2094 (RCL) |

## MEMORANDUM OPINION

This Court has presided over a consolidated action brought by nearly one thousand plaintiffs against the Islamic Republic of Iran (Iran) and the Iranian Ministry of Information and Security (MOIS) under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act (FSIA) since 2001. On May 30, 2003, this Court entered a default judgment as to liability against the defendants and ordered claims for the amounts of damages be submitted to special masters. The special masters issued almost two hundred reports and recommendations that this Court considered in determining the compensatory and punitive damages. On December 7, 2007, this Court entered a default judgment in favor of plaintiffs for approximately $2.65 billion. The special masters seek payment for their work. The Court now authorizes and approves payment to the special masters in the amounts set forth below as compensation for the services they provided. The Court will award costs in the amount of $651,184.45 to be taxed against the defendants.

1

## I. Background

On October 23, 1983, a suicide bomber from Hezbollah detonated thousands of pounds of explosives underneath the U.S. Marine barracks building in Beirut, Lebanon, murdering 241 American servicemen. Hezbollah and its agents received massive material and technical support from the Iranian government, and Iran was complicit in this attack. *See Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 54 (D.D.C. 2003).

Plaintiffs in the actions against Iran and MOIS consisted of family members of the 241 deceased servicemen, as well as administrators of the estates of the servicemen, the servicemen's legal heirs, and injured survivors of that attack. Plaintiffs brought the suits in October 2001 under the FSIA. Given the nearly one thousand claimants seeking redress and the commensurately large number of claims, this Court appointed numerous special masters. *See* ECF Nos. 30–39 (appointing John Swanson, John Carney, Veta Carney, Karen J. Kruger, Paul G. Griffin, Susan Meek, Howard P. Rives, Francis B. Fennessey, David L. Broom and Loraine A. Ray); ECF Nos. 42–46 (appointing Kenneth M. Trombly, Jeffrey A. Manheimer, Christopher A. Byrne, Philip M. Saeta, and Colin M. Dunham). Thirteen special masters performed work in the *Peterson* action. Their task was to "undertake a very thorough, painstaking review of all the relevant testimony, medical evidence, economic reports, and other evidence in order to make clear, accurate recommendations" to the court relating to the damages suffered by each plaintiff. *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31, 110 (D.D.C. 2009). The special masters "review[ed] hundreds, if not thousands of documents, including economic reports and deposition testimony." *Id.* This work "demand[ed] great attention to detail and [was] extraordinarily time-consuming." *Id.*

In 2013, plaintiffs successfully brought an action in the United States District Court for the Southern District of New York to seize Iranian assets in satisfaction of this Court's judgment. The S.D.N.Y. court ordered turnover of $1.75 billion in assets held by Citibank N.A. These assets were cash bonds that Bank Markazi—the Central Bank of Iran—held in an account with Citibank through an intermediary. *Peterson v. Islamic Republic of Iran*, No. 10 CIV. 4518, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013). The court subsequently issued an order creating a Qualified Settlement Fund (QSF) and transferred the seized funds to a trustee for the benefit of the plaintiffs. The court's opinion authorizing the seizure of the assets was affirmed by the Second Circuit and the Supreme Court. *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016); *Peterson v. Islamic Republic of Iran*, 758 F.3d 185 (2d Cir. 2014).

The special masters have not yet been paid for their services and expenses. The special masters have sought payment several times since 2008, but this Court denied these past motions. The Court briefly reviews the previous filings regarding compensation for these special masters.

A. Motions for Compensation from the Victims of Crime Fund

Plaintiffs' counsel filed multiple motions in 2008 for orders authorizing payment on behalf of three special masters. The motions predicated their prayer for relief on 28 U.S.C. § 1605A, which allows certain court appointed special masters to be paid through the Victims of Crime Fund, which is administered by the Department of Justice. ECF No. 242; ECF No. 243; *see* 28 U.S.C. § 1605A(e). However, the *Peterson* action was filed under 28 U.S.C. § 1605(a)(7), not § 1605A. Plaintiffs had assumed that § 1605A, which was enacted as part of the National Defense Authorization Act for Fiscal Year 2008 (after the *Peterson* action was filed), applied with automatic and retroactive force to actions filed under § 1605(a)(7). Pub. L. No. 110-81, § 1083, 122 Stat. 338 (2008) (codified at 28 U.S.C. § 1605A). However, this Court disagreed.

3

The Court denied plaintiffs' motions, reasoning that § 1605A(e) could not be retroactively applied given: (1) the plain language of § 1605A(e)(2), which limits payment to special masters to cases brought or maintained under § 1605A, and (2) the D.C. Circuit's ruling that "[a] plaintiff in a case pending under § 1605(a)(7) may not maintain that action based upon the jurisdiction conferred by § 1605A; in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision." Mem. Op. and Order 2, ECF No. 430 (quoting *Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C. Cir. 2008)).

### B. First Motion for Compensation from a Private Foundation

In April 2009, plaintiffs' counsel made another attempt to obtain payment for nine special masters. This time, counsel argued that the Court had authority under Federal Rule of Civil Procedure 53(g)(2). Rule 53(g)(2) states that special masters' "compensation must be paid either: (A) by a party or parties; or (b) from a fund or subject matter of the action within the court's control." Fed. R. Civ. P. 53(g)(2). Plaintiffs' counsel asked the Court to enter an order "approving payments by the Peace Through Law Foundation, Inc. directly to the Special Masters . . . in amounts acceptable to the Court." Mot. for Order Authorizing Payment to Special Masters 4, ECF No. 435. However, counsel did not provide any information about the Foundation's membership, its organizational structure, or the source of the funding. The Court determined that the most prudent course of action was not to consider plaintiffs' proposed approach to use the private foundation to pay the special masters but for counsel to determine whether, consistent with the guidance offered in *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31 (D.D.C. 2009), the action could qualify for retroactive treatment under § 1605A. This led the Court to deny plaintiffs' counsel's request without prejudice. *Id.* at 111–13.

4

C. Second Motion for Compensation from a Private Foundation

Plaintiffs' counsel did not attempt to qualify the case for retroactive treatment under § 1605A. Instead, in July 2012, counsel made another attempt to secure payment from the Peace Through Law Foundation. Mot. for Order Authorizing Deposit of Funds into Registry of the Ct. for Compensation of Special Masters of this Ct., ECF No. 474. Specifically, plaintiffs' counsel requested that the Court authorize the Foundation to deposit money into the Court's registry from which the Court could direct payment to the special masters. *Id.* Plaintiffs' counsel also requested that the Court impose the costs on defendants. *Id.*

In August 2012, this Court ordered plaintiffs to file (1) a memorandum disclosing the membership structure of the Foundation as well as its source of funds and (2) a memorandum addressing the legal basis for the Court's authority to distribute these funds to the special masters and whether these payments may be levied against the defendants pursuant to the FSIA. Order, ECF No. 475. After plaintiffs filed this information, the Court denied plaintiffs' motion to allow Foundation funds to be channeled through the Court's registry to pay the special masters because the Foundation was "a corporation that is controlled and entirely funded by plaintiffs' counsel, Mr. Thomas Fortune Fay and his firm Fay Kaplan Law, PA." Order, ECF No. 489. The Court determined that "having the special masters compensated indirectly by plaintiffs' counsel via this Foundation might cast doubt on the fairness of the procedures in this case," *id.* at 1–2, and that "if the Court were to allow plaintiffs' counsel to now pay the special masters in this case, the appearance of impropriety would be too great." *Id.*

D. Motion for Compensation from the Qualified Settlement Fund

In May 2016, plaintiffs' counsel made their fourth attempt to obtain payment for the special masters. Counsel sought to have the Court exercise its authority under Rule 53(g) to authorize

payment for the special masters from the QSF and enter judgment for costs pursuant to Rules 53(a) and 54(b) in that amount against Iran and MOIS in favor of the *Peterson* action plaintiffs.

Judge Forrest's order directing turnover of blocked assets noted that the QSF was "created for the benefit" of the *Peterson* plaintiffs, and required a court order authorizing distribution "in accordance with the terms of the Plaintiffs' agreement concerning the distribution of those funds." *Peterson v. Islamic Republic of Iran*, No. 10-cv-4518, 2013 U.S. Dist. LEXIS 188219, at *55, 59 (S.D.N.Y. July 9, 2013). The order establishing the QSF stated that the trustee was to administer the QSF "in accordance with: (i) the terms of the Fund Agreement, (ii) the terms of this Order and any subsequent Orders issued by this Court . . . ." Order Approving Qualified Settlement Fund, *Peterson v. Islamic Republic of Iran*, ECF No. 460 (S.D.N.Y. July 9, 2013) (No. 10-cv-4518) [hereinafter S.D.N.Y. ECF No. 460]. The Fund Agreement declared the fund was created for the benefit of the *Peterson* plaintiffs, "and such other persons, entity or entities . . . to whom the Court directs that distributions shall be made." Agreement for the Peterson § 468B Fund Pursuant to 26 U.S.C. § 468B at ¶ 2.1, *Peterson v. Islamic Republic of Iran*, ECF No. 461 (S.D.N.Y. July 9, 2013) (No. 10-cv-4518) [hereinafter Fund Agreement, S.D.N.Y. ECF No. 461]. The Fund Agreement makes no specific mention of funds to be allocated to compensate special masters. Further, at the time plaintiffs' counsel made this attempt to obtain payment for the special masters from the QSF, the district court in the S.D.N.Y. had not issued any order authorizing the distribution of funds to the special masters. Therefore, this Court declined to supersede the terms of the S.D.N.Y. order approving the QSF, and the Fund Agreement itself, to impose non-negotiated terms and conditions on plaintiffs and plaintiffs' counsel. *Peterson v. Islamic Republic of Iran*, 224 F. Supp. 3d 17, 26 (D.D.C. 2016).

In addition, two special masters sought to require plaintiffs' counsel to pay for the special masters' fees and expenses as a tax or sanction. These special masters argued that sanctions against plaintiffs' counsel were proper because counsel had not taken steps to qualify the *Peterson* action for retroactive treatment under § 1605A or to move for reconsideration of this Court's prior rulings. *Peterson v. Islamic Republic of Iran*, 224 F. Supp. 3d 17, 24 (D.D.C. 2016). This Court rejected this argument because it found that plaintiffs' counsel had not acted in bad faith, vexatiously, wantonly, or for oppressive reasons at any time. *Id.* at 27. This Court also declined to tax costs on plaintiffs' counsel because the Court "consider[ed] defendant Iran responsible, and refuse[d] to set new [compensation] terms which impose the costs of the special masters upon plaintiffs' counsel." *Id.* at 28.

## II. Discussion

### A. The Current Motion for Compensation from the Qualified Settlement Fund

Plaintiffs' counsel has again moved to obtain payment for the special masters from the QSF. The Court now grants this motion, believing the QSF is a proper fund from which to pay the special masters based on Judge Forrest's recent S.D.N.Y. opinion. *See* Mem. Decision & Order, *Peterson v. Islamic Republic of Iran* (S.D.N.Y. July 24, 2018) (No. 10-cv-4518), ECF No. 585-9 [hereinafter ECF. No. 585-9]; *see also* R. & R., *Peterson v. Islamic Republic of Iran* (S.D.N.Y. July 3, 2018) (No. 10-cv-4518), ECF No. 585-8 [hereinafter ECF. No. 585-8]. As discussed in Section I(D), the S.D.N.Y. order approving the QSF declared that "the Fund shall be administered by the Fund Trustee in accordance with: (i) the terms of the Fund Agreement, (ii) the terms of this Order and any subsequent Orders issued by this Court [S.D.N.Y.] . . . ." S.D.N.Y. ECF No. 460. The Fund Agreement establishing the QSF stated: "Pursuant to the Order, the Fund is created for the benefit of Plaintiffs, and such other persons, entity or entities . . . to whom the Court directs

7

that distributions be made." S.D.N.Y. ECF No. 461. In July 2018, Judge Forrest adopted and confirmed special master Massey's report that recommended the S.D.N.Y. "[d]irect the Trustee to distribute funds from the QSF as necessary to compensate the Peterson Special Masters, if and to the extent the D.D.C. fixes their compensation." ECF No. 585-9. Thus, the S.D.N.Y. has now issued an order directing QSF funds to be allocated to compensate the special masters.

This Court now believes it is proper for the special masters to be paid from the QSF based on Judge Forrest's recent order. The special masters "rendered crucial assistance by helping the Court to determine the appropriate amount of monetary damages for hundreds and hundreds of plaintiffs." *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d at 110. The special masters reviewed "hundreds, if not thousands of documents, including economic reports and deposition testimony," and their work "demand[ed] great attention to detail and [was] extraordinarily time-consuming." *Id.* Further, "the sheer volume of the endeavor surely pales in comparison to the emotional toll that such work extracts from these individuals who have worked diligently to achieve justice for victims of terrorism." *Id.* Under Rule 53(g), special masters' compensation "must be paid either: (A) by a party or parties; or (B) from a fund or subject matter of the action within the court's control." Fed. R. Civ. P. 53(g)(2). Plaintiffs were able to secure money assets in the S.D.N.Y. to satisfy part of their judgments. The S.D.N.Y.'s recent ruling that the QSF may be used to pay the special masters means that the QSF now constitutes a fund from which the special masters may be paid.

The amount required to compensate the special masters is relatively minimal. This Court entered a default judgment against Iran for approximately $2.65 billion. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 60 (D.D.C. 2007). The QSF was funded with Iranian assets totaling about $1.75 billion. S.D.N.Y. ECF No. 460. According to Special Master Massey, who

was appointed by Judge Forrest to examine issues related to the payment of the *Peterson* special masters and whose report was adopted in its entirety, "after deducting certain amounts deemed chargeable against all Plaintiffs, approximately $1.6 billion of the amount collected was allocated for payment to or on behalf of the Peterson Plaintiffs, and payment of related expenses, attorneys' fees and other items." ECF No. 585-8, at 35. Also, as of July 3, 2018, Special Master Massey had been informed that "approximately $950 million has been or will shortly be distributed to the Peterson Plaintiffs (and the Advance Companies, at their direction)." *Id.* Taking into account that the total compensation for the special masters is $651,184.45, the burden on the *Peterson* plaintiffs is approximately 0.041% of the total amount allocated to the *Peterson* plaintiffs or approximately 0.069% of the total amount that had been or will shortly be distributed to the *Peterson* plaintiffs. Thus, the amount required to compensate the special masters does not significantly diminish the plaintiffs' hard-won and long overdue compensation.

Further, adequate funds have already been reserved from the QSF to pay these special masters. Plaintiffs' counsel does not have any objection to the use of the QSF to compensate the special masters. *See* ECF No. 585-8.

The Court therefore finds that the QSF may be used to pay the special masters.

B.  Compensation for the Special Masters

This Court set the compensation terms in the order governing the appointed special masters. This Court declared:

> Each special master shall be paid $1,000.00 per day upon submission to the Court of a voucher in the form attached. Where less than a full work day is expended by any special master in performance of duties under this plan, the voucher shall indicate so if less than 1/2 of the day is expended, in which case the special master shall be paid $500.00. Where more than 1/2 of a work day is expended but less than a full day, the per day amount of $1,000.00 shall be paid. In addition each special master shall be paid out of pocket expenses, not to exceed $300.00 per day, exclusive of transportation, and the special master's full transportation expenses.

9

ECF No. 29 § 3. The Court believes it is most appropriate to set eight hours as a full work day and four hours as half a work day. Although the prior order did not specifically state the amount the special masters would be paid for expending exactly half a work day, the Court determines the special masters shall be paid $500 for the days in which they expended exactly half a work day. It is proper for the special masters to receive half a full day's payment for expending half a full day working on the matters in this action. As the Court that appointed the special masters, this Court will now proceed to rule on the exact compensation owed to each special master.

i. *Special Master David L. Bloom*

Based on the voucher submitted by special master Bloom requesting payment of fees and expenses, the Court calculated that special master Bloom is entitled to $11,500 in fees for his time expended working on damages issues.[1] ECF No. 585-5, at 2–10. Bloom also incurred $43.39 in expenses in the course of his duties as a special master. *Id.* Therefore, special master Bloom should be paid $11,543.39 for his service.

ii. *Special Master Christopher A. Byrne*

Based on the voucher submitted by special master Byrne requesting payment of fees and expenses, the Court calculated that special master Byrne is entitled to $10,500 in fees for his time expended working on damages issues. ECF No. 585-5, at 2–10. Byrne did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Byrne should be paid $10,500 for his service.

---

[1] Special master Bloom only requested $3,500 in fees. Bloom added the hours he worked together and determined the equivalent number of full days he worked based on this total. Bloom then calculated his fee amount from this number. However, this calculation does not comport with the Court's compensation plan as set forth in the order governing the appointed special masters. The Court's order directed that the special masters should be paid on a per day basis with the fees added together to give the final amount owed, rather than calculating fees by adding the hours worked together. Therefore, the Court's calculation of the fees that Bloom is entitled to is greater than his requested amount. The Court will award Bloom the amount he is entitled.

10

### iii. *Special Master Colin M. Dunham*

Based on the voucher submitted by special master Dunham requesting payment of fees and expenses, the Court calculated that special master Dunham is entitled to $10,000 in fees for his time expended working on damages issues. ECF No. 585-5, at 15–17. Dunham did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Dunham should be paid $10,000 for his service.

### iv. *Special Master Francis B. Fennessey*

Based on the voucher submitted by special master Fennessey requesting payment of fees and expenses, the Court calculated that special master Fennessey is entitled to $5,000 in fees for his time expended working on damages issues. ECF No. 585-5, at 18–21. Fennessey did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Fennessey should be paid $5,000 for his service.

### v. *Special Master Paul G. Griffin*

Based on the voucher submitted by special master Griffin requesting payment of fees and expenses, the Court calculated that special master Griffin is entitled to $51,000 in fees for his time expended working on damages issues.[2] ECF No. 585-5, at 22–33. Griffin did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Griffin should be paid $51,000 for his service.

### vi. *Special Master Karen J. Kruger*

Based on the voucher submitted by special master Kruger requesting payment of fees and expenses, the Court calculated that special master Kruger is entitled to $34,500 in fees for her time

---

[2] Special master Griffin requested $51,500 in fees. However, Griffin requested $1,000 for 4 hours of work on April 11, 2009, whereas the Court has determined a special master shall be paid $500 for the days in which they expended exactly half a work day. Special master Griffin is therefore entitled to $51,000 in fees.

11

expended working on damages issues. ECF No. 585-5, at 34–46. Kruger also incurred $450.25 in expenses in the course of her duties as a special master. *Id.* Therefore, special master Kruger should be paid $34,950.25 for her service.

       vii.    *Special Master Susan Meek*

Based on the voucher submitted by special master Meek requesting payment of fees and expenses, the Court calculated that special master Meek is entitled to $244,500 in fees for her time expended working on damages issues.[3] ECF No. 585-5, at 47–75. Meek also incurred $13,506 in expenses in the course of her duties as a special master. *Id.* Therefore, special master Meek should be paid $258,006 for her service.

       viii.    *Special Master Jeffrey A. Manheimer*

Based on the voucher submitted by special master Manheimer requesting payment of fees and expenses, the Court calculated that special master Manheimer is entitled to $10,000 in fees for his time expended working on damages issues.[4] ECF No. 585-5, at 76–79. Manheimer did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Manheimer should be paid $10,000 for his service.

       ix.    *Special Master Lorraine A. Ray*

Based on the voucher submitted by special master Ray requesting payment of fees and expenses, the Court calculated that special master Ray is entitled to $209,000 in fees for her time

---

[3] Special master Meek requested $306,506 in fees. However, Meek requested $1,000 for 4 hours of work on numerous occasions, whereas the Court has determined a special master shall be paid $500 for the days in which they expended exactly half a work day. Special master Meek is therefore entitled to $244,500 in fees.

[4] Special master Manheimer requested a payment of $28,000. However, special master Manheimer stated that he expended 10 days working on the issues in this action in his voucher requesting payment. Based on Manheimer's assertion that he worked 10 days, the Court calculated that he was entitled to $10,000 based on the compensation plan, which states each special master shall be paid $1,000 per day. Special master Manheimer did not give any additional documentation as to why he should be entitled to $28,000 rather than $10,000. The Court therefore finds he should be paid $10,000 for his service.

expended working on damages issues.[5] ECF No. 585-5, at 80–92. Ray also incurred $1,374.56 in expenses in the course of her duties as a special master. *Id.* Therefore, special master Ray should be paid $210,374.56 for her service.

  x. *Special Master Judge Howard P. Rives, Jr.*

Based on the voucher submitted by special master Rives requesting payment of fees and expenses, the Court calculated that special master Rives is entitled to $5,500 in fees for his time expended working on damages issues. ECF No. 585-5, at 93–101. Rives did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Rives should be paid $5,500 for his service.

  xi. *Special Master Philip M. Saeta*

Based on the voucher submitted by special master Saeta requesting payment of fees and expenses, the Court calculated that special master Saeta is entitled to $2,500 in fees for his time expended working on damages issues.[6] ECF No. 585-5, at 102–05. Saeta did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Saeta should be paid $2,500 for his service.

  xii. *Special Master John C. Swanson*

Based on the voucher submitted by special master Swanson requesting payment of fees and expenses, the Court calculated that special master Swanson is entitled to $24,500 in fees for

---

[5] Special master Ray requested payment of fees of $208,000. However, special master Ray omitted the $1,000 fee she was due for the 5.8 hours of work she did on April 28, 2005. The Court will award Ray the amount she is entitled, which is $209,000 in fees.

[6] Special master Saeta requested a payment of $6,825. However, special master Saeta stated that he expended 19.5 hours working on the issues in this action in his voucher requesting payment. Saeta did not list the hours he worked each day. He only gave the sum total of those hours. The Court can only assess the fees that special master Saeta is entitled to from this number because of the lack of additional information. Based on a work day of 8 hours, 19.5 hours equals 2 full days and 3.5 hours. Based on the Court's compensation plan as set forth in the order governing the appointed special masters, Saeta is therefore entitled to $2,500. Given the lack of additional documentation as to why special master Saeta should receive $6,825, the Court finds he should be paid $2,500 in fees for his service.

his time expended working on damages issues. ECF No. 585-5, at 106–17. Swanson also incurred $1,310.25 in expenses in the course of his duties as a special master. *Id.* Therefore, special master Swanson should be paid $25,810.25 for his service.

xiii. *Special Master Kenneth M. Trombly*

Based on the voucher submitted by special master Trombly requesting payment of fees and expenses, the Court calculated that special master Trombly is entitled to $16,000 in fees for his time expended working on damages issues. ECF No. 585-5, at 118–21. Trombly did not incur any expenses in the course of his duties as a special master. *Id.* Therefore, special master Trombly should be paid $16,000 for his service.

C. Costs to be Taxed Against the Defendants

Under Rule 53(g)(3), the Court must allocate payment to the special masters among the parties "after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." Fed. R. Civ. P. 53(g)(3). Iran and MOIS provided material support to the terrorist organization that carried out the horrific attack that killed or injured the plaintiffs in the *Peterson* action. Iran and MOIS are therefore responsible for the actions that necessitated the appointment of the special masters. The Court has no reservations about imposing additional costs on Iran and MOIS. Iran and MOIS should be the parties that bear the costs of payment to the special masters. Accordingly, the Court will award costs to be taxed against Iran and MOIS. This will allow the *Peterson* plaintiffs to recoup some or all of the amounts deducted from their distributions from future recoveries of Iranian assets.

III. Conclusion

The Court finds that it is now proper for the special masters to be paid from the QSF based on Judge Forrest's recent S.D.N.Y. order. The Court authorizes and approves payment to the special masters in the amounts set forth in this opinion as compensation for the services they provided. Also, the Court awards costs in the amount of $651,184.45 to be taxed against the defendants. A separate order shall issue.

SIGNED this 21ST day of February, 2019.

                                                Royce C. Lamberth
                                              United States District Judge